**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BEAN LLC d/b/a FUSION GPS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| DEFENDANT BANK, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S UNOPPOSED MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Acting without authority and therefore *ultra vires*, Congressman Devin Nunes signed and issued an overbroad subpoena to Defendant Bank for all of Plaintiff's bank records spanning two years—records that reflect Plaintiff's confidential revenues and expenses and that are not pertinent to any authorized congressional inquiry—without even notifying Plaintiff (the customer of Defendant Bank) of the subpoena, in violation of Plaintiff's statutory rights to privacy of its banking records. The subpoena also violates Plaintiff's First Amendment rights because it demands records that would disclose the identities of individuals or entities who opposed Donald J. Trump in the 2016 campaign.

After Defendant Bank objected to the legitimacy of the subpoena, Mr. Nunes – through his staff – required Defendant Bank to comply with this subpoena, and Defendant Bank, under the threat of compulsory process, stated its intention to do so by the deadline of 9:00 am on October 23, 2017. Plaintiff will suffer irreparable harm if Defendant Bank releases these records. Plaintiff therefore files this action seeking to enjoin Defendant Bank from producing its records.

Defendant Bank does not oppose this action.  Without relief, Plaintiff will suffer an irreparable violation of its rights under the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq*., the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*, and the First Amendment of the U.S. Constitution, pending resolution of this lawsuit.

## BACKGROUND

Plaintiff Bean LLC d/b/a Fusion GPS ("Plaintiff" or "Fusion") is a research firm that provides strategic intelligence and due diligence services to corporations, law firms, and investors worldwide. Among other projects, at the request of a client, it performs research on political candidates. Fritsch Decl. ¶ 6. During the 2016 presidential election campaign, clients hired Plaintiff to conduct political opposition research on then-candidate Donald J. Trump. In the course of this political research, Plaintiff hired a former British intelligence officer to research Donald J. Trump's ties to Russia. This research led to a series of memos popularly known as the "Trump Dossier." *Id.* ¶ 9.

The Trump Dossier appears to have deeply upset President Trump and some of his allies, including Mr. Nunes, who served on President Trump's campaign and chairs the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI" or "Committee"). Despite never having passed a public, formal, unambiguous resolution authorizing an investigation into the Russian interference with the 2016 election, HPSCI has been conducting an unauthorized "Russia investigation." In addition, in early April 2017, the House Ethics Committee began investigating Mr. Nunes for alleged misconduct arising out of the "Russia investigation."  On April 6, 2017, Mr. Nunes announced his recusal from the Committee's "Russia investigation."

Under the guise of the "Russia investigation," and despite Mr. Nunes' recusal from it, Mr. Nunes, acting alone and without authority, served Defendant Bank with a subpoena demanding Plaintiff's banking records from August 2015 through the present (hereinafter "the bank subpoena"). *See* Levy Decl., Ex. A.

The purpose of the subpoena is to obtain Plaintiff's entire confidential list of clients and contractors—regardless of any nexus to the "Russia investigation." The subpoena broadly demands the production of records that would include ***all*** of Plaintiff's confidential clients and its vendors and subcontractors—a request that will sweep in dozens of entities with no connection whatsoever to the Trump Dossier or any other conceivable connection to the purported investigation. Inasmuch as Mr. Nunes is using this *ultra vires* subpoena to learn who funded opposition research on Mr. Trump, it is not pertinent to the "Russia investigation's" inquiry into Russian interference in the 2016 presidential election. Even if Mr. Nunes had authority to issue this subpoena, it suffers from multiple infirmities – *e.g.*, it did not attach any writing indicating that Rep. Michael Conaway or a vote of HPSCI had authorized its recused chairman, Mr. Nunes, to issue the subpoena; it did not attach a formal, unambiguous public resolution for the investigation; and it did not attach a copy of the committee rules. Additionally, Mr. Nunes did not inform Plaintiff of the subpoena.

Upon learning of the subpoena, Plaintiff advised Defendant Bank of its objections. Levy Decl. ¶ 3. In turn, Defendant Bank served objections, in response to the subpoena. But Mr. Nunes, through staff, nevertheless informed Defendant Bank that it must comply with the subpoena by 9:00 a.m., on October 23, 2017, notwithstanding the objections. Levy Decl. ¶ 4. Now Defendant Bank intends to produce Plaintiff's banking records to Mr. Nunes in violation of Plaintiff's statutory and constitutional rights. *Id.* Production of those records will cause

irreparable harm to both Plaintiff and its clients – virtually all of whom have no connection whatsoever to the so-called Trump Dossier.

Plaintiff's business depends upon its clients' expectation of confidentiality in their engagement. Fritsch Decl. ¶¶ 8, 15-16. Once the records are released, Plaintiff's clients and their payments for its services will become public. Identification of Plaintiff's clients and their financial transactions with Plaintiff will harm its business because such disclosures will destroy the business's ability to guarantee to clients that their identity and their work will not be disclosed. *Id*. ¶¶ 8, 15-16. The harm that would ensue from the release of the records cannot be undone and, thus, the release of the records must be temporarily and permanently enjoined.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). To receive a temporary restraining order (TRO), the moving party must show that four factors warrant relief: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "The four factors have typically been evaluated on a 'sliding scale,'" and where "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *McGinn, Smith & Co. v. Fin. Indus. Regulatory Auth.*, 786 F. Supp. 2d 139, 144 (D.D.C. 2011) (quoting *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). In this case, all four factors weigh in

favor of a temporary restraining order prohibiting Defendant Bank from releasing Plaintiff's records in response to an illegitimate subpoena.

## I.     Plaintiff Is Substantially Likely to Succeed on the Merits of Its Claims.

There is a substantial likelihood that Plaintiff will succeed on the merits of its claim that the subpoena is invalid and not part of legitimate legislative activity. Plaintiff is also likely to prevail on the claim that release of its records in response to Mr. Nunes' subpoena would violate the Right to Financial Privacy Act, the Gramm-Leach-Bliley Act, and the First Amendment of the U.S. Constitution.

### A.  Mr. Nunes' Subpoena Is *Ultra Vires* and Is Not Legitimate Legislative Activity.

Defendant Bank should be enjoined from complying with the subpoena because it was signed by a Congressman with no authority to sign it, as part of the Congressman's personal mission to target the firm that conducted opposition research on his ally, President Trump, and nominally as part of an "investigation" that has no formal, public, unambiguous resolution. Moreover, the records demanded have no relevance to the "Russia investigation."

#### i) Mr. Nunes Did Not Have Authority to Sign the Subpoena.

The subpoena was signed by Mr. Nunes alone, who has recused himself from leading the investigation and has no authority to issue this subpoena. Earlier this year, Mr. Nunes recused himself from the HPSCI investigation, while he himself remains under investigation by the House Ethics Committee for his alleged misconduct related to the HPSCI investigation.[1]

---

[1] On April 6, 2017, shortly before the House Committee on Ethics announced that he was under investigation for allegedly making unauthorized disclosures of classified information, Mr. Nunes recused himself from the HPSCI Russia investigation. *See* Emily Huetteman, *Devin Nunes to Step Aside From House Investigation*, N.Y. Times, Apr. 6, 2017, https://nyti.ms/2oMZFCt; *Nunes Statement on Russia Investigation* (Apr. 6, 2017), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775.

Nothing attached to the bank subpoena indicates that Mr. Nunes had any prior consultation with, or authorization from, Rep. Michael Conaway or the Committee's Ranking Member, Rep. Adam Schiff, or that HPSCI held a "vote of the full Committee" to authorize Mr. Nunes to sign and issue the subpoena, as required by HPSCI Committee Rule 10(a): "All subpoenas shall be authorized by the Chair of the full Committee, upon consultation with the Ranking Minority Member, or by vote of the full Committee." Rules of Procedure for the Permanent Select Committee on Intelligence, U.S. House of Representatives, § 10(a). *See* Levy Decl., Ex. B.

**ii) The Subpoena Does Not Comply with Committee Rules.**

Even if Mr. Nunes had authority to issue the subpoena, the subpoena is invalid because it fails to comply with HPSCI rules. Those rules set forth who may sign a subpoena. Rule 10(c) requires that a "subpoena authorized by the Chair of the full Committee or by the full Committee [ ] be signed by the Chair or by any member of the Committee designated to do so by the full Committee." Rule 10(c). The subpoena was not signed by Rep. Michael Conaway, to whom Mr. Nunes delegated leadership of the investigation. *See Nunes Statement on Russia Investigation* (Apr. 6, 2017), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775 (appointing Rep. Conaway in charge of the Committee's Russia investigation). Nothing on the bank subpoena or attached to the subpoena indicates, in writing, that Rep. Michael Conaway authorized the subpoena, and nothing indicates, in writing, that HPSCI voted to authorize Mr. Nunes to sign this subpoena. *See Shelton v. United States*, 327 F.2d 601, 606 (D.C. Cir. 1963) ("Since the Subcommittee did not authorize the issuance of the subpoena to Shelton, the subpoena was invalid.").

Additionally, HPSCI Committee Rule 10(e) provides that "[e]ach subpoena shall have attached thereto a copy of these rules." But the bank subpoena issued did not include a copy of the Committee's rules.

### iii) No Formal, Unambiguous Resolution Authorized This Investigation.

Mr. Nunes has acted alone, pursuant to no resolution.  Inasmuch as he relies on HPSCI's "Russia investigation" as the basis for this subpoena, no formal public "unambiguous resolution" authorizes this investigation, without which the subpoena is not part of a legitimate legislative activity.  *Eastland v. U.S. Serviceman's Fund*, 421 U.S. 491, 506 (1975). Instead of attaching a resolution, the subpoena attached a vague, unsigned one-page document that has undergone no democratic process or vote of any congressional body or sub-body; and an excerpt from what appears to be a press release discussing the "parameters" of the investigation.[2] It is thus impossible for anyone in the greater public – and, in particular, Plaintiff, its confidential clients or Defendant Bank – to evaluate whether the subpoena in this "investigation" seeks matters pertinent to legitimate questions under inquiry, *see Watkins v. U.S.*, 354 U.S. 178 (1957), and whether the issuance of this subpoena constitutes activity that falls within "the legitimate legislative sphere." *Eastland*, 421 U.S. at 503.  Moreover, the identity of the client who paid for opposition research on Mr. Trump is not relevant to the investigation, and disclosure of every single one of the firm's clients over the past two years certainly has no possible relevance to the investigation.  Accordingly, the investigation and this subpoena are not part of a legitimate legislative activity, and this subpoena is not authorized by law.

---

[2] *Cf.* Levy Decl., Ex. A; Press Release, *Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation*, Mar. 1, 2017, https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

Consequently, the subpoena is subject to judicial review because (a) the subpoena was not validly issued by the Committee; (b) the signing and issuance of the subpoena did not "fall within the sphere of legitimate legislative activity," *Eastland*, 421 U.S. at 501; and (c) Defendant Bank (the only named defendant) receives no immunity from the Speech or Debate Clause and, in any event, does not oppose this motion.[3]   Accordingly, Defendant Bank's compliance with this unauthorized and invalid subpoena is subject to judicial review and should be enjoined.

**B. Compliance with the *Ultra Vires* Subpoena Would Violate Plaintiff's Rights under the Right to Financial Privacy Act.**

Defendant Bank's release of records would violate the Right to Financial Privacy Act ("RFPA" or "the Act"), 12 U.S.C. § 3401 et seq., because that statute prohibits banks from releasing customer records to a Government authority, unless the Government complies with statutory provisions with which Mr. Nunes has not complied. Mr. Nunes, purporting to act on behalf of HPSCI, has violated the RFPA by signing and issuing this subpoena without the authority of HPSCI, per its rules, and without notifying Plaintiff of the subpoena.

The purpose of the RFPA is "to protect the customers of financial institutions from unwarranted intrusion into their records while at the same time permitting legitimate law enforcement activity." H.R. Rep. No. 1383, 95th Cong., 2d Sess. 33, *reprinted* in 1978 *U.S. Code Cong. & Admin. News* 9305. The Act "accords customers of banks and similar financial

---

[3] The *Eastland* Court found that a Senate subcommittee's issuance of a subpoena fell within the "sphere of legitimate legislative activity" and was thus afforded protection under the Speech or Debate Clause because the subcommittee "was acting under an unambiguous resolution from the Senate authorizing it to make a complete study of the 'administration, operation, and enforcement of the Internal Security Act of 1950," 421 U.S. at 506 (citations omitted), and "[t]hat grant of authority is sufficient to show that the investigation upon which the Subcommittee had embarked concerned a subject on which 'legislation could be had.'"   *Id.* (citing cases). Here, unlike the Senate subcommittee's investigation in *Eastland*, both the HPSCI investigation, pursuant to which the bank subpoena was purportedly issued, and the issuance of the bank subpoena itself were not part of "legitimate legislative activity."

institutions certain rights to be notified of and to challenge in court administrative subpoenas of financial records in the possession of the banks." *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984). "However, the Act contains strict procedural requirements for alternative methods to obtain financial records, *see e.g.* § 3404 (customer authorization); § 3405 (administrative subpoenas); § 3407 (judicial subpoenas)." *McDonough v. Widnall*, 891 F. Supp. 1439, 1448 (D. Colo. 1995). The statute provides that an "action to enforce any provision of this chapter may be brought in any appropriate United States district court." 12 U.S.C. § 3416.  The RFPA authorizes injunctive relief to require that the procedures of the Act be complied with, *id.* § 3418.

The RFPA applies to a "customer," defined in part as "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution." 12 U.S.C. § 3401(5). A "person," in turn includes "a partnership of five or fewer individuals." *Id.* § 3401(4). Plaintiff is a partnership of four individuals and thus, Plaintiff's privacy rights are protected by the RFPA.  Fritsch Decl. ¶ 3.

The RFPA prevents a bank from releasing the financial records of the bank's customers unless the customer has authorized the disclosure or the Government authority seeks access to the records through an administrative subpoena, search warrant, judicial subpoena, or a formal written request, in accordance with requirements of the statute. 12 U.S.C. §§ 3402, 3403. Plaintiff has not authorized disclosure of its financial records, and Mr. Nunes did not comply with any of the other mechanisms for seeking financial records from the bank under the RFPA. Therefore, any release of records by Defendant Bank would violate the Act.

First, for the administrative subpoena, judicial subpoena, or formal written request, there must be "reason to believe that the records sought are relevant to a legitimate law enforcement

inquiry," 12 U.S.C. §§ 3405(1), 3407(1), 3408(3). As described above there is no legitimate inquiry here.

Second, Defendant Bank's release of records would violate the RFPA because Mr. Nunes did not give Plaintiff any notice at all, let alone notice that complies with the RFPA, which requires service of the subpoena on the customer, including notice of the right to challenge the demand for records in federal court. 12 U.S.C. §§ 3405, 3407, 3408. Therefore, even if the bank subpoena could be characterized as a valid "administrative subpoena," § 3405, "judicial subpoena," § 3407, or "formal written request," § 3408 – which it cannot because the investigation is not legitimate – Defendant Bank is prohibited from releasing the records because the required notice was not given to Plaintiff.

Finally, Defendant Bank would violate the RFPA by releasing Plaintiff's records because Mr. Nunes, acting *ultra vires* and purporting to act on behalf of HPSCI, cannot certify to Defendant Bank that he has complied with the applicable provisions of the RFPA; thus, the statute forbids Defendant Bank from producing Plaintiff's financial records in response to the subpoena. 12 U.S.C. § 3503. *See Young v. U.S. Dep't of Justice*, 882 F.2d 633, 637 (2d Cir. 1989) ("[W]e believe Congress intended the RFPA to regulate the release of customer information from financial institutions in circumstances where adequate controls did not already exist.").

## C. Compliance with the *Ultra Vires* Subpoena Would Violate the Gramm-Leach-Bliley Act.

The Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*, codifies the policy that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a); *see also Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d

735, 739 (7th Cir. 2016) (noting that the Act provides "multiple safeguards to protect the privacy of customers of financial institutions.").

The Act prohibits Defendant Bank from "disclos[ing] to a nonaffiliated third party any nonpublic personal information" unless the financial institution gives the customer notice and an opportunity to opt out. 15 U.S.C. § 6802(a), (b); 12 C.F.R. § 1016.10 (OCC Regulations). Examples of information Defendant Bank is prohibited from disclosing include account balance information, payment history, and the fact that the consumer is or was one of the bank's customers. *See* 12 C.F.R. § 1016.3(q)(2). One exception is where the financial institution must "comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities," *id.* § 6802(e)(8), but the investigation and subpoena at issue here are not "properly authorized," as explained above.

Defendant Bank's release of the bank records would violate the Gramm-Leach-Bliley Act, and Plaintiff would be irreparably harmed by such disclosure.

## D. Compliance with the *Ultra Vires* Subpoena Would Infringe Plaintiff's First Amendment Rights.

Defendant Bank's compliance with the subpoena would abridge Plaintiff's First Amendment rights to engage in free political speech, free political activity, and free association. Seeking, as it does, the identities of those who opposed President Trump, this subpoena is a harsh attack on the First Amendment rights of Plaintiff and some of its clients. Defendant Bank's compliance with the records is caused by Mr. Nunes' coercive power over the bank, and thus Defendant Bank's actions can be fairly attributed to Congress.

### i) Compliance with the *Ultra Vires* Subpoena Would Violate Plaintiff's First Amendment Rights.

The purpose of this subpoena is to discover the identity of Plaintiff's clients; a subpoena for bank records here is the equivalent of a subpoena for Plaintiff's entire confidential client list. Some of these clients contracted with Plaintiff to engage in political activity and free speech, such as the performance of opposition research on candidates for office. Congressional committee demands for membership lists intrude on the core First Amendment rights to freely communicate about political ideas and the privacy of association.  Congress' power to compel information is constrained by constitutional limits.  Its enforcement of a subpoena may not "abridge[e] freedom of speech or press or assembly." *Watkins v. United States*, 354 U.S. 178, 197 (1957). A concrete limitation of Congress' authority to investigate is that the purpose cannot be to expose "for the sake of exposure." *Id.* at 200.

The First Amendment's strongest protections apply to political speech and political affiliation and it has its "'fullest and most urgent application to speech uttered during a campaign for political office.'" *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 508 (D.C. Cir. 2016) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). "When governmental activity collides with First Amendment rights, the Government has the burden of establishing that its interests are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests." *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Laws that burden political speech are subject to strict scrutiny.") (internal quotation marks omitted).

The First Amendment protects the freedom to associate anonymously. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Nat'l Ass'n for*

*Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958)
("*NAACP*"). *See also AFL–CIO v. FEC,* 333 F.3d 168, 175 (D.C. Cir. 2003) ("The Supreme
Court has long recognized that compelled disclosure of political affiliations and activities can
impose just as substantial a burden on First Amendment rights as can direct regulation.").

For that reason, the Supreme Court ruled that the State of Alabama could not compel the
NAACP to disclose the names of its members because such compulsion would result in a
"substantial restraint" of their freedom of association under the First Amendment.  *NAACP*, 357
U.S. at 462-63.  When the court in *Perry v. Schwarzenegger* analyzed a claimant's assertion of a
First Amendment privilege in the face of a subpoena, the court found: "The existence of a prima
facie case turns not on the type of information sought, but on whether disclosure of the
information will have a deterrent effect on the exercise of protected activities." 591 F.3d 1147,
1162 (9th Cir. 2010).

The bank subpoena strikes at "the very heart of the organism which the first amendment
was intended to nurture and protect: political expression and association concerning federal
elections and officeholding." *Fed. Election Comm'n v. Machinists Non-Partisan Political
League*, 655 F.2d 380, 388 (D.C. Cir.), *cert. denied*, 454 U.S. 897 (1981). The bank subpoena
seeks the bank records of the entities and individuals associated with Plaintiff, the firm that
carried out opposition research on then candidate Donald J. Trump. The bank records would
reveal membership lists, identifying individuals and entities that associated with Plaintiff. The
Supreme Court has held that subpoenas to divulge the identities of political dissenters or those
who hold disfavored views implicate First Amendment rights of free speech and association. *See
Watkins v. United States*, 354 U.S. 178 (1957) (involving a subpoena seeking witness testimony
to identify Communist associates); *United States v. Rumely*, 345 U.S. 41 (1953) (involving a

subpoena seeking the identity of purchasers of political books). Release of the records would reveal those who have associated with Plaintiff, an organization engaged in political activity; it would reveal the identities of those expressing certain views on the qualifications of Candidate Trump for public office; and it would deter Plaintiff, its employees, its clients, and all others from engaging in political activity such as research on candidates for public office. Fritsch Decl. ¶¶ 6, 11, 14-16.

There is no compelling government interest in the identities of every single one of Plaintiff's business associates, and yet the bank subpoena sweeps incredibly broadly, ignoring any relevance whatsoever to Russian interference in the 2016 presidential election, and seeks records that would reveal each and every one of Plaintiff's clients for the past two years (as well as each and every vendor or contractor of Plaintiff). Identifying information on which groups or individuals paid for research on Trump's fitness for office cannot possibly having any bearing on an investigation purportedly seeking to investigate Russian involvement in the 2016 election. Disclosure of such information "is likely to affect adversely the ability of" Plaintiff and its clients "to pursue their collective effort to foster beliefs which they admittedly have the right to advocate," because it may deter Plaintiff and its clients from engaging in such political activity in the future and dissuade others from engaging in political research for "fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP*, 357 U.S. at 462-63; *see also* Fritsch Decl. ¶¶ 14-16.

**ii) Defendant Bank's Release of Records Is "State Action."**

Defendant Bank's release of the records can be fairly attributed to Mr. Nunes in his official capacity, and thus Defendant Bank can be held liable for the violation of Plaintiff's First Amendment rights. "[A] challenged activity may be state action when it results from the State's

exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents." *Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296 (2001)). Mr. Nunes has "exercised coercive power" over Defendant Bank and "has provided such significant encouragement" that the Bank's disclosure of records must be deemed to be that of Congress. *Rendell-Baker v. Kohn*, 457 U.S. 830, 839–40 (1982).

In determining whether a private party's actions can be fairly attributed to the government for purposes of determining "state action," the Court looks to two factors: "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (holding that there was state action where a private creditor used the state law's procedural scheme to obtain a pre-judgment writ of attachment of the debtor's property and the County Sheriff executed the writ). Here, Defendant Bank will deprive Plaintiff of its First Amendment rights by complying with the Committee subpoena, "a rule of conduct imposed by the state." And Defendant Bank is a state actor because Defendant Bank, acting under Congress's threat of compulsory process, is a joint participant with Mr. Nunes to expose the identities of Plaintiff's clients. Defendant Bank intends to release the records in violation of Plaintiff's statutory and constitutional rights because it fears the reputational damage of being held in contempt of Congress. Therefore, Defendant Bank is doing the bidding of Mr. Nunes. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 170 (1970)

(holding that a state is responsible for the unconstitutional act of a private party when the state has compelled the act).

Accordingly, under the foregoing circumstances, Defendant Bank's release of the records would be an unconstitutional state action by Defendant Bank acting as a proxy for Mr. Nunes.

## II.    Plaintiff Would Suffer Irreparable Harm in the Absence of Preliminary Relief.

Defendant Bank's release of these records, caused by Mr. Nunes' threat of compulsory process, would immediately cause Plaintiff and its clients irreparable harm.

The loss of statutory protection for financial privacy would irreparably harm Plaintiff. Defendant's violation of Plaintiff's right to privacy in its financial records, protected by the RFPA and the Gramm-Leach-Bliley Act, cannot be remediated.  It appears that Defendant Bank does not contest that its release of records would violate these statutes; rather, the Bank has determined that the harm from being held in contempt of Congress outweighs its obligations to protect Plaintiff's rights to financial privacy. This untenable position—saving itself by overtly violating Plaintiff's rights—should not be permitted. The threat to Plaintiff's rights under these statutes is imminent; as soon as the bank records are released to the Government, Plaintiff's rights under both statutes will be violated and the harm which the statutes were designed to prevent will have occurred. Violation of rights afforded by Congress is certainly irreparable harm.

The "loss  of First Amendment 'freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). Plaintiff and its clients would suffer significant intrusions into their rights to privacy, free association and free political speech as soon as these records are

disclosed. The very threat of this disclosure has already caused a change in the way in which Plaintiff has conducted business and communicated internally and externally.  Fritsch Decl. ¶ 17. Moreover, there is no way to remediate such harm. Release of the records would chill Plaintiff's and its clients' rights to oppose political candidates, express their political views on candidates for office, and to persuade others of their points of view about political candidates. The invasion of their First Amendment rights cannot be undone once these rights are violated – "there can be no do over and no redress.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation omitted). Plaintiff's First Amendment rights are "threatened" and "in fact being impaired" at this moment. *Nat'l Treasury Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (internal quotation marks omitted).

### III.     The Balance of The Equities Is in Plaintiff's Favor.

To balance the equities, the Court "consider[s] the effect on each party of the granting or withholding of the requested relief." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (quotation marks and citations omitted). Here, the established harm to Plaintiff in the absence of an injunction is irreparable.  By contrast, Defendant Bank would suffer no harm from not releasing its customer's records and, indeed, does not oppose this motion.  Defendant Bank simply seeks to avoid being held in contempt of Congress, which would be avoided by this Court's order requiring the injunction.  Thus, this factor weighs heavily in favor of granting the injunction.

### IV. The Public Interest in Protecting Constitutional and Statutory Rights Would Be Furthered by Granting the Preliminary Injunction.

The public interest in protecting statutory rights to financial privacy and First Amendment rights is strong. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" legislative act. *Pursuing America's*

*Greatness*, 831 F.3d at 511. Mr. Nunes is on an *ultra vires* fishing expedition for Plaintiff's client list—information only useful for purposes of harassment and deterring opposition research—and that information will not further any legitimate legislative inquiry. The public interest in preventing this abuse of power, upholding the statutory rights to financial privacy, and protecting free speech strongly favors restraining Defendant Bank's compliance with an unauthorized, illegitimate subpoena while the Court resolves the merits of this case.

## CONCLUSION

For these reasons, this Court should grant Plaintiff's motion for a temporary restraining order and preliminary injunction and order that Defendant Bank not to comply with the subpoena, going forward until this lawsuit is resolved.

Dated: October 20, 2017             Respectfully Submitted,

_/s/ William W. Taylor III_____
William W. Taylor, III (D.C. Bar No. 84194)
Steven M. Salky (D.C. Bar No. 360175)
Rachel F. Cotton (D.C. Bar No. 997132)
**ZUCKERMAN SPAEDER LP**
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 788-1800
wtaylor@zuckerman.com
ssalky@zuckerman.com
rcotton@zuckerman.com

Joshua A. Levy (D.C. Bar No. 475108)
Robert F. Muse (D.C. Bar No. 166868)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
**Cunningham Levy Muse LLP**
1250 Connecticut Avenue, NW, Suite 200
Washington, D.C. 20036
jal@cunninghamlevy.com
202-261-6564