**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BEAN LLC d/b/a FUSION GPS<br>　　　　1700 Connecticut Ave., NW<br>　　　　Suite 400<br>　　　　Washington, DC 20009,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>DEFENDANT BANK,<br><br>　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Case No. 1:17-cv-02187-TSC<br>)<br>)<br>)<br>)<br>)<br>) |

**MOTION TO INTERVENE OF THE PERMANENT SELECT COMMITTEE ON
INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES' AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

The Permanent Select Committee on Intelligence of the U.S. House of Representatives

("Committee") respectfully moves the Court for leave to intervene in this case pursuant to Rule

24 of the Federal Rules of Civil Procedure and Local Civil Rule 7(j) of the U.S. District Court

for the District of Columbia.  The Committee seeks intervention as of right pursuant to Rule

24(a)(2), or in the alternative, permissive intervention under Rule 24(b)(1)(B), to assert the

defenses set forth in the forthcoming Opposition to Plaintiff's Application for a Temporary

Restraining Order and Motion for Preliminary Injunction, and to participate fully in this action.

A proposed Order with a briefing schedule is at Exhibit A.[1]

---

[1] Due to the press of papers due regarding a motion for temporary restraining order related to the
Congress's constitutional power to appropriate public funds, which also is due on Saturday,
October 21, 2017 at 1:00 p.m. EDT, *see* Scheduling Order, *California v. Trump*, 3:17-cv-05895-
VC (N.D. Ca.) (ECF No. 22) (noting amicus briefs "must be filed by Saturday, October 21, 2017
at 10:00 a.m. [PST]"), counsel for the Committee respectfully requests that its deadline for filing
its opposition to Plaintiff's filings, which total more than 90 pages, be extended until not later
than 6 p.m. on Monday, October 24, 2017.  The Committee has informed Defendant Bank that
*(Continued . . . .)*

# BACKGROUND

Congressional Oversight Power.

Article I of the U.S. Constitution vests all legislative powers with Congress, and "the power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 173-74 (1927).  *See also Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 505 n. 15 (1975) ("[T]he scope of [Congress's] power of inquiry … is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."); *id.* at 504 ("Issuance of subpoenas … has long been held to be a legitimate use by Congress of its power to investigate.").

Pursuant to the Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings ….") – and also by statute, *see* 2 U.S.C. § 190d – the House has delegated its substantial and wide-ranging oversight and investigative authority to its committees.  *See* Rules of the House of Representatives, Rule XI.1(b)(1) ("House Rules"), ("Each committee may conduct at any time such investigations and studies at it considers necessary or appropriate in the exercise of its responsibilities under rule X.").[2]  Specifically, the House has delegated to the Committee the authority to conduct oversight regarding "the activities of the intelligence community," and jurisdiction over all legislative matters pertaining to the federal government's "[i]ntelligence and intelligence-related activities."  House Rules X.3(m), X.11(b)(1).  To carry out these responsibilities, the Committee may issue subpoenas for

---

its time to respond to the Bank Subpoena has been extended to Wednesday, October 25, 2017, thereby eliminating any need for an immediate ruling by this Court on Plaintiff's request for temporary restraining order.

[2] *Available at* https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf.

testimony and documents.  *See* House Rule XI.2(m)(1)(B); Rules of the Permanent Select

Comm. on Intelligence, Rule 10(b) ("Committee Rules").[3]

<u>The Committee's Russian Active Measures Campaign Investigation.</u>

On March 1, 2017, Committee Chairman Devin Nunes and Ranking Member Adam

Schiff exercised the Committee's Constitutional oversight role in approving a Scope of

Investigation relating to the "Russian active measures campaign targeting the 2016 election."

*See* Committee Press Release, *Intelligence Committee Chairman, Ranking Member Establish*

*Parameters for Russia Investigation* (Mar. 1, 2017).[4]  The Committee's ongoing investigation

seeks to answer the following questions:

- *What Russian cyber activity and other active measures were directed against the United States and its allies?*

- *Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?*

- *What was the U.S. Government's response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?*

- *What possible leaks of classified information took place related to the Intelligence Community Assessment of these matters?*

*Id.*  As Committee Ranking Member Adam Schiff explained, "***We must follow the facts***

***wherever they may lead, leaving no stone unturned***, and that must also include both the Russian

hacking and dumping of documents as well as any potential collusion between Russia and U.S.

citizens.  ***This investigation is a national security necessity and anything less than a full***

***accounting of all the facts will be insufficient to protect the country and meet the expectations***

---

[3] *Available at* https://intelligence.house.gov/uploadedfiles/hpsci_rules_of_procedure_-_115th_congress.pdf

[4] *Available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

*of the American people*." *Id.* (emphasis added).  Chairman Nunes also promised the American

people that "*we will fully investigate all the evidence we collect and follow that evidence*

*wherever it leads*." *Id.* (emphasis added).  On April 6, 2017, Chairman Nunes announced that

Representative Mike Conway, with assistance from Representatives Trey Gowdy and Tom

Rooney, would lead the investigation, but that Chairman Nunes would "continue to fulfill all my

other responsibilities as Committee Chairman."  Comm. Press Release, *Nunes Statement on*

*Russia Investigation* (Apr. 6, 2017).[5]  Pursuant to Committee Rules, one of those responsibilities

is to issue and sign Committee subpoenas.  Comm. Rule 10(a),(c).

        To provide the American people with a "full accounting of all the facts," and based in

part on classified information obtained by the Committee, on October 4, 2017, the Chairman,

pursuant to the request of Representative Conaway and in accordance with Rule 10 of the

Committee's Rules of Procedure, issued a subpoena to Defendant Bank that is the subject of this

litigation.  The subpoena sought financial records relating to one or more accounts at Defendant

Bank in the name of Bean LLC d/b/a Fusion GPS ("Fusion GPS").  As explained below, the

subpoena was issued after Fusion GPS failed to cooperate with the Committee's investigation

and in order to obtain information that is plainly relevant to the investigation.

        Fusion GPS.

        Fusion GPS is a DC-based firm that "provides premium research, strategic intelligence,

and due diligence services to corporations, law firms, and investors worldwide."  *See*

http://www.fusiongps.com/.  The firm was founded by former Wall Street Journal reporters

Glenn Simpson, Peter Fritsch, and Thomas Catan.  Public reports reveal that Fusion GPS has

allegedly been involved in lobbying against the Global Magnitsky Human Rights Accountability

---

[5] *Available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775

Act (which allows the Executive Branch to impose travel restrictions and sanctions on foreign persons responsible for human rights violations); providing litigation support in the Magnitsky-related *Prevezon Holdings* money laundering case; and receiving compensation from the Russian government.  *See* Senator Chuck Grassley, Press Release, *Checking the Facts: There Is Evidence Fusion GPS Was Paid by Russia While Compiling Trump Dossier*;[6] *id.*, *Complaint: Firm behind Dossier & Former Russian Intel Officer Joined Lobbying Effort to Kill Pro-Whistleblower Sanctions for Kremlin*.[7]

As publically reported, Fusion GPS was commissioned by an unknown third party in Fall 2015 to conduct political opposition research on then presidential candidate Donald Trump. In Spring 2016, that third party allegedly withdrew from or terminated its contract with Fusion GPS.  However, publicly available information indicates that a separate client took over or initiated a contract with Fusion GPS for opposition research on then-candidate Donald Trump.

Based on public reporting, as part of that second contract, Fusion GPS commissioned former British intelligence officer Christopher Steele to conduct a private investigation on Trump.  That work yielded a series of reports, compiled in a 35-page private intelligence "dossier" that made unverified allegations of misconduct pertaining to Trump's relationship with Russian individuals and to alleged "collusion" between the Trump campaign and representatives of the Russian Government during the 2016 presidential election.

The public record further indicates that Mr. Steele was paid an undisclosed sum of money for previous work performed on behalf of the FBI, and that information contained in the

---

[6] *Available at* https://www.grassley.senate.gov/news/news-releases/checking-facts-there-evidence-fusion-gps-was-paid-russia-while-compiling-trump.

[7] *Available at* https://www.grassley.senate.gov/news/news-releases/complaint-firm-behind-dossier-former-russian-intel-officer-joined-lobbying-effort.

"dossier" had been provided to the FBI by late 2016.  Importantly for purposes of the Committee's present investigation, public reporting reveals that other elements of the Intelligence Community also became aware of the "dossier" contents, and providing briefings regarding the "dossier" to both President Obama and then President-elect Trump in early January 2017.  A version of the Steele "dossier" was published by BuzzFeed on January 10, 2017.

As part of its inquiry into the Russian active measures targeting the 2016 U.S. election, the Committee seeks, among other things, to understand all facets of the "dossier" which include:  *Who paid for it?  Who received it?  What steps were taken to corroborate the information contained therein?  Did the FBI rely on the "dossier" as part of its counterintelligence investigation that was initiated in July 2016, as publicly announced by former FBI Director James Comey on March 20, 2017?*   The key to answering many of these questions lies with information in the possession of Fusion GPS, as well as records of one or more Fusion accounts at Defendant Bank.

The records sought by the subpoena will allow the Committee to fully understand and perhaps conclusively determine who paid for the "dossier" and the amount of funds that Fusion GPS paid to Mr. Steele for the performance of his work, as well as determine whether Fusion GPS engaged in other Russia-related work within the scope of the Committee's pending investigation.  Such information is crucial for the Committee to fully investigate not only the "dossier" and its relevance to the question of whether there was possible "collusion" between the Russian Government and the Trump campaign but also other aspects of the Committee's investigation.

To obtain the requisite information, more than two months ago the Committee issued a letter to Messrs. Simpson, Fritsch, and Catan, requesting they provide relevant documents and

materials that could reasonably lead to the discovery of facts within the Committee's
investigation, and inviting them to appear voluntarily before the Committee for a transcribed
interview.   The Committee engaged in numerous e-mail exchanges and telephone conversations,
including hosting a meeting with Fusion GPS' attorneys, Joshua Levy and Rachel Clattenberg, to
understand their clients' concerns with complying with the terms of the Committee's letters.
Unfortunately, those discussions reached an impasse.  Mr. Levy informed the Committee that
none of the three individuals would be willing to fully answer all questions likely posed by the
Committee regarding Fusion GPS' role in the creation of the "dossier" – or even appear for a
voluntary interview without a written agreement preserving privileges and limiting the scope of
questioning.  Mr. Levy advised that his clients would likely invoke attorney-client, contractual
and unspecific First Amendment "privileges" to avoid answering questions concerning the
creation of the "dossier."

Accordingly, on October 4, 2017, the Chairman, pursuant to the request of Representative
Conaway and in accordance with Rule 10 of the Committee's Rules of Procedure for the 115th
Congress, issued subpoenas to Messrs. Simpson, Fritsch, and Catan ("Fusion GPS Subpoenas").
The Fusion GPS Subpoenas required Messrs. Catan and Fritsch to produce all responsive
documents by October 11, 2017, and to appear for deposition on October 18, 2017.  (Mr.
Simpson was required to produce documents by October 17 and appear on November 8, 2017.)
At the request of counsel for Fusion GPS, the deadline for production by Messrs. Fritsch and
Catan was extended to October 16, 2017.

As of the date of this filing, no documents have been produced to the Committee in
response to the Fusion GPS Subpoenas.  Instead, on October 16, 2017, counsel for Fusion GPS
transmitted to the Committee (and promptly to the press) a 17-page letter to the Committee

attacking the legitimacy of the subpoenas and invoking various Constitutional and procedural

privileges.  On October 18, 2017, Messrs. Catan and Fritsch, accompanied by counsel Mr. Levy,

appeared before the Committee for deposition.  During that deposition, both deponents refused to

answer any questions, purportedly on the basis of generalized "Constitutional" privileges.  As

such, the Committee was unable to obtain any information in furtherance of its investigation.

Defendant Bank Subpoena.

After several weeks of back-and-forth with counsel for Fusion GPS revealed that Fusion

GPS would not cooperate with the Committee's inquiry, the Committee sought records from

Defendant Bank relating to Fusion GPS.  The Chairman, pursuant to the request of

Representative Conaway and in accordance with Rule 10 of the Committee's Rules of Procedure

for the 115th Congress, issued a subpoena to Defendant Bank on October 4, 2017 ("Bank

Subpoena").  At the Bank's request, its deadline for production was extended from October 13,

2017 to October 23, 2017.  Defendant Bank, through counsel, in a letter dated October 18, 2017,

initially lodged a number of objections to the Bank Subpoena, several of which parroted

objections previously made by Mr. Levy on behalf of Fusion GPS.  On October 19, 2017, after

Committee Senior Counsel Kashyap P. Patel informed Defendant Bank that all of its procedural

and substantive objections had been rejected, Defendant Bank agreed to comply with the Bank

Subpoena and to produce all responsive documents by 9 A.M. on October 23, 2017.  Defendant

Bank has represented to the Committee that the identification and preparation of responsive

records is complete, and in the possession of counsel awaiting production to the Committee.

On October 19, 2017, after the close of business, counsel for Fusion GPS contacted

Committee staff and indicated that absent some resolution of the Bank Subpoena they intended

to seek relief in federal court.  Despite the late hour, Committee staff communicated with

counsel and, after considering the requests made, declined to extend Defendant Bank's deadline for compliance with the Subpoena in light of Defendant Bank's representation that the responsive records were ready for production.  On the afternoon of Friday, October 20, 2017, less than a full business day before the subpoena deadline and at least 8 days after it appears that counsel for Fusion GPS became aware of the Bank Subpoena, counsel for Fusion GPS notified the Committee that it had filed the instant action challenging the validity of the Bank Subpoena. A telephonic hearing with the Court and all interested parties was held at 5 p.m. the same afternoon.  The Court took the matter under advisement and yesterday evening issued an order directing the Committee to file a motion to intervene by Noon on Saturday, October 21, 2017. *See* Minute Order (Oct. 20, 2017).

## ARGUMENT

Federal Rule of Civil Procedure 24(a)(2) provides that a party seeking to intervene as of right must satisfy four requirements: (1) the application to intervene must be timely; (2) the party must have "an interest relating to the property or transaction that is the subject of the action"; (3) the party must be "so situated that the disposition of the action may as a practical matter impair or impede the party's ability to protect its interest"; and (4) the party's interest must not be adequately represented by existing parties to the action.  A movant for leave to intervene under 24(a)(2) must satisfy the same Article III standing requirements as original parties.  *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732-33 (D.C. Cir. 2003).

A court may also allow permissive intervention under Federal Rule of Civil Procedure 24(b) where a movant (1) makes a timely motion; (2) has a claim or defense; and (3) that claim or defense shares with the main action a common question of law or fact.  Fed. R. Civ. P. 24(b).

The Committee easily satisfies the standards for intervention.

## I.     The Committee Should Be Permitted to Intervene As of Right.

"The right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972).  To that end, pursuant to Rule 24(a)(2), "[a] district court must grant a timely motion to intervene that seeks to protect an interest that might be impaired by the action and that is not adequately represented by the parties." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014); Fed. R. Civ. P. 24(a)(2). The Committee should be granted leave to intervene in this action to (i) protect its interest in Defendant Bank's response to the Committee's valid legislative subpoena and in the important legal principles at stake and, also (ii) to preserve its rights to participate in or bring an appeal in the event of an adverse decision.  As the D.C. Circuit recognized in granting a Senate committee's belated motion to intervene in an appeal, "each interested governmental party" should be encouraged to "see to it that its views are fully represented before the court in some … way at a suitably early stage of the proceedings," rather than waiting until the appellate stage to intervene.  *Paisley v. C.I.A.*, 724 F.2d 201, 204 (1984).

The D.C. Circuit has identified four factors to be considered in ruling on a motion for intervention as of right: "(1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties." *Fund for Animals*, 322 F.3d at 731 (citations and quotation marks omitted). As detailed below, the Committee readily satisfies each of those requirements.

*First*, the Committee moved promptly to intervene in this action – just 24 hours after the Committee first received notice of the Complaint in this action (several hours before the Complaint was publicly-docketed). *Second*, the Committee plainly has a legally protected interest in the proper response the Bank Subpoena issued in furtherance of the Committee's legislative and oversight obligations. *See, e.g.*, *Comm. on Oversight and Gov't Reform v. Holder*, 979 F.Supp.2d 1 (D.D.C. 2013); *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F.Supp.2d 53 (D.D.C. 2008). *Third*, this action threatens to impair the Committee's legally protected interest, because plaintiff seeks to prevent Defendant Bank from producing *any* records in response to the Committee's subpoena. Fourth, defendants are not adequately representing the Committee's interests, because while it has made clear it is willing and able to produce the requested records, it has no legal interest in ensuring that the Committee's legislative prerogatives are respected. *See generally United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (1980) ("*AT&T III*") (intervention "ordinarily should be allowed … unless it is clear" that an existing party provides adequate representation (internal quotation omitted)). *United States v. AT&T* is instructive in this regard. *See United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"). There, the Executive Branch brought suit against AT&T to enjoin it from complying with a Congressional subpoena. The D.C. Circuit recognized that "[a]lthough this suit was brought in the name of the United States against AT&T, AT&T has no interest in this case…." *Id.* at 388-89.

Moreover, the Committee readily meets the requirements for Article III standing in this action. "To establish standing under Article III, a prospective intervenor … must show: (1) injury-in-fact, (2) causation, and (3) redressability." *Fund for Animals*, 322 F.3d at 732-33 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). It is well-established that the

House and its Committees have standing to enforce Congressional subpoenas.  *See, e.g., Miers*, 558 F. Supp. 2d 53, 69 (D.D.C. 2008) ("The House has standing to invoke the federal judicial power to aid in its investigative function"); *Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002) (noting "authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled"); *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 86 ("legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities").

*Injury in Fact*.  To show injury in fact, an intervenor must show "an invasion of legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted). Here, as discussed *supra*, the Committee has a well-established legally protected interest in compliance with its subpoenas.  Plaintiff's attempt to prevent Defendant Bank from complying with the subpoena inflicts an "informational injury" on the Committee that is "sufficiently concrete so as to satisfy the irreducible constitutional minimum of Article III."  *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 85 (quotation marks omitted).   The Committee's interest in vindicating its legislative prerogatives also is sufficiently concrete and particularized here because it relates to production of specific documents identified in the Bank Subpoena.  *See* Ex. __ (Bank Subpoena).  The threatened invasion of the Committee's legally protected interest in ensuring compliance with its subpoenas is plainly actual and imminent because Defendant Bank may choose to adhere to this Court's ruling on the merits of Plaintiff's claims rather than comply with the Committee's subpoena.

*Causation*.  The second element of the standing analysis requires "a causal connection between the injury and the conduct complained of – the injury has to be 'fairly … trace[able] to

the challenged action of the defendant[.]" *Lujan*, 504 U.S. at 560 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  Here, causation is obvious, and the Committee's threatened injury is directly traceable to the conduct of the parties in this action.  The Committee issued a subpoena to Defendant Bank for specifically-identified records, and Plaintiff seeks to prevent the production of all responsive records through this litigation.  *See* Compl. ¶ 56 (ECF No. 1).

> *Redressability.*  "The redressability inquiry poses a simple question: '[I]f [intervenors] secured the relief they sought, …. would [it] redress their injury?" *Wilderness Soc'y v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006).  The answer here is clearly "yes."  This Court may grant the relief that the Committee seeks – namely, an order confirming that the subpoena is valid and enforceable, that the Gramm-Leach-Bliley Act and Right to Financial Privacy Act do not apply to Congressional subpoenas, and that the Committee's subpoena in no way offends Plaintiff's First Amendment rights.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 143 (D.D.C. 2016) ("the Court finds that to the extent the Subpoena implicates Mr. Ferrer's protected freedoms, it is only in an incidental and minimal fashion.  In comparison, the subpoenaed information is highly relevant to the Subcommittee's investigation and potential legislation on Internet sex trafficking."), *vacated as moot by*, *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017).  Redressability is therefore established.

## II.    In the Alternative, the Committee Should Be Allowed to Intervene Permissively.

While the Committee easily meets the standards for intervention as of right, in the alternative, the Court should grant the Committee permissive intervention.  Rule 24(b)(1)(B) requires that "[o]n timely motion, the court may permit, anyone to intervene who… has a claim or defense that shares with the main action a common question of law or fact."  Permissive

intervention is appropriate because the Committee timely moved to intervene and has a claim or defense that shares a common question of law with the main action.  Specifically, a common question of law exists because the central legal issues raised by this litigation are:  (1) Was the Bank Subpoena validly issued?  (*It was.*); (2) Does the Defendant Bank's anticipated production in response to the Bank Subpoena violate the First Amendment rights of the Plaintiff?  (*It does not.*); and (3) Are Congressional subpoenas limited by the Gramm-Leach-Bliley Act and Right to Financial Privacy Act?  (*They are not.*)  The Committee's forthcoming Opposition will address each of the points.  These common legal questions – which strike at the core of the Committee's investigative authority – justify permissive intervention.  Finally, intervention will not "delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). As noted *supra*, the Committee's motion is timely and no delays will result from the Committee's intervention in this matter.

Permissive intervention is therefore appropriate.

## CONCLUSION

For all the foregoing reasons, the Court should grant the Committee's motion to intervene.

Respectfully submitted,

*/s/ Thomas G. Hungar*
THOMAS G. HUNGAR
  *General Counsel*
TODD B. TATELMAN
  *Associate General Counsel*
KIMBERLY HAMM
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515

(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
Thomas.Hungar@mail.house.gov

*Counsel for the Permanent Select Committee on*
*Intelligence of the U.S. House of Representatives*

October 21, 2017

**CERTIFICATE OF SERVICE**

I certify that on October 21, 2017, I filed the foregoing document by the court's CM/ECF system.


/s/ Thomas G. Hungar
Thomas G. Hungar