**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

BEAN LLC d/b/a FUSION GPS )
      1700 Connecticut Ave., NW )
      Suite 400 )
      Washington, DC 20009, )
       )
           Plaintiff, )
       )
    v. )    Case No. 1:17-cv-02187-TSC
       )
DEFENDANT BANK, )
       )
           Defendant, )
       )
       )
PERMANENT SELECT COMMITTEE ON )
INTELLIGENCE OF THE U.S. HOUSE OF )
REPRESENTATIVES, )
           Intervenor. )
_____)

**RESPONSE OF INTERVENOR THE PERMANENT SELECT COMMITTEE**
**ON INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

THOMAS G. HUNGAR
  *General Counsel*
TODD B. TATELMAN
  *Associate General Counsel*
KIMBERLY HAMM
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
Thomas.Hungar@mail.house.gov

*Counsel for Intervenor Permanent Select*
*Committee on Intelligence of the U.S. House of*
*Representatives*

October 23, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................................

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

I.      THE COMMITTEE'S RUSSIAN ACTIVE MEASURES CAMPAIGN
        INVESTIGATION..........................................................................................................3

II.     THE COMMITTEE'S INTEREST IN PLAINTIFF'S ACTIVITY. ...................................5

III.    THE COMMITTEE'S SUBPOENA TO DEFENDANT BANK.......................................9

ARGUMENT ......................................................................................................................11

I.      PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF
        SUCCESS ON THE MERITS. ........................................................................................12

        A.  The Constitution Confers Broad Investigatory Powers on Congress. .........................12

        B.  All Committee and House Rules Were Followed With Respect
            to the Subpoena At Issue...........................................................................................14

        C.  The Committee's Investigation Is Fully Authorized by House Resolution.................17

        D.  The Right to Financial Privacy Act ("RFPA") Does Not Apply to
            Congressional Subpoenas. .........................................................................................20

        E.  The Gramm-Leach-Bliley Act Also Does Not Apply to
            Congressional Subpoenas. .........................................................................................22

        F.  Plaintiff's Objections on First Amendment Grounds Lack Merit. .............................24

            1.  Plaintiff Is Not an "Association" For Purposes of the First Amendment.........26

            2.  Plaintiff Lacks Standing to Assert The Alleged First Amendment
                Rights of Its Customers...................................................................................29

            3.  Plaintiff Has Not Engaged In Protected First Amendment Activities
                and, In Any Event, The Disclosure of its Financial Records Does
                Not Offend the First Amendment. ..................................................................29

            4.  Plaintiff's Free Speech Rights are Not Impaired. ...........................................32

5.   Plaintiff Alleges No Relevant Harm Arising From the Disclosure of Its Financial Records..................................................................................33

II.      PLAINTIFF HAS FAILED TO ESTABLISH A LIKELIHOOD OF IRREPARABLE INJURY. ............................................................................37

III.     THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF THE COMMITTEE. ...................................................................................42

IV.      THE PUBLIC INTEREST SUPPORTS ENFORCEMENT OF THE SUBPOENA. ........43

CONCLUSION.....................................................................................................44

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ...................................................................................11, 37

*AFL-CIO v. FEC*,
    333 F.3d 168 (D.C. Cir. 2003) ...................................................................................28, 33

*Ashland Oil Co., Inc. v. FTC*,
    548 F.2d 977 (D.C. Cir. 1976) .........................................................................................41

*Associated Press v. N.L.R.B.*,
    301 U.S. 103 (1937) .................................................................................................. 36-37

*Barenblatt v. United States*,
    360 U.S. 109 (1959) .............................................................................................12, 13, 42

*Branzburg v. Hayes*,
    408 U.S. 665 (1992) ...............................................................................................32, 36

*Brown v. District of Columbia*,
    888 F. Supp. 2d 28 (D.D.C. 2012) ...................................................................................41

*Buckley v. Valeo*,
    424 U.S. 1, (1976) ...........................................................................................................13

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .........................................................................................38

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ....................................................................................................28, 32

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ...........................................................................................11

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008) ...................................................................................20

*Comm. on Oversight & Gov't Reform v. Holder*,
    979 F. Supp. 2d 1 (D.D.C. 2013) ............................................................................... 19-20

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ...................................................................................11, 12

*Dole v. Local Union 375 Plumbers Int'l Union*,
    921 F.2d 969 (9th Cir. 1990) ..........................................................................34

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)..............................................................1, 12, 13, 14, 17, 19

*Exchange Point LLC v. SEC*,
    100 F. Supp. 2d 172 (S.D.N.Y. 1999)..............................................................20

*Exxon Corp. v. FTC*,
    589 F.2d 582 (D.C. Cir. 1978) ................................................14, 23, 41, 43

*FEC v. Auto. Bus. Svcs.*,
    888 F. Supp. 539 (S.D.N.Y. 1995) ..................................................................30

*FEC v. Machinists Non-Partisan Political League*,
    655 F.2d 380 (1981)..........................................................................................28

*Fleck & Assocs., Inc. v. Phoenix*,
    471 F.3d 1100 (9th Cir. 2006) ..................................................................26, 29

*FTC. v. Owens-Corning Fiberglass Corp.*,
    626 F.2d 966 (D.C. Cir. 1980) .......................................................................41

*FTC v. TRW, Inc.*,
    628 F.2d 207 (D.C. Cir.1980) ........................................................................43

*Ghandi v. Police Dep't of City of Detroit*,
    747 F.2d 338 (6th Cir. 1984) ..........................................................................33

*Holderbaum v. United States*,
    589 F. Supp. 107 (D. Colo. 1984) ..................................................................31

*Hubbard v. United States*,
    514 U.S. 695 (1995).........................................................................................21

*Hunt v. Wash. State Apple Advert. Comm' n*,
    432 U.S. 333 (1977)...................................................................................26, 27

*IDK, Inc. v. Cnty. of Clark*,
    836 F.2d 1185 (9th Cir. 1988) ........................................................................31

*In re Grand Jury Investigation No. 83-2-35*,
    723 F.2d 447 (6th Cir. 1983) ..........................................................................31

*In re Grand Jury Proceedings*,
   810 F.2d 580 (6th Cir. 1987) ........................................................................32

*In re Grand Jury Subpoena Duces Tecum Served Upon PHE, Inc.*,
   790 F. Supp. 1310 (W.D. Ky. 1992) ...............................................................31

*In re Grand Jury Subpoena, Judith Miller*,
   438 F.3d 1141 (D.C. Cir. 2006) .....................................................................32

*In re Grand Jury Subpoena Served Upon Crown Video Unlimited, Inc.*,
   630 F. Supp. 614 (E.D.N.C. 1986) .................................................................31

*In re Subpoena Duces Tecum Issued to CFTC*,
   439 F.3d 740 (D.C. Cir. 2006) ................................................................. 29-30

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*,
   477 U.S. 274 (1986) .......................................................................................26

*Kerr v. United States*,
   801 F.2d 1162 (9th Cir. 1986) .......................................................................36

*Laird v. Tatum*,
   408 U.S. 1 (1972) ...........................................................................................33

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...........................................................................39

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*,
   5 F.3d 1508 (D.C. Cir. 1993) .........................................................................43

*McGrain v. Daugherty*,
   273 U.S. 135, (1927) ................................................................12, 13, 19, 22, 42

*McSurely v. McClellan*,
   521 F.2d 1024 (D.C. Cir. 1975) .....................................................................14

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) .....................................................................40

*Murphy v. Department of Army*,
   613 F.2d 1151 (D.C. Cir. 1979) .....................................................................41

*Nat'l Ass'n for the Advancement of Colored People v. State of Ala. ex rel. Patterson*,
   357 U.S. 449 (1958) ..............................................................................26, 28, 35

*Nat'l Ass'n of Mfrs. v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009) ...................................................................................35

*Nat'l Treasury Emps. Union v. United States*,
    927 F.2d 1253 (D.C. Cir. 1991) ...........................................................................40

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ..............................................................................28

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................28, 32, 39

*Reporters Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.*,
    593 F.2d 1030 (D.C. Cir. 1978) ....................................................................... 34-35

*Sanders v. McClellan*,
    463 F.2d 894 (D.C. Cir. 1972) ..............................................................................36

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016) .....................................................................35

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) .........................................................................11, 12

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ...........................................................................15

*St. German of Alaska E. Orthodox Catholic Church v. United States*,
    840 F.2d 1087 (2d Cir. 1988)................................................................................36

*Townsend v. United States*,
    95 F.2d 352 (D.C. Cir. 1938) ...............................................................................14

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) ..............................................................................................29

*United States v. Am. Tel. & Tel. Co.*,
    551 F.2d 384 (D.C. Cir. 1976) .............................................................................19

*United States v. Bell*,
    414 F.3d 474 (3d. Cir. 2005) ................................................................................31

*United States v. Harriss*,
    347 U.S. 612 (1954)...............................................................................................35

*United States v. Judicial Watch, Inc.*,
    266 F. Supp. 2d 1, 20 (D.D.C. 2002) ...........................................................................36

*United States v. Miller*,
    425 U.S. 435 (1976) ...................................................................................................34

*United States v. Norcutt*,
    680 F.2d 54 (8th Cir. 1982) .......................................................................................34

*United States v. Ritchie*,
    15 F.3d 592 (6th Cir. 1994) ................................................................................. 31-32

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................................11, 12, 37

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C.Cir.1985) .....................................................................................38

## Constitution and Statutes

U.S. Const. art. I, § 5, cl. 2...............................................................................................13

5 U.S.C. § 551(1)(A) & (B) .............................................................................................21

12 U.S.C. § 3401 .......................................................................................................20, 21

12 U.S.C. § 3402 .............................................................................................................20

12 U.S.C. §§ 3405-3407 ..................................................................................................21

12 U.S.C. § 3412(d) .........................................................................................................22

15 U.S.C. § 6801 ..............................................................................................................22

15 U.S.C. § 6802 .......................................................................................................22, 23

15 U.S.C. § 6809..............................................................................................................22

## Legislative Sources

163 Cong. Rec. H7-H11 (daily ed. Jan. 3, 2017)...........................................................17

H. Rep. No. 105-829, *Investigation of Political Fundraising Improprieties
    and Possible Violations of Law, Interim Report* (105th Cong.) .........................................37

Rules of the U.S. House of Representatives, Rule IX.3(b).............................................................33

Rules of the U.S. House of Representatives, Rule X.3(m)......................................................13, 18

Rules of the U.S. House of Representatives, Rule XI.1(b)(1) ................................................13, 33

Rules of the Permanent Select Comm. on Intelligence, Rule 9 ....................................................16

Rules of the Permanent Select Comm. on Intelligence, Rule 10................................3, 8, 9, 13, 16

Rules of the Permanent Select Comm. on Intelligence, Rule 12(a)(1)............................. 23-24, 33

## Other Sources

Evan Perez, Manu Raju, and Jeremy Herb,
  *Nunes Signs Off On New Subpoenas to Firm Behind Trump-Russia Dossier*,
  CNN (Oct. 10, 2017, 9:47 PM) ....................................................................................16

Press Release, Permanent Select Comm. on Intelligence,
  Nunes Statement on Russia Investigation (Apr. 6, 2017)....................................................4

Press Release, Permanent Select Comm. on Intelligence,
  Intelligence Committee Chairman, Ranking Member Establish Parameters
  for Russia Investigation (Mar. 1, 2017)...........................................................3, 25, 43, 44

Senator Chuck Grassley, Press Release, *Checking the Facts:
  There Is Evidence Fusion GPS Was Paid by Russia While
  Compiling Trump Dossier* (Aug. 17, 2017).......................................................................5

Senator Chuck Grassley, Press Release, *Complaint: Firm behind Dossier & Former Russian
  Intel Officer Joined Lobbying Effort to Kill Pro-Whistleblower Sanctions for Kremlin*
  (Mar. 31, 2017) ................................................................................................................5

## INTRODUCTION

Intervenor the Permanent Select Committee on Intelligence of the U.S. House of Representatives (the "Committee")[1] respectfully submits this response in opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Oct. 20, 2017) (ECF No. 2) ("Plaintiff's Memorandum" or "Pl. Mem.").   Plaintiff admitted at the October 20 teleconference that issuance of its requested relief would have the same effect as an order quashing the Committee's constitutionally authorized subpoena for documents.  By bringing suit only against the Defendant Bank, Plaintiff seeks to do indirectly what long-standing Supreme Court precedent unambiguously prevents it from doing directly; namely, quash a valid congressional subpoena.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505-06 (1975). The relief Plaintiff seeks is extraordinary and would directly impede an ongoing congressional investigation of the highest national importance.

This action is wholly the result of the gamesmanship and recalcitrance of Plaintiff in refusing to cooperate with the Committee's investigation into allegations of Russian-related interference in the 2016 presidential election.  Plaintiff's obstruction of this investigation began in August 2017, shortly after being contacted by the Committee with a request for voluntary production of documents.  Negotiations over the Committee's request lasted for several weeks, until ultimately the Committee was forced to conclude that voluntary compliance was unlikely to

---

[1]  The Bipartisan Legal Advisory Group ("BLAG") of the United States House of Representatives has authorized the Committee's intervention in this matter. The BLAG is comprised of the Honorable Paul Ryan, Speaker of the House, the Honorable Kevin McCarthy, Majority Leader, the Honorable Steve Scalise, Majority Whip, the Honorable Nancy Pelosi, Democratic Leader, and the Honorable Steny H. Hoyer, Democratic Whip, and "speaks for, and articulates the institutional position of, the House in all litigation matters." Rule II.8(b), Rules of the United States House of Representatives, available at https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf. The Democratic Leader and Democratic Whip decline to support the Group's position in this case.

be obtained.  On October 4, 2017, the Committee issued subpoenas to Plaintiff's three co-founders – Glenn Simpson, Peter Fritsch, and Thomas Catan – as well as to the Defendant Bank for the purpose of obtaining information relevant and necessary to its investigation.  Declaration of Mark R. Stewart (Oct. 23, 2017) ("Stewart Declaration") ¶ 14.  On October 16, 2017, counsel for Plaintiff transmitted to the Committee a 17-page letter raising baseless challenges to the legitimacy of the Committee's investigation, objecting to the subpoenas, and invoking various meritless claims of privilege.  Stewart Decl. ¶ 16.  To date, more than two months after the Committee first requested Plaintiff's cooperation and assistance in the investigation, no documents have been produced to the Committee.  Stewart Decl. ¶ 21.

Further frustration of the Committee's investigation occurred on October 18, 2017, when two of Plaintiff's co-founders – Messrs. Fritsch and Catan – appeared before the Committee for compelled depositions.  During those depositions, each witness refused to answer any questions of substance – even basic questions about Fusion GPS's general business actives as well as its activity related to the 2016 election, *se*e Stewart Decl. ¶ 17 – instead opting to invoke "Constitutional" privileges under the First and Fifth Amendments.  Ironically, a number of the questions that Mr. Fritsch refused to answer as purportedly privileged, such as questions related to Fusion GPS business practices, *see* Fritsch Decl., ¶ 6, as well as specific questions regarding whether Fusion GPS was engaged to research and investigate presidential candidate Donald J. Trump, *see id.* at ¶ 9, and who they may have employed to conduct such research, *see id.*, have now been answered in Mr. Fritsch's declaration filed publicly with this Court only two days after Mr. Fritsch asserted under oath that providing such information would somehow infringe his right against self-incrimination and his right to free speech.  *See* ECF No. 2-2, Declaration of Peter Fritsch ("Fritsch Declaration").  Plaintiff's recalcitrance and bad-faith

misconduct simply confirm the Committee's inability to obtain meaningful information from Plaintiff and thus the necessity of obtaining the information that Defendant Bank stands ready and willing to provide.

Stripped of its histrionics, Plaintiff's blunderbuss attacks on the Committee Chairman, the Committee's investigation, and the Committee's rules and internal procedures lack merit. Plaintiff has provided no grounds sufficient to establish any likelihood of success on the merits, much less a substantial one.  The fact that Plaintiff does not approve of the Committee's investigation, the Chairman's role in issuing the subpoena, or the Committee's efforts to obtain relevant information does not create a legal rationale for this Court to grant the relief sought. Accordingly, Plaintiff's motion should be denied.

## BACKGROUND

### I.     The Committee's Russian Active Measures Campaign Investigation.

On March 1, 2017, in the exercise of the Committee's constitutional oversight role, Committee Chairman Devin Nunes and Ranking Member Adam Schiff publicly announced a jointly approved a Scope of Investigation relating to the "Russian active measures campaign targeting the 2016 election."  *See* Comm. Press Release, *Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation* (Mar. 1, 2017).[2]  The Committee's ongoing investigation seeks to answer the following questions:

- *What Russian cyber activity and other active measures were directed against the United States and its allies?*

- *Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?*

---

[2] *Available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

- *What was the U.S. Government's response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?*

- *What possible leaks of classified information took place related to the Intelligence Community Assessment of these matters?*

*Id.* As Committee Ranking Member Adam Schiff explained, "***We must follow the facts wherever they may lead, leaving no stone unturned***, and that must also include both the Russian hacking and dumping of documents as well as any potential collusion between Russia and U.S. citizens. ***This investigation is a national security necessity and anything less than a full accounting of all the facts will be insufficient to protect the country and meet the expectations of the American people***." *Id.* (emphasis added).  Chairman Nunes also promised the American people that "***we will fully investigate all the evidence we collect and follow that evidence wherever it leads***." *Id.* (emphasis added).

On April 6, 2017, Chairman Nunes announced that Representative Mike Conway, with assistance from Representatives Trey Gowdy and Tom Rooney, would lead the investigation, but that Chairman Nunes would "continue to fulfill all my other responsibilities as Committee Chairman."  Comm. Press Release, *Nunes Statement on Russia Investigation* (Apr. 6, 2017).[3] Pursuant to Committee Rules, one of those responsibilities is to issue and sign Committee subpoenas.  *See* Rule 10(a), (c) Rules of Procedure for the Permanent Select Committee on Intelligence of the U.S. House of Representatives (115th Cong.).

To provide the American people with a "full accounting of all the facts," and based in part on classified information obtained by the Committee, on October 4, 2017, the Chairman, pursuant to the request of Representative Conaway and in accordance with Rule 10 of the Committee's Rules of Procedure, issued the subpoena to the Bank that is the subject of this

---

[3] *Available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775.

litigation. *See* Decl. of Mark R. Stewart ¶¶ 14-15 (Oct. 23, 2017) ("Stewart Declaration").  The

subpoena sought financial records relating to one or more accounts at the Bank in Plaintiff's

name. *See* Subpoena (Oct. 4, 2017), attached as Ex. A to Levy Decl. (ECF No. 2-3).  As

explained below, the subpoena was issued after Plaintiff failed to cooperate with the

Committee's investigation and in order to obtain information that is plainly relevant to the

investigation.

**II.     The Committee's Interest In Plaintiff's Activity.**

Plaintiff is a DC-based firm that "provides premium research, strategic intelligence, and

due diligence services to corporations, law firms, and investors worldwide."  *See*

http://www.fusiongps.com/.  Plaintiff firm was founded by former *Wall Street Journal* reporters

Glenn Simpson, Peter Fritsch, and Thomas Catan.  *See, e.g.*, Fritsch Decl., ¶¶ 3-5.  Public reports

reveal that Plaintiff has allegedly been involved in lobbying against the Global Magnitsky

Human Rights Accountability Act (which allows the Executive Branch to impose travel

restrictions and sanctions on foreign persons responsible for human rights violations); providing

litigation support in the Magnitsky-related *Prevezon Holdings* money laundering case; and

receiving compensation from the Russian government.  *See* Stewart Decl. ¶ 8; *see also* Senator

Chuck Grassley, Press Release, *Checking the Facts: There Is Evidence Fusion GPS Was Paid by*

*Russia While Compiling Trump Dossier* (Aug. 17, 2017);[4]  Senator Chuck Grassley, Press

Release, *Complaint: Firm behind Dossier & Former Russian Intel Officer Joined Lobbying*

*Effort to Kill Pro-Whistleblower Sanctions for Kremlin* (Mar. 31, 2017).[5]

---

[4] *Available at* https://www.grassley.senate.gov/news/news-releases/checking-facts-there-evidence-fusion-gps-was-paid-russia-while-compiling-trump.

[5] *Available at* https://www.grassley.senate.gov/news/news-releases/complaint-firm-behind-dossier-former-russian-intel-officer-joined-lobbying-effort.

As publically reported, Plaintiff was commissioned by an unknown third party in Fall 2015 to conduct political opposition research on then presidential candidate Donald Trump.  *See* Stewart Decl. ¶ 5.  In Spring 2016, that third party allegedly withdrew from or terminated its contract with Plaintiff.  *See* Stewart Decl. ¶ 5.  However, publicly available information indicates that a separate client took over or initiated a contract with Plaintiff for opposition research on then-candidate Donald Trump.  *See* Stewart Decl. ¶ 5

Based on public reporting, as part of that second contract, Plaintiff commissioned former British intelligence officer Christopher Steele to conduct a private investigation on Trump.  *See* Stewart Decl. ¶¶ 4, 6.  That work yielded a series of reports, compiled in a 35-page private intelligence "dossier" that made unverified allegations of misconduct pertaining to Trump's relationship with Russian individuals and to alleged "collusion" between the Trump campaign and representatives of the Russian Government during the 2016 presidential election ("Trump Dossier").  *See* Stewart Decl. ¶¶ 4, 6.

The public record further indicates that Mr. Steele was paid an undisclosed sum of money for previous work performed on behalf of the Federal Bureau of Investigation ("FBI"), Stewart Decl. ¶ 7, and that information contained in the "Trump Dossier" had been provided to the FBI by late 2016.  *See* Stewart Decl. ¶¶ 4-6, 9.  Importantly, for purposes of the Committee's present investigation, public reporting reveals that other elements of the Intelligence Community also became aware of the "Trump Dossier" contents, and providing briefings regarding the "Trump Dossier" to both President Obama and then President-elect Trump in early January 2017.  *See* Stewart Decl. ¶ 9.  A version of the "Trump Dossier" was published by *BuzzFeed News* on

January 10, 2017. *See* Stewart Decl. ¶ 4; Ken Bensinger, et al, *These Reports Allege Trump Has Deep Ties to Russia* (Jan. 10, 2017).[6]

As part of its inquiry into the Russian active measures targeting the 2016 U.S. election, the Committee seeks to understand all facets of the "Trump Dossier" which include: *Who paid for it? Who received it? What steps were taken to corroborate the information contained therein? Did the FBI rely on the "Trump Dossier" as part of its counterintelligence investigation that was initiated in July 2016, as publicly announced by former FBI Director James Comey on March 20, 2017? See* Stewart Decl. ¶ 9, 10. The key to answering many of these questions lies with information in the possession of Plaintiff, as well as records of one or more Fusion accounts at Defendant Bank. *See* Stewart Decl. ¶ 11.

In addition, the Committee has obtained information suggesting that at least three Russian individuals with ties to Plaintiff also were present at the meeting with Donald Trump, Jr., at Trump Tower on June 9, 2016. *See* Stewart Decl. ¶ 8. Based on this information, the Committee's investigation seeks to investigate the extent of those ties and the potential relationship to the Russian active measures campaign. *See* Stewart Decl. ¶ 8.

The records sought by the subpoena will allow the Committee to fully understand and perhaps conclusively determine not only who paid for the "Trump Dossier" but also reveal the amount of funds that Plaintiff paid to Mr. Steele for the performance of his work, as well as determine whether Plaintiff engaged in other Russia-related work within the scope of the Committee's pending investigation. *See* Stewart Decl. ¶ 11. Additionally, information sought by the subpoena will assist the Committee in determining whether the FBI relied on the "Trump Dossier" as part of its counterintelligence investigation in July 2016. *See* Stewart Decl. ¶ 9.

---

[6] *Available at* https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia.

7

Such information is crucial for the Committee to fully investigate not only the "Trump Dossier" and its relevance to the question of whether there was possible "collusion" between the Russian Government and the individuals associated with political campaigns or any other U.S. Persons, but also other aspects of the Committee's investigation. *See* Stewart Decl. ¶ 11.

To obtain the requisite information, on August 18, 2017, the Committee issued a letter signed by Representative K. Michael Conaway and Ranking Member Adam Schiff to counsel representing Messrs. Simpson, Fritsch, and Catan, requesting they provide relevant documents and materials that could reasonably lead to the discovery of facts within the Committee's investigation, and inviting them to appear voluntarily before the Committee for a transcribed interview. *See* Stewart Decl. ¶ 12, Ex. A (Aug. 18, 2017 Letter). The Committee engaged in numerous e-mail exchanges and telephone conversations, including hosting a meeting with Plaintiff's attorneys, Joshua Levy and Rachel Clattenberg, to understand their clients' concerns with complying with the terms of the Committee's letters. *See* Stewart Decl. ¶ 13. Unfortunately, those discussions reached an impasse. Mr. Levy informed the Committee that none of the three individuals would be willing to fully answer all questions likely posed by the Committee regarding Plaintiff's role in the creation of the "Trump Dossier" – or even appear for a voluntary interview without a written agreement preserving privileges and limiting the scope of questioning. *See* Stewart Decl. ¶ 13(b). Mr. Levy advised that his clients would likely invoke attorney-client, contractual and unspecific First Amendment "privileges" to avoid answering questions concerning the creation of the "Trump Dossier." *See* Stewart Decl. ¶ 13(b).

Accordingly, on October 4, 2017, the Chairman, pursuant to the request of Representative Conaway and in accordance with Rule 10 of the Committee's Rules of Procedure for the 115th Congress, issued subpoenas to Messrs. Simpson, Fritsch, and Catan ("Fusion GPS Subpoenas")

as well as a subpoena to Defendant Bank.  *See* Stewart Decl. ¶ 15.  In accordance with these rules, Representative Conaway, requested Chairman Nunes to issue the subpoenas, and notice was provided to the Ranking Member prior to their issuance. *See* Stewart Decl. ¶ 14. The Fusion GPS Subpoenas required Messrs. Catan and Fritsch to produce all responsive documents by October 11, 2017, and to appear for deposition on October 18, 2017.  *See* Stewart Decl. ¶ 14 (Mr. Simpson was required to produce documents by October 17, 2017 and appear on November 8, 2017.)  At the request of counsel for Plaintiff, the deadline for production by Messrs. Fritsch and Catan was extended to October 16, 2017. *See* Stewart Decl. ¶ 14(a).

As of the date of this filing, no documents have been produced to the Committee in response to the Fusion GPS Subpoenas.  *See* Stewart Decl. ¶ 21.  Instead, on October 16, 2017, counsel for Fusion GPS transmitted to the Committee (and promptly to the press) a 17-page letter to the Committee attacking the legitimacy of the subpoenas and invoking various Constitutional and procedural privileges.  *See* Stewart Decl. ¶ 16 & Ex. B (Oct. 16 Letter).  On October 18, 2017, Messrs. Catan and Fritsch, accompanied by counsel Mr. Levy, appeared before the Committee for deposition.  *See* Stewart Decl. ¶ 17.  During that deposition, both deponents refused to answer any questions, purportedly on the basis of generalized "Constitutional" privileges.  *See* Stewart Decl. ¶ 17. As such, the Committee was unable to obtain any information in furtherance of its investigation.

## III.    The Committee's Subpoena To Defendant Bank.

After several weeks of back-and-forth with counsel for Fusion GPS revealed that Fusion GPS would not cooperate with the Committee's inquiry, the Committee sought records from Defendant Bank relating to Fusion GPS.  The Chairman, pursuant to the request of Representative Conaway and in accordance with Rule 10 of the Committee's Rules of Procedure

for the 115th Congress, issued a subpoena to Defendant Bank on October 5, 2017 ("Bank

Subpoena"). *See* Stewart Decl. ¶ 14; Levy Decl. Ex. A. At the Bank's request, its deadline for

production was extended from October 13, 2017 to October 23, 2017. *See* Stewart Decl. Ex. C

at 1 (Oct. 18, 2017 Letter). Defendant Bank, through counsel, in a letter dated October 18, 2017,

initially lodged a number of objections to the Bank Subpoena, several of which parroted

objections previously made by Mr. Levy on behalf of Fusion GPS. *See* Stewart Decl. Ex. C at 1

(Oct. 18, 2017 Letter). On October 19, 2017, after Committee Senior Counsel Kashyap P. Patel

informed Defendant Bank that all of its procedural and substantive objections had been rejected,

Defendant Bank agreed to comply with the Bank Subpoena and to produce all responsive

documents by 9 A.M. on October 23, 2017. *See* Stewart Decl. ¶ 18. Defendant Bank has

represented to the Committee that the identification and preparation of responsive records is

complete, and in the possession of counsel awaiting production to the Committee. *See* Stewart

Decl. ¶ 18(c).

On October 19, 2017, after the close of business, counsel for Fusion GPS contacted

Committee staff and indicated that absent some resolution of the Bank Subpoena they intended

to seek relief in federal court. *See* Stewart Decl. ¶ 19. Despite the late hour, Committee staff

communicated with counsel and, after considering the requests made, declined to extend

Defendant Bank's deadline for compliance with the Subpoena in light of Defendant Bank's

representation that the responsive records were ready for production. *See* Stewart Decl. ¶ 19(a)

& (b). On the afternoon of Friday, October 20, 2017, less than a full business day before the

subpoena deadline and at least 8 days after it appears that counsel for Fusion GPS became aware

of the Bank Subpoena, counsel for Fusion GPS notified the Committee that it had filed the

instant action challenging the validity of the Bank Subpoena. *See* Stewart Decl. ¶ 19(d). A

telephonic hearing with the Court and all interested parties was held at 5 p.m. the same

afternoon.  *See* Minute Entry (Oct. 20. 2017).  The Court took the matter under advisement and

on the evening of October 20, 2017, issued an order directing the Committee to file a motion to

intervene by Noon on Saturday, October 21, 2017.  *See* Minute Order (Oct. 20, 2017).

In accordance with the Court's Order, the Committee filed its Motion to Intervene on

October 20, 2017.  *See* ECF No. 7.  The Committee's Motion informed the Court that Defendant

Bank had been granted until Wednesday, October 25, 2017 at 9 a.m. to comply with the

subpoena and requested that it be granted until Monday, October 23, 2017, at 6 p.m. to file its

response in opposition to Plaintiff's Motion.  *See id.* at 1 n.1.  The Court granted both the

Committee's Motion to Intervene and an extension of time to file.  *See* Minute Entry (Oct. 21,

2017).

## ARGUMENT

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief," *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  To

demonstrate entitlement to a preliminary injunction, a litigant must show "(1) a substantial

likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is

not granted, (3) that an injunction would not substantially injure other interested parties, and (4)

that the public interest would be furthered by the injunction."  *CityFed Fin. Corp. v. Office of

Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995).  "'When seeking a preliminary injunction,

the movant has the burden to show that all four factors, taken together, weigh in favor of the

injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).[7]

## I.    PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.  The Constitution Confers Broad Investigatory Powers on Congress.

Congress's "power to secure needed information by such means [i.e., compulsory process] has long been treated as an attribute of the power to legislate … [and] is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 161, 174 (1927); *see also, e.g.*, *Eastland*, 421 U.S. at 504 n.15 ("[T]he scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.") (citation and quotation marks omitted); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate[.]").

As a corollary to Congress's constitutionally-based oversight and investigative authority, the Supreme Court has made clear that the "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate." *Eastland*, 421 U.S. at 504 (citation omitted).  As the Court explained:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess

---

[7] The D.C. Circuit has traditionally evaluated the four injunction factors on a sliding scale, but a number of Circuit Judges have correctly read the Supreme Court's decision in *Winter* "at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)).  The Committee submits that in light of *Winter*, the sliding-scale approach is no longer valid, and likelihood of success is an indispensable prerequisite to injunctive relief.

> it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.  All this was true before and when the Constitution was framed and adopted.  In that period the power of inquiry – with enforcing process – was regarded and employed as a necessary and appropriate attribute of the power to legislate – indeed, was treated as inhering in it.

*McGrain*, 273 U.S. at 175; *see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976), *Eastland*, 421 U.S. at 504-05.

Pursuant to the Constitution's Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, which provides that "[e]ach House [of Congress] may determine the Rules of its Proceedings," the House of Representatives has delegated extensive oversight and investigative authority to its committees, including the Permanent Select Committee on Intelligence.  *See* Rules of the House of Representatives ("House Rules"), Rule XI.1(b)(1) ("Each committee may conduct at any time such investigations and studies at it considers necessary or appropriate in the exercise of its responsibilities under rule X [providing for committees' jurisdiction].").[8]

As relevant here, the House has delegated to the Committee the authority to conduct oversight regarding "the activities of the intelligence community," and jurisdiction over all legislative matters pertaining to the federal government's "[i]ntelligence and intelligence-related activities."  House Rules X.3(m), X.11(b)(1).  To carry out these responsibilities, the Committee is empowered to issue subpoenas for testimony and documents.  *See* House Rule XI.2(m)(1)(B); Rules of the Permanent Select Comm. on Intelligence ("Committee Rules"), Rule 10(b).[9]

---

[8] *Available at* https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf.

[9] *Available at* https://intelligence.house.gov/uploadedfiles/hpsci_rules_of_procedure_-_115th_congress.pdf.

Consequently, the role of this Court in reviewing the Committee's investigation is narrow and limited. "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132 (citation omitted). Unlike in disputes regarding civil discovery, where "a rational legislative purpose is present for investigating a particular person, organization, or institution[,] [t]here is no requirement that every piece of information gathered in such an investigation be justified before the judiciary." *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975), *aff'd in part, rev'd in part, and remanded by McSurely v. McClellan*, 553 F.2d 1277, 1280 (D.C. Cir. 1976) (en banc); *see also Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938) ("A legislative inquiry anticipates all possible cases which may arise thereunder and the evidence admissible must be responsive to the scope of the inquiry, which generally is very broad."); *Exxon Corp. v. FTC*, 589 F.2d 582, 593 (D.C. Cir. 1978) ("once a committee or subcommittee has in fact requested trade secret information, the separation of powers demands that the courts do little to interfere with how the Congress deals with this information"). The Supreme Court has recognized that a congressional investigation may lead "up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509. As there can be no question regarding the significant public importance of the Committee's inquiry, it is not this Court's function to adjudicate the motivations of the Committee or second guess the Committee's reasonable determinations regarding the need for this information.

**B. All Committee and House Rules Were Followed With Respect to the Subpoena At Issue.**

Plaintiff asserts that Defendant Bank should be enjoined from compliance with the Committee's subpoena because "it fails to comply with [Committee] rules." Pl. Mem. 6. Plaintiff advances several theories to support its claim of non-compliance. Each is unavailing.

*First*, Plaintiff contends that the subpoena is defective because "it was signed by a Congressman with no authority to sign it …." Pl. Mem. 5. According to Plaintiff, Chairman Nunes has "recused himself from the [Committee's] investigation" and therefore lacks authority to sign subpoenas. *See id. Second*, Plaintiff asserts that the subpoena was not properly authorized by Representative Conaway or by a vote of the full Committee. *See* Pl. Mem. 6. *Finally*, Plaintiff complains that Committee Rule 10(e) was violated because the subpoena at issue "did not include a copy of the Committee's rules." Pl. Mem. 7.[10]

Plaintiff is incorrect about the law, the application of the Committee Rules, and the basic facts regarding Chairman Nunes' alleged "recusal." As an initial matter, it is well-established law in this Circuit that "[t]he presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citation omitted). In other words, this Court must presume that government officials, such as Members of Congress, will act properly in the conduct of their official duties. Accordingly, the Committee does not bear the burden of demonstrating that it adhered to its

---

[10] Plaintiff also includes a red herring regarding the House Ethics Committee's inquiry into actions by Representative Nunes. *See* Pl. Mem. 5, n.1. Even assuming everything Plaintiff intends the Court to infer about the nature of the Ethics Committee investigation is correct, it is irrelevant to the Chairman's power pursuant to House and Committee Rules. Simply put, there is no House Rule that divests Committee Chairmen of their power because of an investigation by the Ethics Committee, and Plaintiff cites to no authority to the contrary.

rules.  Rather, the burden rests with Plaintiff to clearly establish a violation of the Committee

Rules.  Plaintiff cannot satisfy this burden.

 To start, Plaintiff errs in claiming that Chairman Nunes is recused from this investigation.

On April 6, 2017, Chairman Nunes announced that Representative Mike Conaway, with

assistance from Representatives Trey Gowdy and Tom Rooney, would "temporarily take charge

of" the investigation, but that Chairman Nunes would "continue to fulfill all my other

responsibilities as Committee Chairman[.]"  Press Release, Permanent Select Comm. on

Intelligence, Nunes Statement on Russia Investigation (Apr. 6, 2017).[11]  He did not "recuse"

himself from the investigation.  Chairman Nunes' statement establishes only that, consistent with

Committee Rules, he designated other Committee members to "take charge" of the investigation.

*See* Comm. Rule 9(b) ("An authorized investigation may be conducted by members of the

Committee or Committee Staff designated by the Chair, in consultation with the Ranking

Minority Member….").  Nothing in his statement or elsewhere indicates that he was recusing

himself from any involvement in the investigation or relinquishing any of his other powers as the

Committee's Chairman.  To the contrary, Chairman Nunes' statement makes clear that he always

intended to maintain the full panoply of his other powers as Chairman.  And neither the

Committee, nor the House, has taken any action to transfer those powers from Chairman Nunes

to another Member of the Committee.

 Pursuant to Committee Rules, "[a]ll subpoenas shall be authorized by the Chair of the full

Committee …," Comm. Rule 10(a), and are to "be signed by the Chair," *id.* at Rule 10(c).  Thus,

issuance of subpoenas is one of the powers of the Committee Chair, and it is a power that

Chairman Nunes retains.  Plaintiff's assertions to the contrary have no basis in fact or law.

---

[11] *Available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775

Plaintiff also errs in contending (without any supporting evidence) that Representative Conaway did not request issuance of the subpoena. As Representative Conway confirmed to the press before this action was filed, he not only asked for the subpoenas, but also acknowledged that the "mechanics on that fit in with the [C]hairman's responsibilities." Evan Perez, Manu Raju, and Jeremy Herb, *Nunes Signs Off On New Subpoenas to Firm Behind Trump-Russia Dossier*, CNN (Oct. 10, 2017, 9:47 PM).[12] Stewart Decl. ¶ 15.

Given these facts, the Committee's subpoena is unquestionably valid. Chairman Nunes' authorization and signature were necessary prerequisites to issuance of the subpoena under the Committee's rules, and he did in fact authorize and sign the subpoena. Stewart Decl. ¶ 14.

Finally, the Committee's failure to initially attach a copy of its rules to the subpoena is an irrelevant technicality. Nothing in the Committee's Rules suggests that a subpoenas validity depends on adherence to this Rule and Plaintiff cites to nothing suggesting otherwise. It is also worth noting that on October 16, when this objection was initially raised, the Committee immediately provided Plaintiff a hyperlink to its rules,[13] which, as evidenced by Plaintiff's papers, it obviously has relied on. *See* Pl. Mem. 6-7. Plaintiff has not and cannot demonstrate any prejudice or other harm suffered by this technicality.

Accordingly, the Committee's rules provide no legal basis for this Court to conclude that either the Committee's investigation or the subpoena at issue is invalid, and no reason to issue an order preventing Defendant Bank from complying with a lawful congressional subpoena.

**C.  The Committee's Investigation Is Fully Authorized by House Resolution.**

---

[12]  *Available at* http://www.cnn.com/2017/10/10/politics/fusion-gps-subpoenas-devin-nunes/index.html

[13]  Similarly, on October 18 when this identical objection was raised by Defendant Bank, the Committee also provided Defendant Bank with a copy of its rules.

Plaintiff asserts that the issuance of the subpoena is without authority because "Mr. Nunes has acted alone, pursuant to no resolution."  Pl. Mem. 7.  In Plaintiff's view, "no formal public 'unambiguous resolution' authorizes this investigation" and thus "the subpoena is not part of a legitimate legislative activity."  *Id.* (citing *Eastland*, 421 U.S. at 506).

Plaintiff is mistaken, because the Committee's investigation falls well within the scope of the express authorization provided by House Resolution 5, which was approved by the full House on the opening day of the 115th Congress.  *See* 163 Cong. Rec. H7-H11 (daily ed. Jan. 3, 2017) (approving H. Res. 5 by vote of 228-184).  Among other things, House Resolution 5 adopted the Rules of the House for the 115th Congress, and those Rules contain an unambiguous authorization to the Committee empowering it to "review and study on a continuing basis laws, programs, and activities of the intelligence community[.]" Rule X.3(m).  In addition, House Rule X.11(b)(1) confers legislative jurisdiction on the Committee regarding:

> (A)  The Central Intelligence Agency, the Director of National Intelligence, and the National Intelligence Program as defined in section 3(6) of the National Security Act of 1947.
> (B)  Intelligence and intelligence-related activities of all other departments and agencies of the Government, including the tactical intelligence and intelligence-related activities of the Department of Defense.

House Rule X.11(b)(1)(A)-(B).[14]

The investigation falls squarely within this broad grant of oversight and legislative authority.  The Committee has information that Plaintiff was involved in interactions with Russian entities and individuals who are suspected of involvement in alleged efforts by Russia to

---

[14] The "National Intelligence Program" over which the Committee exercises jurisdiction "refers to all programs, projects, and activities of the intelligence community, as well as any other programs of the intelligence community designated jointly by the Director of National Intelligence and the head of a United States department or agency or by the President."  50 U.S.C. § 3003(6).  It encompasses "six Federal Departments, the Central Intelligence Agency, a and the Office of the Director of National Intelligence."  Office of the Dir. Of Nat'l Intelligence, https://www.dni.gov/files/documents/FY%202016%20NIP%20Fact%20Sheet.pdf

interfere in the 2016 election. Stewart Decl. ¶ 9. Moreover, it has been widely reported that Plaintiff was intimately involved in development and dissemination of the "Trump Dossier," which was (i) prepared by a former intelligence agent who had allegedly previously worked for the FBI, (ii) allegedly compiled in part on the basis of information gathered by or in the possession of Russian Intelligence, and (iii) allegedly provided by Plaintiff to the intelligence community. Stewart Decl. ¶¶ 6-9. Accordingly, the Committee is investigating Plaintiff's role in all of these activities, including but not limited to the genesis, creation, and use of the dossier. All of these matters unquestionably relate to "programs, and activities of the intelligence community" and the Committee therefore has House-conferred jurisdiction to investigate them. Moreover, the Committee's investigation of these matters will provide information to guide the Committee in its consideration of possible legislation aimed at addressing any perceived problems or threats that may be revealed by the investigation; consideration of such legislative efforts is also within the jurisdiction conferred on the Committee by House Resolution 5. Plaintiff's claim that the Committee lacks authority to investigate these matters is therefore patently without merit.

Plaintiff appears to take the position that *Eastland* stands for the proposition that every single congressional investigation must be authorized by a separate, stand-alone resolution directed solely to that investigation. The *Eastland* Court said nothing of the kind. Rather, the Court merely considered whether there existed a "grant of authority … sufficient to show that the investigation upon which the Subcommittee had embarked concerned a subject on which 'legislation could be had,'" and concluded that such a grant of authority did exist. *Eastland*, 421 U.S. at 506 (quoting *McGrain*, 273 U.S. at 177). The same is true here, by virtue of House Resolution 5, as well as the Committee Rules, which permit the Chair to initiate and determine

the scope of any investigations.  *See* Comm. Rule 9(a) ("The Committee shall conduct investigations only if approved by the Chair, in consultation with the Ranking Minority Member.").

Plaintiff's apparent belief that an investigation-specific resolution is required would invalidate the vast majority of congressional investigations, and has never been adopted by any court.  To the contrary, courts in this Circuit have repeatedly deemed congressional subpoenas to be enforceable in the absence of any such investigation-specific authorizing resolution.  *See, e.g.*, *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384 (D.C. Cir. 1976); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013); *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).  Plaintiff's arguments to the contrary cannot withstand scrutiny.

### D.  The Right to Financial Privacy Act ("RFPA") Does Not Apply to Congressional Subpoenas.

Plaintiff contends that the subpoena cannot be enforced against Defendant Bank because the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401 *et seq.*, "prohibits banks from releasing customer records to a Government authority" in these circumstances.  Pl. Mem. 8.  Plaintiff is simply incorrect.

As an initial matter, Plaintiff has no rights under RFPA.  The nondisclosure protections relied upon by Plaintiff apply only to the "financial records of any customer."  12 U.S.C. §3402.  The term "customer" means only a "person or authorized representative of that person," and "'person' means *an individual or a partnership of five or fewer individuals*."  12 U.S.C. § 3401(4) & (5) (emphasis added).  Plaintiff is a limited liability company under Delaware law, not a partnership or individual, and therefore Plaintiff lacks standing to assert any claims under RFPA.  *See Exchange Point LLC v. SEC*, 100 F. Supp. 2d 172, 176 (S.D.N.Y. 1999) (holding

that a Delaware LLC lacked standing under RFPA, because "the plain meaning of the statute simply cannot countenance the inclusion of a limited liability company in the term 'individual or partnership of five or fewer individuals'").

Additionally, contrary to Plaintiff's contentions, RFPA applies only to releases of customer records to a "government authority."  12 U.S.C. § 3402 ("[N]o *Government authority* may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution ….") (emphasis added).  RFPA specifically defines the term "government authority" to mean "any agency or department of the United States, or any officer, employee, or agent thereof."  12 U.S.C. § 3401(3).  Neither the House nor the Committee is an "agency or department of the United States" within the ordinary meaning of those statutory terms.

In *Hubbard v. United States*, 514 U.S. 695 (1995), the Supreme Court considered the meaning of the same statutory terms – "any department or agency of the United States" – in deciding whether 18 U.S.C. § 1001 was limited to the Executive Branch or also extended to the Judicial and Legislative Branches.  Overruling a prior decision that had deemed Congress to be a "department or agency," *id.* at 715, the Court concluded that, absent evidence of contrary Congressional intent, the terms "department or agency of the United States" refers only to executive branch entities.  *See id.* at 699-700.  As the Court explained, "while we have occasionally spoken of the three branches of our Government, including the Judiciary, as 'department[s],' that locution is not an ordinary one.  Far more common is the use of 'department' to refer to a component of the Executive Branch."  *Id*. at 699 (citation omitted).  And it is hornbook administrative law that the Congress (like the Judiciary) is generally not considered to be an "agency."  *See*, *e.g.*, 5 U.S.C. § 551(1)(A) & (B).

There is no evidence either in the text or legislative history of RFPA to indicate that the terms "agency or department of the United States," as used in section 3401(3), were intended by Congress to depart from their ordinary meaning.  On the contrary, the statutory context confirms that the ordinary meaning was intended.  RFPA expressly exempts administrative subpoenas, judicial subpoenas, and search warrants from its disclosure prohibition, 12 U.S.C. §§ 3405-3407, but makes no mention of Congressional subpoenas, which obviously it would have done if Congress had intended itself to be covered.

Furthermore, Congress expressly provided that "[n]othing in [RFPA] shall authorize the withholding of information by any officer or employee of a supervisory agency from a duly authorized committee or subcommittee of the Congress."  12 U.S.C. § 3412(d).  This provision further buttresses the conclusion that Congress did not intend for RFPA to inhibit its constitutional "power to secure needed information by" compulsory process, which "has long been treated as an attribute of the power to legislate … [and] is an essential and appropriate auxiliary to the legislative function."  *McGrain*, 273 U.S. at 161, 174.  Far more explicit language than is present in RFPA would be required to conclude that Congress chose to restrict its Article I powers in such a fashion.

Accordingly, RFPA erects no barrier to Defendant Bank's compliance with the Committee's subpoena.

### E.  The Gramm-Leach-Bliley Act Also Does Not Apply to Congressional Subpoenas.

Plaintiff is equally wrong in contending that the Gramm-Leach-Blilely Act, 15 U.S.C. §§ 6801 *et seq.* ("GLB Act") "prohibits Defendant Bank from 'disclos[ing] to a nonaffiliated third party any nonpublic personal information' unless the financial institution gives the customer notice and an opportunity to opt out."  Pl. Mem. 11 (quoting 15 U.S.C. § 6802(a)).  Plaintiff is

wrong.  In the first place, Plaintiff has no rights under Section 6802(a), because that provision

applies only the disclosure of "nonpublic personal information" of a "*consumer*[.]"  15 U.S.C.

§ 6802(a) (emphasis added).  The GLB Act defines "consumer" as "an individual who obtains,

from a financial institution, financial products or services which are to be used primarily for

personal, family, or household purposes" or "the legal representative of such an individual."  15

U.S.C. § 6809(9); *see also* 15 U.S.C. § 6809(4) (defining "nonpublic personal information" in

terms of "consumer" information).  Plaintiff is a limited liability company, not a "consumer,"

and therefore lacks standing to sue under the GLB Act.

In any event, Plaintiff's claims would fail on the merits even if the GLB Act were

applicable here, which it is not.  The GLB Act's prohibition is not absolute.  To the contrary, the

GLB Act contains several exceptions to its general rule of nondisclosure absent notice and

opportunity to opt out.  Of particular relevance here is the exception at 15 U.S.C. § 6802(e)(8),

which provides that the GLB Act does not apply when the financial institution must disclose

customer information "to comply with Federal, State, or local laws, rules, and other applicable

legal requirements; [or] to comply with a properly authorized civil, criminal, or regulatory

investigation or subpoena or summons by Federal, State, or local authorities . . . ." 15 U.S.C. §

6802(e)(8).  Plaintiff does not deny that this language is applicable to congressional committee

subpoenas; rather, Plaintiff argues that it does not apply here because the Committee's

"investigation and subpoena at issue here are not 'properly authorized.'"  Pl. Mem. 11.  Plaintiff

is wrong.

As demonstrated above, *see supra* Part I.A.-C, there is no legitimate ground for disputing

that the subpoena to Defendant Bank was "properly authorized" by the Committee.  Thus, a plain

reading of the GLB Act establishes that the section 6802(e)(8) exception is applicable.

Accordingly, the Act's nondisclosure provision has no application here, and neither the Bank nor the Committee was required to provide Plaintiff with notice or an opportunity to opt out.

While neither RFPA nor the GLB Act limit the power of Congress to obtain financial records pertinent to congressional investigations, Plaintiff can take comfort from the fact that "release of information to the Congress does not constitute 'public disclosure.'" *Exxon Corp.*, 589 F.2d at 589 (citation omitted).  To the contrary, the Committee's Rules provide that

> [e]xcept as otherwise provided by these rules and the Rules of the House of Representatives, members of the Committee and Committee Staff shall not at any time, either during that person's tenure as a member of the Committee or as Committee Staff, or anytime thereafter, discuss or disclose, or cause to be discussed or disclosed[,] . . . (B) Any information received by the Committee in executive session.

Comm. Rule 12(a)(1).  Documents produced in response to the Bank Subpoena will be treated as executive session materials, and accordingly are protected from public disclosure absent a vote of the full Committee.  Stewart Decl. ¶ 20.

### F.  Plaintiff's Objections on First Amendment Grounds Lack Merit.

Contrary to Plaintiff's apparent belief, the First Amendment does not provide blanket immunity from production of documents in response to an otherwise valid government subpoena; to conclude otherwise would render the government's subpoena power (whether judicial, executive, administrative, or legislative) meaningless.  Nor does the First Amendment shield information concerning the commercial transactions of a private for-profit company, particularly one that, like Plaintiff, is not actually engaged in protected associational activity.

The Committee has made no demand that infringes on Plaintiff's First Amendment rights.  The Committee's Bank Subpoena seeks a limited set of bank records from a third-party holder of those records relating to financial transactions of a private corporation engaged in a variety of commercial activity – not from a trade association, a campaign or political committee,

24

a labor union, a 501(c)(4) social welfare organization, a public interest organization, or even a private corporation with any discernible educational, cultural, religious, social or political goals, or any goals beyond maximizing the corporate owners' wealth.  The holder of the records, Defendant Bank, has already collected and prepared the records for production.  In all relevant respects, the Committee's subpoena is an unremarkable and routine third-party document request of a type that is commonplace and consistently complied with in civil discovery, administrative investigations, and grand jury proceedings.

What is remarkable, however, is Plaintiff's response to the Bank Subpoena.  Plaintiff raised a number of spurious objections, addressed *supra*, as well as a sweeping and fanciful constitutional claim – that production of financial records relating to a handful of accounts at a single bank would violate the First Amendment rights of Plaintiff and its customers by revealing the identity of Plaintiff's customers.

The identity of Plaintiff's customers is an issue of central importance to the Committee's Russia investigation, which is itself a matter of national urgency and compelling public interest. As the Committee has made clear, it is investigating whether "the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons."  *See* Committee Press Release, *Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation* (Mar. 1, 2017) ("Committee Press Release").[15]  Given Plaintiff's intimate connection with the subject matter of this investigation and public and classified information suggesting multiple interactions among Plaintiff, Russian entities and individuals, and members of the intelligence community on matters relating to the Russia investigation, Plaintiff's financial dealings with third parties are critical to the

---

[15] *Available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

Committee's ability to make that determination.   Plaintiff's claim that disclosure of its customers' identities would offend Plaintiff's and its customers' rights of free speech and association, Compl. ¶ 65, are baseless.

### 1.  Plaintiff Is Not an "Association" For Purposes of the First Amendment.

Plaintiff, a for-profit company incorporated under Delaware law, Compl. ¶ 6, seeks to cloak its financial records from all government scrutiny by claiming that its plainly commercial enterprise is, instead, an "association" under the First Amendment.  *See* Pl. Mem. 12-13.  Under Plaintiff's theory, its financial records will reveal a list of Plaintiff's customers, a customer list is akin to a membership list, and as such would identify customers that "associated with Plaintiff," Pl. Mem. 12, 13, in violation of the freedom of association enjoyed by Plaintiff and its customers.  Plaintiff's argument is too clever by half, and an insult to the efforts of true advocacy organizations.

As the Supreme Court held in *Nat'l Ass'n for the Advancement of Colored People v. State of Ala. ex rel. Patterson*, "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of . . . freedom of speech."  357 U.S. 449, 460 (1958).  Central to the Court's holding is that the right of association, for First Amendment purposes, has a different and more focused meaning than the generic term "association."  For First Amendment purposes, a protectable "association" is one made up of persons who are engaged in a "collective effort" "for the advancement of beliefs and ideas" that are shared among the association's members. *See id.* at 461.  This foundational aspect of associational standing is oft-repeated and well-understood:  "Associational standing is reserved for organizations that 'express the[] collective views and protect the[] collective interests' of their members." *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432

U.S. 333, 345 (1977)).  The doctrine "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986).

Unlike the associations at issue in *NAACP* and its progeny, the record and Plaintiff's public statements about its customers reveal the following:

- Plaintiff's corporate clients come from many different sectors, *see* Compl. ¶ 11 ("Plaintiff is a research firm that provides strategic intelligence and due diligence services to corporations, law firms, and investors worldwide.");

- Plaintiff seeks to advance its clients' interests, including "investment decisions" and the sound allocation of capital," rather than its own consistent policy goals, *see* Fritsch Decl., ¶ 6 ("Fusion GPS engages in research and investigation on behalf of its clients."); Compl. ¶ 11 (noting company's provision of "due diligence services"); "About Fusion" page, *archived at* https://web.archive.org/web/20110814073733/http://www.fusiongps.com:80/about.h tml;

- Plaintiff's activities span a wide range of topics and issues outside its vaguely-asserted "political activity" services, *see* Compl. ¶ 11 (noting the provision of "strategic intelligence and due diligence services to corporations, law firms, and investors worldwide"); "About Fusion" page, *archived at* https://web.archive.org/web/20110814073733/http://www.fusiongps.com:80/about.h tml ("[o]ur team has special depth in matters of financial fraud and complex due diligence");

- Plaintiff apparently does not seek employees with any particular political views, and identifies no associational goal in public job positions.  *See* Investigative Reporters & Editors, Job Posting for "Freelance Data Journalist" with an "entrepreneurial mindset" for Fusion GPS, "a premium research firm," *available at* https://www.ire.org/jobs/job/492/; and

- Significantly, the subset of Plaintiff's clients involved in political activity do not share common goals and, indeed, its clients' goals are mutually inconsistent and conflicting, *see* Fritsch Decl., ¶ 6 ("Our clients include private sector businesses and individuals, as well as political organizations and politicians *on both the left and the right*.") (emphasis added).

Far from "express[ing] the[] collective views and protect[ing] the[] collective interests" of a coherent group of like-minded individuals or entities, *Hunt*, 432 U.S. at 345, Plaintiff has no members, is not focused on advancing any consistent policy agenda on behalf of like-minded persons, and instead is merely a profit-maximizing hired gun, selling its investigative services to the highest bidder.  The nature of Plaintiff's for-profit business, and the lack of any discernible set of organizational, political, or social goals that are collectively shared with its widely disparate set of customers, forecloses its ability to claim a protected right of association with those customers.  *Cf. NAACP*, 357 U.S. at 452 (nonprofit membership corporation seeking "to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States"); *AFL-CIO v. FEC*, 333 F.3d 168, 171 (D.C. Cir. 2003) (labor union); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 503 (D.C. Cir. 2016) ("political committee that works for the election of federal officeholders"); *Citizens United v. FEC*, 558 U.S. 310, 324-25 (2010) (nonprofit corporation funded by donations and engaged in "express advocacy"); *see also id.*, Br. App., No. 08-205 at 5 ("Citizens United is a nonprofit membership corporation that has tax-exempt status under 26 U.S.C. § 501(c)(4) as an 'organization[ ] not organized for profit but operated exclusively for the promotion of social welfare.' . . . Through a combination of education, advocacy, and grass-roots programs, Citizens United seeks to promote the traditional American values of limited government, free enterprise, strong families, and national sovereignty and security."); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1163-64 (9th Cir. 2010) (proponents of a particular ballet measure to amend state constitution); *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 382-83 (1981) (committee organized to draft a candidate for President).

While the members of an "association" for purposes of the First Amendment need not share identical interests in all respects, there must be some discernible common thread or overarching goal of the association itself that aligns with its members' or contributors' collective views.  Plaintiff has identified no consistent set of shared policy goals with its customers that it hopes to vindicate.  Rather, Plaintiff simply sells its services to a widely disparate set of customers in order to maximize its own profits by advancing its *customers'* individual goals – whatever those goals may be, and even if those goals are entirely unrelated to, or even inconsistent with, the goals of other customers.  To be sure, Plaintiff does have one consistent goal:  its desire to be compensated for its work.  Profit, however, is not a protectable associational interest.  *See Fleck & Assocs.*, 471 F.3d at 1106.

### 2. Plaintiff Lacks Standing to Assert The Alleged First Amendment Rights of Its Customers.

Plaintiff seeks to vindicate the alleged First Amendment rights of its customers, *see* Compl. ¶¶ 64-69, Prayer for Relief (4), but it lacks standing to do so.  Where, as here, "the allegations in the complaint make clear that 'members' of [Plaintiff] are merely customers," and Plaintiff "does not allege that its customers in any way have come together to form an organization for their mutual aid and benefit," there is no associational standing.  *See Fleck & Assocs.*, 471 F.3d at 1106.  In addition, to adequately allege associational standing, Plaintiff must establish that "the interests [the suit] seeks to protect are germane to the organization's purpose." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996).  Where the "the purpose of the 'association' … is to turn a profit," there is no associational standing.  *Fleck & Associates*, 471 F.3d at 1106-07 (rejecting associational standing to challenge ordinance prohibiting live sex acts by an association who ran that type of

business because plaintiff merely had customers,  not members, and suit to allegedly vindicate "putative privacy interests of its customers" was not germane to plaintiff's purpose).

### 3. Plaintiff Has Not Engaged In Protected First Amendment Activities and, In Any Event, The Disclosure of its Financial Records Does Not Offend the First Amendment.

As the party seeking to prevent disclosure, Plaintiff is required to establish the applicability of any First Amendment privilege it asserted as a basis for Defendant Bank to withhold documents.  *See In re Subpoena Duces Tecum Issued to CFTC*, 439 F.3d 740, 750-51 (D.C. Cir. 2006) ("The basis of a privilege must be adequately established in the record through evidence sufficient to establish the privilege with reasonable certainty.") (internal punctuation and citations omitted).  Plaintiff's repeated assertion that it is an "organization engaged in political activity," *see* Pl. Mem. at 14; *see also* Compl. ¶ 11, Fritsch Decl., ¶ 14, does not compel the conclusion that its commercial "activity" is entitled to First Amendment protection.  Plaintiff states only that it has "some" clients that engage in political activity and that it assists those clients with research.  *See, e.g.*, Compl. ¶ 11.  Under Plaintiff's theory, any service provider to a political campaign could resist government inquiry into its business operations under the First Amendment.  This would be an absurd result, and this Court should reject Plaintiff's theory.  For example, in *FEC v. Automated Business Services*, 888 F. Supp. 539, 542 (S.D.N.Y. 1995), the court enforced an administrative subpoena to examine the records of vendors that provided services to a campaign committee, observing that

> [t]he notion that by doing business with vendors that are owned or operated by its political supporters, a campaign committee can shield those vendors from investigation by the F.E.C. is a baseless attempt to hamper the proper functioning of the F.E.C. …. [I]f respondents' argument were valid, then ultimately all campaigns could make themselves immune from federal election laws, by only doing business with their political supporters.

*Id.* at 543 (internal quotation marks omitted).  In reaching its conclusion, the court relied upon its earlier opinion rejecting an order to show cause seeking to stay compliance with a subpoena served on the campaign's bank:

> The mere vending of goods or services to a political association neither evinces support for that association, nor makes the vendor a member of that association. Thus, the First Amendment clearly affords no such protection to vendors of goods or services to political associations.

*Id.* at 542.

Plainly, the fact that Plaintiff's financial records will include the names of its "business associates" does not offend the First Amendment.  *See Holderbaum v. United States*, 589 F. Supp. 107, 112 (D. Colo. 1984) (refusing to quash an IRS summons for financial records; "the Court believes that an individual should not be insulated from tax liability or investigation into his tax liability merely because he … deals with members of a particular organization").  Producing records that reveal customer lists of a commercial enterprise does not offend the First Amendment because commercial transactions do not give rise to associational rights, even if the underlying subjects of the transactions are themselves protected speech. *United States v. Bell*, 414 F.3d 474, 485 (3d. Cir. 2005) (customer list of tax professional not protected); *IDK, Inc. v. Cnty. of Clark*, 836 F.2d 1185, 1193-95 (9th Cir. 1988) (escort/client relationship not protected by freedom of association); *In re Grand Jury Subpoena Duces Tecum Served Upon PHE, Inc.*, 790 F. Supp. 1310, 1317 (W.D. Ky. 1992) (commercial relationship between publisher and customers not protected "associational right" under First Amendment); *In re Grand Jury Subpoena Served Upon Crown Video Unlimited, Inc.*, 630 F. Supp. 614, 619 (E.D.N.C. 1986) ("the commercial relationship arising from the sale of videotapes by the

subpoenaed corporations to their customers is not protected by the First Amendment's freedom of association guarantee," even though videotapes themselves were protected form of speech).

Even where a clearly privileged relationship exists with a client, courts routinely refuse to shield the client's identity from disclosure. *See, e.g., In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir. 1983) ("The federal forum is unanimously in accord with the general rule that the identity of a client is, with limited exceptions, not within the protective ambit of the attorney-client privilege." (collecting cases)); *United States v. Ritchie*, 15 F.3d 592, 602 (6th Cir. 1994) ("[V]irtually every court to consider the issue has concluded that client identity and payment of fees is not privileged information."). Plaintiff's work for its clients is akin to freelance reporting (although not subject to normal journalistic ethics). In that regard, it is noteworthy that courts uniformly recognize that there is no First Amendment privilege that shields a journalist's sources from disclosure. *See, e.g., In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1146-47 (D.C. Cir. 2006); *In re Grand Jury Proceedings¸* 810 F.2d 580, 583 (6th Cir. 1987) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 689-91 (1992)). If bona fide reporters engaged in investigative journalism for leading news organizations have no First Amendment privilege to shield their sources from disclosure in response to a government investigation, *a fortiori* Plaintiff has no First Amendment right to shield its for-profit financial transactions from disclosure.

### 4.  Plaintiff Free Speech Rights are Not Impaired.

In addition to its baseless right-of-association claim, Plaintiff also appears to contend that compliance with the Bank Subpoena would somehow violate its free speech rights. Compl. ¶¶ 65, 68. To the extent Plaintiff complains that the compelled disclosure of financial records requires it to "provide more information … than [it] otherwise would," the D.C. Circuit analyzes such disclosure requirements "far less skeptically than … bans on speech." *Pursuing America's*

*Greatness v. FEC*, 831 F.3d 500, 507 (D.C. Cir. 2016).  As the Supreme Court held in *Citizens United*, permissible disclosure rules include "the name and address (or Web site address) of the person or group that funded [a televised electioneering] advertisement."  *Citizens United*, 558 U.S. at 366.  If the identity of persons funding core political speech is properly subject to public disclosure, as the Supreme Court has repeatedly held, there can be no possible First Amendment objection to disclosure to an investigative committee of Congress, under executive session confidentiality rules, of financial records regarding the activities of a private for-profit investigative firm.

### 5. Plaintiff Alleges No Relevant Harm Arising From the Disclosure of Its Financial Records.

Injunctive relief is not available based merely on conclusory assertions that "the exercise of first amendment rights is being 'chilled' by the mere existence, without more, of governmental investigative and data-gathering activity."  *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 347 (6th Cir. 1984) (quoting *Laird v. Tatum*, 408 U.S. 1, 10 (1972)).  In order to make out a claim of First Amendment injury, plaintiffs must present evidence of a "specific present objective harm" or a threat of "a specific future harm." *Ghandi*, 747 F.2d at 347 (quoting *Laird*, 408 U.S. at 14).  That is particularly true in the context of a challenge to a mere disclosure requirement, like that imposed by the Bank Subpoena.  "When facing a constitutional challenge to a disclosure requirement, courts … balance the burdens imposed on the individuals and associations against the significance of the government interest in disclosure and consider the degree to which the government has tailored the disclosure requirement to serve its interests." *AFL-CIO*, 333 F.3d at 176.

Plaintiff asserts a panoply of purported harms, but these assertions do not suffice, particularly in light of the fact that the Committee's Rules guard against the type of public

disclosure that Plaintiff fears. *See supra* at Part I.D; Comm. Rule 12(a)(1); House Rule IX.3(b) ("Under no circumstances may minutes or transcripts of executive sessions, or evidence of witnesses in respect thereto, be disclosed or copied" in response to a subpoena issued to a House Member, officer, or employee); House Rule XI.2(k)(7) ("Evidence . . . taken in executive session, and proceedings conducted in executive session, may be released or used in public sessions only when authorized by the committee, a majority being present); Stewart Decl. ¶ 20.

In *Dole v. Local Union 375 Plumbers Int'l Union,* for example, the Ninth Circuit rejected conclusory affidavits alleging union members' fear of reprisal if their identities were revealed in light of an agency policy that protected such information from disclosure. 921 F.2d 969, 974 (9th Cir. 1990). "The government will disseminate the information only on a 'need to know' basis. As a result, the Fund needed to establish that its members legitimately feared retribution by those few governmental employees who would have access to its records. No such showing has been made in this case." *Id.* (quoting *McLaughlin v. Serv. Emps. Union, AFL-CIO, Local 280*, 880 F.2d 170, 178 (9th Cir. 1989)).

Plaintiff's conclusory assertion that "Plaintiff and its clients would suffer significant intrusions into their rights to privacy, free association and free political speech as soon as these records are disclosed" is not sufficient. As an initial matter, there is no constitutional privacy right in bank records. *United States v. Miller*, 425 U.S. 435, 445-46 (1976). For the reasons explained above, there are also no free association and free speech rights implicated by disclosure of Plaintiff's financial records. Plaintiff's claims that there has been "a change in the way in which [it] has conducted its business," Pl. Mem. 17; Fritsch Decl., ¶ 17, and that political clients will be "less willing" to conduct "opposition research," Fritsch Decl., ¶ 15, are far too speculative and insubstantial to prevent the limited disclosure sought by the Committee. At

most, Plaintiff merely alleges a "generalized dread" of government intrusion, which does not rise

to the level of a First Amendment infringement. *See United States v. Norcutt,* 680 F.2d 54, 56

(8th Cir. 1982) (per curiam) ("generalized dread, undoubtedly shared by many taxpayers, of

investigation by the IRS" does not constitute First Amendment infringement); *Reporters Comm.*

*for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1058-59 (D.C. Cir. 1978) ( "The mere

prospect that [an] investigation may occur or, indeed, the actual conduct of such investigation

does not 'chill' or otherwise abridge First Amendment rights, even though it may give rise to

subjective inhibitions for those who desire to avoid the prospect of investigation altogether.").

Courts have routinely rejected arguments that compelled disclosure of information

regarding contributors, clients, and associates of organizations involved in political activities

implicate the First Amendment.  As the D.C. Circuit explained "[m]ore than fifty years ago, the

Supreme Court held that the public disclosure of 'who is being hired, who is putting up the

money, and how much' they are spending to influence legislation is 'a vital national interest.'"

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) (citing *United States v. Harriss*, 347

U.S. 612, 625–26, (1954)).  In *Taylor*, even though the trade association presented an

uncontested affidavit that provided that it "regularly lobbies on a variety of hot-button issues . . .

that may lead to adverse consequences for members identified as 'actively participa[ting]' in

such efforts," including "mob violence," "becoming litigation targets," "boycotts, shareholder

suits, demands for political contributions or support, and other forms of harassment," the court

concluded that the trade association "has tendered no 'record evidence of the sort proffered

in *NAACP v. Alabama*.'"  *Id.* at 22 (quoting *NAACP*, 424 U.S. at 71). The court found that the

risks the trade association claimed it would face if forced to disclose its members and lobbying

efforts "are no different from those suffered by any organization that employs or hires lobbyists

itself, and little different from those suffered by any individual who contributes to a candidate or political party." *Id.*

The same is true here. The Legislative Branch's interest in vindicating its constitutional oversight authority outweighs any hypothetical First Amendment rights that may be implicated. *Senate Perm. Subcomm. on Investigations v. Ferrer*, 199 F. Supp. 3d 125, 143 (D.D.C. 2016) (citations omitted) ("[e]ven if [Plaintiff's] activities . . . were entitled to greater scrutiny, the record shows that the subpoena's impact on [Plaintiff's] First Amendment freedoms is 'so slight' that the Subcommittee's interests must prevail."), *vacated as moot*, 856 F.3d 1080, 1089 (D.C. Cir. 2017); *cf. Sanders v. McClellan*, 463 F.2d 894, 900 (D.C. Cir. 1972) ("[A] legislative investigation may require some scrutiny of the exercise of what may be claimed to be a constitutionally protected freedom. We think to hold otherwise would unduly constrict Congress' investigatory powers."); *see also Branzburg v. Hayes*, 408 U.S. 665, 686 (1972) (explaining "prevailing constitutional view" that "First Amendment interest asserted by [a journalist] was outweighed by the general obligation of a citizen to appear before a grand jury or at trial, pursuant to a subpoena, and give what information he possesses"); *Kerr v. United States,* 801 F.2d 1162, 1164 (9th Cir. 1986) (enforcing an IRS summons even though it required producing names of organization's members); *St. German of Alaska Eastern Orthodox Catholic Church v. United States,* 840 F.2d 1087, 1093-94 (2d Cir. 1988) (enforcing summons that sought "disclosure of contributors' names" because the "compelling governmental interest" in "enforcement of the tax laws" outweighed associational rights of organizations' members); *United States v. Judicial Watch, Inc.,* 266 F. Supp. 2d 1, 20 (D.D.C. 2002) ("Courts have enforced IRS summonses that require churches to reveal their membership lists" (citing cases), *aff'd*, 371 F.3d 824 (D.C. Cir. 2004)).

The consequence of Plaintiff's blanket First Amendment argument would be that Congress cannot obtain any information, no matter how focused, regarding the activities of any business that provides research or consulting services and happens to have, for example, political organizations, political candidates, or trade associations among its clients.  Yet all businesses have clients, and a business is not excused from responding to subpoenas for financial records merely because it, or its clients, may engage in protected activities.  *Cf. Associated Press v. NLRB.*, 301 U.S. 103, 132-33 (1937) ("The business of the Associated Press is not immune from regulation because it is an agency of the press.  The publisher of a newspaper has no special immunity from the application of general laws.").  Congressional oversight into campaign and political activities is common, and the notion that such oversight offends the First Amendment is a novel proposition indeed.  *See* H. Rep. No. 105-829, *Investigation of Political Fundraising Improprieties and Possible Violations of Law, Interim Report* (105th Cong.) ("In the closing months of the 1996 campaign, a multitude of campaign finance violations involving foreign money being funneled into the political system came to light.  In the opening days of the 105th Congress, the House Committee on Government Reform and Oversight as well as the Senate Governmental Affairs Committee were tasked with investigating potential campaign law violations.").[16]

## II.   PLAINTIFF HAS FAILED TO ESTABLISH A LIKELIHOOD OF IRREPARABLE INJURY.

Plaintiff offers only conclusory and unsubstantiated speculation in an effort to meet its heavy burden of establishing that irreparable injury is likely in the absence of injunctive relief.  Plaintiff's failure to satisfy the irreparable injury requirement is a separate and independent ground requiring denial of its motion, even leaving aside its inability to satisfy the other three

---

[16] Available at https://www.congress.gov/congressional-report/105th-congress/house-report/829/1)).

requirements for injunctive relief.  As the Supreme Court has emphasized, regardless of a

plaintiff's showing with respect to the other factors, "[o]ur frequently reiterated standard requires

plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence

of an injunction."  *Winter*, 555 U.S. at 22 (emphasis omitted) (citations omitted); *see also*

*Abdullah*, 753 F.3d at 197 ("'When seeking a preliminary injunction, the movant has the burden

to show that all four factors, taken together, weigh in favor of the injunction.'") (citation

omitted).

      The D.C. Circuit has consistently "set a high standard for irreparable injury."  *Chaplaincy*

*of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  In particular, "the

injury 'must be both certain and great; it must be actual and not theoretical.'"  *Id*. (quoting *Wis.*

*Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  The court has also

emphasized "the further requirement that the movant substantiate the claim that irreparable

injury is 'likely' to occur.  *Bare allegations of what is likely to occur are of no value* since the

court must decide whether the harm will *in fact* occur.  *The movant must provide proof that the*

*harm has occurred in the past and is likely to occur again, or proof indicating that the harm is*

*certain to occur in the near future*."  *Wis. Gas*, 758 F.2d at 674 (first and third emphases added).

      Plaintiff falls far short of meeting this demanding burden.  Its principal claimed injury is

the conclusory assertion that "[t]he loss of statutory protection for financial privacy would

irreparably harm Plaintiff" and "[t]he threat to Plaintiff's rights under these statutes is

imminent."  Pl. Mem. 16.  As explained in Part I.D, E *supra*, Plaintiff's statutory claims are

meritless, because the statutes at issue do not apply to congressional subpoenas.  Moreover, even

if that were not the case – and it plainly is – mere assertions that a plaintiff's statutory rights

would be violated absent an injunction go only to the question of likelihood of success, and do

nothing to satisfy the separate and independent requirement that the movant must submit *evidence* establishing a demonstrable likelihood of actual irreparable injury. *Wis. Gas*, 758 F.2d at 674 ("*Bare allegations of what is likely to occur are of no value*…."). The Supreme Court in *Winter* expressly rejected the notion that "a strong likelihood of prevailing on the merits" lowers the burden of showing irreparable injury arising from statutory violations, 555 U.S. at 21, and Fusion has not even come close to showing a strong likelihood of success on its statutory claims.

Plaintiff next contends that its First Amendment claim establishes irreparable injury, relying on *Pursuing America's Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016). In that case, the court held that a content-based restraint on the plaintiff's ability to engage in political speech was probably unconstitutional because it was not a mere "disclosure requirement" but instead a "ban on speech." *Id.* at 507, 511. Accordingly, the court concluded that irreparable injury was likely because, absent relief, the plaintiff "cannot include candidate names in its website or social media page titles during this election cycle." *Id.* at 511.

*Pursuing America's Greatness* is of no help to Plaintiff. In the first place, Plaintiff has not established a likelihood of success on its First Amendment claim, so that fundamental predicate for this theory of irreparable injury is lacking. Even leaving aside that fatal flaw, the claim asserted by Plaintiff bears no relationship to the claim that the D.C. Circuit deemed sufficient to give rise to irreparable injury in *Pursuing America's Greatness*. Far from a "ban on speech," the Bank Subpoena imposes no restraint whatsoever on Plaintiff's ability to speak to whomever it chooses, in whatever manner and through whatever means it desires, on whatever subject it wishes. The subpoena is instead (at most) a mere "disclosure requirement" (and a limited one at that, since the disclosure is limited to the Committee and its staff). Accordingly, it does not implicate the concerns about bans on political speech that justified the finding of

irreparable injury in *Pursuing America's Greatness*.  As the D.C. Circuit explained in that case,

"[w]e view disclosure rules far less skeptically than we do bans on speech."  831 F.3d at 507.[17]

Plaintiff also points to *National Treasury Employees Union v. United States*, 927 F.2d 1253

(D.C. Cir. 1991) (Thomas, J.) (*NTEU*), but that case merely confirms Plaintiff's inability to

establish irreparable injury.  The *NTEU* plaintiffs challenged a ban on honoraria for government

employees on the ground that it violated "their First Amendment rights to make appearances,

deliver speeches, and write articles for compensation."  *Id.* at 1253.  Without questioning the

plaintiffs' likelihood of success on the merits, the D.C. Circuit held that they were not entitled to

preliminary injunctive relief because they could not establish irreparable injury.  *Id.* at 1256.  The

alleged First Amendment violation (regardless of merit) was insufficient to constitute irreparable

injury, because "[n]othing in the record convinces us that the [plaintiffs] will cease speaking or

writing" in the absence of relief.  *Id.* at 1255.

Precisely the same is true here.  Plaintiff asserts in conclusory fashion that production of

its financial records to the Committee "would chill Plaintiff's and its clients' rights to oppose

political candidates, express their political views on candidates for office, and to persuade others

of their points of view about political candidates," Pl. Mem. 17, but offers no concrete evidence

to substantiate those boilerplate assertions.  The proffered self-serving declaration of Plaintiff's

employee Peter Fritsch cannot fill that gap, because it is equally conclusory and speculative.  The

---

[17] The other cases cited by Plaintiff in its attempt to establish irreparable injury did not even involve the First Amendment, and irreparable injury was found on the basis of actual evidence (rather than conclusory and speculative allegations like those advanced by Plaintiff here).  *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (irreparable injury to organization's voter-registration activities found based on evidence establishing that "the number of voters successfully registered at League drives plummeted" once challenged restriction took effect); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (implementation of police checkpoint program caused irreparable injury because it directly interfered with plaintiffs' ability "to drive upon the public streets of the District of Columbia").

D.C. Circuit has squarely held that "[b]are allegations of what is likely to occur are of no value," *Wis. Gas*, 758 F.2d at 674, but Plaintiff offers nothing more.  Plaintiff has thus failed to meet its burden of "provid[ing] proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.*[18]  And that is hardly surprising, because even entities that are much more closely linked to protected First Amendment activity than is Plaintiff – such as political campaign committees, media entities, and the like – routinely produce financial records in response to government investigations. Even if Plaintiff had offered actual evidence – as opposed to conclusory assertions – of likely harm from public disclosure of the identity of its clients, moreover, it still could not establish irreparable injury.  The speculative fears of hypothetical adverse consequences cited by Plaintiff rest on the assumption that all of Plaintiff's clients will become publicly known if the Bank complies with the Bank Subpoena.  But Plaintiff offers no evidence to substantiate that assumption, and binding Circuit precedent precludes this Court from accepting it:  "We have heretofore held that release of information to the Congress does not constitute 'public disclosure.' ….  The courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon Corp.*, 589 F.2d at 589; *see*, *e.g.*, *FTC v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980); *Ashland Oil Co., Inc. v. FTC*, 548 F.2d 977, 979 (D.C. Cir. 1976) (per curiam); *see also Murphy v. Dep't of Army*, 613 F.2d 1151, 1155, 1155-56 (D.C. Cir. 1979) (rejecting assertion that "disclosure of information to Congress is disclosure to the whole world").  Plaintiff's

---

[18] *See also*, *e.g.*, *Brown v. District of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012) (plaintiff's speculative contentions that "denial of tenure 'has and will continue to tarnish [her] professional reputation,' [and] that 'most other law schools would view denial of tenure as a negative statement regarding [her] qualifications," were insufficient to establish irreparable injury to reputation, absent "evidence . . . that demonstrates, for example, that other law schools have refused or would refuse to hire her due to defendants' denial of tenure").

concerns are particularly misplaced in the context of this investigation, because as explained

above, *supra* at Part I.E, any records produced by the Bank will be treated as executive session

material subject to strict confidentiality provisions under the Committee's Rules.  Accordingly,

Plaintiff's speculative parade of horribles is both factually and legally insufficient to establish

irreparable injury.

Finally, Plaintiff's assertion that its clients will suffer irreparable injury fails for all of the

same reasons, and also for the additional reason that Plaintiff lacks standing to assert the rights of

third parties.  *See* Part I.F.2, *supra*.  Accordingly, Plaintiff has failed to meet its burden of

proving that irreparable injury is likely in the absence of injunctive relief.

## III.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF THE COMMITTEE.

The balance of the equities clearly favors the Committee here.  Plaintiff has not proven

that it would suffer any injury if its bank produces financial records to the Committee in the

same manner that countless entities, including entities directly involved in protected speech

activities, routinely produce financial records in response to civil discovery subpoenas,

government administrative subpoenas or civil investigative demands, grand jury subpoenas, and

the like.  Nor has Plaintiff shown that its ability to speak, write, or advocate on anything it

wishes will be in any way restricted by the mere production of is banking records to the

Committee.

By contrast, the Committee's interest in prompt compliance with the Bank Subpoena is of

the highest order.  As the Supreme Court has held, Congress's "power of inquiry – with process

to enforce it – is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273

U.S. at 174.  "The power of inquiry" extends "over the whole range of the national interests

concerning which Congress might legislate…." *Barenblatt*, 360 U.S. at 111.  "A legislative

body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175.

Here, the Committee is investigating matters of immense national importance, and Plaintiff's actions and interactions with Russia-related individuals and entities and the intelligence community lie at the very heart of that investigation.  It is difficult to imagine a congressional investigation of greater importance, *see* Comm. Press Release ("This investigation is a national security necessity….") (Ranking Member Adam Schiff), yet Plaintiff's intransigence and refusal to cooperate have left the Committee with no practical choice but to seek necessary information from the Bank.  The Committee's interest in proceeding with its investigation is self-evident, and injunctive relief would directly hinder and frustrate that ongoing investigation.  The balance of the equities thus favors denial of Plaintiff's motion.

## IV.    THE PUBLIC INTEREST SUPPORTS ENFORCEMENT OF THE SUBPOENA.

For the same reasons, the public interest strongly supports denial of relief.  Plaintiff's contrary argument rests on the same flawed arguments rejected above, and ignores the clear and compelling public interest in the speedy and efficient conduct of the Committee's investigation. Even in the less pressing context of administrative investigations, which derive from statutory authority (whereas Congress's power of investigation is derived from the Constitution itself), the D.C. Circuit has "recognized a strong public interest in having" such "investigations proceed 'expeditiously and without impediment.'"  *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (quoting *FTC v. TRW, Inc.,* 628 F.2d 207, 210 (D.C. Cir.1980).  *A fortiori*, the public interest in expeditious and unimpeded

congressional investigations is compelling.  *Exxon Corp.*, 589 F.2d at 593 (there is a "clear

public interest in maximizing the effectiveness of the investigatory powers of Congress.  The

welfare of the public is a factor to be weighed in determining whether or not to issue an

injunction, and the investigatory power is one that the courts have long perceived as essential to

the successful discharge of the legislative responsibilities of Congress.") (citation omitted).  And

it is difficult to imagine a congressional investigation of greater national significance than this

one.  *See* Comm. Press Release ("[A]nything less than a full accounting of all the facts will be

insufficient to protect the country and meet the expectations of the American people.") (Ranking

Member Adam Schiff).  The public interest in permitting the Committee to proceed with its

investigation is self-evident, and compels rejection of Plaintiff's motion.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's request for a temporary injunction should be

denied and the case should be dismissed with prejudice.

Respectfully submitted,

*/s/ Thomas G. Hungar*
THOMAS G. HUNGAR
  *General Counsel*
TODD B. TATELMAN
  *Associate General Counsel*
KIMBERLY HAMM
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
Thomas.Hungar@mail.house.gov

*Counsel for the Permanent Select Committee*
*on Intelligence of the U.S. House of Representatives*

October 22, 2017

**CERTIFICATE OF SERVICE**

I certify that on October 22, 2017, I filed the foregoing document by the court's CM/ECF

system, which I understand caused it to be served on all registered parties.


*/s/ Thomas G. Hungar*
Thomas G. Hungar