## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BEAN LLC d/b/a FUSION GPS<br>      1700 Connecticut Ave., NW<br>      Suite 400<br>      Washington, DC 20009,<br><br>               Plaintiff,<br><br>    v.<br><br>DEFENDANT BANK,<br><br>               Defendant,<br><br><br>PERMANENT SELECT COMMITTEE ON<br>INTELLIGENCE OF THE U.S. HOUSE OF<br>REPRESENTATIVES,<br>               Intervenor. | Case No. 1:17-cv-02187-TSC |

### DECLARATION OF MARK R. STEWART

1. I currently am, and have been since February 2017, General Counsel for the House Permanent Select Committee on Intelligence ("Committee").  In this capacity, I provide legal oversight of Committee matters, including the Committee's investigation regarding the Russian active measures campaign targeting the 2016 U.S. election and the publicly announced parameters of that investigation.  The facts set forth in this Declaration are based upon my personal knowledge.

2. House Resolution 5, approved by the full House on January 3, 2017, and adopting the Rules of the House of Representatives for the 115th Congress, grants the Committee broad oversight over intelligence- and intelligence-related activities.

1

3.  In an exercise of its oversight jurisdiction, on March 1, 2017, the Committee publicly announced its Scope of Investigation regarding the Committee's investigation relative to the Russian active measures campaign targeting the 2016 U.S. election.   While a detailed, six-page Committee scoping document remains classified, the Committee announced key questions the investigation seeks to answer: *1) What Russian cyber activity and other active measures were directed against the United States and its allies?; 2) Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?; 3) What was the U.S. Government's response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?; and 4) What possible leaks of classified information took place related to the Intelligence Community Assessment of these matters?*

4.  Based on extensive media reporting and the Committee's own investigative efforts, the Committee formed a reasonable belief no later than March 17, 2017, that Fusion GPS and its founders Mr. Glenn Simpson, Mr. Peter Fritsch, and Mr. Thomas Catan ("Fusion GPS principals") may have relevant information responsive to the Committee's investigation. Specifically, the Committee learned of Fusion GPS' commissioning of former British intelligence officer Christopher Steele to compile the approximate 35-page "Trump Dossier."  A version of the "Trump Dossier" was published by *BuzzFeed News* on January 10, 2017.

5.  Through public reporting, the Committee learned that Fusion GPS was allegedly commissioned by one or more unnamed parties in Fall 2015 to conduct political opposition research on then presidential candidate Donald Trump; that this unnamed third party withdrew from its investigation contract with Fusion GPS during Spring 2016; and that additional

2

(unnamed) client(s) took over the contract and continued to pay for the opposition research on candidate Donald Trump.

6.  Based on public reporting, the Committee learned that, as part of that second contract, Fusion GPS retained the services of Mr. Steele as a subcontractor to conduct an investigation on then-candidate Donald Trump focusing on Trump's purported ties to Russia.  Public reports indicate that the resulting "Trump Dossier" was allegedly based in part on information gathered by or in the possession of Russian intelligence.

7.  The Committee also learned that, as reported publicly, Mr. Steele had been paid an undisclosed sum of money for previous work performed on behalf of the Federal Bureau of Investigation ("FBI") over many years, dating to at least 2010.

8.  The Committee also learned from media reporting that at least three of the individuals who attended a meeting with Donald Trump, Jr., at Trump Tower on June 9, 2016 – Soviet counterintelligence officer Rinat Akhmetshin, Russian lawyer Natalia Veselnitskaya, and Russian-born interpreter Anatoly Samochornov – also have ties to Fusion GPS dating to at least 2015.  The Committee seeks to investigate the extent of these ties and their potential relationship to the Russian active measures campaign, and the financial records requested in the subpoena will directly assist in that effort.  Fusion GPS has also reportedly been involved in lobbying against the Global Magnitsky Act, and has been accused of working on behalf of the Russian Government in an effort to fight U.S. sanctions.  Additionally, Fusion GPS has allegedly provided litigation support to Russian holding group *Prevezon* in a Magnitsky-related money-laundering case, a case in which – according to a Foreign Agent Registration Act complaint filed by Hermitage Capital Management on July 15, 2016 – the same three above referenced

individuals who were present at the June 9, 2016 Trump Tower meeting have also been involved.

Thus, the extent to which the banking records shed light on Fusion GPS's relationship with these

and any other individuals or entities with links to Russia has become a core focus of the

Committee's investigation.

9.   A copy of the "Trump Dossier" was reportedly provided to the FBI in 2016 and

briefed to President Obama and then President-elect Trump by elements of the intelligence

community in January 2017.  Thus the Committee seeks to determine whether the FBI—an

intelligence community component over which the Committee exercises oversight—relied on the

"Trump Dossier" or other information provided by Fusion GPS and/or reported longtime FBI

informant Christopher Steele as part of its counterintelligence investigation that was initiated in

July 2016—which was publicly announced by former FBI Director James Comey on March 20,

2017—or any other law enforcement or intelligence investigation.  Given that Fusion GPS was

hired to conducted political opposition research—beginning in 2015—related to the 2016

campaign that is the focus of the Committee's inquiry, access to Defendant Bank's records is

expected to reveal key facts regarding the relationships between and among Fusion GPS, its

clients and subcontractors, and the U.S. Government.

10.   As part of its inquiry, the Committee is also seeking to understand all facets of the

"Trump Dossier," including who received it, and what steps (if any) were taken—including by

U.S. Government agencies—to corroborate the information contained therein?

11.   The responsive records in the possession of Defendant Bank will also allow the

Committee to fully understand and conclusively determine who may have paid for the "Trump

Dossier" and the amount of funds that Fusion GPS paid to Mr. Steele for the performance of his

work, and will also further the Committee's investigation into the extent of Fusion GPS's

engagement in other Russia-related work and interactions with other Russia- and/or intelligence-

community-related entities and individuals within the scope of the Committee's investigation.

The answers to such questions are likely to be found in the possession of Fusion GPS and in the

records of one or more Fusion GPS accounts at Defendant Bank.  Access to bank records is

fundamental to understanding the extent and nature of key investigation-related links and

relationships.  Further, such information is necessary for the Committee to fully investigate the

"Trump Dossier" and its relevance to the question of whether there was possible "collusion"

between the Russian Government and individuals associated with political campaigns or any

other U.S. Persons in accordance with the public parameters of the Committee's investigation.

12.   On August 18, 2017, the Committee issued a letter signed by Representative K.

Michael Conaway and Ranking Member Adam Schiff to Joshua Levy, the counsel representing

the Fusion GPS principals.  A true and correct copy of the August 18, 2017, letter is attached

hereto as Exhibit A.  The letter requested that the Fusion GPS principals provide the Committee

with all relevant documents and materials that could reasonably lead to the discovery of facts

with the Committee's investigation, and invited them to appear voluntarily before the Committee

for a transcribed interview.

13.  Committee staff engaged in numerous e-mail exchanges and telephone conversations

with Mr. Levy in September and October 2017 as part of an effort to schedule the Fusion GPS

principals for an interview.

a. After Mr. Levy failed to propose interview date(s) despite numerous requests,

the Committee's Deputy General Counsel, Scott Glabe, sent Mr. Levy an e-mail on

September 29, 2017, indicating that the Committee would resort to compulsory process

unless Mr. Levy provided such dates by noon on October 2, 2017.

      b. In response, Mr. Levy requested a meeting. On October 3, 2017, the

Committee hosted a bipartisan meeting with Mr. Levy and his co-counsel, Rachel

Clattenberg, to discuss the Fusion GPS principals' concerns with complying with the

terms of the Committee's letter. During that meeting and consistent with a prior e-mail

sent to the Committee on October 2, 2017, Mr. Levy informed Committee staff that his

clients would be unable to fully answer all questions likely posed by the Committee

during a voluntary interview. Mr. Levy advised that his clients would likely invoke

various constitutional, common law, and contractual privileges in response to questions

from the Committee. Mr. Levy further indicated that his clients would also refuse to

appear for a voluntary interview absent a prior written agreement that limited the scope of

questioning and expressly preserved certain privileges. Mr. Levy was informed that such

a precondition would be inconsistent with Committee practice and the manner in which

all other prior voluntary interviews in this investigation had been conducted.

14. On October 4, 2017, Committee Chairman Devin Nunes issued subpoenas for

testimony and documents to each of the Fusion GPS principals. Additionally, a subpoena for

documents was successfully served on Defendant Bank on October 5, 2017.

      a. The subpoenas directed the Fusion GPS principals to produce responsive

documents—by October 17, 2017, in the case of Mr. Simpson and by October 11, 2017

in the case of Messrs. Fritsch and Catan (which deadline was subsequently extended to

October 16, 2017, at the request of Mr. Levy).

b. The subpoenas further directed the Fusion GPS principals to appear for

compelled testimony—on November 8, 2017, in the case of Mr. Simpson; and October

18, 2017, in the case of Messrs. Fritsch and Catan.

c. The subpoena to Defendant Bank required it to provide all documents sufficient

to identify Fusion GPS's banking transaction history, among other items, from August 1,

2015 to October 4, 2017, by October 13, 2017—which deadline was subsequently

extended to October 23, 2017, at the request of counsel for Defendant Bank Alexander

Bono.

15.   All four subpoenas were issued pursuant to Rule 10 of the *Rules of Procedure For*

*Permanent Select Committee on Intelligence, United States House of Representatives, 115th*

*Congress*.  Representative K. Michael Conaway requested that Chairman Nunes issue the

subpoenas, and notice of their pending issuance was provided to the Ranking Member via an e-

mail from me to the Minority General Counsel before the subpoenas were issued.  This

consultation e-mail further informed the Minority General Counsel, Maher Bitar, that copies of

the subpoenas were available for review in the office of the Committee's Chief Clerk.

16.   On October 16, 2017, Mr. Levy sent the Committee a 17-page letter which attacked

the legitimacy of the subpoenas issued to his clients and the jurisdiction of the Committee to

execute its constitutionally authorized oversight obligations.  A true and correct copy of the

October 16, 2017 letter is attached hereto as Exhibit B.  Mr. Levy, on behalf of his clients, again

invoked various constitutional, common-law, and common law privileges in this letter.

17.   On October 18, 2017, Mr. Catan and Mr. Fritsch, accompanied by Mr. Levy and Ms.

Clattenberg, each appeared before the Committee to give compelled testimony pursuant to their

respective subpoenas.

a. During their interviews, both Mr. Fritsch and Mr. Catan refused to answer any substantive questions, and each invoked constitutional privileges not to testify, including the First and Fifth Amendments.

b. On October 19, 2017, Mr. Fritsch executed a declaration in support of Fusion GPS' motion for Temporary Restraining Order and Preliminary Injunction.  This declaration included information that would have been responsive to questions posed to Mr. Fritsch during his appearance before the Committee.

18.  Defendant Bank, via its counsel Mr. Bono, indicated in a letter dated October 18, 2017, that it both objected to the Committee's subpoena pursuant to specific procedural and substantive objections, and requested an additional unspecified extension of the subpoena compliance deadline to work with the Committee to address the objections.  A true and correct copy of the October 18, 2017 letter is attached hereto as Exhibit C.

a. In an e-mail reply on October 19, 2017, Majority Senior Counsel Kash Patel, declined to grant a further extension and rebutted each of Defendant Bank's objections.

b. In an October 19, 2017 e-mail response, Mr. Bono informed the Committee that Defendant Bank intended to comply with the subpoena and produce all responsive documents by 9 A.M. on October 23, 2017.

c. Mr. Bono has since been repeatedly confirmed verbally and in writing that Defendant Bank desires to comply with the subpoena and has completed the production and preparation of responsive documents.

19.  On the evening of October 19, 2017, Mr. Levy sent an e-mail informing Committee

Majority staff that his client Fusion GPS had been informed by the Defendant Bank that it

intended to comply with the Committee subpoena and that Fusion GPS would "have no choice

but to seek judicial relief tomorrow morning."

      a. Mr. Levy's e-mail further requested a conference call on the evening of

October 19, 2017, to discuss "an effort to resolve the matter outside of court."  Majority

counsel consented to the call and discussed with Mr. Levy and his co-counsel William

Taylor for over 30 minutes a request to extend Defendant Bank's subpoena deadline in an

effort to continue discussions with Fusion GPS on how they may be able to voluntarily

provide certain financial records partially responsive to the Committee's subpoena.

      b. After due but expeditious consideration, the Committee declined the offer to

grant the Defendant Bank an extension.

      c. As requested, Mr. Levy and Mr. Taylor were informed of this decision, via e-

mail, later that evening.

      d. The next morning, October 20, 2017, Fusion GPS filed the instant action.

    20.  Rule 12 of the *Rules of Procedure For Permanent Select Committee on Intelligence,*

*United States House of Representatives, 115th Congress* prohibits the disclosure of "any

information received by the Committee in executive session," except as otherwise provided by

Committee Rules of the Rules of the House of Representatives.  Consistent with Committee and

House Rules, it is the Committee's standard and consistent practice to handle any documents

produced to the Committee pursuant to a subpoena as executive session material.  Accordingly,

any records produced by Defendant Bank in response to the subpoena would be treated as

executive session material—and protected from public disclosure absent a vote of the full

Committee during a Committee business meeting.

21. As of October 23, 2017, no documents have been produced to the Committee in response to either the Fusion GPS Subpoenas or the subpoena to Defendant Bank.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 23rd day of October 2017, in Washington, D.C.

MARK R. STEWART

10

# Exhibit A

Devin Nunes, California, CHAIRMAN

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
RANKING MEMBER

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, SPEAKER OF THE HOUSE
Nancy Pelosi, DEMOCRATIC LEADER

UNCLASSIFIED//COMMITTEE SENSITIVE

# U.S. HOUSE OF REPRESENTATIVES

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC–304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225–4121

DAMON NELSON
STAFF DIRECTOR

TIMOTHY S. BERGREEN
MINORITY STAFF DIRECTOR

August 18, 2017

## VIA CERTIFIED U.S. AND ELECTRONIC MAIL

Joshua A. Levy
Cunningham Levy Muse
1250 Connecticut Avenue, N.W.
Suite 200
Washington D.C. 20036

Dear Mr. Levy:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S. election, the House Permanent Select Committee on Intelligence requests that your clients, Fusion GPS and Glenn Simpson, Peter Fritsch, and Thomas Catan, preserve and produce certain documents and other materials to the Committee and participate in voluntary, transcribed interviews at the Committee's offices.

We respectfully ask that your clients produce to the Committee, by no later than the close of business on **September 1**, 2017, the following:

Any documents, records, electronically stored information including e-mail, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

Of particular interest to the Committee is the dossier compiled for your company by Mr. Christopher Steele. According to multiple press accounts, your company was paid by both Republican and Democratic interests to conduct opposition research on Donald Trump, including with respect to Mr. Trump's ties to Russia.[1]

In complying with this request, we ask that your clients furnish to the Committee, in unredacted form, any and all responsive material in your clients' actual or constructive possession, custody, or control or otherwise available to your clients, including responsive material possessed by any

---

[1] *See, e.g.,* Scott Shane, *What We Know and Don't Know About the Trump-Russia Dossier,* THE NEW YORK TIMES (Jan. 11, 2017).

UNCLASSIFIED//COMMITTEE SENSITIVE

third party to be transferred to your client's possession and shared with the Committee. This request is also made on an ongoing basis: if after making an initial production to the Committee your clients find additional responsive material, they should produce that material to the Committee.

Should it become necessary to do so, the Committee may supplement this document request contained in this letter at any time.

Committee staff will work with you to arrange your clients' interview(s). The interview(s) may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

2

# Exhibit B

# Cunningham|Levy|Muse

Cunningham Levy Muse LLP
1250 Connecticut Ave NW, Suite 200
Washington, DC  20036

T   (202) 261-6564
F   (202) 261-3508

cunninghamlevy.com

October 16, 2017

*via* Electronic Mail

Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
HVC-304, U.S. Capitol
Washington, DC  20003
c/o Kashyap P. Patel
Kash.Patel@mail.house.gov

> **Re:** ***Subpoenas – Thomas Catan, Peter Fritsch & Glenn Simpson of Fusion GPS***

Dear Chairman Nunes:

Through this letter, we timely respond to the subpoenas issued on October 4, 2017, bearing your signature and demanding documents and testimony from our clients Thomas Catan, Peter Fritsch and Glenn Simpson of Fusion GPS, purportedly as part of the House Permanent Select Committee on Intelligence's "Russia investigation."[1]

This letter will address our objections, on behalf of Messrs. Catan, Fritsch and Simpson, to the foregoing subpoenas for documents and testimony.  In the main, these objections go to the legitimacy of these subpoenas, your authority, the authority of the House Permanent Select Committee on Intelligence ("HPSCI" or "the Committee"), the ambiguity and pertinency of these subpoenas, and the scope of our clients' First Amendment rights.  Notwithstanding these objections, our clients, in good faith, immediately preserved documents.

---

[1] The subpoenas are attached to this letter at Exhibits A, B and C.

Cunningham|Levy|Muse

Despite your recusal from the Committee's Russia investigation after falling under scrutiny by the House Ethics Committee, your unilateral issuance of these subpoenas violates your recusal and further undermines the legitimacy of this investigation.  Nothing within the subpoenas or their attachments provides any indication that the Committee authorized you, as Chair, to sign or issue them.  This act is another example of how you, as Chair, have run your own operation in parallel to the Committee's investigation.  Indeed, in your haste to circumvent your own Committee's investigation, rules, process and Ranking Member, you and your staff sent us subpoenas directing "the Central Intelligence Agency" – with which our clients have no relationship – to produce documents.

The subpoenas include multiple other infirmities.  They are not issued pursuant to any publicly identifiable, formal and unambiguous resolution establishing this investigation.  Nor do the subpoenas attach any such formal resolution; rather, they attach what appears to be an excerpt from a press release.  That is an insufficient and legally improper substitute.  Of acute importance, these subpoenas, if indeed directed to our clients, violate the First Amendment rights of our clients and their clients, and would chill any American running for office – regardless of party affiliation, political viewpoint or candidate preference – from conducting confidential opposition research in an election.  No individual should be expected to respond to such an abuse of power.

Before you issued these subpoenas, we, in correspondence and in the single meeting permitted by your staff, had set forth and elaborated upon the privileges and legal obligations that our clients are required to maintain.  Notwithstanding these privileges and obligations, our clients could have provided information to this Committee, subject to certain assurances acceptable to every other congressional committee seeking the same information.  As this letter will set forth, prior to the issuance of these subpoenas, we worked in good faith to cooperate at each step and proposed a way forward that would balance the interest of the Committee to obtain information for its investigation with our need to protect those privileges and obligations.  But within 24 hours of making that proposal, you, acting as Chair – and without consulting the Ranking Member and without any further discussion of our proposal – issued these subpoenas.

The abrupt issuance of these subpoenas demonstrates your unwillingness to work in good faith with counsel in order to obtain information from our clients for this Committee's investigation.[2]  It is shameful and reflects a pattern of ultra vires behavior, whereby you have launched your own parallel

---

[2] See Evan Perez, Manu Raju & Jeremy Herb, "Nunes Signs off on New Subpoenas to Firm behind Trump-Russia Dossier," CNN, Oct. 10, 2017 ("A Democratic committee source said 'the subpoenas were issued unilaterally by the majority, without the minority's agreement and despite good faith engagement thus far by the witnesses on the potential terms for voluntary cooperation.'"), available at http://www.cnn.com/2017/10/10/politics/fusion-gps-subpoenas-devin-nunes/index.html.

Cunningham|Levy|Muse

investigation to the detriment of any serious attempt by this Committee to obtain information about whether the Russian government and its associates influenced the 2016 presidential election. For example, as has been widely reported, two of your staff members made an unscheduled visit to the London offices of Fusion GPS subcontractor Christopher Steele's solicitors -- at the precise time that Mr. Steele (a former British intelligence official) was there meeting with them.[3]

Based on this Committee's bad faith interactions with the undersigned counsel and its pattern of unprofessional conduct exhibited during different points throughout this investigation, you have left us with no choice but to advise our clients to assert their privileges in the face of these subpoenas.  By contrast, this has not been the result with other congressional committees investigating the same subject matter; for example, Fusion GPS co-founder Glenn Simpson testified for 10 hours before the Senate Judiciary Committee.  Now that you, and by extension, your staff, have proven to be unreliable partners in good faith negotiations, we cannot reasonably be expected to trust anything that you or your staff would represent to us. We cannot in good conscience do anything but advise our clients to stand on their constitutional privileges, the attorney work product doctrine and contractual obligations.[4]

In light of the assertion of privileges before this Committee by Messrs. Catan, Fritsch and Simpson, we ask that they be excused from appearing for testimony before this Committee on the dates demanded through the Chair's subpoenas.

I.    Procedural History

Since March 2017, our clients have been cooperating with congressional investigations of Russian interference during the 2016 presidential election.  In each of these investigations, we have worked in good faith with the other congressional committees investigating this matter, even as some of these

---

[3] Ali Watkins, "Hunt for Trump Dossier Author Inflames Russia Probe," POLITICO, Aug. 4, 2017, available at http://www.politico.com/story/2017/08/04/trump-steele-dossier-russia-241299.

[4] We note that the "Instructions," attached to the subpoenas, state that the U.S. House of Representatives and the Committee "do not recognize" common law privileges and contractual obligations.  *See, e.g.,* HPSCI Subpoena to Thomas Catan, Oct. 4, 2017, at 5 ¶ 11, attached at Exhibit C.  However, in order to preserve common law privileges for purposes of other proceedings, we are required by federal courts to protect those privileges here and not waive them.  See U.S. v. Philip Morris, 212 F.R.D. 421 (D.D.C. 2002) (holding that Philip Morris had waived the attorney-client privilege over documents by not making all reasonable efforts to protect the privilege before Congress and thus was compelled to produce the same otherwise privileged documents in litigation).  Likewise, without consent from our clients' contractual parties to disclose matters covered by confidentiality agreements, our clients are required to preserve that confidentiality.

Cunningham|Levy|Muse

other committees have pursued information from our clients in an aggressive and, at times, unfair manner.  Our clients' cooperation with these committees has been costly and burdensome to a small business and to its principals.  But our clients have nevertheless cooperated due to their recognition of Congress' right to information, as well as those other committees' acknowledgement of our clients' rights and privileges – a balance that you as Chair have refused to strike.  The following history of our clients' interaction with Congress demonstrates a clear record of cooperation and good faith, supported by our course of conduct working with your staff, prior to your abrupt ultra vires issuance of these subpoenas.

       A.     <u>Cooperation with the Senate Judiciary Committee</u>

On March 24, 2017, we received from Senate Judiciary Committee Chairman Charles Grassley a letter seeking information and documents from Mr. Simpson.[5]  A week later, without any notice to counsel and prior to any substantive conversations with counsel about the March 24 letter, Chairman Grassley publicly referred Mr. Simpson to the U.S. Department of Justice for criminal investigation regarding false allegations that he did not comply with the requirements of the Foreign Agents Registration Act, 22 U.S.C. § 611 et seq.[6]

On April 7, 2017, we sent a letter to Chairman Grassley and asserted constitutional and common law privileges.[7]  On June 23, 2017, we sent a follow-up letter elaborating on the privileges asserted.[8]  On July 19, 2017, Chairman Grassley and Ranking Member Dianne Feinstein sent Mr. Simpson a letter seeking an even broader set of documents as well as his testimony at a July 26, 2017, hearing.[9]  On behalf of Mr. Simpson, we agreed to respond to the document request on a rolling basis and presented him to the committee for a voluntary transcribed interview, subject to a broad, but limited scope, and written assurances from the Chair and Ranking Member that nothing he said at the interview would constitute a waiver of any privilege.  On August 3, 2017, the Senate Judiciary Committee Chair and Ranking Member sent us a letter, setting forth the terms of our agreement.[10]  On August 9, 2017, we produced thousands

---

[5] See Letter from Senator Charles E. Grassley to Glenn Simpson, March 24, 2017, available at https://www.judiciary.senate.gov/imo/media/doc/2017-03-24%20CEG%20to%20Fusion%20GPS%20(Trump%20Dossier).pdf.

[6] See Letter from Senator Charles E. Grassley to Hon. Dana Boente, Acting Deputy Attorney General, March 31, 2017, available at https://www.grassley.senate.gov/news/news-releases/complaint-firm-behind-dossier-former-russian-intel-officer-joined-lobbying-effort.

[7] See Letter from Joshua A. Levy to Senator Charles E. Grassley, April 7, 2017, attached at Exhibit D.

[8] See Letter from Joshua A. Levy to Senator Charles E. Grassley, June 23, 2017, attached at Exhibit E.

[9] See Letter from Senator Charles E. Grassley & Senator Dianne Feinstein to Glenn Simpson, July 19, 2017, available at https://www.judiciary.senate.gov/imo/media/doc/2017-07-19%20CEG%20DF%20to%20Glenn%20Simpson%20(Document%20Request).pdf.

[10] See Letter from Senator Charles E. Grassley & Senator Dianne Feinstein to Joshua Levy, August 3, 2017, available at Exhibit F.

of documents.  On August 11, 2017, Senate Judiciary Committee staff acknowledged that the documents were responsive, and, on August 17, 2017, we continued to respond to the Senate Judiciary Committee document request.  On August 22, 2017, Mr. Simpson sat for ten hours of questions and told the truth, at a voluntary transcribed interview before the Senate Judiciary Committee.[11] A transcript of that testimony has not been released by the Senate Judiciary Committee.

### B.      Cooperation with the Senate Select Committee on Intelligence

On July 14, 2017, the Chair and Ranking Member of the Senate Select Committee on Intelligence sent our clients a letter seeking voluntary cooperation.  Since that time, we have been cooperating with that committee to balance the interests of the committee in obtaining information for legislation and perfecting oversight with the need for our clients to protect privileges and meet other legal obligations.

### C.      Cooperation with the House Permanent Select Committee on Intelligence

On August 18, 2017, Rep. Conaway and the Ranking Member of this Committee sent a letter to counsel asking that Messrs. Catan, Fritsch and Simpson appear for voluntary interviews and produce documents.[12]  The letter, however, did not specify the information being sought.  Your staff and counsel agreed to discuss the letter in September.  On September 20, 2017, committee staff informed counsel of the Committee's interest in interviewing Messrs. Catan, Fritsch and Simpson; staff, however, did not seek documents.  Staff said the interviews would pertain to the scope of the Committee's investigation; however, the Committee had not yet provided counsel with that scope in writing, apologized for not having included it with the August 18 letter and said staff would send us the written scope of the investigation to us.  We told staff that, upon its receipt, we would review the document and discuss it with them further.  After the call, the Chair's staff sent counsel a one-page document setting forth the 'parameters' of the information being sought through the August 18, 2017, letter.  We understand this one-pager is an excerpt from a Committee press release.  It is not a formal committee resolution.  In any event, we intended to discuss the matter on the phone with staff.

Rather than entertain a phone call to discuss the matter further, majority staff, on September 26, 2017, sent counsel an email stating:  "Please let us know which of your clients have agreed to come in for an interview before our committee, the details of which we have outlined in previous telephonic

---

[11] See Tom LoBianco & Ted Barrett, "Russia Dossier Firm Founder Speaks With Senate Judiciary Investigators," CNN, Aug. 22, 2017, http://cnn.it/2in58Rf; Ali Dukakis et al., "Attorney: Glenn Simpson Did Not Reveal Clients For Trump 'Dossier' To Investigators," ABC NEWS, Aug. 22, 2017, http://abcn.ws/2w1dz7T.

[12] See letter from Rep. K. Michael Conaway & Rep. Adam Schiff to Joshua A. Levy, Aug. 18, 2017, at Exhibit G.

conversations. We hope to hear from you by close of business Thursday September 28. Thanks very much."

On September 28, we timely responded as follows:

On September 20, we spoke on the phone with both staffs.  In that call, we informed you that we had not yet received language setting forth the scope of this Committee's investigation.  On the same call, we said that we would review the language once we received it, evaluate your request for interviews and get back to you the following week.  Later that day, you sent us a memorandum setting forth the scope of the Committee's investigation.

The scope of the investigation is exceedingly broad, and the scope of any interview, by necessity, would be narrower than the scope of the entire investigation.  It would be helpful to have notice from the Committee what the scope of the interviews for these three witnesses would be, so that we can properly evaluate how such an interview would impact any of the company's legal obligations and privileges and/or that of its clients.  Depending on what you are seeking to learn from our clients, questions might call for testimony that would be protected by various constitutional and common law privileges, as well as other legal obligations.  Please understand that most of what Fusion GPS employees know derives from their confidential client-based work.  Disclosure of such material therefore requires the consent of Fusion GPS [clients], and we will need greater specificity from staff in order to help obtain that consent.

As discussed, Mr. Simpson and Fusion GPS have cooperated with Congress.  In cooperating with Congress, Mr. Simpson testified for ten (10) hours.  Before doing so, we worked with another congressional committee on an agreement that balanced the interest of the committee to seek information with the company's obligations, as well as the burdens imposed on this small company and its employees.  As a matter of fundamental fairness, we would like the opportunity to sit down and discuss the same considerations with you.

We can meet with you any time next week.  Please let me know what dates work for you.  Thank you.[13]

---

[13] E-mail from Joshua A. Levy to Kash Patel (Sept. 28, 2017, 4:28 PM EST).

Cunningham|Levy|Muse

Later that day, minority staff agreed to meet with majority staff and us.  But your staff ignored our considerations, as well as our invitation to sit down for a meeting to discuss them.  Instead, on September 29, your staff e-mailed us to say:  "As you know, your clients have been invited for a voluntary interview, and are encouraged to provide information on that basis.  However, if you are unwilling or unable to supply prospective interview date(s) by noon on <u>Monday, October 2, 2017</u>, we will resort to compulsory process."[14]


On October 2, we did what your staff asked and timely provided the requested "prospective interview date(s)."  We also explained that our clients could participate in voluntary transcribed interviews, subject to certain assurances from the Committee about scope and the treatment of privileges, and we renewed our request for a meeting to discuss these matters.  We wrote as follows:


We have times during the weeks of November 6 and 13 for interviews, subject to certain assurances from the Committee about the interviews' scope and the treatment of privilege, as well as consent from Fusion GPS's former clients.  We renew our simple request to hold a meeting to discuss our considerations with you, as we had done elsewhere in Congress.

Having sat through the Senate Judiciary Committee's interview of Mr. Simpson, we can tell you the vast majority of his testimony fell within the scope of this committee's investigation.  We encourage you to wait for the release of the transcript.  It will inform your investigation and will help this committee narrow its areas of inquiry, without further burdening Fusion GPS, a small company that already has spent considerable resources cooperating with Congress.  Fusion GPS has cooperated with Congress, the information from that cooperation could be available very soon, and Congress should not compel this small business to divert considerable time and money in order to prepare for and answer a redundant set of questioning.

Further, we have never asked for the Committee to modify the scope of the investigation itself.  Rather, we have asked you to identify a narrower scope of the interviews, within the investigation.  As a matter of fairness to the potential witnesses and your Committee's time and resources, were we to know more about what the Committee seeks to learn from our clients, we could help the Committee receive that information in a maximally efficient way.

In the face of your request, Fusion GPS must meet its legal obligations and protect certain privileges, which it lacks the authority to waive.  Should this Committee compel

---

[14] E-mail from Scott Glabe to Joshua A. Levy and Kash Patel (Sept. 29, 2017, 3:16 PM EST).

Fusion GPS to disclose confidential information from these client matters, Fusion GPS may be forced to stand on its privileges.  Compulsory process here would chill anyone, including the members of this Committee, from conducting confidential opposition research in a federal election campaign.  Fusion GPS should not be forced to disclose information about confidential opposition research conducted during a presidential campaign, including but not limited to the identity of the clients, because such information is protected by the First Amendment.

Fusion GPS worked with and for its clients in furtherance of its clients' First Amendment rights to engage in political activity and political speech, to speak anonymously, to associate freely with others, to exercise freedom of the press, and to petition their government.  Fusion GPS continued to work, in the absence of a client, in furtherance of the same First Amendment rights.  The information sought is protected by those First Amendment privileges.  These freedoms are ones we all value and lie at the very foundation of our constitutional democracy.  "[S]peech on public issues occupies the highest run of the hierarchy of First Amendment values, and is entitled to special protection."  Snyder v. Phelps, 562 U.S. 443, 452 (2011) (internal quotation marks omitted).  On a similar pedestal is the freedom of association:  "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed." Knox v. Serv. Employees Int'l Union, Local 100, 567 U.S. 298, 309 (2012).  Likewise:  "the right to petition [the government is] one of the most precious of the liberties safeguarded by the Bill of Rights" because "the right is implied by the very idea of a government, republican in form."  BE & K Constr. Co. v. NLRB, 536 U.S. 516, 524-25 (2002) (internal quotation marks and alteration omitted).

The Supreme Court has limited the right of Congress to demand information and materials from Americans when doing so would violate their First Amendment rights.  "[T]he constitutional rights of witnesses will be respected by the Congress as they are in a court of justice....  Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged."  Watkins v. United States, 354 U.S. 178, 188 (1957).  For that reason, the Supreme Court ruled that the State of Alabama could not compel the NAACP to disclose the names of its members because such compulsion would result in a "substantial restraint" of their freedom of association under the First Amendment.  NAACP v. Alabama, 357 U.S. 449, 462-63 (1958).  When the court in Perry v. Schwarzenegger analyzed a claimant's assertion of a First Amendment privilege in the face of a subpoena, the court found:  "The existence of a prima facie case turns not on the type of information sought, but on whether disclosure of the information will have a deterrent effect on the exercise of protected activities." 591 F.3d 1147, 1162 (9th Cir. 2010).

Fusion GPS also must honor confidentiality obligations in its contracts with clients, and it lacks the authority to waive those obligations.  Similarly, where it has worked at

Cunningham|Levy|Muse

the direction of counsel, in anticipation of litigation, Fusion GPS is not authorized to waive the attorney work product privilege over such work.

We remain committed to balancing the Committee's interest in obtaining information for its investigation with the need for our client to honor its legal obligations and preserve its privileges, as well as those of its clients.  To that end, as set forth in correspondence last week, we are available this week to meet with you to discuss issues that are likely to arise during the course of the interview, and how to meet them ahead of time, so that both we and the Committee have clarity going forward.  Per Ms. Greene's e-mail of September 28, the minority staff is available and willing to meet with us.  We hope you can be available, too.[15]

Finally, your staff agreed to meet with us.

On October 3, 2017, we met with majority and minority staff.  The meeting was straightforward, cordial and lasted about an hour.  At the meeting, we discussed a number of considerations and seemed to have charted a way forward toward cooperation, in the absence of compulsory process.  Just as we had sought – with success – from the Senate Judiciary Committee Chair and Ranking Member, we asked for a broad, but more limited scope and written assurances from the Committee, at the member level, that nothing said in those interviews would interfere with their ability to assert privileges before the Committee at a later date.  As noted with your staff, were the Committee to have granted those requests, we would have worked with Fusion GPS' clients to obtain consent, so that the appropriate individuals could testify.  At the meeting, we had told staff that Mr. Simpson would have the most information, and that the other two witnesses would have little to no information.  We encouraged staff to review the Senate Judiciary Committee transcript because it, once public, would be part of the record anyway and would, by necessity, save everyone from what likely would be a redundant set of questioning.  Your staff indicated an interest in attorney proffers, so that the Committee could better understand the value in talking to all or only some of the three individuals, as well as the desired scope of the interviews.  Your staff also discussed the possible prioritization of Mr. Simpson's interview over, and instead of, the interviews of the other two individuals, whose knowledge is far less and likely repetitive of what Mr. Simpson knows.  Were the Committee to have limited the scope of the interviews and agreed to our requested written assurances about privilege, we were prepared to make those proffers.  We also told the Committee staff that we were open to other thoughts about a way forward for voluntary cooperation. Surprisingly at this meeting, given your staff's once purported urgent need for interview dates from us, no one from your staff ever mentioned whether the proposed dates were either available, too early or

---

[15] E-mail from Joshua A. Levy to Scott Glabe, Shannon Green, and Kash Patel (Oct. 2, 2017, 11:01 AM EST).

Cunningham|Levy|Muse

too soon.  We exited the meeting with an expectation that we would receive a constructive response from the Committee in the next couple days, and that we would be able to continue to work with staff about a path toward voluntary cooperation.

But we received nothing of the sort.  To the contrary, on the very next day (i.e. October 4, 2017), we received the three instant subpoenas for documents and deposition testimony.  The subpoenas required depositions of Messrs. Catan and Fritsch not in November, as we had proposed, but on October 18, 2017.  Two of the subpoenas require the production of documents no later than October 11, 2017.  The third subpoena requires production of documents by October 17, 2017, and a deposition for Mr. Simpson on November 8, 2017.

On October 6, 2017, we asked your staff for a reasonable two-week extension of time by which to respond to the subpoenas requiring production of documents.  Your staff rejected that request and required us to respond on October 16, 2017.

II.     General Objections to the Subpoenas for Testimony and Documents

Through these subpoenas, you demand testimony and documents.  These subpoenas include a number of infirmities, as a general matter, including:

A.     You, as Chair, Were Not Authorized to Issue Subpoenas in This Investigation.

We object to this subpoena because you are no longer authorized to issue subpoenas for testimony or materials in this investigation, on your own.  Inasmuch as you, as Chair, were authorized to issue these subpoenas, your unilateral exercise of that power was unethical, given your own pledge of recusal and your status in this investigation as a witness to alleged obstruction efforts – namely, that you surreptitiously worked with White House officials to discuss and bring to light classified documents, without consulting the Ranking Member, in order to help defend the White House in what was supposed to be an oversight investigation conducted by the Committee you chairs.[16]

---

[16] See Brian Barrett, "Devin Nunes:  A Running Timeline of His Surveillance Claims and White House Ties," WIRED, Apr. 12, 2017, available at https://www.wired.com/2017/04/devin-nunes-white-house-trump-surveillance/.

In early April 2017, the House Ethics Committee began investigating you for ethical breaches related to to this alleged misconduct, in connection with HPSCI's Russia investigation.  Upon the commencement of the House Ethics Committee investigation, you announced on April 6, 2017, that you would "continue to fulfill all [your] other responsibilities as Committee Chairman," but that "Representative Mike Conaway, with assistance from Representatives Trey Gowdy and Tom Rooney, temporarily take charge of the Committee's Russia investigation while the House Ethics Committee looks into this matter."[17]  The House Ethics Committee investigation continues.

When, in late May 2017, you emerged from your recusal to sign subpoenas in this investigation, without written authority from Messrs. Conaway, Gowdy or Rooney, Ranking Member Adam Schiff stated that the authority to issue subpoenas in this investigation "should have been delegated to Mike Conaway in consultation with myself.  That hasn't happened yet, … [a]nd I think that's a violation of the recusal by the chairman."[18]  Fred Wertheimer, president of Democracy 21 and longtime advocate of bipartisan campaign finance reform, said:  "This is an incredibly inappropriate action, and it is a matter that the House Ethics Committee must look at promptly.  Nunes is supposed to be completely out of the Russia investigation."[19]

The October 4, 2017, subpoenas bear your signature and omit any indication that Mr. Conaway authorized them.  Nor does the subpoena indicate any prior consultation with the Ranking Member.  While you might have retained other duties as Chair, you are no longer running this investigation and thus lack the authority to issue and serve subpoenas pursuant to it.  We therefore object to the issuance and service of these subpoenas on that basis.

B.      The Subpoenas Were Not Issued Pursuant to a Formal Unambiguous Resolution.

The Committee has failed to pass a public resolution regarding this investigation.  None is attached to these subpoenas.  In fact, attached to prior correspondence and these subpoenas, in lieu of a resolution, is an odd, one-page, unsigned Microsoft Office document that includes four broad questions and press statements from the committee chair and ranking member.[20]  Indeed, it appears to be an

---

[17] Press Release, "Nunes Statement on Russia Investigation," Congressman Devin Nunes, Apr. 6, 2017, available at https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775.
[18] Russell Berman, "The Un-Recusal of Devin Nunes," THE ATLANTIC, Jun. 1, 2017, available at https://www.theatlantic.com/politics/archive/2017/06/the-un-recusal-of-devin-nunes/528882/.
[19] Id.
[20] *See, e.g.*, Exhibit A.

Cunningham|Levy|Muse

excerpt from a press release.  It is thus impossible for anyone in the greater public, including this investigation's witnesses such as our clients, to evaluate whether a subpoena, in this "investigation," seeks matters pertinent to legitimate questions under inquiry, see Watkins v. U.S., 354 U.S. 178 (1957), and whether the issuance of this subpoena constitutes activity that falls within "the legitimate legislative sphere." Eastland v. U.S. Serviceman's Fund, 421 U.S. 491, 503 (1975) (emphasis added).  In Eastland, the Court found that a Senate subcommittee's issuance of a subpoena fell within the "sphere of legitimate legislative activity" and was thus afforded protection under the Speech or Debate Clause because, among other things, the subcommittee "was acting under an unambiguous resolution from the Senate authorizing it to make a complete study of the 'administration, operation, and enforcement of the Internal Security Act of 1950," id. at 506 (citing S. Res. 341, 91st Cong, 2d Sess. (1970)), and "[t]hat grant of authority is sufficient to show that the investigation upon which the Subcommittee had embarked concerned a subject on which 'legislation could be had.'" Id. (citing cases).  By contrast, no "unambiguous resolution" is present here; instead, we have a vague, unsigned one-pager that seemed to have undergone no democratic process or vote of any congressional body or sub-body.  We therefore object to these subpoenas because they were not issued pursuant to a formal unambiguous resolution and thus do not fall within "the sphere of legitimate legislative activity." Id. (emphasis added).

C.     The Subpoenas Violate the Committee's Rules.

HPSCI Committee Rule 10(e) provides that "[e]ach subpoena shall have attached thereto a copy of these rules."[21]  But the subpoenas issued did not include a copy of the committee's rules.  Rather than hide the ball and set traps for our clients, you as Chair and your staff should have been transparent and should have attached a copy of the Committee's rules to these subpoenas.  But either out of malice or as a consequence of your haste to circumvent the Committee's process and its Ranking Member, you omitted them from these subpoenas.  Without the rules attached to the subpoenas, you issued the subpoenas in violation of the Committee's rules.  We therefore object to the subpoenas on that basis.

D.     Enforcement of These Subpoenas Would Violate the First Amendment Rights of Our Clients and Their Clients.

---

[21] Rules of Procedure for the Permanent Select Committee on Intelligence, U.S. House of Representatives, § 10(e), available at https://intelligence.house.gov/uploadedfiles/hpsci_rules_of_procedure_-_115th_congress.pdf.

Cunningham|Levy|Muse

The immediate production demands as set forth in Schedule A attached to the subpoenas, taken on their own terms, constitute a broad, undifferentiated and impermissible inquiry into Fusion GPS' and its clients' constitutionally protected free speech and free association activities under the First Amendment, and the information sought through this unconstitutional inquiry is not relevant or pertinent to the scope of this investigation, however improperly or poorly defined.  These subpoenas demand the production of all documentation reflecting any confidential opposition research conducted on a presidential candidate.   Enforcement of this subpoena would certainly chill the exercise of confidential opposition research in elections and might put a halt to it, once and for all, further depriving our fellow citizens of information before they vote for their next president.

There is no general governmental authority – either in the Legislature or the Executive – to require those engaged in the free association and free speech activity protected by the First Amendment to give up their books and records or to provide whatever other information about that activity the government may demand.

To the contrary, the first principle here is "that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment" and, because that is so, "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest."  Buckley v. Valeo, 424 U.S. 1, 64 (1976).  Thus, "the subordinating interests of the State must survive exacting scrutiny," and there must "be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed."  Id. (footnotes omitted).

In the context of a legislative inquiry, as Gibson v. Fl. Legis. Investigative Comm'n, 372 U.S. 539 (1963), recognizes, "before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights," the inquiring committee must establish a "foundation" based on "fact and reason" that demonstrates the necessity of disclosure to achievement of a "compelling" public interest.  Id. at 557.

The essential point, then, is the one the Supreme Court crystallized 60 years ago: "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press,

freedom of political association, and freedom of communication of ideas." Sweezy v. NH, 354 U.S. 234, 245 (1957).


The First Amendment's protection in this regard "reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'" Buckley, 424 U.S. at 14, and, that protection extends to all aspects and stages of the "debate." Id. From the "'abstract discussion' ... of political policy generally [to] advocacy of the passage or defeat of legislation," to "the right to engage in 'vigorous advocacy,'" id. at 48, all political activities in the continuum of the public discourse "lie at the very core of the First Amendment," Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87-97 (1982).

It is, moreover, "beyond debate" that the First Amendment protects lawful associational activity as well as individual activity. NAACP v. Alabama, 357 U.S. 449, 460-61 (1958). "[E]ffective advocacy of both public and private points of view ... is undeniably enhanced by group association," Buckley, 424 U.S. at 22 (quoting NAACP, 357 U.S. at 460). For the purposes of associational rights, "it is immaterial whether the beliefs sought to be advanced by [the] association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP, 357 U.S. at 460-61. As the Constitution recognizes, the association exists as a means for engaging in "effective advocacy" of the group's beliefs; and, accordingly, the autonomy and integrity of the association, no less than that of its members, must be free from compromise.

The danger to First Amendment protected associational activity posed by government-compelled disclosure is particularly acute where the activity in question is political activity and where the disclosure is required of certain associations engaged in political activity and not others. As the three-judge district court stated in Pollard v. Roberts, 283 F. Supp. 248 (E.D. Ark.), aff'd, 393 U.S. 14 (1968) (per curiam), in enjoining a prosecuting attorney's subpoena of the bank records and contributor lists of the Arkansas Republican Party:


To the extent that a public agency or officer unreasonably inhibits or discourages the exercise by individuals of their right to associate with others of the same political persuasion in the advocacy of principles and candidates of which and of whom they approve, and to support those principles and candidates with their money if they choose to do so, that agency or officer violates private rights protected by the First Amendment. [283 F. Supp. at 258-59.]


That danger is accentuated when the "broad subpoena" seeking materials of a "delicate nature" is directed to an independent association engaged in political activity. Fed. Election Comm'n v.

Cunningham|Levy|Muse

Machinists Non-Partisan Political League, 655 F.2d 380, 388 (D.C. Cir.), cert. denied, 454 U.S. 897 (1981). The Machinists Court cautioned:

> [T]he subject matter of [the subpoenaed] materials represent[ed] the very heart of the organism which the first amendment was intended to nurture and protect: political expression and association concerning federal elections and officeholding. The FEC first demands all available materials which concern a certain political group's "internal communications," wherein its decisions "to support or oppose any individual in any way for nomination or election to the office of President in 1980" are revealed.... Then this federal agency, whose members are nominated by the President, demands all materials concerning communications among various groups whose alleged purpose was to defeat the President by encouraging a popular figure from within his party to run against him. As a final measure, the FEC demands a listing of every official, employee, staff member and volunteer of the group, along with their respective telephone numbers, without any limitation on when or to what extent those listed participated in any MNPL activities. The government thus becomes privy to knowledge concerning which of its citizens is a "volunteer" for a group trying to defeat the President at the polls.... [R]elease of such information to the government carries with it a real potential for chilling the free exercise of political speech and association guarded by the first amendment. [655 F.2d at 388 (footnotes omitted).]

It is apparent that these dangers are most acute when the subpoenaed materials "represent the very heart of ... political expression and association concerning federal elections and office holding," when the inquiring body is constituted, not of appointed law-enforcement officials but of successful candidates for political office who in the nature of things have a profound political interest in obtaining and evaluating those materials, and when the political branch deploys its governmental powers against independent actors on the political scene.

So it is here. A Congressman, who served on and advised Donald J. Trump's presidential campaign, has used the office to which he was elected to issue a subpoena to a third party that had engaged in opposition research on Mr. Trump that took place during the same campaign. The threat to the First Amendment interests at stake could not be greater. The subpoenas seek to burden "a category of speech that is 'at the core of our First Amendment freedoms'—speech about the qualifications of candidates for public office." Republican Party of Minnesota v. White, 536 U.S. 765, 774 (2002).

Cunningham|Levy|Muse

Significantly, First Amendment freedom of association protects not only the privacy of group affiliation, but also the confidential internal documents of organizations involved in political activity. "[T]he Supreme Court has concluded that extensive interference with political groups' internal operations and with their effectiveness [ ] implicate[s] significant First Amendment interests in associational autonomy." Am. Fed'n of Labor & Cong. of Indus. Organizations v. Fed. Election Comm'n, 333 F.3d 168, 176–77 (D.C. Cir. 2003) ("AFL-CIO v. FEC") (citing Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214 (1989) and Tashjian v. Republican Party, 479 U.S. 208, 224 (1986)).  In AFL-CIO v. FEC, the D.C. Circuit held that a Federal Election Commission regulation that required public release of the Commission's investigatory materials after the close of an investigation violated the First Amendment associational rights of the groups subject to the investigation, in that case, the Democratic National Committee and the AFL-CIO. The court grounded its decision on the fact that disclosure of the groups' "confidential internal materials" would unlawfully intrude into the groups' "'privacy of association and belief guaranteed by the First Amendment,' . . . as well as seriously interfere[] with internal group operations and effectiveness." Am. Fed'n of Labor & Cong. of Indus. Organizations v. Fed. Election Comm'n, 333 F.3d 168, 177–78 (D.C. Cir. 2003) (quoting Buckley, 424 U.S. at 64).

The subpoenas here seek to expose the confidential internal records of an organization involved in political activity merely to harass a group whose work you as Chairman want to discredit for political reasons. The "First Amendment prevents use of the power to investigate enforced by the contempt power to probe at will and without relation to existing need." DeGregory v. Attorney Gen. of State of N. H., 383 U.S. 825, 829 (1966) (citing Watkins v. United States, 354 U.S. 178, 197 – 200 (1957)). The subpoenas here are not related to any "existing need," and certainly no "compelling" government interest. The subpoenas seek documents, the disclosure of which would "have a potential for chilling the free exercise of political speech and association guarded by the First Amendment," Wyoming v. U.S. Dep't of Agric., 208 F.R.D. 449, 454 (D.D.C. 2002) (internal quotation marks omitted), and would also "cripple" political research organizations' "ability to operate effectively[,] ... reduc[ing] 'the free circulation of ideas both within and without the political arena.'" Brown, 459 U.S. at 98 (quoting Buckley, 424 U.S. at 71).

E.     The Subpoenas Demand Irrelevant Information and Material.

Based on the demand for documents, it appears as though these subpoenas are a vehicle to assist Senator Grassley obtain materials sought in March 2017, regarding an unrelated Senate Judiciary Committee oversight question as to whether the FBI had complied with its confidential informant policy. That matter, of course, is not pertinent to even the "parameters" of this investigation set forth in the excerpt from the HPSCI press release, attached to these subpoenas.

Cunningham | Levy | Muse

Such a matter has nothing to do with whether the Russian government interfered with the 2016 election, counter-measures against it, leaks or cyber-intrusion.  It is a simple question of FBI policy compliance.

Secondarily, these subpoenas seek to help Senator Grassley obtain the answer to another irrelevant and inappropriate question – the identities of Fusion GPS' clients.  Who contracted with Fusion GPS during the 2016 election campaign has absolutely no bearing on what findings Christopher Steele developed overseas, let alone on whether the Russian government interfered with the 2016 U.S. presidential election.

<u>CONCLUSION</u>

Incorporating the foregoing points and authorities by reference, we set forth specific objections to the subpoenas for documents and have attached those specific objections to this letter at Appendix A.  Likewise, for the foregoing reasons, we object to the subpoenas for our clients' testimony.

Should you compel any of our three clients to appear at the scheduled deposition, they will invoke their constitutional privileges not to testify.  Since that will be the case, we ask that the Committee excuse them from appearing.[22]

Sincerely,

Joshua A. Levy
Robert F. Muse
Rachel M. Clattenburg

cc:     Rep. Michael Conaway
        Rep. Adam Schiff

Enclosures

---

[22] See D.C. Legal Ethics Opinion 358, Subpoenaing Witness When Lawyer for Congressional Committee Has Been Advised that Witness Will Decline to Answer Any Questions on Claim of Privilege; Legal Ethics Opinion 31 Revisited, available at https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion358.cfm.

# Exhibit C



NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
SHANGHAI
TAIWAN
BOSTON
HOUSTON
LOS ANGELES
HANOI
HO CHI MINH CITY

*FIRM and AFFILIATE OFFICES*

ALEXANDER D. BONO
DIRECT DIAL: +1 215 979 1181
PERSONAL FAX: +1 215 689 4472
E-MAIL: abono@duanemorris.com

*www.duanemorris.com*

ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

October 18, 2017

**VIA EMAIL**

The Honorable Devin Nunes, Chairman
The Honorable K. Michael Conaway, Acting Chairman on Russia Investigation
The Honorable Adam Schiff, Ranking Member
Permanent Select Committee on Intelligence
United States House of Representatives
HVC-304, U.S. Capitol
Washington, DC  20003

> Re:   **United States House of Representatives,
> Permanent Select Committee on Intelligence (*"Select Committee"*)'s
> Subpoena dated October 4, 2017, Directed to '██████████
> ████)" (*"Subpoena"*)[1]**

Dear Chairman Nunes, Acting Chairman Conaway, and Ranking Member Schiff:

We represent ██████████████ concerning the Subpoena. Our client and my firm appreciate the courtesy extending the Subpoena compliance date until October 23, 2017 at 9:00 a.m.

████ respectfully requests an additional extension, objects and responds to the Subpoena as stated below, and respectfully requests a meaningful opportunity to cooperate with the Select Committee to address apparent infirmities in the Subpoena and objections to production raised by ████ customer.

---

[1] ████ was incorrectly named in the Subpoena as ████████████ ██████ On October 12, 2017, the Select Committee amended the Subpoena to be addressed, served, and executed on ████████

DUANE MORRIS LLP

30 SOUTH 17TH STREET   PHILADELPHIA, PA 19103-4196        PHONE: +1 215 979 1000   FAX: +1 215 979 1020

██████████'s Responses and Objections to
Permanent Select Committee on Intelligence Subpoena
October 18, 2017
Page 2

**Duane**Morris

## OBJECTIONS – PROCEDURAL

1.      ██████ objects to the Subpoena because the Subpoena is procedurally defective.

2.      ██████ objects to the Subpoena to the extent that it is signed by Chairman Nunes as "Chairman or Authorized Member" and dated October 4, 2017, which is after he recused himself on April 6, 2017 from the Select Committee's Russia Investigation referenced in the Subpoena ("*Select Committee's Russia Investigation*").

3.      ██████ objects to the Subpoena because the Select Committee Rules of Procedure were not attached to the Subpoena in violation of Rule 10(e) of the Select Committee Rules of Procedure.

4.      ██████ objects to the Subpoena to the extent it was made in the absence of a formal, unambiguous resolution regarding the Select Committee's Russia Investigation.

5.      ██████ objects to the Subpoena to the extent that the Select Committee's Russia Investigation is not approved by Chairman Nunes or Acting Chairman Conaway in consultation with Ranking Minority Member Adam Schiff in violation of Rule 9(a) of the Select Committee Rules of Procedure.

6.      ██████ objects to the Subpoena to the extent that the Subpoena was not authorized by Chairman Nunes or Acting Chairman Conway in consultation with Ranking Minority Member Adam Schiff, or by vote of the full Committee, in violation of Rule 10(a) of the Select Committee Rules of Procedure.

7.      ██████ objects to the Subpoena to the extent it does not fall within the "sphere of legitimate legislative activity." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975).

## OBJECTIONS – DEFINITIONS AND INSTRUCTIONS

1.      ██████ objects to Definition No. 6 because "you" and "your" are defined to "include all offices, individuals, or entities *within the Central Intelligence Agency*, including, without limitation, anyone presently or formerly employed by, assigned to, or detailed there."[2] Thus, the Subpoena seeks responses from a government agency over which the responding party, ██████ lacks control and is ambiguous.

---

[2]  Emphasis added throughout unless indicated to the contrary.

████████'s Responses and Objections to
Permanent Select Committee on Intelligence Subpoena
October 18, 2017
Page 3

DuaneMorris

    2.    ████████ objects to Definitions Nos. 3 and 6 to the extent they are indefinite and undefined because they are "not limited to" or "without limitation."

    3.    ████████ objects to Instruction No. 9 and expressly reserves its rights and protections under the attorney/client privilege, the attorney work product privilege or any other statutory or common law privilege.

    4.    ████████ objects to Instruction No. 13 because the "request is continuing in nature and applies to any newly-discovered information" and therefore is overly burdensome.

## OBJECTIONS – SUBSTANTIVE

    1.    ████████ objects to the Subpoena to the extent that it attempts to place burdens or requirements on ████████ that are inconsistent with the Rules of the House of Representatives, the Rules Adopted by the Committees of the House of Representatives, or the Select Committee's Rules of Procedure.

    2.    ████████ objects to the Subpoena to the extent that the requests for documents are overbroad, unduly burdensome, and oppressive.

    3.    ████████ objects to the Subpoena to the extent that it requires production or identification of data, documents and information:

    a.    subject to the attorney/client privilege, the attorney work product privilege or any other statutory or common law privilege;

    b.    subject to the self-investigative privilege or self-critical analysis privilege;

    c.    relating to a Suspicious Activity Report ("*SAR*") or any information that would disclose a SAR or reveal the existence of a SAR because such disclosure or revelation is expressly prohibited by federal law and regulation, *see* 31 U.S.C. § 5318(g)(2)(A)(i) and 12 C.F.R. § 21.11(k)(1) and any attempts to request such disclosure or revelation will result in notification, pursuant to the foregoing federal law and regulation, to (i) Director, Litigation Division, Office of the Comptroller of the Currency; and (ii) The Financial Crimes Enforcement Network (FinCEN); or

    d.    constituting or relating to OCC materials because such disclosure is expressly prohibited by federal law and regulation pursuant to 12 C.F.R. § 18.9;

    4.    ████████ objects to the Subpoena to the extent that the requests for documents are vague and ambiguous, or contain undefined or ambiguous terms.

██████████'s Responses and Objections to

**Duane Morris**

Permanent Select Committee on Intelligence Subpoena
October 18, 2017
Page 4

5.   ████████ objects to the Subpoena to the extent that it seeks documents that are protected from disclosure by Federal law and regulation.

6.   ████████ objects to the Subpoena to the extent that the requests for documents are cumulative and/or duplicative.

7.   ████████ objects to the Subpoena to the extent it seeks the production of documents, data and information that are confidential, privileged, sensitive, or proprietary to ████ █████, or confidential customer data that that is prohibited or protected from disclosure under any Federal and State Privacy Law or Regulations, including the Right to Privacy Act of 1978, 12 U.S.C. § 3401 *et seq.* and the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*

8.   ████████ objects to the Subpoena because its customer has objected to production of its documents that are its bank records.

9.   ████████ objects to the Subpoena because it infringes on ████████'s customer's First Amendment rights.

### RESPONSES

████████ expressly incorporates its Objections to each individually numbered paragraph, 1 -10, in Schedule A of the Subpoena.

Given the foregoing Objections, particularly ████████'s customer's objections, before producing responsive documents, ████████ respectfully requests a meaningful opportunity to cooperate with the Select Committee to address apparent infirmities in the Subpoena and objections to production raised by ████████'s customer. Notwithstanding these Objections, ████ is taking appropriate steps to preserve its records. We are authorized by ████████ to accept service of a validly issued subpoena that satisfies the procedural objections ████████ has asserted.

Please contact me if you wish to set a time to meet to address the issues raised in this response.

Respectfully,

Alexander D. Bono

AB:ws

cc:   Kashyap P. Patel, House Permanent Select Committee on Intelligence, Senior Counsel for Counterterrorism (*via Email*)