# EXHIBIT A

UNITED STATES v. AMERICAN TEL. & TEL. CO. 121
Cite as 567 F.2d 121 (1977)

UNITED STATES of America
v.
AMERICAN TELEPHONE & TELEGRAPH COMPANY et al., John E. Moss, Individually and on behalf of the U. S. House of Representatives and the House Committee on Interstate and Foreign Commerce, Appellant.

No. 76–1712.

United States Court of Appeals, District of Columbia Circuit.

Argued June 3, 1977.

Decided Oct. 20, 1977.

Rehearing Denied Dec. 12, 1977.

Justice Department brought action to enjoin telephone company from complying with subpoena of subcommittee of House of Representatives issued in course of investigation into warrantless "national security" wiretaps. Chairman of subcommittee intervened. The United States District Court for the District of Columbia, Oliver Gasch, J., 419 F.Supp. 454, issued the injunction and subcommittee chairman appealed. The Court of Appeals, 551 F.2d 384, remanded for negotiation by the parties. After remand, the District Court prepared its report of negotiations between the parties. The Court of Appeals, Leventhal, Circuit Judge, held that: (1) complete judicial abstention on political question grounds was not warranted; (2) neither the claims of the executive nor the legislative branches of the propriety of their acts was conclusive on the court; (3) the Constitution does not confer on the executive absolute discretion in the area of national security; (4) the "Speech or Debate" clause was not intended to immunize congressional investigatory actions from judicial review; (5) accommodation between the two branches is contemplated by the Constitution. The court proposed an approach of gradualism rather than a rigid arrangement, and set forth for the benefit of the parties a procedure involving limited committee access and verification, and in camera resolution of disputes.

Order in accordance with opinion.

1. Constitutional Law ⚖68(1)
Political question doctrine did not bar judicial resolution of action by Justice Department to enjoin telephone company from complying with subpoena of subcommittee of House of Representatives issued in course of investigation into warrantless national security wiretaps.

2. Constitutional Law ⚖68(1)
Simple fact that conflict exists between legislative and executive branches over congressional subpoena does not preclude judicial resolution under political question doctrine.

3. Constitutional Law ⚖68(1)
Fact that case is viewed as political case, or involves political controversy, does not mean that it presents only political questions beyond jurisdiction or proper role of court.

4. Constitutional Law ⚖68(1)
Application of political question doctrine or any close adaptation thereof is not appropriate where neither of the conflicting political branches has clear and unequivocal constitutional title and it is or may be possible to establish effective judicial settlement.

5. War and National Emergency ⚖37
Constitution does not confer on executive absolute discretion in area of national security.

6. United States ⚖12
Speech or debate clause was not intended to immunize congressional investigatory actions from judicial review. U.S.C.A. Const. art. 1, § 6, cl. 1.

7. United States ⚖12
Speech or debate clause was intended to protect legislators from executive and judicial harassment. U.S.C.A.Const. art. 1, § 6, cl. 1.

8. United States ⚖23(2)
Congress' investigatory power is not, itself, absolute.

**122**  567 FEDERAL REPORTER, 2d SERIES

**9. United States ⟶23(4)**

Fortuity that documents sought by congressional subpoena are not in hands of party claiming injury from subpoena should not immunize that subpoena from challenge by that party.

**10. United States ⟶12**

Justice Department's action to enjoin telephone company from complying with subpoena of subcommittee of House of Representatives issued in course of investigation into warrantless national security wiretaps was not barred by speech or debate clause and fact that executive was not in position to assert its claim of constitutional right by refusing to comply with subpoena did not bar challenge so long as members of subcommittee were not, themselves, made defendants in suit to enjoin implementation of subpoena. U.S.C.A.Const. art. 1, § 6, cl. 1.

**11. United States ⟶12**

Immunity from judicial inquiry afforded by speech or debate clause is personal to members of Congress and where they are not harassed by personal suit against them, clause cannot be invoked to immunize congressional subpoena from judicial scrutiny. U.S.C.A.Const. art. 1, § 6, cl. 1.

Supplemental Opinion

**12. Federal Courts ⟶921**

In action by Justice Department to enjoin telephone company from complying with subpoena of subcommittee of House of Representatives issued in course of investigation into warrantless national security wiretaps, Court of Appeals, in view of desirability of reaching accommodation between the two branches, proposed approach of gradualism rather than rigid arrangement, and set forth for benefit of parties procedure involving limited committee access and verification of documents requested, with in camera judicial resolution of disputes; and district court might permit participation of counsel for Subcommittee if court deemed such participation necessary in order to make in camera determinations.

Appeal from the United States District Court for the District of Columbia (D.C. Civil 76–1372).

Joseph M. Hassett, Washington, D.C., with whom E. Barrett Prettyman, Jr., Jean S. Moore and Janet L. McDavid, Washington, D.C., were on the brief for appellant.

Irwin Goldbloom, Deputy Asst. Atty. Gen., Washington, D.C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., Thomas S. Martin, Sp. Asst. Atty., Leonard Schaitman, Neil H. Koslowe, David J. Anderson and John T. Boese, Attys., Dept. of Justice, Washington, D.C., were on the brief for appellee United States of America.

Nathaniel Hawthorne, Washington, D.C., entered an appearance for appellees American Tel. & Tel. Co., et al.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

This case brings to us for a second time conflicting assertions by the executive and legislative branches, contentions that require the third branch to decide whether its constitutional mandate to decide controversies extends to such a conflict, and if so what measure of judicial resolution is sound and appropriate.

This is a general and abstract preface for a specific and concrete clash. The dispute arose out of an investigation by the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce. In the course of the investigation, the Subcommittee issued a subpoena for certain documents in the hands of the American Telephone and Telegraph Co. (AT&T). The Justice Department sued to enjoin AT&T from complying with the subpoena, on the ground that compliance might lead to public disclosure of the documents, with adverse effect on na-

UNITED STATES v. AMERICAN TEL. & TEL. CO.    **123**
Cite as 567 F.2d 121 (1977)

tional security. Congressman Moss, chairman of the Subcommittee, intervened on behalf of the House, as the real party in interest. The District Court issued the injunction and Chairman Moss appealed.

When we first came to the case, we developed a novel and somewhat gingerly approach for the delicate problem of accommodating the needs and powers of two coordinate branches in a situation where each claimed absolute authority. *See United States v. AT&T*, 179 U.S.App.D.C. 198, 551 F.2d 384 (1976). To the extent possible, we wished to avoid a resolution that might disturb the balance of power between the two branches and inaccurately reflect their true needs. We therefore refrained from deciding the merits of their claims, and indeed did not resolve the preliminary issue of whether the dispute presented a nonjusticiable political question. Instead we remanded the record to the District Court for further proceedings during which the parties and counsel were requested to attempt to negotiate a settlement. We called for a report by the District Court within three months. That time was later extended, to permit the new officials of the incoming administration to grapple with the problem. On April 22, 1977, District Judge Gasch made his report. We heard oral argument on June 3, 1977.

Negotiation has narrowed but not bridged the gap between the parties. Accordingly, we must adopt a somewhat more traditional approach. We begin by deciding that complete judicial abstention on political question grounds is not warranted. In addressing the merits, however, we continue to move cautiously. Taking full account of the negotiating positions, we have chartered the course that we think is most likely to accommodate the substantial needs of the parties. Doubtless, neither will be satisfied. But in our view there is good reason to believe that the procedure set forth in this opinion will prove feasible in practice, with such adjustments and refinements as may be evolved by the parties and the district court. What we decide is only that, so long as this procedure gives promise of satisfying the substantial needs of both parties, this court may appropriately continue to refrain from a decision upholding either of the claims of absolute authority. Should the parties test our approach and encounter difficulties, we may have to determine whether further relief is warranted. In that effort we will be aided by the experience of the parties.

I. FACTUAL BACKGROUND

A. Facts Culminating in Our Earlier Opinion

The facts as of our prior opinion, set forth in 551 F.2d at 385–88, may be summarized briefly.

The purpose of the Subcommittee's investigation was to examine the nature and extent of warrantless wiretapping in the United States for asserted national security purposes, and to determine whether legislation was required to curb possible abuse of that power. In carrying out warrantless taps authorized by the Attorney General, the FBI used AT&T facilities—"leased lines"—to carry tapped communications to its monitoring stations. It obtained these lines through "request letters" addressed to AT&T which specified a target line to be tapped, identified by telephone number, address, or numerical designation.

In furtherance of the investigation, a subpoena, issued on June 22, 1976, required AT&T to turn over to the Subcommittee all national security request letters. Thereupon, the Justice Department sought to negotiate with Subcommittee Chairman Moss an alternative means of satisfying the Subcommittee's needs which would, at the same time, minimize the risk to national security posed by the possibility of public disclosure of request letters pertaining to foreign intelligence surveillance.[1] Negotiations focused upon the possibility of substituting

---

1. The Justice Department perceived little risk to national security from release of backup memoranda pertaining to domestic surveillance. Dispute has focused on access to backup memoranda concerning foreign intelligence surveillance.

for these request letters expurgated copies of the backup memoranda upon which the Attorney General had based his decisions to authorize the warrantless taps. All information in these memoranda that would identify the targets of the taps would be replaced by generic descriptions. The Subcommittee agreed to an initial canvass of two years, 1972 and 1975. These memoranda, providing information as to the purpose and nature of the tap, would probably have been more useful to the Subcommittee than the request letters themselves.

The stumbling block in the negotiations was the means of verifying the accuracy of the executive's classification of surveillance as domestic or foreign, and of the generic descriptions. The Subcommittee proposed that three of its staff members conduct verification by examining the original memoranda corresponding to a subsample of the edited memoranda. They would inspect the original memoranda at the FBI, but would be permitted to take notes back to the Subcommittee. The White House rejected this proposal, in view of the House rule giving any member of the House access to such notes.[2]

The White House proposed that Chairman Moss, rather than the Subcommittee staff, inspect the subsample of unedited memos. This was rejected by the Subcommittee.

The executive's final proposal, made by President Ford to Chairman Moss, was that the Attorney General would conduct the verification. If the Subcommittee were dissatisfied, it could appeal to the President. Chairman Moss rejected this proposal.

On July 22, after negotiations had broken down, the Justice Department sued to enjoin AT&T from complying with the Subcommittee subpoena. Chairman Moss intervened as a defendant. The District Court granted the injunction and Chairman Moss appealed.

Rather than attempt to resolve the dispute at that time, this court remanded to the District Court, with the suggestion that the parties attempt to negotiate a settlement. We indicated at that time what appeared to be the outlines of a possible settlement, 551 F.2d at 395 & n. 18: Subcommittee access to edited backup memoranda seemed likely to satisfy the Subcommittee's needs more readily than access to the request letters, without posing so serious a risk to national security. Verification of the accuracy of classification and generic descriptions might be done by Subcommittee staff members, with disputes to be resolved by the District Court after *in camera* inspection of the edited and original memoranda.

B. Subsequent Developments

On March 11, 1977, in the first negotiating session after our remand, the Justice Department offered to furnish to the Subcommittee only expurgated backup memoranda. If the Subcommittee should raise a question concerning the classification of a memorandum as pertaining to foreign or domestic surveillance, the Attorney General would review the material and verify the propriety of the classification. The Subcommittee balked at the absence of independent verification. As a counterproposal, it suggested that it receive, in addition, a sample of unexpurgated memoranda and request letters, which would be kept under adequate security arrangements.[3] Justice Department representatives rejected this proposal.

In the second negotiating session, on March 14, the Department of Justice proposed *in camera* review of unexpurgated memoranda by the court, if the Subcommittee should raise a question concerning any expurgated version. Subcommittee representatives rejected this proposal, arguing that verification must be done by the Subcommittee itself, since the Court was not in a position to determine what was important

---

2. Rule XI § 2(e)(2) of the House of Representatives. See 551 F.2d at 386 & n. 3.

3. Suppl. Appendix for Appellee at 152. See note 2 *supra* concerning access by other members of the House to such material.

UNITED STATES v. AMERICAN TEL. & TEL. CO.　　125
Cite as 567 F.2d 121 (1977)

to the Subcommittee's investigation.[4] The Subcommittee proposed that its selected staff members have access to original memoranda at the FBI, with the privilege of taking their notes back to the Subcommittee.[5] The Justice Department continued to oppose a procedure whereby unexpurgated memoranda or staff notes would be lodged with the Subcommittee, and hence available to all members of the House.

On March 21, Chairman Moss met with Attorney General Bell. Discussion centered on the possible examination by the Subcommittee of unexpurgated memoranda, with the privilege of taking notes, and appropriate safeguards against dissemination of sensitive information through such note-taking. The Attorney General agreed to submit to the Subcommittee a specific proposal along these lines.[6]

On April 12, Attorney General Bell wrote to Chairman Moss offering a "no strings attached" examination of all expurgated memoranda for the two sample years to see if it would satisfy the needs of the Subcommittee.[7] On April 18, he formally proposed the *in camera* verification procedure that had been proposed and rejected on March 14. Chairman Moss rejected this proposal.[8]

On April 22, the district court submitted its report to this court, noting that there were still significant differences between the parties.

On May 11, the Justice Department amended the above offer,[9] in an attempt to satisfy the "spirit" of the suggestion in our earlier opinion, 551 F.2d at 395 & n. 18. The amended offer went beyond the April 18 proposal by proffering for inspection by the Subcommittee staff and for use in verification not only all expurgated memoranda for the two sample years, but also 10 unexpurgated memoranda randomly selected by the Subcommittee. The Attorney General reserved the right, however, to make a substitution if an unexpurgated memorandum, as randomly selected, was in his opinion of such a nature that disclosure would cause grave injury to the national security or might result in physical harm to any person. Such right of substitution would be subject to approval of the District Court after *in camera* examination of the relevant documents. Subcommittee staff would not be permitted to convey notes or information regarding the contents of any memoranda to the Subcommittee.

The Subcommittee, in its last meeting with the District Court and Justice Department representatives on May 12, rejected this proposal on three grounds: 1. That the sample size (less than 5% of the 217 "foreign intelligence surveillance" backup memoranda) was too small to be statistically valid; the Subcommittee stated that a 25% sample of unexpurgated memoranda was the minimum it would accept. 2. That the right of substitution reserved by the Attorney General further impaired the validity of the sample. 3. That *in camera* verification procedures[10] were not acceptable since the court was not equipped to carry these out properly, and since such judicial involvement would violate the Speech or Debate Clause.

II. QUESTIONS PRESENTED

A. Political Question

[1] Preliminarily, we must consider whether this case calls for judicial absten-

---

4. Suppl. Appendix for Appellee at 159.

5. *Id.* at 162.

6. Suggestions of Defendant Moss as to Matters to be Reported to the Court, at 5.

7. *Id.*, Exhibits, tab B–13.

8. *Id.* at 8. The proposal of April 18, and presumably that of April 12, did not permit notes on the memoranda to be lodged with the Subcommittee. *Id.*, Exhibits, tab B–17 (Memorandum of Understanding, dated April 15, prepared by Attorney General).

9. Transcript of Proceedings in the District Court, Apr. 20, 1977.

10. *In camera* verification would now serve *two* functions: to verify the necessity of the Attorney General's substitution, and to check on misclassification or use of inaccurate generic terms if the Subcommittee thinks such impropriety has occurred.

**126**     **567 FEDERAL REPORTER, 2d SERIES**

tion under the political question doctrine. The issues are the possible unseemliness of a judicial exploration of the needs and motives of the other two branches, and the question whether there are "judicially discoverable and manageable standards"[11] for balancing the conflicting constitutional powers asserted by the parties. We noted these considerations in our earlier opinion.[12]

[2, 3] The simple fact of a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution. See *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 162 U.S.App.D.C. 183, 498 F.2d 725 (1974).[13] Indeed, disputes between two branches of the government are inherently different from those to which the political question abstention doctrine has traditionally been applied.[14] The fact that a case is viewed as a "political case," or involves a "political controversy," does not mean that it presents only "political questions" beyond the jurisdiction or proper role of the court. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Normally, when the court abstains on political question grounds it acquiesces in a "commitment of the issue" to one of the political branches for resolution of the merits. 369 U.S. at 217, 82 S.Ct. 691. That branch is recognized as having the constitutional authority to make a decision that settles the dispute. Where the dispute consists of a clash of authority between two branches, however, judicial abstention does not lead to orderly resolution of the dispute. No one branch is identified as having final authority in the area of concern. If negotiation fails—as in a case where one party, because of chance circumstance, has no need to compromise—a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government.

We now come to consider whether the "political question" doctrine, which has been developed by the courts as a pragmatic and prudential doctrine to abstain from certain matters even though within their constitutional ambit, dictates that we should withdraw from further consideration of this case, notwithstanding the lack of a political branch to which the question stands "committed." Such a withdrawal would be rooted in a lack of "competence" of the judiciary to decide the issues.[15] The pragmatic origin and quality of the "political question" doctrine has a corollary in pragmatic application, focusing on whether the questions involved at any stage present "judicially discoverable and manageable standards" (369 U.S. at 217, 82 S.Ct. 691), and thus are susceptible to competent adjudication by the courts. The present dispute, in its original stance, raised serious questions as to the competence of a court to resolve it on the merits. It was not diffi-

---

11. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

12. 551 F.2d at 394.

13. More generally, disputes concerning the allocation of power between the branches have often been judicially resolved. *See e. g., United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed.2d 1153 (1952); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926); *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); *Campaign Clean Water, Inc. v. Train,* 489 F.2d 492 (4th Cir. 1973), vacated on other grounds, 420 U.S. 136, 95 S.Ct. 847, 43 L.Ed.2d 82 (1975); *State Highway Comm'n v. Volpe,* 479 F.2d 1099 (8th Cir. 1973). These cases can be distinguished from the present dispute as involving suits by or against a state or private person who had a material stake in the outcome. See generally Cox, Executive Privilege, 122 U.Pa.L.Rev. 1384 (1974) (arguing that in the absence of such an interest in the outcome, judicial abstention is warranted). Nevertheless, for the reasons set forth in the text, we feel obligated to address the merits of the present dispute.

14. The role of the political question doctrine in the setting of this case is explored in Comment, *United States v. AT&T*: Judicially Supervised Negotiation and Political Questions, 77 Colum. L.Rev. 466 (1977).

15. See *Atlee v. Laird,* 347 F.Supp. 689 (E.D.Pa. 1972), aff'd without opinion sub nom. *Atlee v. Richardson,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

cult to identify the relevant considerations in general terms: the need of the Subcommittee for the information sought, the likelihood of public disclosure, and the magnitude of resultant harm to national security. What loomed as unmanageable, or at least elusive, was the process of weighing these factors to determine their relative magnitude.[16] Our earlier decision to encourage further negotiation has, we believe, largely obviated this problem by bringing into sharper focus the needs of the parties. See Part IIB *infra*.

We do not accept the claims of either the executive or the legislative branch that its determination of the propriety of its acts is conclusive on the court.[17] Such claims invite this court to adapt the political question doctrine for the situation where the political branches are in conflict.[18]

[4] In our view, neither the traditional political question doctrine nor any close adaptation thereof is appropriate where neither of the conflicting political branches has a clear and unequivocal constitutional title, and it is or may be possible to establish an effective judicial settlement.

As Judge Friendly recalled in his 1976 Bicentennial lecture, it is one of the major strengths of the Constitution, and far from a weakness, that conflicting viewpoints have been resolved through intermediate positions.[19] Much of this spirit of compromise is reflected in the generality of language found in the Constitution—generality which allows for dispute as to which of the coordinate branches may exercise authority in a particular fact situation.[20]

The framers, rather than attempting to define and allocate all governmental power in minute detail, relied, we believe, on the expectation that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system.[21] Under this view, the coordinate branches do not exist in an exclusively adversary relationship to one another when a conflict in authority arises. Rather, each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation. This aspect of our constitutional scheme avoids the mischief of polarization of disputes. Professor Freund has cautioned that "[i]n the eighteenth-century Newtonian universe that is the Constitution, an excessive force in one direction is apt to produce a corresponding counterforce." [22]

---

16. 551 F.2d at 394.

17. Each branch has argued that its discretion to act under the circumstances of this case is not subject to judicial review. Congress bases its claim of absolute discretion on the Speech or Debate Clause, Brief for Appellant at 49–57, while the executive relies on its obligation to safeguard the national security, Brief for Plaintiff-Appellee at 23.

18. The facts of this dispute thus present two analytically distinct opportunities for judicial abstention under the political question doctrine. This Court could abstain *completely*, on the ground that judicial intervention in a dispute between the political branches is inappropriate; or we could intervene only for the purpose of determining that one branch's claim of absolute discretion is valid. *See* Comment, *United States v. AT&T: Judicially Supervised Negotiation and Political Questions*, 77 Colum. L.Rev. 466, 487–88 (1977). We reject both alternatives.

19. Address by Hon. Henry J. Friendly (January 29, 1976) (U.S. Department of Justice Bicentennial Lecture Series).

20. See Friendly Speech, *supra* note 19, at 17–18.

21. One commentator has noted that "where such a conflict of powers arises, the constitutional scheme would seem to require no less than that the line between them be drawn at the point of optimal accommodation." Comment, *United States v. AT&T: Judicially Supervised Negotiation and Political Questions*, 77 Colum.L.Rev. 466, 490 (1977).

22. Freund, Foreword: On Presidential Privilege, 88 Harv.L.Rev. 13, 20 (1974). Recent and early examples of this phenomenon are surveyed by Judge Friendly in his Bicentennial Speech (Jan. 29, 1976) (U.S. Dept. of Justice Bicentennial Lecture Series at 17–25).

**128**    **567 FEDERAL REPORTER, 2d SERIES**

The present dispute illustrates the danger of polarization, as well as the road to mediation. The positions of the parties are closer now than they were initially. Nevertheless, agreement has not been reached, and it is necessary for this Court to consider the conflicting claims of the parties to absolute authority. Both claims are put in absolute terms, to run without limit; and neither can be accepted as put.

[5] The executive would have it that the Constitution confers on the executive absolute discretion in the area of national security. This does not stand up. While the Constitution assigns to the President a number of powers relating to national security, including the function of commander in chief and the power to make treaties and appoint Ambassadors, it confers upon Congress other powers equally inseparable from the national security, such as the powers to declare war, raise and support armed forces and, in the case of the Senate, consent to treaties and the appointment of ambassadors.

More significant, perhaps, is the fact that the Constitution is largely silent on the question of allocation of powers associated with foreign affairs and national security.[23] These powers have been viewed as falling within a "zone of twilight" in which the President and Congress share authority or in which its distribution is uncertain.[24] The present dispute illustrates this uncertainty. The concern of the executive that public disclosure of warrantless wiretapping data may endanger national security is, of course, entirely legitimate. But the degree to which the executive may exercise its discretion in implementing that concern is unclear when it conflicts with an equally legitimate assertion of authority by Congress to conduct investigations relevant to its legislative functions.

The Subcommittee has pressed a different argument, that judicial interference with its actions in this dispute is barred by the constitution. Reliance is placed on the Speech or Debate Clause, which provides that "for any Speech or Debate in either House, [Senators or Representatives] shall not be questioned in any other Place"[25]

In *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324, the Supreme Court had occasion to scrutinize the role of the Speech or Debate Clause in immunizing a congressional subpoena from judicial interference. There, a Senate Subcommittee investigating internal security matters issued a subpoena directing a bank to produce bank records of an organization suspected of subversive activity. The organization, arguing that its First Amendment rights were being infringed, sued members of the Subcommittee to enjoin implementation of the subpoena. The Supreme Court held that where the actions of members of Congress fall within the "sphere of legitimate legislative activity," the Speech or Debate Clause is an absolute bar to judicial interference. *Id.* at 503, 95 S.Ct. 1813. This broad language must, however, be examined in the context of other decisions concerning the congressional investigatory power.

In *Eastland* itself, the Supreme Court acknowledged its earlier holdings that, in a criminal prosecution for refusal to answer congressional inquiries, defendants could assert as a defense the claimed infringement of their First Amendment rights, and the Court would balance this against the public interest in the congressional investigation going forward. *Id.* at 509 n. 16, 95 S.Ct. 1813; see *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

Another instance of judicial balancing of executive and legislative interests emerged

---

23. L. Henkin, Foreign Affairs and the Constitution 16–17 (1972).

24. See *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

25. Const. Art. I, § 6, cl. 1.

UNITED STATES v. AMERICAN TEL. & TEL. CO. 129
Cite as 567 F.2d 121 (1977)

when the Senate Committee investigating improper activities in the 1972 presidential campaign issued a subpoena directing the President to deliver certain relevant tapes and documents. The President declined on the ground of executive privilege. The Committee sought to enforce the subpoena. This court weighed the public interest protected by the President's claim of privilege against the interest that would be served by disclosure to the Committee, and declined to enforce the congressional subpoena. *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 162 U.S.App.D.C. 183, 498 F.2d 725 (1974).

[6–9] It appears from *Watkins, Barenblatt* and *Senate Select Committee* that individual members of Congress are not impermissibly "questioned in any other place" regarding their investigatory activities merely because the validity and permissibility of their activities are adjudicated. In these cases, unlike *Eastland*, the challenge to congressional investigatory activity was raised as a defense. The distinction should not be dismissed as merely procedural, since it sheds light on the nature and purpose of the protection afforded by the Speech or Debate Clause. The Clause was intended to protect legislators from executive and judicial harassment.[26] "[L]egislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" *Eastland v. United States Servicemen's Fund*, 421 U.S. at 503, 95 S.Ct. at 1821 (*quoting Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967)). As is clear from *Watkins, Barenblatt,* and *Senate Select Committee*, however, the Clause does not and was not intended to immunize congressional investigatory actions from judicial review. Congress' investigatory power is not, itself, absolute. *Barenblatt v. United States*, 360 U.S. 109, 111–12, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). And the fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party. *See* Justice Marshall's concurring opinion in *Eastland*, 421 U.S. at 513, 95 S.Ct. at 1826.

[10] If the request letters were only in the hands of the Justice Department, it could have refused to comply with the legislative demand, citing *Senate Select Committee*. The fact that the request letters are available from AT&T as well as from the Justice Department does not make the legislative authority unreviewable in court, for AT&T could have refused to comply and insisted on an ultimate court decision to avoid prosecution.[27] The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge so long as members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena. *See Eastland*, 421 U.S. at 513, 95 S.Ct. at 1826, Justice Marshall concurring.[28]

The approach by which the Executive here achieves judicial consideration of its challenge is not properly subject to reproach as exalting form over substance. The role of the court often turns on matters of procedure. The contrary position of the Subcommittee is itself an exercise in procedural refinement: The Subcommittee argues that the court can act only if AT&T itself initiates a challenge to the subpoena; so long as AT&T merely awaits a court ruling on the Executive's challenge, the court must abstain. It would be strange indeed if the Constitution made judicial consideration available to one who defies the legislature outright, but not to one like AT&T, who seeks an orderly resolution of a disputed question.

---

26. *United States v. Johnson*, 383 U.S. 169, 179, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

27. The court would decide whether AT&T had standing to raise the national security question when it had been directed by the Executive branch to resist production on that ground. *See* 551 F.2d at 387.

28. In the present case, of course, the legislative parties intervened on their own motion.

[11] In sum, while this case is similar in several respects to the situation in *Eastland*, as earlier noted (551 F.2d at 391), for purposes of considering whether the Executive's claim is entitled to at least some judicial consideration, we emphasize that no member of the Subcommittee in the present dispute has been made a defendant in a judicial proceeding. The courts do not accept the concept that Congress' investigatory power is absolute. What the cases establish is that the immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny.

B. Balancing

[12] We now address the task of weighing the claims and accommodating the needs of the disputing parties. As already noted, we encouraged negotiations in order to avoid the problems inherent in formulating and applying standards for measuring the relative needs of the parties, 551 F.2d at 394. While negotiations did not resolve the dispute, they did narrow the gap between the parties and provide a more informed basis for further judicial consideration.

The course of negotiations reflects something of greater moment than the mere degree to which ordinary parties are willing to compromise. Given our perception that it was a deliberate feature of the constitutional scheme to leave the allocation of powers unclear in certain situations,[29] the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme. Correspondingly, a court judgment that reflects the compromises achieved through negotiation marks an allocation of powers determined in furtherance of the constitutional process.

Turning to concrete matters, we first summarize the issues on which negotiations focused, and the final positions of the parties on these issues. The key issue was whether the Subcommittee would have access to unedited backup memoranda. Related questions concerned what the size of the sample of unedited memoranda would be if access were allowed; whether the Subcommittee staff would be permitted to take notes of the unedited memoranda and deliver such notes to the Subcommittee; what the role of *in camera* resolution of disputes would be; and the possibility of the executive's making a substitution for one or more unedited memoranda chosen by the Subcommittee because of the extraordinary sensitivity of the contents.

The Subcommittee has mentioned throughout this dispute that it must have access to unedited backup memoranda to verify the accuracy of the Justice Department's generic substitution for deleted terms and its classification of memoranda as pertaining to foreign or domestic intelligence. The Subcommittee regards *in camera* verification by the district court as inadequate, viewing the court as ill equipped to make such judgments.

In connection with its access to both edited and unedited memoranda, the Subcommittee has also demanded that its representatives be permitted to take notes for use by the Subcommittee members.

Until a short while ago, the Justice Department refused to consider allowing the Subcommittee access to unexpurgated memoranda. Recently, however, spurred by a memorandum and order of this Court,[30] the executive has offered to the Subcommittee an arrangement modeled after a suggestion in our earlier opinion: the executive has relaxed its position on the issue of unexpurgated memoranda to the extent that it is willing to permit Subcom-

---

29. See Part IIA *supra*.

30. Memorandum and Order of Apr. 28, 1977.

mittee staff members to inspect 10 randomly selected original memoranda for the two sample years for purposes of verification, as well as all expurgated memoranda for the two sample years. If staff members conducting the verification conclude that domestic surveillance material has been improperly classified as foreign, or that generic substitutions are inaccurate, the district court would make an *in camera* determination of this matter and decide whether, in light of its finding, further disclosure to the Subcommittee was warranted.

The Justice Department refused to allow notes to be carried back to the Subcommittee, however;[31] and it insists on retaining a protective device: if any of the randomly selected original memoranda would, in the opinion of the Attorney General, cause grave injury to the national security or possibly result in physical harm to any person it disclosed, another randomly selected memorandum may be substituted. The substitution would have to be approved by the District Court after *in camera* inspection of the relevant documents to assure that the Attorney General's concerns were warranted.

The Subcommittee's response to this most recent proposal by the executive was lukewarm at best. The Subcommittee objected to the sample size (10 out of 217) offered by the Executive, asserting that a fair sampling required access to the original versions of 25% of the memoranda for the sample years (1972 and 1975).[32] The Subcommittee further objected to the substitution procedure, as destroying the validity of the random sample. It was not satisfied that *in camera* inspection would sufficiently guard against misuse of this procedure by the executive.

Two significant points on which the parties remain apart are the size of the sample of unexpurgated memoranda and the substitution procedure.[33] The parties are sufficiently close at this point, and have demonstrated their major concerns with sufficient clarity, to permit this Court to intervene responsibly. Rather than impose a rigid arrangement, however, we choose to continue our approach of gradualism. We propose an approach that should be tested by the parties. We are not required to say whether the Subcommittee is entitled to all that it seeks when time and experience may confirm that it does not need, in any genuine and substantial sense, more than is provided by our approach.

This gradual approach is consistent with our view that the present dispute should be regarded as a concerted search for accommodation between the two branches. If the procedure we outline proves deficient, adjustments may be required—but meanwhile the needs of the parties and the available means of accommodation will be brought into even sharper focus.

Under our approach, the Subcommittee staff would select at random a sample of 10 unedited memoranda for the two sample years, and compare these with the corresponding expurgated ones.[34] On the issue

---

31. The Justice Department has insisted that all memoranda, expurgated and unexpurgated, be examined at the F.B.I. House Rule XI would permit access by all members of the House to notes carried back to the Subcommittee. See note 2 supra.

32. At proceedings before the District Court on April 20, 1977, where the parties reported their progress in negotiations, the Subcommittee counsel appeared to suggest that this figure had some statistical significance:

> The Committee met with the General Accounting Office and asked them to indicate what would be a reasonable sample to validate and to check, and there is a computer program and a memo which suggested something greater than 25 percent but the Committee is willing to accept 25 percent.

33. We do not regard the note-taking issue as one of major significance at this time; nor are the Subcommittee's objections to *in camera* inspection of primary concern, since the Executive has agreed that initial verification will be conducted by Subcommittee staff members.

34. We are not unmindful of the issue raised by the Subcommittee as to the adequacy of a sample of 10 documents. (See footnote 31, *supra*). But there is a difference in objectives between, e.g., a sample that must be large enough to be representative of the whole population, for valid statistical extrapolation; a sample that must be large enough to check on a private citizen

of notes, still a bone of contention, our approach would permit the staff to take notes on their impressions concerning the accuracy of the classification of the memoranda as relating to foreign intelligence surveillance [35] and use of generic terms, but the notes would have to be left at the FBI under seal. The Subcommittee staff could report their conclusions orally to the Subcommittee. The Subcommittee would then decide whether to take a claim of inaccuracy—alleging, for example, executive abuse of the "foreign intelligence" rubric—to the District Court for resolution. If the District Court, upon *in camera* inspection of the original and edited memoranda and of the staff notes, found significant inaccuracy, it would take remedial action. The specifics of its actions are a matter for sound discretion. Relief might involve, for example, providing the Subcommittee staff access to a larger sample of unedited memoranda to determine whether any previously discovered inaccuracy was isolated or systematic. If the initial inaccuracy suggested deviousness, the District Court might conclude that the cooperative approach is unfruitful and unmanageable, and that the court should withdraw from its assistance to the executive by dissolving the injunction.

The executive would be permitted to employ the substitution procedure, but only upon an *in camera* showing of two things: the accuracy and fairness of the edited memorandum,[36] and the extraordinary sensitivity of the contents of the original memorandum to the national security.[37] The determination of the District Court will, of course, be subject to appellate review.[38]

In order to gain necessary assistance in making its *in camera* determinations, the District Court may give the parties' counsel access to the material in question. The presentations of counsel regarding the fairness of the editing and the sensitivity of the material may be of significant help to the Court. *Compare Nixon v. Sirica*, 159 U.S. App.D.C. 58, 79, 487 F.2d 700, 721 (1973).

While the parties are testing this verification procedure, the Subcommittee should

---

subject to no constraints other than the criminal law; and a sample large enough to deter high officials, in whom special trust and confidence have been reposed, from any tendency to manipulate or deceive. What our approach provides is a window that lets in enough light to inhibit chicanery.

35. There has been some dispute between the parties as to the definition of "foreign intelligence surveillance." Early in the course of negotiations, the parties agreed that "[f]oreign intelligence surveillances are surveillances of the communications of foreign governments, political parties or factions, military forces, agencies or enterprises controlled by such entities or organizations composed of such entities . . . or foreign-based terrorist groups or persons knowingly collaborating with any of the foregoing; domestic surveillance include[s] all other surveillances." 551 F.2d at 386 n. 1. Subsequently, the Justice Department expanded its definition of "foreign intelligence surveillance" to include "targets of a recruitment effort by any of the foregoing"—i.e., persons who were not knowingly collaborating with a foreign party.

In classifying surveillance as domestic or foreign for purposes of the procedure we outline, the Justice Department should not unilaterally adopt its own definition, but should identify those in the disputed area to bring them to Congress's attention. This identification should be done for all edited memoranda in the two sample years, rather than being left to be discovered by the random selection procedure.

36. In this regard, the District Court will take scrupulous care in comparing the two documents and in considering the implications of the deletions.

37. We contemplate that the executive will have to satisfy a "very heavy burden," *New York Times Co. v. United States*, 403 U.S. 713, 731, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (White, J., concurring), in demonstrating its need to invoke the substitution procedure.

38. The Court of Appeals will review the documents under seal. *United States v. Lemonakis*, 158 U.S.App.D.C. 162, 183–84, 485 F.2d 941, 962–63 (1973).

The Subcommittee has expressed concern that the Attorney General may abuse the substitution procedure to destroy the validity of the random sample. A safeguard against this is, of course, provided by the requirement that substitution must be approved by the District Court after *in camera* inspection of the relevant materials. In addition, should it develop that the substitution procedure is used often—even if justifiably—the sample size may ultimately have to be enlarged. We leave this matter to be determined in light of subsequent events.

have access, if desired, to all memoranda for the sample years, in edited form.[39]

Our holding, as noted, determines only the *present* needs of the Subcommittee. Its *future* needs will depend on what the verification procedure uncovers. If it reveals cheating or deceptiveness, our assessment of the relative needs of the parties will naturally be altered.

We are aware that from the legislative viewpoint, any alternative to outright enforcement of the subpoena entails delay. The additional time required by the procedure now outlined should be modest.[40] More importantly, there is an offset, in that the memoranda are likely to be more revealing than the request letters. But even assuming that there will be some delay while the executive and the judicial branches conduct their respective review, this is an inherent corollary of the existence of coordinate branches. The Separation of Powers often impairs efficiency, in terms of dispatch and the immediate functioning of government. It is the long-term staying power of government that is enhanced by the mutual accommodation required by the Separation of Powers.[41]

We sustain the injunction against AT&T at least until the procedure outlined above has been tried and has proved inadequate.

*So ordered.*

Supplemental Opinion on Petition for Rehearing

ORDER

PER CURIAM.

On consideration of appellees' petition for rehearing, it is

ORDERED by the court that the aforesaid petition for rehearing is denied, for the reasons stated in the following supplemental opinion filed this date.

SUPPLEMENTAL OPINION

[12] The government has filed a petition for rehearing focusing upon the portions of our opinion of October 20, 1977, relating to *in camera* proceedings.

The government asks us to clarify that it was not our intent to permit counsel for the parties to participate in those *in camera* proceedings directed at verifying the need for invoking the substitution procedure. If our intent was to permit such participation by counsel, the government moves that we modify the opinion to preclude such participation, in the interest of national security.

It was and is our intention to give the district court the authority to permit the participation of counsel for the Subcommittee if the court deems such participation necessary in order to make the *in camera* determinations called for by our opinion.

This power should, of course, be exercised gingerly, particularly in regard to determinations concerning the need for the substitution procedure, which by definition means that the executive has concluded that especially sensitive documents are involved. It is to be used only if the court finds it necessary in order that it may engage in a considered way in the judicial function we have outlined.

We are aware of the cases that have upheld *ex parte* proceedings, and accordingly have held that private parties do not have a *right* to have their counsel participate in *in camera* proceedings. *See Phillippi v. Central Intelligence Agency*, 178 U.S.

---

39. Memoranda that were edited in connection with the Executive's earlier settlement offers may have been prepared under the assumption that they would not be removed from the FBI. They may contain only absolutely essential deletions and thus remain sensitive. In light of our conclusion that the Subcommittee should have these memoranda to carry on its work, we permit the executive to further edit such memoranda to the extent necessary to assure security.

40. With an important legislative interest involved, there is a plain duty on both the executive and judicial branches to advance any problems for prompt consideration.

41. *See Myers v. United States*, 272 U.S. 52, 293, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting).

**134**   567 FEDERAL REPORTER, 2d SERIES

App.D.C. 243, 247, 546 F.2d 1009, 1013 (1976); *Fonda v. Central Intelligence Agency,* 434 F.Supp. 498 (D.D.C. 1977).* The present case does involve the additional consideration that it is a body of the legislature that is seeking access, and that it has not only threshold legal standing but claims the high ground of seeking information for a legislative purpose.

Counsel for a legislative committee may be subject to the kind of security clearance that our decision contemplated for congressional staff, and may also be subject to a district court's conditions on access to *in camera* material. In such respects, the participation of counsel is in aid of the court, his primary position is as an officer of the court, and he may even be precluded from consultation with his client on the matters involved.

We are here dealing with hypothetical problems—which we presume and hope will never arise. We grapple, however, with the problem put forward by the executive in order to obviate unnecessary doubt. We have not accepted the contention that the executive determination that national security may be involved is conclusive and not subject to any further inquiry, nor have we accepted the rival claim that Congressional right of access to documents for legislative purposes is at any time absolute. If in the interest of national security the executive seeks the aid of the judicial branch, the courts are entitled to obtain, under circumscribed conditions, the aid they need for their task.

The petition for rehearing is denied.

*So ordered.*



---

UNITED STATES of America

v.

Anthony J. BROOKS, Appellant.

UNITED STATES of America

v.

John J. HAZEL, Jr., Appellant
(two cases).

Nos. 76–1818, 76–1819 and 77–1018.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 1, 1977.

Decided Nov. 10, 1977.

Rehearing Denied Dec. 9, 1977.

Defendants were convicted in the United States District Court for the District of Columbia, June L. Green, J., of possession of a sawed-off shotgun and they appealed. The Court of Appeals, Robb, Circuit Judge, held that: (1) the trial court's individual examination of prospective jurors, which developed no significant probability of prejudice against defendants from pretrial publicity, was adequate and there was no reason for the court to grant a continuance sua sponte; (2) the evidence did not entitle one defendant to an instruction on entrapment; (3) defendant was not entitled to a midtrial severance of his case from that of his codefendant, merely because the codefendant's testimony contradicted defendant's, and (4) failure of the prosecutor to excise from a videotape secretly made of defendant a dialogue in which defendant asserted that his main "hustle" was stealing was not prejudicial error.

Affirmed.

Spottswood W. Robinson, III, Circuit Judge, filed an opinion dissenting in part.

1. Jury ⟸131(2)

Method and manner of conducting jury voir dire are left to discretion of trial judge.

---

\* We are asked to waive our Rule 8(f) and resort to an unpublished memorandum in another case. We find no need to do so, however, because the principle to be established is clear.