UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BEAN LLC,                          .
                                   .
              Plaintiff,           .    CA No. 17-2187 (TSC)
                                   .
      v.                           .
                                   .
JOHN DOE BANK,                     .    Washington, D.C.
                                   .    Friday, October 20, 2017
              Defendant.           .    5:14 p.m.
. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff Bean LLC:            WILLIAM W. TAYLOR III, ESQ.
(Via Telephone)                    RACHEL F. COTTON, ESQ.
                                   Zuckerman Spaeder, LLP
                                   1800 M Street, NW
                                   Suite 1000
                                   Washington, DC 20036
                                   (202) 778-1800

                                   JOSHUA A. LEVY, ESQ.
                                   RACHEL M. CLATTENBURG, ESQ.
                                   Cunningham Levy Muse LLP
                                   1250 Connecticut Ave, NW
                                   Suite 200
                                   Washington, DC 20036
                                   (202) 261-6564

For Defendant John Doe Bank:       ALEXANDER D. BONO, ESQ.
(Via Telephone)                    FORREST HANSEN, ESQ.
                                   Duane Morris LLP
                                   30 South 17th Street
                                   Philadelphia, PA 19103-4196
                                   (215) 979-1181

                                   JOSEPH J. ARONICA, ESQ.
                                   Duane Morris LLP
                                   505 Ninth Street, NW
                                   Suite 1000
                                   Washington, DC 20004
                                   (202) 776-7824

For Intervenor Permanent Select          THOMAS G. HUNGAR, ESQ.
Committee on Intelligence of the         TODD B. TATELMAN, ESQ.
U.S. House of Representatives:           U.S. House of Representatives
(Via Telephone)                          Office of General Counsel
                                         219 Cannon House Office Bldg.
                                         Washington, DC 20515
                                         (202) 225-9700


Court Reporter:                          BRYAN A. WAYNE, RPR, CRR
                                         U.S. Courthouse, Room 4704-A
                                         333 Constitution Avenue, NW
                                         Washington, DC 20001
                                         (202) 354-3186

```
 1                      P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Civil Action 17-2187, Bean LLC
 3    versus Defendant Bank.  For the plaintiff, William Taylor,
 4    Rachel Cotton, Joshua Levy, Rachel Clattenburg.  For the
 5    defense, Alexander Bono, Joseph Aronica, Forrest Hansen.  From
 6    the Office of General Counsel, Thomas Hungar and Todd Tatelman.
 7           THE COURT:  All right.  Good afternoon, everyone.
 8    This is Judge Chutkan.  We're here on a motion for a temporary
 9    restraining order regarding a subpoena that has been filed, I
10    understand, by Congressman Nunes on the Defendant Bank for
11    certain financial records.  It appears that Bean LLC has filed
12    a motion to quash the subpoena on the bank because the subpoena
13    seeks Bean LLC's financial records.  Am I correct?
14           MR. TAYLOR:  Actually, it's not -- technically, it's
15    a complaint in a civil action.
16           THE COURT:  And because we're on the phone, and even
17    if we weren't on the phone, can you please identify yourself
18    before you speak?
19           MR. TAYLOR:  Yes.  This is Bill Taylor, Your Honor.
20           THE COURT:  Hello, Mr. Taylor.
21           MR. TAYLOR:  How do you do.  The matter is proceeding
22    with a complaint which asserts a civil cause of action and which
23    seeks a temporary restraining order.  So, technically, it's not
24    a motion to quash.  It's an attempt to seek a temporary
25    restraining order, which would have the same effect as a motion
```

1  to quash, but it's a temporary restraining order, ordering the

2  bank not to comply with the subpoena.

3          THE COURT:  All right.  And, Mr. Taylor, you represent

4  Bean LLC.  Correct?

5          MR. TAYLOR:  Yes, ma'am.

6          THE COURT:  Is counsel for the bank present?

7          MR. BONO:  Yes, Your Honor.  Alexander Bono and

8  Joseph Aronica as well.

9          THE COURT:  All right.  And is there counsel for

10  Congressman Nunes present?

11          MR. HUNGAR:  Yes, Your Honor.  Although, just to be

12  clear, I'm Thomas Hungar, General Counsel for the House of

13  Representatives, and we are here on behalf of the House

14  Permanent Select Committee on Intelligence, which is chaired by

15  Chairman Nunes.

16          THE COURT:  All right.  Let me ask counsel for the --

17  well, first, before we proceed any further, there is a motion to

18  allow the bank to proceed without being named.

19      What is your position on the motion, Mr. Hungar?

20          MR. HUNGAR:  I'm sorry.  I'm not familiar with that

21  motion.  A motion for the bank to proceed without -- oh, it's

22  just been handed to me -- under a pseudonym.  We have no

23  objection to that.

24          THE COURT:  All right.  The motion will be granted.

25  The bank will be permitted to proceed under a pseudonym as

1    "Defendant Bank."

2             MR. BONO:  Your Honor, Alexander Bono for the bank.

3    Thank you very much.

4             THE COURT:  You're welcome.

5        All right.  Now, next, I understand from the pleadings

6    that the bank negotiated an extension for compliance with the

7    subpoena for nine o'clock on Monday.  Is that correct?

8             MR. BONO:  Alexander Bono for the bank.  Correct.

9             THE COURT:  Okay.  And, Mr. Taylor, as I -- and you

10   have to forgive me because these papers came to me late in the

11   afternoon.  Have the parties discussed simply getting an

12   extension for compliance with the subpoena so that we can have

13   an orderly hearing on this?

14            MR. TAYLOR:  Yes, Your Honor.  This is William Taylor.

15   We requested of the staff representatives for Mr. Nunes that

16   there be a 48-hour extension, from Monday to Wednesday, in which

17   we could both discuss a way to resolve this and also have a more

18   orderly and nonemergency proceeding.  That is set forth in

19   Mr. Levy's declaration.  Mr. Levy's declaration also attaches

20   the response of the staff which declined our request.

21            THE COURT:  Which -- I'm sorry.  What was the last

22   part of what you said?

23            MR. TAYLOR:  Declined our request for a 48-hour

24   extension of the time within which the bank might have to

25   comply with the subpoena.

1          THE COURT:  Okay.  Mr. Hungar, is that your position?

2   Is that the position that you're asserting here, that you're not

3   prepared to offer an extension of time for compliance with the

4   subpoena?

5          MR. HUNGAR:  Yes, Your Honor.  The committee has

6   already granted one extension.  This is, obviously, a highly

7   sensitive, high-profile, extremely active investigation with

8   multiple interviews scheduled in the upcoming weeks for which

9   information that they're trying to get from the plaintiff is

10  extremely important.

11      The plaintiff, in our view, has not been proceeding in

12  good faith as evidenced, among other things, by the fact that

13  in depositions of three of the plaintiff's employees, they took

14  the Fifth and/or First Amendment so-called privilege in response

15  to virtually every question, even though Mr. Fritsch has now

16  filed a declaration with this Court providing information that

17  he refused to provide to the committee in response to its

18  questions.

19      So we think this is simply a last-ditch effort by the

20  plaintiff to continue to block a legitimate, constitutionally

21  authorized investigation of the highest national importance.

22          THE COURT:  Mr. Hungar, did you inform Bean LLC that

23  you were subpoenaing their financial records from their bank?

24          MR. HUNGAR:  No, Your Honor, although my understanding

25  -- I don't know if this is the case, but I think the bank would

1    be able to provide this information.  My understanding is that

2    there's reason to believe that plaintiff learned of the subpoena

3    to the bank some time ago, but the committee did not provide

4    that notice.

5        And the statute that the plaintiff relies on, the Right to

6    Financial Privacy Act, as a basis to the claim that there was

7    some obligation to provide notice does not apply to Congress

8    by its express terms and by the definitional provision which

9    defines the subject "government entities" as "departments and

10   agencies," which the Supreme Court has said, construing similar

11   language in other statutes, does not apply to Congress.

12            THE COURT:  Mr. Taylor, what's your response to that?

13            MR. TAYLOR:  The statute itself contains a prohibition

14   against a financial institution disclosing records of its

15   depositors, Your Honor, and it has five exceptions to that,

16   one of which is administrative subpoena, another is a search

17   warrant, another is a judicial subpoena.  And it is true that

18   none of those exceptions appears to address a subpoena from

19   Congress.

20       Nevertheless, the policy of the United States Congress

21   embodied in this statute is to protect the privacy of the

22   records of a depositor in a financial institution.  And if you

23   look at § 3412, it refers to the Congress being able to get

24   information of this sort from a supervisory agency.

25       I would say, Your Honor, that there's a statutory

interpretation question presented.  But on the face of it, for
the bank to produce these records without having given their
depositors the notice and the opportunity to protest will be
flatly illegal and would be contrary to the -- not only the
Bliley Act, but also the Right to Financial Privacy Act.

At most, you have a question of statutory interpretation on
which the Court ought to have briefing if we're going to have
that argument, because -- you haven't directed me to this yet,
but this is one thing about this case, which is that if these
documents are produced Monday morning, the entire case is moot.

THE COURT:  Right.

MR. TAYLOR:  So we have a situation in which harm is
palpable, and even if we didn't have a substantial claim and a
likelihood of success on the merits, the clear nature of the
harm without judicial relief and the minimal intrusion that
would be effected by a temporary restraining order is just about
all you need to know, it seems to me, to put this case on hold
in a status quo so that you can get the benefit of something
other than a rush job on Friday afternoon.  I frankly don't
understand why we are here, Your Honor.

THE COURT:  Mr. Hungar, can you articulate for me the
House of Representatives' prejudice if it is forced to wait a
day or two days -- if it's forced to wait till the end of the
day Monday or the end of the day Tuesday for resolution of the
issue of the subpoena?  How is it prejudiced?

1          MR. HUNGAR:  Well, several ways.  First of all, just

2     as a practical matter, my office is in the midst of briefing

3     another emergency TRO proceeding in California involving

4     constitutional issues of the highest importance and billions of

5     dollars of federal funding that 19 states are seeking to compel

6     the United States to pay without a congressional appropriation

7     that implicates hugely important separation-of-powers principles

8     for the Congress.  So, in order for us to address that, which

9     we're briefing over the weekend, we just have a practical

10    difficulty if we were to try and postpone some things in order

11    to file some briefs as early as Monday or whatever Mr. Taylor

12    might be contemplating.

13         But putting that aside and coming from the perspective

14    of the committee, as I said, the Constitution is clear that

15    congressional committees authorized by the House, as the

16    Committee on Intelligence, expressly is authorized to

17    investigate all activities having to do with the intelligence

18    community and intelligence gathering, which this unquestionably

19    is --

20         THE COURT:  Mr. Hungar, I'm not debating your

21    authority to investigate.  I'm simply asking you to articulate

22    for me the harm that you would suffer by being forced to wait

23    12 or 24 hours for the information that you seek.  I understand

24    it's more work to brief an issue.  Believe me, as somebody who

25    is dealing with my second TRO in two days, I'm aware of that.

```
 1    But beyond extra work involved in briefing the issue, what

 2    prejudice or what harm would you suffer by being forced to wait

 3    a short period of time for this information?

 4           MR. HUNGAR:  The harm, as I mentioned before, the

 5    committee has teed up numerous interviews in which the

 6    information that the bank stands willing and ready to provide

 7    is relevant.

 8           THE COURT:  When are these interviews going to take

 9    place?

10           MR. HUNGAR:  I can confer with my client and see if I

11    can give you more information about that.

12           MR. BONO:  Your Honor, this is Alexander Bono for the

13    bank.

14           THE COURT:  Yes, Mr. Bono.

15           MR. BONO:  I just want to make a statement if the

16    Court will permit me.

17           THE COURT:  Of course.

18           MR. BONO:  There was a comment that the bank did

19    not give notice or an opportunity to object, and we vigorously

20    dispute that.  We were called within an hour after we reached

21    out to committee's counsel to say we represented the bank.

22        We were called within an our by our customer's lawyer, and

23    we shared the subpoena.  They asked for the records, their own

24    records; we shared their customer records.  So to say that there

25    was no notice and no opportunity to object, we disagree with
```

1    that, respectfully.

2                THE COURT:  All right.  Thank you, Mr. Bono.

3                MR. HUNGAR:  Your Honor, Thomas Hungar again.  Going

4    back to your specific question, the committee informed me they

5    have two transcribed interviews with members and staff present

6    scheduled for Tuesday, another one for Wednesday --

7                THE COURT:  Well, wait.  Wait.  I don't have Livenote

8    before me, so I can't look at a transcript right now.  You have

9    interviews scheduled with whom?

10               MR. HUNGAR:  They have two interviews with witnesses

11   scheduled on Tuesday at which members of Congress are scheduled

12   -- have arranged to be present to be able to participate, and an

13   additional interview with a witness scheduled for Wednesday.

14   And again, I'm scheduling these things for members of Congress

15   to be present.  Obviously, it's a difficult challenge.  This is

16   a huge and ongoing, important investigation, and further delay

17   is simply a frustration of Congress's constitutional authority

18   to investigate.  And as a --

19               THE COURT:  Is it your position that you require these

20   records to be able to effectively interview these witnesses?

21               MR. HUNGAR:  My understanding is that the information

22   that the committee has been seeking from Fusion for some time

23   now, for months --

24               THE COURT:  No, no.  I'm not asking about the

25   information you've been seeking from Fusion.  I'm asking you if

1    the information that you're seeking in the subpoena to the bank

2    is information that you need to conduct these interviews.

3         MR. HUNGAR:  Yes.  Yes.  And I'm sorry for being

4    unclear.  But the committee started by seeking this information

5    from Fusion.  Fusion has been recalcitrant.  So they're going to

6    the bank because of their inability to get cooperation from

7    Fusion, and the information that they hope to get from the bank

8    would help shed light on the things that Fusion has refused to

9    give them information about, namely the genesis of and

10   relationships and contacts arising out of the preparation of

11   the Trump dossier and its implications for the intelligence

12   community, which is exactly at the core of what the committee's

13   investigating, and the continued delays like Fusion are

14   continuing to hinder that investigation.

15        And as counsel for the bank noted, Fusion I think is

16   playing games by having waited until Friday afternoon before the

17   extended Monday morning deadline to come running into this Court

18   in the hope that they could get the Court to grant some sort of

19   an extension based on the fact that it's the last minute, even

20   though, based on the representation by counsel for the bank,

21   Fusion has known about this for some time and could easily have

22   come in last week and given everybody ample time to brief it.

23        THE COURT:  Mr. Taylor?

24        MR. TAYLOR:  May I respond, Your Honor?

25        THE COURT:  Yes.

1          MR. TAYLOR:  It's always difficult to respond to a

2   sort of stream of consciousness which accuses us of proceeding

3   in bad faith and being dilatory.  Now, here are the facts.

4          Yesterday the bank was told by the committee that its

5   objections to the subpoena were rejected.  Until that point, the

6   matter was not ripe.  The bank had been engaged in conversations

7   with the committee, had presented objections to the committee,

8   as we point out, and was told yesterday that their objections

9   were overruled and they had to produce on Monday.

10          It was only at that point that our distress became obvious,

11   and that's why we asked the committee, or whoever it is that

12   speaks for Congressman Nunes, give everybody 48 hours, and from

13   Monday until Wednesday, let's see if we can't work something out

14   to get you the information that you really are interested in and

15   not force the bank to turn over all of the financial records.

16          I would like to call to your attention, Your Honor, the

17   subpoena itself.  It is Exhibit A to the declaration of

18   Mr. Levy, and I wonder if I can ask you to put it before you.

19          THE COURT:  Yes.  Just give me a moment.

20          MR. TAYLOR:  All right.  Thank you.

21          THE COURT:  All right.  I have it before me.

22          MR. TAYLOR:  You will see, when you look at it, that

23   it is so broad as to require every single bank record in the

24   account that Fusion has at this bank.  And one wonders why in

25   the --

1              THE COURT:  And you're referring to Schedule A?

2              MR. TAYLOR:  I'm referring to Schedule A.

3              THE COURT:  All right.

4              MR. TAYLOR:  Look at "Documents."

5         1.  Documents sufficient to identify any property

6    maintained at any [Bank] anywhere in the world.  Okay.

7         No. 5, for example.  Transaction history for the relevant

8    time period for all accounts.

9         8.  All documents concerning any advisory investment

10   banking, capital markets, commercial banking, or other financial

11   services provided during the relevant time period to Bean.

12        9.  All documents concerning any other services provided

13   during the relevant time by the bank to Bean.

14        And 10.  All documents concerning any applications for

15   loans or letters for credit, etc., etc.

16        Now, the only information that the committee or the

17   congressman or Mr. Hungar could conceivably articulate that

18   would be responsive to his query about the dossier is what do

19   the financial records of the bank show about Fusion's client who

20   made payments to Fusion that were used in the work of the

21   dossier.

22        These events cover the payments to Fusion by 15 to 20

23   other clients over the space of two years.  It's a wholesale

24   disclosure of all of Fusion's businesses when the -- everybody

25   knows that only a tiny portion of these records might in any way

1    be relevant to the preparation of the dossier which was done

2    beginning in April of 2016 and by a British former intelligence

3    officer, and finished sometime in the fall of '16.

4        So this is -- when you consider the claim that they have to

5    have this information for some interview, the only information

6    that they could possibly get from this bank -- you know, this is

7    deposits and checks, deposits and checks -- is what monies went

8    into the account and what monies came out of the account by

9    tens, twenties, different clients of the firm, and you won't be

10   able to tell from the bank records which one of those clients'

11   transactions to the firm was associated with the dossier.

12       So we've offered to them to sit down and discuss a way to

13   get them the records that relate the payments to the dossier.

14   We offered it last night; we're prepared to discuss it again.

15   The answer is, no, not only will we not discuss that with you,

16   we want all of the records, and we want them Monday morning.

17       With all due respect, Your Honor, we have demonstrated not

18   just palpable harm to us if this TRO is not granted, but a high

19   possibility of success on the merits.  Mr. Nunes had no more

20   authority than I do to issue this subpoena.  None of the

21   requirements of the committee are met to authorize the subpoena.

22       The man said, I'm having nothing else to do with the Russia

23   investigation, I give up all my legislative authority, I am

24   recused; and all of a sudden, in the midst of what you and all

25   of us understand to be an uproar by the White House about the

so-called dossier, Mr. Nunes reappears and reports the issuance of the subpoena to the bank.

All we're saying this Friday afternoon, Your Honor, we've made more than a sufficient showing that if you don't grant relief today, our rights are never going to be adjudicated in this case.  It will be moot, and you will never have and we will never have the opportunity for full adjudication of these claims, which I think you can see from the papers themselves that they are substantial.

They are somewhat novel, because I don't know of any congressional committee where a recused chairman has tried to issue a subpoena.  I grant you that.  But we are not -- our claim is really that the bank is in the position of having to comply if the Court doesn't grant relief.

So it does occur to us that to put this matter in a status quo pending a reasonable time for us to either brief a preliminary injunction, which would be the next step, is a very modest ask for the plaintiff in this case because, in the absence of it, our harm is irreparable, as those terms are used, and the public interest and the balance of harm clearly warrants the relief that we're asking for.

With all due respect, Your Honor, we didn't wait until the last minute to come in here.  We -- when we had no other remedy, no other possibility, we very reluctantly sought to ask the United States District Court to protect our rights.

1          THE COURT:  Mr. Taylor -- and this is not meant to

2     indicate how I intend to rule one way or the other on the

3     motion, but how much -- and forgive me if this is in your

4     pleadings, but as you might understand, I didn't get these very

5     long ago.

6          MR. TAYLOR:  Yes, Your Honor.

7          THE COURT:  How much time is it that you're requesting?

8          MR. TAYLOR:  Well, we are asking for a temporary

9     restraining order, Your Honor, which under the rules lasts for

10    10 days, and that would presumably be followed by briefing on

11    a preliminary injunction, which we'd be happy to do within that

12    time table.

13         THE COURT:  All right.

14       Mr. Bono, what is the bank's position in all of this?

15         MR. BONO:  Your Honor, the bank is between the

16    proverbial rock and the hard place.

17         THE COURT:  I understand.

18         MR. BONO:  We wish to comply with the congressional

19    subpoena.  We made objections; they were denied.

20         THE COURT:  The bank did make objections to the

21    subpoena initially; is that correct?

22         MR. BONO:  Absolutely, Your Honor.

23         THE COURT:  All right.

24         MR. BONO:  And they were turned down.  And we also,

25    Your Honor, you can see by the pleadings, we did not oppose this

injection, because we do value extremely highly the privacy

of our customers.  So we are completely cognizant about our

customers' desire not to have this information shared, and we

have to decide: Do we obey a congressional subpoena and contempt

of Congress, or do we face the wrath of our customer who files

an injunction against us?

THE COURT:  I understand.

MR. BONO:  That's where we are.  So we would like to

do the right thing.

THE COURT:  All right.

MR. HUNGAR:  Your Honor, it's Todd Hungar for the

House, if I may address a couple points?

THE COURT:  Yes.

MR. HUNGAR:  Because the recitation from plaintiff's

counsel I think did not give an accurate portrayal of a number

of matters.

First of all, taking his points in reverse order and his

assertion that the chairman of the committee said "I give up my

legislative authority and recuse myself" is simply false.  The

statement from the chairman is in the pleadings, and it's a

matter of public record.

What he said is that he's assigning to Representative

Conaway responsibility to take charge of the Russia investigation

but that the chairman will continue to fulfill all of his other

responsibilities as committee chairman.  One of those

1   responsibilities under the rules of the Intelligence Committee

2   is to authorize subpoenas, which is exactly what he did here.

3          THE COURT:  Okay.  Mr. Hungar, I will tell you that

4   while that is an issue that has been raised, that is not in the

5   forefront of my consideration at this moment.  It is really the

6   -- you know, it certainly is part of plaintiff's complaint and

7   it is an issue, but I'm more concerned with the harm that

8   plaintiffs face if the subpoena is complied with on Monday

9   morning, less so on who issued the subpoena.

10          MR. HUNGAR:  I understand, Your Honor.  But first of

11   all, under Supreme Court precedent, courts can't issue relief in

12   the nature of injunctive relief unless they satisfy the four

13   criteria, one of which is likelihood of success on the merits,

14   and the plaintiffs have no likelihood of success on the merits.

15   And that's doubly so in the congressional context.

16     It's unprecedented.  I'm not aware of any cases where a

17   court has issued a restraining order against a congressional

18   subpoena, and particularly not where the Court can make a

19   finding that there is a likelihood of success on the merits.

20          THE COURT:  Well, there are a number of issues that

21   plaintiffs have raised with regard to the subpoena, not least

22   among them is the breadth of the subpoena, the time period of

23   the documents requested, the kinds of documents requested.

24     Is it your position, Mr. Hungar, that the Court has no

25   authority to grant plaintiffs any relief regarding the subpoena,

1    that I have no jurisdiction?

2            MR. HUNGAR:  Your Honor, this is not like a discovery

3    subpoena where the discretion of the Court is implicated.  If

4    there were a constitutional or statutory flaw in this

5    constitutionally authorized subpoena, that would be one thing.

6    But it's not a matter in which the Court has discretion simply

7    to determine whether what Congress does in its exercise of its

8    Article I powers determined it needs to have that --

9            THE COURT:  Oh, no.  I don't believe that's

10   Mr. Taylor's claim at all, but I'll let Mr. Taylor speak for

11   himself.  But I'll let you finish, Mr. Hungar.

12           MR. HUNGAR:  Mr. Taylor was also suggesting that the

13   dossier is the only thing that the committee is interested in.

14   That's simply not the case.  There is evidence -- indeed, public

15   information -- suggesting that his client had other Russia-

16   related matters that it was engaged in during this same time

17   period that also had implications for the Russia investigation.

18   And the committee, therefore, is interested in pursuing

19   information about those as well, which is why his offer to

20   provide information that's strictly limited to one or two

21   clients for the dossier is insufficient.

22       In addition, the committee is seeking to determine whether

23   there are any connections between Fusion and the intelligence

24   community, which is part of what this information would be

25   designed to obtain.

1   THE COURT:  All right.

2   MR. HUNGAR:  And so some of that information is

3   classified and obviously not public, but there's also public

4   information to that effect.  So they can't very well sit down

5   with Fusion and describe exactly what it is they're looking for

6   based on classified information, which is why, in the exercise

7   of its constitutionally granted discretion, the committee has

8   decided to seek this information.

9   One final point, if I may, because counsel for the

10   plaintiff went back to the statutory argument a while back --

11   THE COURT:  Can you slow down a little bit?  My court

12   reporter is having some difficulty keeping up.

13   MR. HUNGAR:  I'm sorry, Your Honor.  I just wanted

14   to go back to the Right of Financial Privacy Act point because

15   counsel had referred to it earlier.  He didn't quote to the

16   actual operative sentence of the statute.

17   This is 12 U.S.C. § 3412(d).  It says, "Nothing in this

18   chapter," this chapter being the Right to Financial Privacy Act,

19   "shall authorize the withholding of information by any officer

20   or employee of a supervisory agency from a duly authorized

21   committee or subcommittee of the Congress."

22   And then 12 U.S.C. § 3401(3) defines the coverage of

23   the act, government authority, and the act only applies to

24   government authority.  It says, "'Government authority' means

25   any agency or department of the United States, or any officer,

1    employee, or agent thereof."

2         The Supreme Court in *Hubbard v. United States*, 514 U.S. 695,

3    held that the terms "department or agency of the United States,"

4    when used by Congress in statutes, refer to the Executive Branch

5    entities, not to the Congress.

6         So it's clear that the Right to Financial Privacy Act,

7    which is what the plaintiff has been referring to here, does

8    not apply to Congress, does not impose any restrictions here,

9    and it provides no basis for a finding of likelihood of success

10   on the merits.

11        THE COURT:  All right.  Mr. Taylor, since you represent

12   the plaintiff, I will let you have the last word on this, and

13   then I will try and issue a decision shortly.

14        MR. TAYLOR:  Your Honor, I don't want to prolong this.

15   It is certainly not true that the United States district courts

16   are without authority to give relief to subpoenas which are

17   illegal or which invade the First Amendment rights of depositors

18   or which are otherwise defective.

19        That's simply not the case that the Court has no

20   jurisdiction to narrow the subpoena or to grant relief when

21   it's appropriate.  With all due respect, the first I heard

22   about their unwillingness to discuss a resolution because of

23   other matters is just now.

24        So all I can tell you, Your Honor, is that we ought not to

25   be here.  There ought to be a way of having a deliberate and

1    professional -- either a litigation or some way to try to

2    resolve this with us, because we are the stakeholder.  And for

3    reasons that are mysterious to me, we have not been able to get

4    any acquiescence by Mr. Hungar and his colleagues on that front.

5              So we are without any remedy unless the Court utilizes

6    its power to maintain this matter in the status quo under a

7    temporary restraining order, and of course we would address any

8    scheduling issues the Court would like to impose after that.

9              THE COURT:  All right.

10             MR. TAYLOR:  Thank you very much.

11             THE COURT:  Thank you all.  I appreciate your getting

12   all together at this time on a Friday evening, especially my

13   courtroom staff who had to be brought back in here.  I'll take

14   this under advisement.  I'll try and issue a ruling as soon as I

15   can.  Do I have contact information for everyone?  My law clerk

16   indicates that I do.  All right.  Thank you all.

17             MR. TAYLOR:  You may not have cell phones, but you

18   have e-mails, Your Honor.

19             THE COURT:  Yes.  I have e-mails.

20         All right.  Thanks.  We're adjourned.

21         (Proceedings adjourned at 5:49 p.m.)

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A Wayne*
BRYAN A. WAYNE