## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| BEAN LLC d/b/a FUSION GPS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action 1:17-cv-2187-TSC |
| ) | |
| DEFENDANT BANK, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| PERMANENT SELECT COMMITTEE ) | |
| ON INTELLIGENCE OF THE U.S. ) | |
| HOUSE OF REPRESENTATIVES, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| _____ ) | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

Plaintiff renews its request for a Temporary Restraining Order preventing Defendant Bank from producing records of all of Plaintiff's transactions with any law firm, "media company" or journalist with which it has worked. *None* of those demands are pertinent to the Committee's "Russia investigation," and disclosure of the documents would cause irreparable harm to Plaintiff by destroying the confidentiality of its business with its clients and contractors and by violating Plaintiff's First Amendment rights to free speech and free association. The nature of the records demanded and the purported "justifications" demonstrate that the subpoena at issue is overbroad because it is not limited to records pertinent to a legislative purpose, and the effort to enforce it has no purpose other than to harm Plaintiff.

I.    **PLAINTIFF'S OBJECTIONS TO INTERVENOR'S REQUESTED BANK RECORDS**

Pursuant to the terms of the Agreement embodied in the Court's Order of October 27, 2017 (the "Order"), Intervenor, on November 1, 2017, demanded that Defendant Bank produce 112 of the nearly 400 records in Defendant Bank's possession.  The list of documents prepared and demanded by Intervenor is attached hereto as Exhibit A (filed under seal).  It provided what it considered a justification for the documents demanded, a copy of which is attached hereto as Exhibit B (filed under seal).  On the same day, Plaintiff presented Intervenor with objections to these demands, attached hereto as Exhibit C (filed under seal).  On November 2, 2017, counsel for Plaintiff and Intervenor held a phone call at Plaintiff's counsel's request in which Plaintiff's counsel urged Intervenor to narrow or withdraw the documents it demanded.  Counsel for Intervenor replied that it was "not in a position to accept [Plaintiff's] suggestion that it withdraw its request for these specified transactions, which are necessary for its investigation."  *See* Exhibit C.

As provided in the October 27, 2017, Order, Plaintiff now must renew its request for a temporary and permanent order preventing Defendant Bank from producing the documents itemized in Exhibit A, with certain exceptions.[1]  In its order of dismissal, the Court retained jurisdiction to grant this relief.

II.    **PLAINTIFF MEETS THE STANDARD FOR A TEMPORARY RESTRAINING ORDER**

A.  **Legal Standard**

In our original motion papers, we briefed the legal requirements for a Temporary Restraining Order, *see* Mem. of Points & Authorities in Supp. of Pl.'s Unopposed Emergency

---

[1] Plaintiff has authorized Defendant Bank to produce Request Nos. 54-64 & 82, in redacted format to protect non-pertinent private data.

Mot. for a Temp. Restraining Order and Prelim. Inj. (Dkt. No. 2-1) at 4-8, and we incorporate those arguments here.[2] "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). To receive a temporary restraining order (TRO), the moving party must show that four factors warrant relief: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "The four factors have typically been evaluated on a 'sliding scale,'" and where "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *McGinn, Smith & Co. v. Fin. Indus. Regulatory Auth.*, 786 F. Supp. 2d 139, 144 (D.D.C. 2011) (quoting *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).  In this case, all four factors weigh in favor of a temporary restraining order prohibiting Defendant Bank from complying with demands for non-pertinent records, the disclosure of which would violate Plaintiff's First Amendment rights and confidentiality obligations, and irreparably harm Plaintiff, without prejudice to Intervenor.

As the Court will no doubt see when it reviews the long list of records demanded and their purported justifications, the harm that will flow from their production is irreparable, and the

---

[2] Plaintiff also incorporates all of its points and authorities in its previously submitted briefs. *See* Mem. of Points & Authorities in Supp. of Pl.'s Unopposed Emergency Mot. for a Temp. Restraining Order and Prelim. Inj. (Dkt. No. 2-1); Pl.'s Reply in Support of its Emergency Mot. for a Temp. Restraining Order and Prelim. Inj. (Dkt. No. 13).

legal principles that govern this question are so clear that there is no room for serious debate over the merits of Plaintiff's claim.

With the exception of those documents that we have authorized Defendant Bank to produce, none of the other documents requested bear any nexus to the Committee's "Russia investigation," and the purported "justifications" for the requests could not be clearer on that point. None of the "justifications" explains why the records are pertinent to any question under inquiry.

### B.  Plaintiff Will Succeed on the Merits of this Case.

#### 1.  This Court Has Full Authority to Prohibit Disclosure of the Demanded Records.

The Federal Courts have clear authority to review, restrict, condition or enjoin congressional subpoenas which are so overbroad as to call for documents not pertinent to an articulated legislative purpose and which invade First Amendment and privacy rights.  *See United States v. Amer. Telephone & Telegraph Co.,* 567 F.2d 121, 129-30 (D.C. Cir. 1977) (hereinafter "*AT&T II*"); *Watkins v. United States*, 354 U.S. 178, 187-88 (1957).

Intervenor has from time to time suggested that this Court has no power to grant relief.  It does not argue, as it could not, that *Eastland v United States Servicemen's Fund,* 421 U.S. 491 (1975) affects this Court's jurisdiction or authority to review the Committee's improperly overbroad congressional subpoena. In *Eastland*, a non-profit sued a Senator and his staff to enjoin enforcement of the subpoena they served on the non-profit's bank, and the Court held that the Senator and his staff were immune from suit because the Speech or Debate Clause of the Constitution precluded them from being "questioned in any other place" – *e.g.*, the Federal Courts.  *See Eastland*, 421 U.S. at 509.  Here Plaintiff is not suing the Committee, its Chair or its staff.  The Committee has *chosen* to be here, has not taken the position that it is a necessary

party, and has not claimed – and cannot claim – that relief should not be granted under a theory that Intervenor is immune from suit under the Speech or Debate Clause.

Our Court of Appeals, as well as other courts, have made it clear that "Congress' investigatory power is not, itself, absolute" and is not immune from judicial review. *AT&T II,* 567 F.2d at 129.

Indeed, this lawsuit is precisely the vehicle envisioned by Justice Marshall, in his *Eastland* concurrence, when he wrote "to emphasize that the Speech or Debate Clause does not entirely immunize a congressional subpoena from challenge by a party not in a position to assert [its] constitutional rights by refusing to comply with it." *Id.* at 513 (Marshall, J., concurring). Justice Marshall stated: "When duly subpoenaed … a person does not shed his constitutional right to withhold certain classes of information," *id.* at 515 (Marshall, J., concurring); *see id.* at 517 (Marshall, J., concurring) (stating that "[t]his case does not present the questions of what would be the proper procedure, and who might be the proper parties defendant, in an effort to get before a court a constitutional challenge to a subpoena duces tecum issued to a third party").

As Plaintiff has done here, the plaintiff in *AT&T II,* 567 F.2d at 122, sued a private party to enjoin *it* from complying with a congressional subpoena, and the district court entered a temporary restraining order, after which the district court granted summary judgment in favor of the plaintiff and entered a preliminary injunction. *See id.* at 123. On appeal, the court of appeals, like this Court, did not enforce the congressional subpoena, but rather encouraged the parties to resolve the matter on their own. *See id.* However, the case came back to the court of appeals, which sustained the injunction on AT&T's compliance with the congressional subpoena. *See id.* at 133.

In reaching this decision, the *AT&T II* court explained why judicial review of congressional subpoena was permitted, notwithstanding the Speech or Debate Clause, when the plaintiff was suing AT&T (not a member of Congress) to enjoin the phone company's compliance with the congressional subpoena:

> As is clear from Watkins, Barenblatt, and Senate Select Committee, however, the Clause does not and was not intended to immunize congressional investigatory actions from judicial review. Congress' investigatory power is not, itself, absolute. Barenblatt v. United States, 360 U.S. 109, 111-12, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). And the fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party. See Justice Marshall's concurring opinion in Eastland, 421 U.S. at 513, 95 S.Ct. at 1826.

*AT&T II*, 567 F.2d at 129. The *AT&T II* court elaborated, stating that the plaintiff was not in a position to challenge the congressional subpoena in a contempt proceeding because the subpoena was not served on the plaintiff, and plaintiff could not be held in contempt for not complying with it. *See id*. The court stated that such a dynamic should not foreclose plaintiff's right to challenge the congressional subpoena, "so long as members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena." *Id.* (citing *Eastland*, 421 U.S. at 513 (Marshall, J., concurring)). The court's rationale for the foregoing specific point, contrary to Intervenor's assertions in its prior papers, had nothing to do with the fact that the plaintiff was the Executive Branch. What mattered to the court was the fact that the phone company (not Congress, its committee, its members or its staff) was being sued. *See id.* ("The approach by which the [plaintiff] here achieves judicial consideration of its challenge is not properly subject to reproach as exalting form over substance. The role of the court often turns on matters of procedure."). In the *AT&T II* court's own words:

> In sum, while this case is similar in several respects to the situation in Eastland, as earlier noted (551 F.2d at 391), for purposes of considering whether the Executive's claim is entitled to at least some judicial consideration, we emphasize

that no member of the Subcommittee in the present dispute has been made a defendant in a judicial proceeding. The courts do not accept the concept that Congress' investigatory power is absolute. What the cases establish is that the immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny.

*Id.* at 130.

Further, the Supreme Court's earlier decision in *Watkins,* 354 U.S. at 187, made clear that

federal courts must enforce the limitations on the legal authority of Congress to probe:

There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress…. Nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible.

Indeed, one of the reasons why the *AT&T I* court encouraged settlement, rather than invalidate

the congressional subpoena, was the absence of "any allegation that Congress is seeking to

'expose for the sake of exposure.'" *United States v. Amer. Telephone & Telegraph Co.*, 551 F.2d

384, 393 (D.C.Cir. 1977) (hereinafter "*AT&T I*") (citing *Watkins*, 354 U.S. at 200). Here,

however, in the blatant absence of any pertinency, Intervenor's demands are transparently

designed solely to expose Plaintiff's clients and contractors simply to punish Plaintiff and

destroy its business relationships through the disclosure of them.

The House Permanent Subcommittee on Intelligence is not a grand jury or a law

enforcement agency. It cannot demand private records just because it would like to see them. Its

power of inquiry is limited to records "pertinent" to its investigation. *See Watkins*, 354 U.S. at

214–215. Intervenor makes no concession to this principle and makes no effort to limit the

subpoena to its appropriate bounds. It insists that Defendant Bank produce over 100 bank

records, even though it cannot identify a single one not already produced that is pertinent to the investigation or any legitimate reason why any of them would be.

   2.   **The Subpoena Is Overbroad Because It Seeks to Compel Production of Records Not Pertinent to A Legitimate Legislative Inquiry.**

Intervenor appears to have abandoned its purported need to review Plaintiff's bank records on the basis of "classified information," in favor of new excuses, none of which meets any required standard. It no longer even refers to the single page press release which it earlier described as defining the scope or "parameters" of its inquiry.  That press release identified four questions the Committee was seeking to answer:

> What Russian cyber activity and other active measures were directed against the United States and its allies?

> Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?

> What was the government's response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?

> What possible leaks of classified information took place related to the Intelligence Community Assessment of these matters?[3]

There is no conceivable relevance to these questions that can be advanced to justify prowling through Plaintiff's banking transactions with clients and vendors who have nothing to do with the dossier or with Russia. Intervenor's current demands consist of the following categorical requests, each of which fails to demand pertinent information and implicates Plaintiff's First Amendment rights and confidentiality obligations.  The purported explanation for why these items are "necessary" fail to establish pertinency, particularly in light of Plaintiff's

---

[3] Press Release, *Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation*, Mar. 1, 2017, *available at* https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

exposure of these requests as having no connection to Russia or Mr. Trump.  *See generally* Decl. of P. Fritsch, attached hereto at Exhibit D (filed under seal).  To wit:

1. <u>Law Firms</u>:  Intervenor demands bank records related to transactions with 10 law firms under the false and offensive premise that "Fusion GPS has established a pattern and practice of using law firms as intermediaries to mask the true beneficiaries of its research."  Exhibit B.  It does not, of course, provide any factual basis for the insult.  Law firms, on behalf of their clients, contract with third parties on a confidential basis, during ongoing litigation and in situations in which litigation is reasonably foreseeable.  *See* Decl. of John Doe, Ex. 5 (Dkt. No. 13-3) to Pl.'s Reply Br., at ¶¶ 6-7; Decl. of John Doe, Ex. 6 (Dkt. No. 13-4), to Pl.'s Reply Br. at ¶¶ 4, 6-7.  Such work occurs every day, all over the country. None of the law firms about which Intervenor seeks information (other than Perkins Coie and Baker Hostetler) contracted with Fusion GPS to perform work related to Russia or Donald Trump, in any way.  *See* Decl. of P. Fritsch at ¶ 4, attached hereto at Exhibit D.  The demands for records related to these other law firms are not pertinent to Intervenor's investigation and, most importantly, the records are protected by the First Amendment and confidentiality.  *See id.* at ¶3.  This demand is clearly a recently contrived effort to find some justification to take the bank records and use them to further harass and punish Fusion and its clients.

2. <u>Media Company A</u>:  Intervenor demands bank records related to "media companies…to determine whether such companies were the beneficiary of dossier or other Russia related information."  Exhibit B.  Again, there is no effort to connect this curiosity to a legislative purpose or fact.  It is contrived to substitute for the ridiculous

notion that Intervenor can demand documents in an overbroad subpoena from a third party and not explain what it is looking for or why. This company received no payment related to Russia or Donald Trump. *See* Decl. of P. Fritsch, Exhibit D, at ¶ 5. The demand for records related to this company are not pertinent. The records are protected by the First Amendment and confidentiality. *See id.* at ¶ 3.

3. <u>Journalists</u>: Intervenor demands bank records related to payments to any "journalists who have reported on Russia issues relevant to its investigation" and "individuals on (sic) have contributed to press stories on Russia issues relevant to its investigation." Exhibit B. The requested records related to payments to the journalists and "individuals" are protected by the First Amendment and confidentiality, and they are not pertinent, as they are not related to Russia or Donald Trump. *See* Decl. of P. Fritsch, Exhibit D, at ¶¶ 3&6. In attempting to justify the overbroad subpoena earlier, Intervenor could have, but of course did not, argue the relevance to its inquiry of any such payments.

4. <u>[Business A]</u>: Intervenor demands bank records related to Business A because it "has long represented [a holding company]" and is a "registered agent of the foreign government of" a particular country. Exhibit B. Intervenor could have requested any bank records related to payments to entities on behalf of the foregoing holding company or the foregoing particular country, but it did not. Nor does this request have anything to do with classified information. Business A retained Fusion GPS for services that were unrelated to the foregoing holding company, the foregoing particular country, Russia or Donald Trump. *See* Decl. of P. Fritsch, Exhibit D, at

¶ 7.  The request for bank records related to Business A is not pertinent.  The records are protected by the First Amendment and confidentiality.  *See id.* at ¶ 3.

5.  [Business B]:  Intervenor demands bank records related to Business B because of its representation of "[a company], who (sic) is suing the U.S. government over a fine imposed for 'reckless disregard' of U.S. sanctions on Russia related to a joint venture with [another company]."  Exhibit B.  This justification is similarly contrived to create some argument other than classified information.  Business B retained Fusion GPS for a matter that had nothing to do with the foregoing companies, Russia or Donald Trump.  *See* Decl. of P. Fritsch, Exhibit D, at ¶ 8.  The request is not pertinent.  The records are protected by the First Amendment and confidentiality. *See id.* at ¶ 3.

6.  "Re-production" of Records:  Intervenor demands the "re-production" of records from two clients and several contractors, as well as the unproduced records of any and all additional transactions with them.  Plaintiff objects to the production of these records as follows:  *First*, records of the additional transactions were not produced because the work related to them pertained to separate matters and has no nexus to Russia or Mr. Trump, *see* Decl. of P. Fritsch, Exhibit D, at ¶ 9; the requests are therefore not pertinent to the investigation.  *Second*, the "re-production" of records is redundant of what has been produced.  Inasmuch as Intervenor demands the redacted metadata pertaining to those previously produced records, Intervenor has no right to the metadata because it is not pertinent to the "Russia investigation."  That metadata includes Plaintiff's bank account number (which Intervenor already has, from the face of the subpoena); the other party's bank account numbers; the name of the banks

making the payment and receiving the payment; and the addresses of those banks, among other sensitive, and not pertinent, data.  That information does not further any legitimate legislative purpose and is exceedingly private.

For the reasons set forth in Plaintiff's earlier filed papers, compliance with these demands would cause Plaintiff irreparable harm and impair the public interest, and an injunction would not prejudice Intervenor or its investigation, which would not benefit at all from the demanded records.

Over Intervenor's objections, Plaintiff has proposed, in the alternative, that the Court appoint a Special Master under Federal Rule of Civil Procedure 53 or some other third-party neutral to take custody of the records, consult with the parties together and separately, and make determinations as to whether any of the remaining records are pertinent. Short of the Court taking on this task itself, a Special Master is the only other remaining course that would prevent unwarranted intrusion into Plaintiff's private affairs and violation of its First Amendment rights. Intervenor previously declined to agree on the ground that it could not share classified information with the Special Master or other neutral.  It is now clear that Intervenor's requests have nothing to do with classified information.

Under the circumstances, the Court should grant the order requested. It could condition the order on compliance with authority granted to a Special Master.

## CONCLUSION

For these reasons, this Court should grant Plaintiff's motion for a temporary restraining order and preliminary injunction and order that Defendant Bank not to comply with the subpoena, going forward until this lawsuit is resolved.

Dated: November 3, 2017               Respectfully Submitted,

  /s/ William W. Taylor III
William W. Taylor, III (D.C. Bar No. 84194)
Steven M. Salky (D.C. Bar No. 360175)
Rachel F. Cotton (D.C. Bar No. 997132)
**ZUCKERMAN SPAEDER LP**
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 788-1800
wtaylor@zuckerman.com
ssalky@zuckerman.com
rcotton@zuckerman.com

Joshua A. Levy (D.C. Bar No. 475108)
Robert F. Muse (D.C. Bar No. 166868)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
**Cunningham Levy Muse LLP**
1250 Connecticut Avenue, NW, Suite 200
Washington, D.C. 20036
Tel: 202-261-6564
jal@cunninghamlevy.com
rmuse@cunninghamlevy.om
rmc@cunninghamlevy.com

**CERTIFICATE OF SERVICE**

I certify that on November 3, 2017, I filed the foregoing on the court's CM/ECF system, which caused it to be served on all registered parties.

   /s/ Rachel M. Clattenburg
   Rachel M. Clattenburg