THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BEAN LLC d/b/a FUSION GPS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action 17-cv-2187-TSC |
| DEFENDANT BANK, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PERMANENT SELECT COMMITTEE ON INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S RENEWED APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff has cooperated with Intervenor. It authorized the production of pertinent bank records ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Intervenor now acknowledges that the vast majority of the records that it subpoenaed are not pertinent to its investigation. But it nevertheless demands the production of all of Plaintiff's transactions with any law firm, media company or journalist. As Intervenor's purported justifications for these records make clear, the remaining demands seek no pertinent material, and, if not restrained, will violate Plaintiff's constitutional rights to due process, free speech and free association, and destroy Plaintiff's confidential relationships with its clients.

Intervenor concedes, as it must, that a congressional committee's authority to investigate is not immune from judicial review. *See* Intervenor's Mem. in Opp. to Pl's Renewed

Application for TRO (Dkt. No. 25-3) at 8.  Despite that concession, it denies that this Court may play any role in protecting Plaintiff from an overbroad and harassing subpoena.  The Supreme Court has repeatedly refuted Intervenor's interpretation of the lack of a role for the judiciary in reviewing congressional investigations.  *See, e.g.*, *Eastland v. USSF*, 421 U.S. 491, 513, 517 (1975) (Marshall, J., concurring); *United States v. Rumely*, 345 U.S. 41, 44 (1953); *Kilbourn v. Thompson*, 103 U.S. 168, 190, 195 (1880).  Nor can Intervenor disguise itself as a law enforcement agency, as it has tried to do in its papers, *see* Intervenor Mem. in Opp. at 3, 14-15, in order to escape judicial review of its overbroad demands.  *See Watkins v. United States*, 354 U.S. 178, 187, 200 (1957) ("Nor is the Congress a law enforcement or trial agency.").

The Supreme Court has been clear that congressional committees cannot pry into private affairs, expose for the sake of exposure, name names or issue subpoenas for no purpose other than to punish subjects.  *See Watkins*, 354 U.S. at 187, 200; *see also Kilbourn*, 103 U.S. at 190, 195.  Yet that is precisely what the Committee and its "recused" chair, a former Trump campaign adviser, are doing—at the urging of President Trump. Beginning just days before Intervenor submitted its latest overbroad demands to Plaintiff, President Trump tweeted non-stop for several days about the need to investigate Plaintiff, in retaliation for its investigation of his campaign and his White House.[1]

---

[1] *See, e.g.*, Donald J. Trump, @realDonaldTrump, Oct. 29, 2017, [four consecutive tweets at 6:53 am, 7:02 am, 7:09 am; 7:17 am], https://twitter.com/realDonaldTrump/status/924635359480303616;https://twitter.com/realDonaldTrump/status/924637600094326784; https://twitter.com/realDonaldTrump/status/924639422066384896; https://twitter.com/realDonaldTrump/status/924641278947622913 ("Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?), ... the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia, …"collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's...are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!"); Donald J. Trump, @realDonaldTrump, Oct. 30, 2017, 4:37 am, https://twitter.com/realDonaldTrump/status/924963492645437441 ("Report out that Obama Campaign paid $972,000 to Fusion GPS. The firm also got $12,400,000 (really?) from DNC. Nobody knows who OK'd!").

The subpoena was not drafted to identify records responsive to the Committee's Russia inquiry. *See* Exhibit A to First Levy Decl. (Dkt. No. 2-3) (requesting all of Plaintiff's banking records for the past two years). Instead, it was drafted and pursued to harass and punish Plaintiff. The unmistakable fact is that if Plaintiff had not filed this suit, the Committee would have happily prowled through all of Plaintiff's banking records and used them for no purpose other than to inflict harm. And despite this suit, the Committee still seeks to do exactly that with regard to certain categories of Plaintiff's clients.

What remains at issue before the Court are overbroad demands for records that Intervenor does not even seriously attempt to justify as being pertinent to the Committee's Russia inquiry. The Court should prevent any further harassment and intrusion into Plaintiff's constitutional rights and grant the order.

## ARGUMENT

Plaintiff has already demonstrated that all four of the preliminary injunction factors weigh in favor of a TRO. *See* Mem. of Points & Auth. in Supp. of Pl's Unopposed Emergency Mot. for a Temp. Restraining Order and Prelim. Inj. at 4-8.[2] In this reply, Plaintiff addresses a few supplemental points to respond to Intervenor's arguments.

---

[2] The Committee misreads the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), and this Circuit's subsequent opinion in *Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011), claiming that the "sliding scale" approach is no longer valid. Opp. at 7. *Winter* did not establish a new approach; it merely decided that the lower courts had erred by holding that where the plaintiff had shown a strong likelihood of success on the merits, they need only show the "possibility" of irreparable harm. 555 U.S. at 22. Similarly, the suggestion that *Sherley v. Sebelius* changed the sliding scale approach in this Circuit is directly contradicted by Judge Ginsburg's opinion for the court. Although the court noted that *Winter* could be read to suggest or even hold "that a likelihood of success is an independent free-standing requirement for a preliminary injunction" (quoting *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288 (2009)), the Court explicitly refused to decide the issue. Instead, in deciding that the plaintiffs were not entitled to preliminary injunctive relief, the Court remarked that "[w]e reach this conclusion under the sliding scale approach to the preliminary injunction factors; a fortiori we would reach the same conclusion if likelihood of success on the merits is an independent requirement." 644 F.3d at 399. The Committee might wish it to be otherwise, but the sliding scale approach remains appropriate in this Circuit.

**A. Plaintiff Has Demonstrated a Substantial Likelihood of Success on the Merits.**

Intervenor's position depends on this Court accepting that it has no ability to do anything in the face of a plainly overbroad and abusive subpoena requesting records that even Congress does not attempt to justify as pertinent. This is simply not the law.

1. Courts May Enforce Limits on Congress' Authority to Subpoena Documents.

As much as Intervenor would like to pretend otherwise, federal courts in this circuit have enjoined a private party's compliance with a congressional subpoena in *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121 (D.C. Cir. 1977) ("*AT&T II*"). And contrary to Intervenor's argument, no court has limited the *AT&T II* decision to disputes between the executive and legislative branches.

Intervenor attempts to ignore the clear limits imposed on congressional powers to investigate by claiming that it is equivalent to the SEC or some other federal law enforcement agency, *see* Intervenor Mem. in Opp. at 3, 14-15, despite the fact that the Supreme Court has stated precisely the opposite: "Nor is the Congress a law enforcement or trial agency." *Watkins*, 354 U.S. at 187; *see also United States v. Welden*, 377 U.S. 95, 117 (1964) (Black, J., dissenting) ("Congress is not a law enforcement agency; that power is entrusted to the Executive. Congress is not a trial agency; that power is entrusted to the Judiciary."). The *Watkins* Court continued and set forth additional limitations on Congress' authority to conduct investigations:

> But broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress.… No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to "punish" those investigated are indefensible.

*Id.* Such limitations must be enforced by the courts.

The *Watkins* Court, of course, also discussed another limitation unique to a congressional committee's authority to investigate: pertinency, which is a well-established standard for congressional investigations. 354 U.S. at 207-16. In *Senate Select Ethics Comm. v. Packwood*, 845 F. Supp. 17, 21 (D.D.C. 1994), the court found that any record demanded by the Senate Ethics Committee had to be "pertinent." Intervenor incorrectly relied on this same decision to argue that the pertinency test is not applicable. *See* Intervenor Mem. in Opp. (Dkt. No. 25-3) at 9-10. In *Packwood*, the court found: "Senator Packwood **_correctly_** observed that the records sought must at least be 'pertinent' to the congressional inquiry." 845 F. Supp. at 21 (emphasis added).[3] This pertinency standard grew out of an Act of Congress, limiting the authority of a congressional investigation to demand only information, material or testimony "pertinent to the question under inquiry." *See Watkins*, 354 U.S. at 207 (citing 2 U.S.C. § 192). However, as even *Packwood* indicates, the standard has been applied outside of the context of 2 U.S.C. § 192. *See, e.g.*, *Packwood*, 845 F. Supp. at 21; *Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 137–38 (D.D.C. 2016), *vacated as moot sub nom.*, *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017) (applying pertinency standard to congressional subpoena in action by Senate subcommittee to enforce document subpoena); *Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975) (enjoining bank from complying with congressional subpoena for documents unrelated to subcommittee investigation and noting that materials subpoenaed by a Congressional committee must only be produced, *inter alia*, where the "materials sought are pertinent to the investigation").

---

[3] Whereas the *Packwood* court did not dispute the legitimacy of the subpoena demanding Senator Packwood's diaries, Plaintiff and Defendant Bank have disputed the legitimacy of the subpoena served on Defendant Bank. *See* Pl's Mem. in Support of Application for Emergency TRO (Dkt. No. 2-1) at 5-8; Pl's Reply in Support of Emergency TRO (Dkt. No. 13) at 3-4; First Levy Decl. (Dkt. No. 2-3) at ¶ 4.

Fundamentally, the pertinency doctrine guarantees that no person be deprived of due process under the law through the enforcement of a congressional subpoena. On the same day the Court decided *Watkins*, it decided *Sweezy v. State of N.H.*, 354 U.S. 234, 254 (1957), and found that "if the Attorney General's interrogation [made pursuant to a state legislative investigation] of petitioner were in fact wholly unrelated to the object of the legislature in authorizing the inquiry, the Due Process Clause would preclude the endangering of constitutional liberties." *See also Scull v. Virginia*, 359 U.S. 344 (1959) (reversing a conviction for contempt on due process grounds, in which the witness was not given the opportunity to determine whether the question being asked of him by a state legislative committee was pertinent); *Rumely*, 345 U.S. at 44 (holding that an ambiguous authorizing resolution prevented the committee from compelling the representative of a private organization to disclose the names of all those who had distributed literature to influence public opinion). Where Plaintiff is unable to resist the subpoena served on a third party (*i.e.*, Defendant Bank), it cannot avail itself of a contempt proceeding and thus must seek relief from this Court, through the instant proceeding. Such was precisely the reasoning employed by the *AT&T II* court, which enjoined compliance with a congressional subpoena at the request of a third party that could not resist the subpoena or avail itself of a contempt proceeding.

Nor does Intervenor's gross exaggeration of *Exxon Corp. v. FTC*, 598 F.2d 582 (D.C. Cir. 1978), aid its cause to avoid judicial review here. In *Exxon Corp.*, the parties did "not dispute . . . that Congress has a right of access to" the information being demanded by a congressional committee. *See id.* at 585. In short, pertinency was not at issue; it was conceded. Thus, the issue before the *Exxon Corp.* court "concern[ed] solely the question of notice to parties

prior to disclosure of their confidential information and of safeguards to ensure the continued confidentiality of such information once disclosed to the Congress." *Id.* at 586.[4]

### 2. Intervenor Has Failed to Meet Its Burden of Establishing Pertinency.

Plaintiff need not provide the reasons why a congressional demand for materials is pertinent; that is the burden of the congressional committee. *See Packwood*, 845 F.Supp. at 21. Intervenor has failed to meet this burden. Moreover, even if Intervenor's burden were the lesser burden that it so strenuously seeks, Intervenor Mem. in Opp. (Dkt. No. 25-3) at 13-16, it has failed to meet even that burden, too. Indeed, in its 45-page opposition brief, Intervenor made no attempt to even reference the "parameters" of the Committee investigation to justify its demand. This is because Intervenor could not make any good faith claim that what it demands is pertinent to the investigation, as Plaintiff has authorized the production of every requested bank record related to Russia or Donald Trump. And while Intervenor previously claimed that the bank records were pertinent to classified portions of the investigation, that justification has now disappeared and has been replaced by the brazen assertion that it need not justify the pertinency of its demands.

But Intervenor's explanations make clear that these newly demanded records have no connection whatsoever to the Committee's investigation. For example, the Committee seeks records about Plaintiff's transactions with law firms on the basis that "Fusion has established a pattern and practice of using law firms as intermediaries to mask the true beneficiaries of its research." *See* Pl.'s Renewed App., Ex. B. Intervenor stated:

> Given the large sums involved in these retentions, it is highly unusual at best for law firms to assume such payment obligations on behalf of clients (rather than asking their clients to pay directly) absent some reason for concealing the identity of their clients.

---

[4] Furthermore, the court expressly "emphasize[d]" that it was "not address[ing] the question" of when a congressional subpoena "has been properly issued." *Exxon Corp.*, 589 F.2d at 592.

> Disclosure of the transactions will not reveal the identity of those intentionally concealed clients, but it will permit the Committee to make inquiries of those law firms to determine the nature of their involvement with Plaintiff and any possible relationship to the subject matters of the Committee's investigation.

Intervenor Mem. in Opp. (Dkt. No. 25-3) at 19.  In other words, Intervenor concedes the transactions at issue are not pertinent or in any way connected to Russia or the four questions that purport to establish the parameters of the Committee's investigation.

Intervenor finally rests on the notion that any record related to Plaintiff is pertinent because "its actions lie at the center of the congressional investigation." *See* Intervenor's Mem. in Opp. at 2.  It seeks to transform a probe of Russian active measures into an investigation of Plaintiff.  Even in *Packwood*, the court permitted limitation on what the Senate Ethics Committee could see within the most important document regarding the central subject of the investigation – *i.e.*, Packwood's diaries.  *See Packwood*, 845 F.Supp. at 20 & n.6 (permitting "masking" of certain information in the diaries).

Plaintiff has authorized Defendant Bank to produce all records pertinent to the four questions listed in the committee's so-called "parameters" of its investigation—all of the bank records potentially pertinent to "the Dossier" and Plaintiff's work for Baker Hostetler on behalf of Prevezon.  What remains demanded are not pertinent to the Committee's investigation.  And, in seeking records "to determine . . . any possible relationship to the subject matters of the Committee's investigation," even the Committee does not pretend otherwise.

        3.    <u>The Purpose of Intervenor's Overbroad Demands Is to Harass and Punish Plaintiff.</u>

We respectfully submit that Intervenor is using these overbroad demands to punish Plaintiff for having investigated Mr. Trump. This form of punishment is little different from Intervenor's disparate treatment of Plaintiff's principals, who – in a McCarthy-like fashion –

were compelled to appear for a deposition after it was known they would be invoking their constitutional privileges not to testify – a sharp departure from the practice of this Committee with regard to other witnesses who invoked their constitutional privileges not to testify and yet were excused from having to appear.[5] On the heels of the announcement of indictments in the special counsel's investigation, Intervenor is following the orders of the president to "DO SOMETHING!"[6] Through these overbroad demands for bank records, Intervenor consequently has sought to name names and use these records as "exposure for exposure's sake." *See Exxon*, 589 F.2d at 588 (stating that "[t]he disclosure was not to be used as 'exposure for exposure's sake'" (quoting *Watkins*, 354 U.S. at 178)).

Further evidence of Intervenor's intention to use these demands as punishment is its canard that by invoking its constitutional privileges, Plaintiff's executives have created an adverse inference that permits Intervenor to conduct a fishing expedition and give Intervenor a license to any record it chooses, regardless of its pertinency. *See* Intervenor's Mem. in Opp. at 3, 17-18, 38; Decl. of S. Glabe (Dkt. No. 25) at ¶ 9; Second Decl. or M. Stewart (Dkt. No. 25) at ¶ 19. Intervenor did not and cannot cite to any decision from any court supporting that position. Intervenor's claim that the lawful assertion of the Fifth Amendment by Plaintiff's principals entitles the Court to infer that Plaintiff possesses documents relevant to the Committee's investigation and that that inference alone entitles them to obtain Plaintiff's Bank Records is as stunning as it is wrong. It is stunning to assert that an inference that Plaintiff is withholding relevant records necessarily entitles them to any Bank records they want. And it is wrong to

---

[5] *See* Jeremy Herb and Evan Perez, "Fusion GPS Partners Plead Fifth before House," CNN.com, Oct. 18, 2017, *available at* http://cnn.it/2gPIZaU.

[6] Donald J. Trump, @realDonaldTrump, Oct. 29, 2017, [four consecutive tweets at 6:53 am, 7:02 am, 7:09 am; 7:17 am], https://twitter.com/realDonaldTrump/status/924635359480303616;https://twitter.com/realDonaldTrump/status/924637600094326784; https://twitter.com/realDonaldTrump/status/924639422066384896; https://twitter.com/realDonaldTrump/status/924641278947622913

claim that the inference from the assertion of the Fifth Amendment is that Plaintiff is withholding something pertinent. Not only is there no required inference to be drawn from a lawful assertion of the Fifth Amendment right against self-incrimination, *see, e.g.*, *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (finding that the *Baxter* inference is permissive); *Evans v. Robbins*, 897 F.2d 966, 970 (8th Cir. 1990) (same), but the inference that Intervenor claims – *i.e.*, that Plaintiff is withholding any relevant documents – is not marginally justified by the exercise of their testimonial privilege.

> 4. <u>Plaintiff's Free Associations and Free Speech Are Entitled to First Amendment Protection.</u>

As a matter of law, Plaintiff's First Amendment rights to free speech and free association turn on its conduct and not, as Intervenor incorrectly argues, on Plaintiff's status as a business. *Compare* Intervenor Mem. in Opp. at 24; *with Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342–43 (2010) ("The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster.") (internal quotation marks omitted). *See also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (finding that the First Amendment right to associate depends not on the identity of the speaker, but on whether "the group engages in 'expressive association'"); *In re GlaxoSmithKline plc*, 732 N.W.2d 257, 268 (Minn. 2007) ("Organizations such as GSK [GlaxoSmithKline plc] and PhRMA [Pharmaceutical Research and Manufacturers of America] are clearly entitled to the First Amendment protection of their association rights, both within their respective organizations and with respect to communications with other organizations.").

Contrary to Intervenor's assertions, Intervenor Mem. in Opp. at 24-25, the "First Amendment's protection of expressive association is not reserved for advocacy groups." *Boy*

*Scouts of Am. v. Dale*, 530 U.S. at 648. Moreover, the First Amendment protection for expressive association is not reserved for groups that engage in collective speech on political matters, although that expression certainly falls within its ambit, but for groups that "engage in *some form* of expression, whether it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. at 648 (2000) (emphasis added); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) (analyzing whether the Forum for Academic and Institutional Rights, Inc.'s rights to associate were violated, without ever discussing the for-profit or non-profit nature of the corporation). Fusion and its clients associate "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Defendant Bank's compliance with the overbroad subpoena would violate the First Amendment rights of Plaintiff and its clients by chilling their engagement in expressive association because they would not be able to do so without fear of being targeted and having their associations revealed to Congress. The "compelled disclosure of affiliation" with Plaintiff that will occur if Defendant Bank complies with the overbroad subpoena would dissuade clients and potential clients from associating with Plaintiff. *See, e.g.*, *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.").

As Intervenor concedes, Plaintiff and its clients associate with each other for political activities and purposes. *See* Intervenor Mem. in Opp. at 24. Indeed, this is now even more obvious with the disclosure of Plaintiff's anti-Trump clients: the Washington Free Beacon, Perkins Coie and its clients, the Democratic National Committee and the Hillary Clinton

campaign, as associates of Plaintiff.[7]  Disclosure and exposure of other of Plaintiff's associations would plainly violate the First Amendment.  Although Intervenor complains that Plaintiff has not provided particularized evidence as to which clients engaged Plaintiff for political matters and which did not, Plaintiff has provided evidence that its "engagements frequently relate to political matters of public importance, including but not limited to research about political candidates and issues."  Decl. of Peter Fritsch, in Supp. of Fusion's Unopposed Mot. for Temp. Restraining Order & Prelim. Inj. ¶ 6.  To require Plaintiff to further disclose it and its clients' political activities would inflict the very kind of First Amendment damage that Plaintiff seeks to avoid by bringing this suit.  More important, it is not Plaintiff who bears the burden of persuasion in the matter.

### B. Compliance with These Overbroad Demands Would Irreparably Harm Plaintiff.

Mere production of these non-pertinent records would irreparably harm a firm whose business, whether it be political research or investigations of corporate wrongdoing, is built on the premise of confidentiality.  The moment that Intervenor takes custody of the records, Plaintiff's First Amendment rights and confidentiality interests are irreparably injured, *see* John Doe and Jane Doe Decls., Exs. 5-13 to Pl's Reply in Support of Emergency TRO (Dkt. Nos. 13-3 – 13-11), and this case would become moot.  There would be no further opportunity for review.

Plaintiff has a First Amendment right to associate freely with clients and contractors on political and other matters and a First Amendment right to engage in those client-activities when they further political and commercial speech.  It also has a right to maintain the confidentiality of those relationships.  The very production of these records to the Committee, without more,

---

[7] Plaintiff has standing to assert the First Amendment rights of its clients. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) (holding that booksellers had standing to assert the First Amendment rights of their customers).

would mean the end of Plaintiff's client relationships related to those records, as well as the immediate violation of Plaintiff's constitutional rights. *See, e.g.*, John Doe and Jane Doe Decls., Exs. 5-13 to Pl's Reply in Support of Emergency TRO (Dkt. Nos. 13-3 – 13-11). In *Schiller v. City of New York*, No. 04CIV.7921(KMK)(JCF), 2006 WL 3592547, at *5 (S.D.N.Y. Dec. 7, 2006), for example, the court explained a similar dynamic:

> The City suggests that fear of public disclosure of WRL members' identities could be allayed by designating the unredacted minutes "attorneys'-eyes-only." However, "[i]t is the government itself that Plaintiffs fear, and therefore confining the information to government ... counsel will hardly assuage those fears or avoid the intimidation that Plaintiffs fear might follow." *International Action Center v. United States,* 207 F.R.D. 1, 3 (D.D.C. 2002).

And exposure of those relationships certainly would destroy those relationships and frighten others from engaging in confidential relationships with Plaintiff, including political activity engagements. This is particularly true were Intervenor to be permitted to demand documents not because of their pertinency to the investigation, but simply because of Plaintiff's alleged status as being central to this investigation.

### C.  The Balance of the Equities Is in Plaintiff's Favor.

The harm to Plaintiff's confidential business relationships, Plaintiff's business itself and its First and Fifth Amendment rights will be immediate and irreversible should compliance not be restrained. By contrast, there is no prejudice to Defendant Bank or to the Committee from any delays associated with the grant of a TRO and an orderly briefing schedule. First, and most importantly, Plaintiff has already authorized Defendant Bank to produce the pertinent records, so the Committee has in its possession the records pertinent to its investigation. The outstanding records have no bearing on the Committee's investigation and, therefore, there would be no prejudice to the Committee if they were never produced. However, even if this Court were to deem the outstanding records to be pertinent and require their production, the Committee would

13

suffer no prejudice from any delay in receiving them.  While Intervenor's brief contains large swaths of revisionist history of how the parties came to be in this dispute,[8] what should be clear to the Court is that, once the Committee was before the Court, the emergency nature of the response to the subpoena evaporated.  Whereas the Committee originally refused to extend the subpoena compliance deadline for even 48 hours, ████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████.  Thus, the purported emergent need for the records has apparently disappeared.  Lastly, it has always been the case that the Committee's investigation can continue through the end of this congressional term, which does not expire for more than a year from now.

D. **The Public Interest Supports a TRO.**

These demands illustrate an abuse of power by a congressional committee, and it is in the public interest for this Court to ensure that after Plaintiff's efforts to authorize the production of all pertinent records and to permit the Committee to review all others, Intervenor should be precluded from demanding additional records that have no demonstrable pertinence to its investigation.  At the heart of this matter is a fundamental question of due process under the Fifth Amendment and the rights to free speech and free association, all of which would be denied to Plaintiff, were a TRO not entered.  Few issues are of greater public importance than the

---

[8] Plaintiff notes, however, that it has been cooperating with two other congressional committees investigating the same exact subject matter.  It presented the same terms for cooperation, agreed to by those committees, to *this* committee, but *this* committee rejected those terms.  A day after Plaintiff's counsel presented those terms, Congressman Nunes, in bad faith, served subpoenas on Plaintiff's principals.  *See* Second Levy Decl. ¶ 6 & Ex. D (Dkt. No. 13-2).  Despite that, his lawyers have had the temerity to falsely charge Plaintiff's counsel with interference in this investigation.  *See* Intervenor's First Opp. Br. (Dkt. No. 12) at 1-2, 8; Intervenor's Mem. in Opp. (Dkt. No. 25-3) at 38-39.  Over a month later, however, we presented the Committee with the same terms today, and we are pleased that the Committee has accepted them, so that Plaintiff's co-founder Glenn Simpson can participate in a voluntary interview, with an assurance from Congressman Conaway and Congressman Schiff that Mr. Nunes' subpoena served on Mr. Simpson will be withdrawn, and that nothing he says in the voluntary interview shall interfere with his ability to assert privileges in the Committee's investigation.

14

vindication of constitutional rights, whether under the Fifth or First Amendments, both of which will be violated if compliance is not restrained. Intervenor is plainly punishing Plaintiff for its exercise of its First Amendment right to associate freely with anti-Trump political campaigns and to research Mr. Trump for them, and then claiming constitutional privileges. When a congressional committee has obtained the records it needs and seeks to needlessly interfere in Plaintiff's business by extracting non-pertinent records from it, it serves no legitimate legislative purpose, is an act of punishment for political purposes, and is squarely within the public interest for this Court to restrain such an abuse of power.

## CONCLUSION

For all of the foregoing reasons herein and in Plaintiff's previously filed briefs, the Court should enter a temporary restraining order.

Dated: November 8, 2017

Respectfully Submitted,

 /s/ William W. Taylor III
William W. Taylor, III (D.C. Bar No. 84194)
Steven M. Salky (D.C. Bar No. 360175)
Rachel F. Cotton (D.C. Bar No. 997132)
**ZUCKERMAN SPAEDER LP**
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
Tel: (202) 788-1800
wtaylor@zuckerman.com
ssalky@zuckerman.com
rcotton@zuckerman.com

Joshua A. Levy (D.C. Bar No. 475108)
Robert F. Muse (D.C. Bar No. 166868)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
**CUNNINGHAM LEVY MUSE LLP**
1250 Connecticut Avenue, NW, Suite 200
Washington, D.C. 20036
Tel: (202) 261-6564
jal@cunninghamlevy.com
rmuse@cunninghamlevy.com
rmc@cunninghamlevy.com