# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BEAN LLC d/b/a FUSION GPS<br>        1700 Connecticut Ave., NW<br>        Suite 400<br>        Washington, DC 20009,<br><br>                        Plaintiff,<br><br>        v.<br><br>DEFENDANT BANK,<br><br>                        Defendant,<br><br><br>PERMANENT SELECT COMMITTEE ON<br>INTELLIGENCE OF THE U.S. HOUSE OF<br>REPRESENTATIVES,<br>                        Intervenor. | Case No. 1:17-cv-02187-TSC |

## RESPONSE OF INTERVENOR THE PERMANENT SELECT COMMITTEE ON INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES IN OPPOSITION TO PLAINTIFF'S RENEWED APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

THOMAS G. HUNGAR
   *General Counsel*
TODD B. TATELMAN
   *Associate General Counsel*
KIMBERLY HAMM
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
Thomas.Hungar@mail.house.gov

*Counsel for Intervenor Permanent Select
Committee on Intelligence of the U.S. House of
Representatives*

November 21, 2017

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

COMMITTEE'S MODIFIED SUBPOENA FOR RECORDS ..................................... 4

ARGUMENT ....................................................................................................... 6

I.    PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL
      LIKELIHOOD OF SUCCESS ON THE MERITS ........................................... 7

      A.  The Role Of The Courts In Reviewing A Congressional Subpoena
          Is Narrowly Circumscribed And Must Be Exercised
          With Appropriate Deference To A Coordinate Branch
          Of Government Exercising Its Core Constitutional Power ......................... 8

      B.  The Committee's Subpoena Seeks Information In
          Furtherance Of A Valid Legislative Purpose ......................................... 12

      C.  Plaintiff's First Amendment Argument Lacks Merit ............................... 21

           1.  Plaintiff Is Not An Association For
               Purposes of the First Amendment ................................................. 24

           2.  Plaintiff Lacks Standing To Assert The Alleged
               First Amendment Rights Of Its Customers ..................................... 27

           3.  Plaintiff Has Not Engaged In Protected First Amendment
               Activities And, In Any Event, The Disclosure Of Its
               Financial Records Does Not Offend The First Amendment .............. 27

           4.  Plaintiff's Free Speech Rights Are Not Impaired ........................... 30

           5.  Plaintiff Alleges No Relevant Harm Arising
               From The Disclosure Of Its Financial Records ............................... 31

      D.  Plaintiff Has Identified No Legally-Cognizable
          "Confidentiality" Or "Privacy" Privileges ............................................ 31

      E.  The Committee's Subpoena Is Valid .................................................... 35

II.   PLAINTIFF CANNOT ESTABLISH IRREPARABLE INJURY ................... 36

III.    THE BALANCE OF EQUITIES CLEARLY FAVORS
        ENFORCEMENT OF THE MODIFIED SUBPOENA ....................................................40

IV.     PUBLIC INTEREST SUPPORTS ENFORCEMENT
        OF THE MODIFIED SUBPOENA .................................................................................42

CONCLUSION..............................................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama,*
    753 F.3d 193 (D.C. Cir. 2014)...................................................................................7

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003).................................................................................26

*Ashland Oil Co., Inc. v. FTC,*
    548 F.2d 977 (D.C. Cir. 1976).................................................34, 38, 40, 41, 43

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976).............................................................................................3, 18

*Bergman v. Senate Special Comm. on Aging,*
    389 F. Supp. 1127 (S.D.N.Y. 1975)...................................................................32, 33

*Buckley v. Valeo,*
    424 U.S. 1 (1976)..........................................................................................3, 16, 24

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006).................................................................................36

*Citizens United v. FEC,*
    558 U.S. 310 (2010).................................................................................22, 23, 26

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995).....................................................................................6

*Cole v. McClellan,*
    439 F.2d 534 (D.C. Cir. 1970).................................................................................13

*Connecticut v. Massachusetts,*
    282 U.S. 660 (1931)...................................................................................................41

*Council on Am.-Islamic Relations v. Gaubatz,*
    667 F. Supp. 2d 67 (D.D.C. 2009).........................................................................40

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009).................................................................................7

*Davidov v. U.S. SEC,*
    145 F. Supp. 2d 386 (S.D.N.Y. 2006).....................................................................15

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975)...........................................................................................2, 8, 9

*Endicott Johnson Corp. v. Perkins,*
    317 U.S. 501 (1943)....................................................................................................13

*Exch. Point LLC v. SEC,*
    100 F. Supp. 2d 172 (S.D.N.Y. 1999)..................................................................3, 14, 33

*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978) ................................. 8, 11, 12, 13, 37, 40, 41, 42, 42-43, 43

*FEC v. Automated Bus. Servs.,*
    888 F. Supp. 539 (S.D.N.Y. 1995).......................................................................23, 30

*FEC v. Machinists Non-Partisan Political League,*
    655 F.2d 380 (1981)..............................................................................................24, 26

*Flatt v. U.S. SEC,*
    No. 10-60073-MC, 2010 WL 1524328 (S.D. Fla. Apr. 14, 2010) .............................14, 15

*Fleck & Assocs., Inc. v. Phoenix,*
    471 F.3d 1100 (9th Cir. 2006) ............................................................................23, 26, 27

*FTC. v. Owens-Corning Fiberglass Corp.,*
    626 F.2d 966 (D.C. Cir. 1980) ...................................................................... 34, 35, 37-38

*G.M. Leasing Corp. v. United States,*
    429 U.S. 338 (1977)....................................................................................................32

*Holderbaum v. United States,*
    589 F. Supp. 107 (D. Colo. 1984)...............................................................................30

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977)....................................................................................................25

*IDK, Inc. v. Cty. of Clark,*
    836 F.2d 1185 (9th Cir. 1988) ......................................................................................29

*In re Grand Jury Investigation No. 83-2-35,*
    723 F.2d 447 (6th Cir. 1983) ........................................................................................34

*In re Grand Jury Subpoena Duces Tecum Served Upon PHE, Inc.,*
    790 F. Supp. 1310 (W.D. Ky. 1992).............................................................................29

*In re Grand Jury Subpoena Served Upon Crown Video Unlimited, Inc.,*
  630 F. Supp. 614 (E.D.N.C. 1986)......................................................................29

*In re Subpoena Duces Tecum Issued to CFTC,*
  439 F.3d 740 (D.C. Cir. 2006).............................................................................22

*In re Vitamins Antitrust Litig.,*
  120 F. Supp. 2d 58 (D.D.C. 2000).......................................................................18

*Matter of SEC Private Investigation/Application of John Doe re Certain Subpoenas,*
  No. M8-85, 1990 WL 119321 (S.D.N.Y. Aug. 10, 1990)..................................15

*McGrain v. Daugherty,*
  273 U.S. 135, (1927)...........................................................................................43

*McPhaul v. United States,*
  364 U.S. 372 (1960).......................................................................9, 10, 13, 14

*McSurely v. McClellan,*
  521 F.2d 1024 (D.C. Cir. 1975).....................................................................9, 10

*Morgan Stanley DW Inc. v. Rothe,*
  150 F. Supp. 2d 67..............................................................................................40

*Murphy v. Department of Army,*
  613 F.2d 1151 (D.C. Cir. 1979)..........................................................................38

*Nat'l Ass'n for the Advancement of Colored People v. Alabama ex rel. Patterson,*
  357 U.S. 449 (1958).....................................................................................25, 26

*Nat'l Commodity & Barter Ass'n v. United States,*
  951 F.2d 1172 (10th Cir. 1991) .....................................................................14, 15

*Okla. Press Publ'g Co. v. Walling,*
  327 U.S. 186 (1946)........................................................................................ 13-14

*Perry v. Schwarzenegger,*
  591 F.3d 1147 (9th Cir. 2010) ............................................................................26

*Pursuing Am.'s Greatness v. FEC,*
  831 F.3d 500 (D.C. Cir. 2016).............................................................................26

*SEC v. Dowdell,*
  144 F. App'x 716 (10th Cir. 2005) .................................................................14, 15

*Senate Permanent Subcomm. on Investigations v. Ferrer,*
    199 F. Supp. 3d 125 (D.D.C. 2016) ................................................................31

*\*Senate Select Committee v. Packwood,*
    845 F. Supp. 17 (D.D.C. 1994) ...................................................2, 9, 10, 16

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ...............................................................6, 7

*Sussman v. U.S. Marshals Serv.,*
    494 F.3d 1106 (D.C. Cir. 2007) ............................................................35

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
    517 U.S. 544 (1996) ..............................................................................27

*United States v. Am. Tel. & Tel. Co. ("AT&T I"),*
    551 F.2d 384 (D.C. Cir. 1976) ............................................ 8, 10, 11-12

*United States v. Am. Tel. & Tel. Co. ("AT&T II"),*
    567 F.2d 121 (D.C. Cir. 1977) ............................................................10, 11

*United States v. Ballin,*
    144 U.S. 1 (1892) ....................................................................................36

*United States v. Bell,*
    414 F.3d 474 (3d. Cir. 2005) ..................................................................29

*United States v. Inst. for Coll. Access & Success,*
    27 F. Supp. 3d 106 (D.D.C. 2014) .........................................................24

*United States v. Miller,*
    425 U.S. 435 (1976) ......................................................... 31-32, 32

*United States v. Morton Salt Co.,*
    338 U.S. 632 (1950) ...............................................................................32

*United States v. R. Enterps., Inc.,*
    498 U.S. 292 (1991) .......................................................................3, 9, 10

*United States v. Ritchie,*
    15 F.3d 592 (6th Cir. 1994) ......................................................... 34-35

*United States v. Rostenkowski,*
    59 F.3d 1291 (D.C. Cir. 1995) ...............................................................36

*United States ex rel. Bilokumsky v. Tod,*
    263 U.S. 149 (1923) ........................................................................................18

*Watkins v. United States,*
    354 U.S. 178 (1957) ............................................................................. 8, 12-13

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................6, 7

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C.Cir.1985) ................................................................ 36-37

**Constitution and Statutes**
U.S. Const. art. I, § 5, cl. 2 ....................................................................................36

15 U.S.C. § 6802 ....................................................................................................33

15 U.S.C. § 6809 ....................................................................................................33

**Legislative Sources**
163 Cong. Rec. H7-H11 (daily ed. Jan. 3, 2017) ..................................................35

Rules of the U.S. House of Representatives, Rule X.11(b)(1) ...............................35

**Other Sources**
Appellant Br., *Citizens United v. FEC,*
    558 U.S. 310 (2010) No. 08-205 ................................................................26

Fusion GPS, *About Fusion* ............................................................................. 24-25

Henry J. Friendly, Benchmarks (1967) ..................................................................33

Jeremy Herb & Evan Perez,
    *Fusion GPS Partners Plead Fifth Before House Intel,*
    CNN (Oct. 18, 2017) ..................................................................................39

Katie Bo Williams, *House Republicans Growing Impatient with Russia Probe,*
    The Hill (Oct. 26, 2017) ............................................................................42

Restatement (Second) of Contracts § 264 (1981) ..................................................34

Robert L. Haig, ed., 8 Bus. & Comm. Litig. Fed. Cts.
    § 89:35 (4th ed) ..........................................................................................34

# INTRODUCTION

The Permanent Select Committee on Intelligence of the U.S. House of Representatives ("Committee") respectfully submits this response[1] in opposition to Plaintiff's Renewed Motion (ECF No. 23) ("Pl. Renewed Mot.") and Memorandum in Support (ECF No. 23-1) ("Plaintiff's Renewed Memorandum" or "Pl. Renewed Mem."). At the cost of considerable inconvenience and delay, the Committee has now reviewed the approximately 400 pages of records responsive to the Bank Subpoena – which by Plaintiff's calculation "contain[ed] several thousand checks drawn on, withdrawals from and deposits into [Plaintiff's] bank account," Second Fritsch Decl. (ECF No. 13-1) ¶ 3 – and is now seeking production of only a small fraction of those thousands of transactions (only 70 remain in dispute), which contain investigative leads that are necessary to the Committee's ongoing investigation. Continuing its pattern of intransigent and baseless resistance to a lawful congressional investigation of the highest national importance, however, Plaintiff opposes production of even this relative handful of transactions.

Contrary to the fundamental premise of Plaintiff's latest submission, the Committee does not bear the burden of demonstrating the "pertinence" of each record sought by the Committee. That is simply not how investigations work – whether by congressional committees or by any other organ of government. This is not a criminal prosecution for contempt of Congress, in which pertinence would be an element of the prosecution's burden of proof, nor is it an

---

[1] The Bipartisan Legal Advisory Group ("BLAG") of the United States House of Representatives has authorized the Committee's intervention in this matter. The BLAG is comprised of the Honorable Paul Ryan, Speaker of the House, the Honorable Kevin McCarthy, Majority Leader, the Honorable Steve Scalise, Majority Whip, the Honorable Nancy Pelosi, Democratic Leader, and the Honorable Steny H. Hoyer, Democratic Whip, and "speaks for, and articulates the institutional position of, the House in all litigation matters." Rule II.8(b), Rules of the United States House of Representatives, available at https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf. The Democratic Leader and Democratic Whip decline to support the Group's position in this case.

enforcement action brought by the Committee against an unwilling subpoena recipient. Rather, this is a request by Plaintiff for this Court to take the extraordinary step of enjoining the third-party recipient of a congressional investigative subpoena from willingly complying with that subpoena – a step fraught with immense constitutional difficulties by virtue of its direct intrusion upon Congress's Article I powers, and one that no court in this Circuit has ever taken at the behest of a private litigant. Plaintiff thus bears a heavy burden indeed, and at a minimum could not hope to prevail without establishing a clear and compelling legal right under the Constitution or applicable statutory law to such extraordinary and unprecedented relief.

Despite Plaintiff's best efforts, it falls far short of establishing any such right. Instead, Plaintiff merely asserts that, in its opinion, it has nothing pertinent to offer the Committee. Plaintiff cites no authority, however, for the proposition that a private party whose actions lie at the center of a congressional investigation can block enforcement of a congressional subpoena to a third party by disputing pertinence, and it is well established that it would be "manifestly impracticable to leave to the subject of the investigation alone the determination of what information may or may not be probative of the matter being investigated." *Senate Select Committee v. Packwood*, 845 F. Supp. 17, 21 (D.D.C. 1994).

While the Committee "is not a grand jury or a law enforcement agency," Pl. Renewed Mem. 7, its power to investigate is no less broad. Congress's long-established authority to compel the production of evidence, like that of grand juries, is derived from the Constitution itself, and "is as penetrating and far-reaching as the potential power to enact and appropriate …." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) (citation and quotation marks omitted). Plainly, therefore, there is no basis for Plaintiff's *ipse dixit* assertion that the Committee's power to investigate matters within its jurisdiction is any less wide-ranging than

2

that of a grand jury or administrative agency, both of which have been held by the Judiciary to possess the authority to seek and obtain far more sweeping compilations of financial records than the narrow and precisely targeted records sought by the Committee here. *See generally United States v. R. Enterps., Inc.*, 498 U.S. 292, 299 (1991) (cautioning against "[r]equiring the Government to explain in too much detail the particular reasons underlying a subpoena").

Indeed, even in the context of subpoenas issued by administrative agencies in civil cases, which are merely exercising whatever subpoena authority Congress has chosen to confer upon them in the exercise of its legislative power, it is hornbook law that investigative subpoenas seeking broad categories of information are entirely appropriate, without the need to justify each particular piece of information sought. *See, e.g., Exch. Point LLC v. U.S. SEC*, 100 F. Supp. 2d 172, 176 (S.D.N.Y. 1999) (refusing to quash or modify broad SEC subpoena for financial records that "cover[ed] many records that are not related to the SEC's investigation," because the information requested "'touches a matter under investigation'" (citation omitted)). The subpoena power exercised by Congress itself, which is inherent in the very legislative power that created the administrative agencies and granted them subpoena authority, is no less sweeping than that of its creations. *Buckley v. Valeo*, 424 U.S. 1, 137-38 (1976).

It is worth remembering also that this suit is before the Court only because of the refusal of Plaintiff's principals either to cooperate voluntarily with the Committee's investigation or to furnish the necessary information during compelled depositions. While Plaintiff's principals are entitled to assert the privilege against self-incrimination during their respective depositions if there is a good-faith basis for such assertion, the Committee and this Court are equally entitled to draw adverse inferences from those privilege assertions. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Here, the only logical inference to be drawn is that those privilege

3

assertions are tantamount to an admission that Plaintiff possesses additional information – as yet unrevealed – that is relevant to the Committee's investigation. That inference provides a sufficient basis in itself for the Committee to pursue other avenues of obtaining said relevant information, including this subpoena for Plaintiff's financial records.

In addition, the interactions between Plaintiff and the Committee fully justify the Committee's unwillingness to accept at face value Plaintiff's representations that it has no remaining relevant information. *See* Committee Response in Opposition (ECF No. 12) ("Comm. Mem.") 2-3; Declaration of Scott L. Glabe ("Glabe Decl.") ¶¶ 10-15. Plaintiff's repeated pattern of denying relevance, then grudgingly allowing the production of additional relevant transactions, *id.*, simply confirms the Judiciary's wisdom in rejecting the notion that the subjects of an investigation are entitled to determine what documents are relevant.

Accordingly, for all the reasons stated below, as well as those set forth in the Committee's first response in opposition, which is incorporated herein by reference, and particularly in light of the Committee's substantial modification of the scope of its subpoena, the Court should deny Plaintiff's renewed request for a preliminary injunction and temporary restraining order.

## COMMITTEE'S MODIFIED SUBPOENA FOR RECORDS



on October 27, 2017, Defendant Bank produced records that, according to Plaintiff,

Glabe Decl. ¶ 12. Such records included certain payments to Plaintiff from

, payments by Plaintiff to various entities including

███████████████████████ and transactions with individuals such as ███████████

███████████. *See id.*

From October 30 to November 1, 2017, █████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ ("Responsive

Records") ███████████████████████████. *See* Glabe Decl. ¶ 17.

████████████████████████████████████████████████████

████████ but Plaintiff's principal [Mr. Fritsch] has asserted under oath in this proceeding that

those records "contain several thousand checks drawn on, withdrawals from and deposits into

Fusion's bank account." Second Fritsch Decl. ¶ 3; *accord* Pl. Reply 6.

On November 1, 2017, after a careful and diligent review of what Plaintiff describes as

"several thousand" transactions, Second Fritsch Decl. ¶ 3, which review was informed, in part,

by classified information in the possession of the Committee, *see* Glabe Decl. ¶ 19, Committee

Review Counsel identified 82 transactions necessary for its investigation and that had not been

previously produced by Defendant Bank on October 27, and so notified counsel for Plaintiff and

Defendant Bank. *See id.* ¶ 18. In addition, Committee Review Counsel informed Plaintiff and

Defendant Bank that it sought the re-production of certain pages reflecting line entries for 30

transactions already produced to it, so that the Committee would have a single production set,

with sequential Bates pages, for ease of reference. *See id.* In total, the Committee requested that

Plaintiff instruct Defendant Bank to produce (or reproduce) a mere 112 transactions out of the

"several thousand" transactions reviewed. *See id.* In addition, the Committee seeks ██████████

███████████████ records relating to each of the 112 transactions. *See id.* ¶ 31. It is the

Committee's understanding that this requested data is exclusive to Defendant Bank and does not contain or implicate Plaintiff or Plaintiff's client information. *See id.*

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████. *See id.* ¶ 16. Subsequently, on November, 3, 2017, the Committee received from Defendant Bank a "First Supplemental Production," which included 12 of the transactions requested, specifically those involving ████

██████████████████████████████████████████████████████. *See id.* ¶ 33. As a result of this development, the Committee's request has been reduced from 82 transactions to 70.

In short, contrary to Plaintiff's characterization of a "long list of records," Pl's Renewed Mem. at 3, the subpoena has been significantly modified and now seeks only the eminently reasonable production of pages reflecting 100 transactions (of which 30 transactions already have been produced), which amounts to an exceedingly small number of the Plaintiff's bank records.

## ARGUMENT

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To demonstrate entitlement to a preliminary injunction, a litigant must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995). "'When seeking a preliminary injunction,

the movant has the burden to show that all four factors, taken together, weigh in favor of the

injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension*

*Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

     Plaintiff attempts to evade its burden of proving all four of the preliminary injunction

factors, pointing to the so-called "sliding scale." Pl. Renewed Mem. 3. But in *Winter* the

Supreme Court expressly rejected the sliding-scale approach, which had been proffered as a

purported justification for lessening the movant's burden of proving irreparable injury, 555 U.S.

at 21-22, and multiple D.C. Circuit Judges have correctly read *Winter* "at least to suggest if not

to hold 'that a likelihood of success is an independent, free-standing requirement for a

preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring

opinion)). In light of *Winter*, the sliding-scale approach is no longer valid, and Plaintiff cannot

prevail without meeting its burden of proving, by a "clear showing," each and every one of the

four requisite factors. *Sherley*, 644 F.3d at 392. It has not even come close.

## I. PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

     Plaintiff's renewed application, while incorporating Plaintiff's previous submissions,

claims a likelihood of success based primarily on the following theories: (i) the modest number

of financial records still at issue are allegedly not "pertinent" to the Committee's investigation;

(ii) production of this relatively small number of records will somehow infringe on Plaintiff's

"free speech and free association" rights; and (iii) Plaintiff's "confidentiality obligations" will be

impaired. Pl. Renewed Mem. 1, 3. For the reasons already provided by the Committee in its

original opposition, and for the reasons set forth below, Plaintiff cannot demonstrate any

likelihood of success on the merits.

A.      **The Role Of The Courts In Reviewing A Congressional Subpoena Is Narrowly Circumscribed And Must Be Exercised With Appropriate Deference To A Coordinate Branch Of Government Exercising Its Core Constitutional Power.**

It is well-established that Congress's power "to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins v. United States*, 354 U.S. 178, 187 (1957). It is equally axiomatic that the "[i]ssuance of subpoenas … [is] a legitimate use by Congress of its power to investigate." *Eastland*, 421 U.S. at 504 (citation omitted). And, when Congress does resort to compulsory process, "[i]t is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action." *Watkins*, 354 U.S. at 187, 187-88.

Contrary to Plaintiff's suggestion, the Committee has never asserted that its investigative power is "immune from judicial review." Pl. Renewed Mem. 5. What the Committee has stressed, however, is that the specific relief that Plaintiff seeks is extraordinary, while this Court's power to intrude into the Legislative Branch's exercise of its constitutionally grounded power of inquiry is severely limited, and one that can be exercised only in furtherance of clear constitutional or statutory commands and with due regard to the interests of a coordinate branch of government. Comm. Mem. 14. As the D.C. Circuit explained in response to a similar request by a private litigant to restrain a third party's compliance with a congressional request for information, such a ruling "would skirt dangerously close to being at least the temporary 'equivalent to an order quashing [the official request or subpoena,] which is generally an impermissible frustration of the congressional power to investigate['] …, and hence would raise serious constitutional issues." *Exxon Corp. v. FTC*, 589 F.2d 582, 588 (D.C. Cir. 1978) (quoting *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 388 (1976) ("*AT&T I*"). Plaintiff's attempts

to downplay the constitutionally problematic nature of the relief it seeks are thus foreclosed by binding Circuit precedent.

Not surprisingly, therefore, Plaintiff's invitation for this Court to conduct or mandate a searching line-by-line inquiry into the "pertinence" of the remaining disputed transactions finds no support in the law. Even in the context of a subpoena enforcement action brought by a congressional committee against an unwilling subpoena recipient, no such requirement exists. "In determining the proper scope of a legislative subpoena [in such an enforcement action], this Court may only inquire as to whether the documents sought by the subpoena are 'not plainly incompetent or irrelevant to any lawful purpose [of the Subcommittee] in the discharge of [its] duties.'" *Packwood*, 845 F. Supp. at 20-21 (quoting *McPhaul v. United States,* 364 U.S. 372, 381 (1960)). And when, in such a case, "an investigative subpoena is challenged on relevancy grounds, the Supreme Court has stated that the subpoena is to be enforced 'unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the ... investigation.'" *Id.* (quoting *R. Enterps.*, 498 U.S. at 301).

Moreover, "[t]here is no requirement that every piece of information gathered in [a congressional] investigation be justified before the judiciary." *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975), *aff'd in part and rev'd in part*, 553 F.2d 1277, 1280 (D.C. Cir. 1976) (en banc) (per curiam). In fact, the Supreme Court has made clear that a congressional investigation may lead "up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509. So, while the Committee does not contest this Court's power to adjudicate this dispute, it does adhere to the well-established view that the Court's inquiry on likelihood of success should be limited to

9

whether the Committee's inquiry is authorized under House Rules, and whether Plaintiff has met

its heavy burden of proving, by a clear burden, that the Committee's subpoena is "plainly

incompetent or irrelevant to any lawful purpose," *McPhaul*, 364 U.S. at 301, of the Committee

and that there is "no reasonable possibility that the category of materials the Government seeks

will produce information relevant to the general subject of the ... investigation," *R. Enterprises*,

498 U.S. at 301. *See, e.g., McSurely*, 521 F.2d at 1041; *Packwood*, 845 F. Supp. at 20-21.

Plaintiff's plea for this Court to stray from the traditional, narrowly-defined role of the

Judicial Branch in congressional investigations rests on its misreading of the D.C. Circuit's

*AT&T* decisions, *see* Pl. Renewed Mem. 5, but those cases provide no support for Plaintiff's

position. Unlike here, in the *AT&T* cases, the D.C. Circuit faced "the delicate problem of

accommodating the needs and powers of two coordinate branches in a situation where each

claimed absolute authority," *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 123 (D.C. Cir.

1977) ("*AT&T II*"), and both the Executive and Legislative Branches asserted that their actions

were "unreviewable by the courts." *AT&T I*, 551 F.2d at 391. On the one hand, the Executive

claimed that "the Constitution confers on the executive absolute discretion in the area of national

security." *AT&T II*, 567 F.2d at 128. On the other hand, Congress, relying on the Speech or

Debate Clause, argued "that judicial interference with its actions in this dispute is barred by the

constitution." *Id.* Faced with these dueling claims of constitutional superiority in a direct clash

between the two political branches of government, the D.C. Circuit rejected both absolutes,

holding instead that neither branch's power was absolute, *id.* at 128-29, and that some form of

accommodation of the interests of both coequal branches was therefore necessary to resolve the

constitutional clash, *id.* at 130. None of those concerns is present here. This case involves no

separation-of-powers clash between the political branches that the Court must resolve, nor does it

present competing claims of absolute constitutional immunity from judicial review. Plaintiff is obviously not a coordinate branch of government asserting its compelling interest in national security as a basis for resisting a congressional subpoena, and Plaintiff's attempt to put itself in the position of the Executive Branch is nothing short of laughable. *AT&T* simply has no application here.

The result reached in the *AT&T* cases is equally irrelevant here. The *AT&T II* court's decision to leave the injunction against AT&T in place was not based on any evaluation of the underlying merits of the dispute, but rather was the product of the court's decision to direct the Executive Branch *itself* to provide certain information to Congress, 567 F.2d at 131-33, while leaving for another day the question "whether the Subcommittee is entitled to all that it seeks," *id.* at 131.

Thus, the *AT&T* cases are of no help to Plaintiff. The unique accommodation approach adopted by the D.C. Circuit in that case, which was intended to resolve the dispute in a manner that minimized judicial entanglement in the constitutional tensions posed by a direct clash between the political branches, plainly cannot be transposed to the completely different setting of this case. Indeed, Plaintiff's suggestion that *AT&T II* amounts to an invitation for courts to follow a similar approach in cases brought by private parties, *see* Pl. Renewed Mem. 6-7, is foreclosed by binding Circuit precedent. One year after its decision in *AT&T II,* the D.C. Circuit made clear that courts must make every effort to avoid interfering with congressional investigations at the behest of private parties, since such relief "would skirt dangerously close to being at least the temporary 'equivalent to an order quashing [the official request or subpoena,] which is generally an impermissible frustration of the congressional power to investigate[']... and hence would raise serious constitutional issues." *Exxon Corp.*, 589 F.2d at 588 (*quoting AT&T I,*

551 F.2d at 388). In so holding, the *Exxon* court expressly invoked the Supreme Court's

decision in *Eastland*, even though that case arose under the Speech or Debate Clause. 589 F.2d

at 588-89 & n.13. As the *Exxon* court explained, notwithstanding the Clause's inapplicability in

a suit to enjoin a third party's compliance with a congressional subpoena, the *Eastland*

"decision's emphasis on the necessity for courts to refrain from interfering with or delaying the

investigatory functions of Congress" had "an obvious relevance" to the requested injunctive

relief at issue there. *Id.* at 588-89. Precisely the same is true here.

### B.   The Committee's Subpoena Seeks Information In Furtherance Of A Valid Legislative Purpose.

The Committee's narrowed requests are plainly in furtherance of its valid legislative

purpose. After previously denying the relevance of the records sought by the Committee,

Plaintiff has now effectively conceded that a number of those records are relevant to the

Committee's investigation. Third Declaration of Peter Fritsch (Nov. 3, 2017) ("Third Fritsch

Decl.") ¶¶ 4, 9. Plaintiff cannot now seriously contend that the vastly narrowed subpoena has no

valid legislative purpose in light of the intense Legislative Branch and Executive Branch interest

in the Russian active measures campaign.

Nevertheless, Plaintiff asserts that the Committee must establish that the narrow set of

records it now seeks are "pertinent to [its] investigation." Pl. Renewed Mem. 1, 7, 8. Plaintiff

cites to no controlling authority for the proposition that a third party, whose actions lie at the

center of a congressional investigation, has a judicially enforceable right to prevent compliance

with a congressional subpoena by challenging the pertinency of the information sought. The

only case Plaintiff even attempts to cite for this proposition is *Watkins*, *see* Pl. Renewed Mem. 7,

but that case arose in the context of a criminal prosecution for contempt of Congress in violation

of 2 U.S.C. § 192, which makes "pertinen[cy]" an element of the crime. *Watkins*, 354 U.S. at

181. *Watkins* did not involve a civil suit brought by a private third party seeking to enjoin compliance with a congressional subpoena, and it certainly did not hold or suggest that the question of pertinency would be dispositive in such a case.

In addition, Plaintiff's insistence that this Court adopt a heightened standard for pertinency and mandate a line-by-line review of the records sought by the Committee simply ignores the fact this Circuit has consistently held that courts should not only "refrain from creating 'needless friction' with a coordinate branch of government …[,]" *Exxon Corp.*, 589 F.2d at 590 (quoting *Cole v. McClellan*, 439 F.2d 534, 535-536 (D.C. Cir. 1970)), but also "refrain from interfering with or delaying the investigatory functions of Congress," *id.* at 589. Both "needless friction" and further delay would necessarily occur if Plaintiff's baseless request were to be accepted.

In any event, even if "pertinency" were the relevant standard, Plaintiff would not come close to meeting its burden of establishing that the 70 disputed transactions are not pertinent to the Committee's investigation. The Supreme Court has made clear that "pertinency" is not an onerous requirement, even in the criminal context where it properly applies. In *McPhaul v. United States*, for example, the Court held that pertinency was "clearly shown" when it was "reasonable to suppose" that the requested records would reveal whether or not an entity under investigation was engaged in activities within the scope of the committee's investigation. 364 U.S. at 381. In those circumstances, even though the committee could not know in advance whether or not the requested records would establish any connection, "the records called for by the subpoena were not 'plainly incompetent or irrelevant to any lawful purpose [of the Subcommittee] in the discharge of [its] duties,' *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 [(1943)], but, on the contrary, were reasonably 'relevant to the inquiry,' *Okla. Press Publ'g*

*Co. v. Walling*, 327 U.S. 186, 209 [(1946)]," and thus pertinency was established. *McPhaul*, 364 U.S. at 381-82.[2]

Nor is the alleged breadth of a congressional subpoena probative of a lack of pertinency. Where, as here, the Committee's "inquiry … [i]s a relatively broad one[,] … the permissible scope of materials that could reasonably be sought [i]s necessarily equally broad." *McPhaul*, 364 U.S. at 382.

Similar principles govern all forms of investigative subpoenas. Thus, courts routinely reject arguments that the production of bank records sought in a government investigation must be limited to the precise transactions at issue. *See, e.g.*, *SEC v. Dowdell*, 144 F. App'x 716, 723-24 (10th Cir. 2005) (affirming denial of motion to quash subpoena for attorney bank records where "it is likely that not every document requested by the subpoena will be related to [the subject of the investigation]"); *Exch. Point LLC*, 100 F. Supp. 2d at 176 (refusing to quash or modify broad SEC subpoena for financial records that "cover[ed] many records that are not related to the SEC's investigation," because the information requested "touches a matter under investigation" (citation omitted)); *Flatt v. U.S. SEC*, No. 10-60073-MC, 2010 WL 1524328, at *4 (S.D. Fla. Apr. 14, 2010) (same); *see also Nat'l Commodity & Barter Ass'n v. United States*, 951 F.2d 1172, 1175 (10th Cir. 1991) (affirming "broad" subpoenas issued by the government in investigation regarding violations of currency transaction reporting requirements where subpoenas sought records that "admittedly are not subject to the currency transaction reporting requirements").

---

[2] Notably, the two cases quoted by the *McPhaul* Court – in describing the test for pertinency in a prosecution for criminal contempt – both involved *administrative* subpoenas, confirming that even in the context of a criminal prosecution, the standard applicable to congressional subpoenas is no less broad and flexible than that governing the sweeping investigative subpoenas typically issued by administrative agencies.

This is true both because courts are loathe to impermissibly intrude on the investigatory methods of the government, and because of "the complex nature of the United States financial system and the numerous ways money can be moved within it." *Nat's Commodity*, 951 F.2d at 1175. Courts recognize that government investigators must be allowed to "to trace the path of the proceeds," *Flatt*, 2010 WL 1524328, at *4, of transactions under investigation and, to do so, the government must have broad access to the financial records of the entity involved in the transactions, even if that access results in disclosure of transactions that are not the subject of the government's investigation. *See id.* at * 4; *see also Dowdell*, 144 F. App'x at 724 ("[B]ecause the subpoena seeks to identify persons, at this time unknown to the [government] but associated with [the target], by tracking related funds which passed through [the third-party] bank account, the relevancy of the documents requested is apparent on the face of the subpoena.").

Plaintiff's attempt to burden the Committee's investigation, by forcing it to establish or prove "pertinency" under some heightened standard and on a transactional basis, is plainly inconsistent both with the burden of proof in this case, which lies squarely with Plaintiff, and with the standard consistently applied in government investigations. Courts routinely allow broad discovery of financial records based on government investigators' "reasonable belief that the records sought are relevant," observing that in the context of "'investigative subpoenas,'" "'[o]nce a person's connection to apparently illicit conduct has been shown, it is relevant to know whether that person's bank account contains evidence of such conduct.'" *Davidov v. U.S. SEC*, 415 F. Supp. 2d 386, 387, 392 (S.D.N.Y. 2006) (emphasis omitted) (quoting *Matter of SEC Private Investigation/Application of John Doe re Certain Subpoenas*, No. M8-85, 1990 WL 119321, at *2 (S.D.N.Y. Aug. 10, 1990)).

Plaintiff does not even attempt to demonstrate that the Committee's narrowly drawn request for a modest number of financial records somehow fails the "reasonably relevant" standard applicable to government subpoenas for financial records. Nor is there any basis for Plaintiff's apparent attempt to impose a heightened standard for congressional subpoenas, which would lead to the absurd result that Congress would possess less investigative power than do the administrative agencies it has created. This position was specifically rejected by the Supreme Court in *Buckley v. Valeo*, which made clear that an administrative agency's powers "of an investigative and informative nature ... fall[] in the same general category as those powers which Congress might delegate to one of its own committees[.]" 424 U.S. at 137-38 (per curiam).

Here, Plaintiff's objection to production of the remaining transactions sought by the Committee boils down to its oft-repeated assertion that the requested transactions "have[] no connection to Russia or Mr. Trump." Pl. Renewed Mem. 9; *see also id.* at 10 (journalist records "are not pertinent, as they are not related to Russia or Donald Trump"); *id.* at 10 ("Business A retained [Plaintiff] for services that were unrelated to ... Russia or Donald Trump."); *id.* at 11 ("Business B retained [Plaintiff] for a matter that had nothing to do ... with Russia or Donald Trump."). In other words, Plaintiff's position is that the Committee is obligated to take Plaintiff's word that no additional relevant information exists.

Deferential reliance on material witnesses to make unilateral relevance determinations is simply not how investigations work – whether by Congress or any other investigative body. As courts have noted, "it is manifestly impracticable to leave to the subject of the investigation alone the determination of what information may or may not be probative of the matters being investigated." *Packwood*, 845 F. Supp. at 21. This is particularly true here, where the full scope

of the Committee's investigation is classified and, therefore, cannot possibly be known to Plaintiff. *See* Glabe Decl. ¶ 19.

Moreover, the actions of Plaintiff to date cast serious doubt on the credibility of its assertions regarding the nature of the information it possesses. For instance, Plaintiff, through its representatives, has consistently underrepresented the amount of information it possesses that is relevant to the Committee's investigation, even under its own crabbed view of "relevance." For example, as early as October 19, the Committee was informed by a representative of Plaintiff that "only transactions related to one [Plaintiff] client were relevant to the Committee's inquiry." Glabe Decl. ¶ 10. Contrary to this representation, the October 27, 2017, production of records deemed relevant by Plaintiff included transactions related to at least *six* counterparties and *two* of Plaintiff's clients.   Glabe Decl. ¶ 12.

Additionally, as previously detailed, Plaintiff's principals asserted the Fifth Amendment in response to all substantive questions from the Committee at their depositions, thereby attesting under oath to an imminent risk of criminal prosecution if they were to answer the Committee's questions about their involvement in matters within the scope of this investigation. *See* Declaration of Mark R. Stewart (ECF No. 12-1) ("Stewart Decl.") ¶ 17. Yet, the very next day, one of those principals, Mr. Fritsch, executed a sworn declaration to this Court providing information that would have been directly responsive to some of the Committee's questions, thereby casting considerable doubt on the veracity of his sworn testimony the day before. *See id.* It should be noted, moreover, that the Committee has not sought any information from Plaintiff or its principals that thus far suggests any basis for such criminal liability. *See* Glabe Decl. ¶ 9. It logically follows either that Plaintiff's principals may have been perjuring themselves when they testified to a purportedly good-faith belief that their answers would tend to incriminate

them, and/or that they are in possession of incriminating information of relevance to the Committee's investigation that they have not yet disclosed. Either inference provides a further rational basis for the Committee's belief that, in fact, additional relevant information exists in Plaintiff's financial transactions.

Additionally, since the Committee's investigation is a civil inquiry, not a criminal proceeding, the Committee and the Court are entitled to draw adverse inferences from the fact that Plaintiff's principals have chosen to assert their privilege against self-incrimination. *See, e.g., Baxter*, 425 U.S. at 318; *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 58, 68 (D.D.C. 2000). As Justice Brandeis observed, "[s]ilence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923) (citations omitted).

Furthermore, Plaintiff's assertions regarding what is relevant to the Committee's investigation have continued to evolve and shift, casting still further doubt on the credibility of its latest protestations. After Plaintiff had purportedly caused the Bank to produce to the Committee on October 27 all of the bank records that Plaintiff deemed relevant to the Committee's investigation, Glabe Decl. ¶ 12, the Committee reviewed the remaining transactions and provided the Bank and Plaintiff with its dramatically narrowed list of additional requested transactions. *See id.* ¶ 18. Plaintiff responded by claiming that, with the exception of transactions relating to ███████████, the other newly requested records "are not pertinent to any question under inquiry." Pl. Renewed Mem., Ex. C. Two days later, however, Plaintiff voluntarily produced an additional transaction from ██████████████ █████████████████████████████████ as well as the transactions related to ███████████, both of which Plaintiff had previously

18

failed to disclose and had earlier described as "not pertinent." *See* Glabe Decl. ¶ 33. That description was plainly lacking in credibility, given Plaintiff's subsequent voluntary production.

In addition, on November 3, 2017, as part of its supplemental production, Plaintiff produced to the Committee numerous transactions from ████████████████ effectively admitting their pertinence, and despite the fact that it had previously indicated that the original production contained *all* transactions directly relevant to the Committee's investigation. *See id; id* ¶ 12. Plaintiff had at no time previously indicated that records related to ███████████ ████ existed or were relevant to the Committee's investigation. *See id.* at ¶ 33.

Even leaving aside Plaintiff's demonstrated unreliability, the Committee has ample basis to believe that the 70 disputed transactions are related to its investigation. For example, the Committee now knows that two law firms, Perkins Coie and BakerHostetler, engaged Plaintiff's services on matters of direct interest to the Committee. *See id.* ¶¶ 20-22. This previously unknown fact alone provides a reasonable basis for the Committee to inquire about transactions with other law firms during the same relevant time frame who may also have engaged with Plaintiff regarding similar or related activity. *See id* ¶ 22. Given the large sums involved in these retentions, it is highly unusual at best for law firms to assume such payment obligations on behalf of clients (rather than asking their clients to pay directly) absent some reason for concealing the identity of their clients. Disclosure of the transactions will not reveal the identity of those intentionally concealed clients, but it will permit the Committee to make inquiries of those law firms to determine the nature of their involvement with Plaintiff and any possible relationship to the subject matters of the Committee's investigation. *See id.* Such investigative leads are plainly pertinent to the investigation under any possible standard.

19

Plaintiff's interactions with media entities will provide equally pertinent investigative leads. As highlighted in a 2011 press interview with Plaintiff co-founder Peter Fritsch, Plaintiff's specialty is "seeding its opposition research into news stories." *See id.* at ¶ 23. For example, the Committee has information that Plaintiff brokered meetings for dossier author Christopher Steele with at least five major media outlets in September 2016, including Yahoo News, which specifically reported on facts citing information it received from a "single 'well-placed Western intelligence source.'" *See id.* at ¶ 27. The additional transactions requested by the Committee therefore include transactions related to Plaintiff's work on behalf of another media outlet in which Plaintiff could have seeded its research, Media Company A ███████ ████████████████████████████████████████████████████████████████ ████████████████████████. *See id.* Additionally, the Committee seeks transactions related to three individual journalists, █████████████████████████████████, each of whom have reported on and/or been quoted in articles regarding topics related to the Committee's investigation, some of which were published as recently as October 2017. *See id* ¶ 25. All of this material will provide important avenues of investigation for the Committee, and is therefore demonstrably pertinent to the Committee's inquiry.

Finally, the Committee has sought transactions related to two ████████ firms, Business A ███████████████████, and Business B ████████████ *See id.* ¶¶ 28-30. The Committee has information suggesting that Business A has long represented ██████████████ ████████████████████████████████████████████████████████████ ████████████████████. *See id.* ¶ 29. The Committee's publicly-announced investigation parameters specifically include "links between Russia and individuals associated with political campaigns or any other U.S. Persons." Accordingly, these transactions

are within the scope of the Committee's investigation because they will enable the Committee to investigate the nature of the relationships they evidence to ascertain their significance for purposes of the Committee's inquiry.  In addition, since January 2017, the Committee is aware that Business A ███████████████████████████████████████. *See id.* ¶ 29. The Trump campaign's and Administration's policy toward ██████ also is a component of the Committee's investigation. *See id.*

Likewise, the Committee has information that Business B ████████████████ ████████████████████████████████████████████. *See id.* ¶ 30. Of particular relevance to the Committee is Business B's ██████████████████████ ████████████████████████████████████████████████ ██████████████████████████. *See id.*  Given that the "Trump dossier" drafted by Plaintiff contractor Christopher Steele implicates ███████████████████████ ████████████████████████████████████████████████████████ ██████████████████. *See id.*

## C.    Plaintiff's First Amendment Argument Lacks Merit.

The Committee has made no demand that infringes on Plaintiff's First Amendment rights. *See Comm. Mem.* 24-37.  The Committee's original subpoena to Defendant Bank sought a limited set of financial records relating to transactions of a private corporation engaged in a variety of commercial activity – not from a trade association, a campaign or political committee, a labor union, a 501(c)(4) social welfare organization, a public interest organization, or even a private corporation with any discernible educational, cultural, religious, social or political goals, or any goals beyond maximizing the corporate owners' wealth. *See* Stewart Decl. ¶ 14.  In all relevant respects, the Committee's subpoena was an unremarkable and routine third-party

document request of a type that is commonplace and consistently complied with in civil discovery, administrative investigations, and grand jury proceedings.

What was remarkable, however, was Plaintiff's response to the subpoena. Plaintiff raised the sweeping and fanciful constitutional claim that production of financial records relating to a handful of accounts at a single bank would violate the First Amendment rights of Plaintiff and its customers by revealing the identity of Plaintiff's customers. Notwithstanding the baseless nature of that claim, the Committee has now significantly narrowed its request and seeks production of only a modest number of financial transactions – 70 disputed transactions out of what Plaintiff describes as "thousands" originally covered by the subpoena. Second Fritsch Decl. ¶ 3. Nonetheless, Plaintiff renews its meritless First Amendment objection. As previously explained, Comm. Mem. 26-29, Plaintiff cannot seriously contend that it has a First Amendment right of association with its customers – and the same is true with respect to its own vendors as well.

As the party seeking to prevent disclosure, Plaintiff bears the burden of establishing the applicability of any First Amendment privilege as a basis for enjoining Defendant Bank from producing records in response to the Committee's Narrowed Request. *See In re Subpoena Duces Tecum Issued to CFTC*, 439 F.3d 740, 750-51 (D.C. Cir. 2006) ("The basis of a privilege must be adequately established in the record through evidence sufficient to establish the privilege with reasonable certainty.") (internal punctuation and citations omitted). To date, Plaintiff's primary response to the Committee's showing that it lacks a protectable associational interest is that it is "indisputable," Plaintiff's Reply (ECF No. 13) ("Pl. Reply") 14, that corporate entities are entitled to First Amendment protection under the Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010). *Citizens United*, however, had nothing whatsoever to do with the First Amendment right of association – it held that corporations, like individuals, were entitled to

22

freedom of speech, *id.* at 318, 371-72, a proposition that is of no relevance here given that Plaintiff has not even attempted to demonstrate that its ability to speak has been restrained in any cognizable way.[3]

Here, in order to assert the purported First Amendment rights of its customers and vendors, Plaintiff must first establish that it is a protectable association, and then separately establish that compelled disclosure will chill its associational rights. Plaintiff cannot meet its initial burden of establishing that it is an association for First Amendment purposes by conclusory statements regarding the activities of certain of its customers, without explanation as to how these customers' activities implicate any associational goals of Plaintiff itself and of Plaintiff's other customers. Plaintiff's business operations are not shielded from government inquiry merely because some of its customers are engaged in political activity. *FEC v. Automated Bus. Servs.*, 888 F. Supp. 539, 542 (S.D.N.Y. 1995). And Plaintiff's desire to maximize profit is certainly not a protectable associational right. *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006).

Contrary to Plaintiff's apparent belief, the First Amendment does not provide blanket immunity from production of documents in response to an otherwise valid government subpoena; to conclude otherwise would render the government's subpoena power (whether judicial, executive, administrative, or legislative) meaningless. "[T]here are governmental

---

[3] While Plaintiff alleges (without explanation) that its "free speech" rights are implicated, Pl. Renewed Mem. 1, it has made no coherent showing to that effect. *See* Comm. Mem. 32-33. At most, Plaintiff appears to allege, in vague terms, that its customers' free speech rights are somehow implicated by the production of a modest number of bank records reflecting debits to and credits from Plaintiff's bank accounts. *See* Pl. Renewed Mem. 9-12. Plaintiff lacks standing to assert those customers' rights, even if they were adequately pled and cognizable. *See* Comm. Mem. 29-30.

23

interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." *Buckley*, 424 U.S. at 66 (citation omitted). For this reason, *even if* Plaintiff had adequately alleged a First Amendment associational right – a huge leap of logic under these circumstances – the government can overcome that showing upon a "compelling interest" for the records. *See FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 382-83 (1981). The D.C. Circuit has held that a "compelling interest" is presumed in the case of government subpoenas, even where "highly sensitive" information is sought, if the agency has statutory jurisdiction to conduct the investigation pursuant to which the subpoena was issued. *Id.* at 389. The same is true here. As has been amply demonstrated, Comm. Mem. 14-20; *supra* Part I.E, the Committee is authorized to conduct an investigation into the Russian active measures campaign, so the Committee's compelling interest is self-evident. *See generally United States v. Inst. for Coll. Access & Success*, 27 F. Supp. 3d 106, 115, 115 n.8 (D.D.C. 2014) (rejecting First Amendment objection to administrative subpoena because government agency had statutory authorization to conduct the investigation and the subpoena was "reasonably relevant" to the investigation, and explaining that "the presence of First Amendment issues alone is not enough to thwart ... enforcement") (citation omitted).

### 1. Plaintiff Is Not An "Association" For Purposes Of The First Amendment.

Plaintiff is a for-profit company that provides a broad array of commonplace commercial due diligence and research services to a wide range of corporate clients, as well as clients representing interests on both sides of the political spectrum. *See* Complaint (ECF No. 1) ("Compl.") ¶ 11 ("Plaintiff is a research firm that provides strategic intelligence and due diligence services to corporations, law firms, and investors worldwide."); Fusion GPS, *About*

*Fusion,* (Plaintiff provides "due diligence" services "crucial to investment decisions and performance," as well as "regulatory compliance, asset recovery and market intelligence" services);[4] Declaration of Peter Fritsch (ECF No. 2-2) ("Fritsch Decl.") ¶ 6 ("Our clients include private sector businesses and individuals, as well as political organizations and politicians on both the left and the right.").

As previously explained, Comm. Mem. 26-29, Plaintiff is not a protectable "association" made up of persons who are engaged in a "collective effort" "for the advancement of beliefs and ideas" that are shared among the association's members. *Nat'l Ass'n for the Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 463 (1958). Plaintiff asserts that because certain of its clients had a common goal – "oppos[ing] President Trump and his allies" – then all of Plaintiff's activities must be shielded from government intrusion under its First Amendment associational rights. *See* Pl. Reply 14-15. But Plaintiff can no longer advance this argument, because Plaintiff and its dossier-related clients have now chosen to publicize their identity and involvement in "oppos[ing] President Trump" – with no resulting "chilling" effect – and thus the purported threat to First Amendment interests has been shown to be illusory. Pl. Reply 8, 15; Glabe Decl. ¶¶ 11, 15.

In any event, Plaintiff cannot claim associational rights merely because certain of its commercial customers, by happenstance, want the same things as other commercial customers – the association *itself* must "express the[] collective views and protect the[] collective interests" of a coherent group of like-minded individuals or entities. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977). While the members of an "association" for purposes of the

---

[4] *Archived page available at*
https://web.archive.org/web/20110814073733/http://www.fusiongps.com:80/about.html

First Amendment need not share identical interests in all respects, there must be some discernible common thread or overarching goal of the association. *Cf. Citizens United*, 558 U.S. at 324-25 (nonprofit corporation funded by donations and engaged in "express advocacy"); *see also id.*, Appellant Br., No. 08-205 at 5 ("Citizens United is a nonprofit membership corporation that has tax-exempt status under 26 U.S.C. § 501(c)(4) as an 'organization[ ] not organized for profit but operated exclusively for the promotion of social welfare.' … Through a combination of education, advocacy, and grass-roots programs, Citizens United seeks to promote the traditional American values of limited government, free enterprise, strong families, and national sovereignty and security."); *NAACP*, 357 U.S. at 452 (nonprofit membership corporation seeking "to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States"); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 503 (D.C. Cir. 2016) ("political committee that works for the election of federal officeholders"); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1163-64 (9th Cir. 2010) (proponents of a particular ballot measure to amend state constitution); *AFL-CIO v. FEC*, 333 F.3d 168, 171 (D.C. Cir. 2003) (labor union); *Machinists Non-Partisan Political League*, 655 F.2d at 382-83 (committee organized to draft a candidate for President).

Plaintiff has not shown that any such consistent policy agenda exists for it and its clients. Accordingly, Plaintiff is not a protected association. It is instead a profit-maximizing hired gun, selling its investigative services to the highest bidder. Plaintiff's goal – to be highly compensated for its work – is not a protectable associational interest. *See Fleck & Assocs.*, 471 F.3d at 1106. Nor is this profit-maximizing goal for itself one that Plaintiff shares with its customers.

### 2. Plaintiff Lacks Standing To Assert The Alleged First Amendment Rights Of Its Customers.

While some of Plaintiff's customers may (or may not) be engaged in First Amendment activities, that is beside the point. Plaintiff would have standing to assert the First Amendment rights of its *members* (here, allegedly, its customers) only if Plaintiff were a protected *association.* It is not. When, as here, "the allegations in the complaint make clear that 'members' of [Plaintiff] are merely customers," and Plaintiff "does not allege that its customers in any way have come together to form an organization for their mutual aid and benefit," there is no associational standing. *Fleck & Assocs.*, 471 F.3d at 1106.

In addition, to adequately allege associational standing, Plaintiff must establish that "the interests [the suit] seeks to protect are germane to the organization's purpose[.]" *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996). When the "the purpose of the 'association' … is to turn a profit," there is no associational standing. *Fleck & Assocs.*, 471 F.3d at 1106 (rejecting associational standing to challenge ordinance prohibiting live sex acts by an association who ran that type of business because plaintiff merely had customers, not members, and suit to allegedly vindicate "putative privacy interests of its customers" was not germane to plaintiff's purpose).

### 3. Plaintiff Has Not Engaged In Protected First Amendment Activities And, In Any Event, The Disclosure Of Its Financial Records Does Not Offend The First Amendment.

Plaintiff also raises additional purported First Amendment objections to the disclosure of the disputed transactions. Plaintiff's claims of constitutional infirmity are unclear and conclusory at best, but it objects to the production of records reflecting the following:

- a small number of transactions that Plaintiff claims are irrelevant to the Committee's inquiry even though they involve customers or contractors whose activities undisputedly fall within the scope of the Committee's investigation, Third Fritsch Decl. (11/3/2017) ¶ 4 (referencing Committee Request No. 4 (BakerHostetler); *id.* at ¶ 9 (referencing Committee Request Nos. 44-45, 47, 49-50, 52-53 (           and 74-76      ;

- payments received from 9 customers that Plaintiff asserts "do not pertain to any work related to" or "had nothing to do" with Russia or Donald Trump or other areas of the Committee's inquiry, *id.* at ¶¶ 4-8 (referencing Committee Requests Nos. 12-16, 17, 18-31, 32-43); and

- payments made to three contractors that Plaintiff asserts "are not pertinent to work related to Russia or Donald Trump," *id.* at ¶ 6 (referencing Committee Requests Nos. 66, 68-69, 107-112).

Plaintiff seeks to have this Court – or a Special Master – engage in an unwarranted assessment, on a document-by-document basis, of Congressional need for the requested records. Pl. Renewed Mem. 12. But Plaintiff itself is unwilling to disclose to this Court, on a document-by-document basis, how its First Amendment rights are implicated by the Committee's narrowed requests, and avers merely that "the records are protected by the First Amendment and confidentiality." Pl. Renewed Mem. 9-10.

For the reasons stated above, Plaintiff is not a protected association and cannot resist discovery on the basis that its customer lists will be revealed by this narrowed production. Indeed, the identities of certain of Plaintiff's customers who retained Plaintiff for Russia-related work and contractors who assisted Plaintiff in this paid work are already public, so the core element of Plaintiff's purported First Amendment objections – the alleged concern about exposure of the identity of anti-Trump clients – no longer exists even under Plaintiff's view. Glabe Decl. ¶ 11, 15. No First Amendment associational right could possibly be implicated by producing additional transactions relating to these now (by virtue of seemingly calculated media disclosures by Plaintiff and/or its clients themselves, *id.*) publicly known customers and contractors. To the extent Plaintiff is alleging that the remaining transactions it seeks to shield

28

reflect "political activit[ies]," Plaintiff's Memorandum In Support of Temporary Restraining

Order (ECF No. 2-1) ("Pl. Mem.") 11, of its customers, Plaintiff has failed to provide any

specific evidence to that effect, and in any event it lacks standing, as explained above, to assert

the First Amendment rights of its customers.

Plaintiff has no additional First Amendment basis to shield its business records from

government review.  Producing records that reveal customer lists of a commercial enterprise

does not offend the First Amendment because commercial transactions do not give rise

to associational rights, even if the underlying subjects of the transactions are themselves

protected speech.  *United States v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005) (customer list of tax

professional not protected); *IDK, Inc. v. Cty. of Clark*, 836 F.2d 1185, 1193-95 (9th Cir. 1988)

(escort/client relationship not protected by freedom of association); *In re Grand Jury Subpoena*

*Duces Tecum Served Upon PHE, Inc.*, 790 F. Supp. 1310, 1317 (W.D. Ky. 1992) (commercial

relationship between publisher and customers not protected "associational right" under First

Amendment); *In re Grand Jury Subpoena Served Upon Crown Video Unlimited, Inc.*, 630 F.

Supp. 614, 619 (E.D.N.C. 1986) (holding that "the commercial relationship arising from the sale

of videotapes by the subpoenaed corporations to their customers is not protected by the [F]irst

[A]mendment's freedom of association guarantee," even though videotapes themselves were

protected form of speech).[5]

Under Plaintiff's theory of the First Amendment, any service provider to a political

campaign could resist government inquiry into its business operations.  This would be an absurd

result, and courts are understandably reluctant to shield political vendors' commercial

---

[5] At most, Plaintiff has alleged in conclusory terms that certain of its customers are engaged in political activities.  Plaintiff has made no showing that the law firms, media organizations, and contractors at issue in the narrowed transactions were engaged in protected activities.

transactions from government inquiry on First Amendment grounds.  For example, in *FEC v. Automated Business Services*, the court enforced an administrative subpoena to examine the records of vendors that provided services to a campaign committee, observing that

> [t]he notion that by doing business with vendors that are owned or operated by its political supporters, a campaign committee can shield those vendors from investigation by the F.E.C. is a baseless attempt to hamper the proper functioning of the F.E.C. .... [I]f respondents' argument were valid, then ultimately all campaigns could make themselves immune from federal election laws, by only doing business with their political supporters.

888 F. Supp. at 542 (internal quotation marks omitted).  In reaching its conclusion, the court relied upon its earlier opinion rejecting an order to show cause seeking to stay compliance with a subpoena served on the campaign's bank:

> The mere vending of goods or services to a political association neither evinces support for that association, nor makes the vendor a member of that association.  Thus, the First Amendment clearly affords no such protection to vendors of goods or services to political associations.

*Id.* at 542.  *See also Holderbaum v. United States*, 589 F. Supp. 107, 111, 112 (D. Colo. 1984) (refusing to quash an IRS summons for financial records, stating "the Court believes that an individual should not be insulated from tax liability or investigation into his tax liability merely because he ... deals with members of a particular organization").

### 4.  Plaintiff's Free Speech Rights are Not Impaired.

As previously demonstrated, Comm. Mem. 32-33, Plaintiff also cannot identify any intrusion on its freedom of speech.  Plaintiff's Reply and Renewed Memorandum failed to address the Committee's arguments in this regard, so the Committee stands on those arguments.

### 5. Plaintiff Alleges No Relevant Harm Arising From the Disclosure of Its Financial Records.

As previously demonstrated, Comm. Mem. 33-37, Plaintiff is not entitled to injunctive relief on the basis of its conclusory assertions of harm. Although the Committee's original subpoena was entirely proper and valid, Plaintiff's asserted panoply of purported harms are even more implausible now in light of the fact that the Committee has dramatically narrowed its requests. Moreover, the Committee's Rules guard against the type of public disclosure that Plaintiff claims to fear (except, of course, when Plaintiff and its clients decide to publicize the very facts that Plaintiff has claimed would destroy its business and threaten First Amendment freedoms if disclosed). *See* Comm. Mem. 24, 33-34; Stewart Decl. ¶ 20. "Even if [Plaintiff's] activities ... were entitled to greater scrutiny, the record shows that the subpoena's impact on [Plaintiff's] First Amendment freedoms is 'so slight' that the [Committee's] interests must prevail." *Senate Permanent Subcomm. on Investigations v. Ferrer*, 199 F. Supp. 3d 125, 143 (D.D.C. 2016) (citations omitted), *vacated as moot*, 856 F.3d 1080, 1089 (D.C. Cir. 2017).

### D. Plaintiff Has Identified No Legally-Cognizable "Confidentiality" or "Privacy" Privileges

Plaintiff also claims that production of the 70 disputed transactions "will violate Plaintiff's ... confidentiality obligations" and invade Plaintiff's "privacy rights," and the requested records "are protected by ... confidentiality." Pl. Renewed Mot. 2; Pl. Renewed Mem. 4, 9-12. It is unclear why Plaintiff believes that its purported "privacy" or "confidentiality" concerns are relevant to the Court's resolution of Plaintiff's application (the same concerns are shared by any recipient of a government inquiry or subpoena), but it is clear that neither of these vaguely worded objections is a legitimate basis to resist a Congressional subpoena.

With respect to Plaintiff's asserted privacy rights in the 70 disputed transactions, as an initial matter, there is no constitutional privacy right in bank records. *United States v. Miller*,

425 U.S. 435, 442-43 (1976) (discussing "[t]he lack of any legitimate expectation of privacy concerning the information kept in bank records," and noting that "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government."). In addition, "corporations can claim no equality with individuals in the enjoyment of a right to privacy." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *accord G.M. Leasing Corp. v. United States,* 429 U.S. 338, 353, (1977) ("[A] business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context."). While explaining that there are "limits" to what the government can demand from corporate entities, the Supreme Court has also recognized the limited role of the judiciary in assessing the propriety of a government investigation – "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Morton Salt*, 338 U.S. at 652. Agencies are entitled to no more deference in conducting statutorily defined investigations than Congress in conducting constitutionally derived investigations in furtherance of its Article I power.

Plaintiff's reliance on *Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130-31 (S.D.N.Y. 1975), for the proposition that this Court may enjoin the production of records that reflect "purely personal financial matters" of Plaintiff's customers is misplaced. The Senate subpoena at issue in *Bergman* was directed at individuals, not a corporate entity, as here. *Id.* at 1129. The *Bergman* court based its holding on what it viewed as a "personal interest in privacy" enjoyed by the individual plaintiffs, ruling that "purely personal" financial records should not be produced to the Senate committee. *Id.* at 1131. In this regard, *Bergman* is no longer good law. The decision pre-dates the Supreme Court's 1976 decision in *United States v. Miller*, in which the Court held that "we perceive no legitimate 'expectation of privacy'" in

banking records, which "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business," 425 U.S. at 442. Indeed, the *Bergman* court relied upon the lower court decision reversed by the Supreme Court in *Miller*. *See* 389 F. Supp. at 1130. Thus, *Bergman* provides no support for Plaintiff here. But *Bergman* remains relevant in one respect: in a holding that remains good law, the court correctly recognized that documents relating to plaintiffs' "corporate ... activities or dealings" had to be produced to the Senate committee. *Id.* at 1130. The same is true here. Plaintiff's corporate bank records are not "personal" in any respect.

Because there is no free-standing privacy right enjoyed by corporate entities, or bank customers generally, Plaintiff also appears to reassert (albeit only in passing) its statutory privacy claims under the Right to Financial Privacy Act ("RFPA") and the Gramm-Leach-Bliley Act ("GLB Act"). Compl. ¶¶ 49-63. But as the Committee has shown, Comm. Mem. 29-30, Plaintiff (a Delaware LLC) lacks standing to bring claims under these Acts, because by their plain terms these Acts do not apply to financial records held by a corporate entity, such as an LLC. *See Exch. Point LLC*, 100 F. Supp. 2d at 176 (holding that Delaware LLC lacked standing under RFPA, because "the plain meaning of the statute simply cannot countenance the inclusion of a limited liability company in the term 'individual or partnership ...'"); 15 U.S.C. §§ 6802(a), 6909(9) (GLB Act) (relating to disclosure of the financial records of a "*consumer*," defined as an "*individual* who obtains ... financial ... services ... for *personal, family, or household purposes*") (emphases added); *cf.* Henry J. Friendly, Benchmarks 202 (1967) (recounting Justice Frankfurter's three rules of statutory interpretation as "(1) [r]ead the statute; (2) read the statute; (3) read the statute!"). In addition, as explained in Committee's original brief, neither Act applies to Congressional subpoenas. *See* Comm. Mem. 20-24.

Plaintiff's asserted confidentiality obligations fare no better.  It is not clear if Plaintiff is claiming a contractual obligation to maintain the confidentiality of its clients' identities, or simply acknowledging that as a business matter, it chooses to exercise discretion with respect to its paid engagements.  Regardless, Plaintiff has failed to establish the existence of any relevant contractual provision, or to allege how either reason (contractual term or a sound business decision) would defeat a valid government subpoena to Plaintiff's bank.  The D.C. Circuit has held that agencies and private parties cannot withhold documents from Congress on confidentiality grounds, allowing disclosure to Congress even when the documents contain highly sensitive trade secrets.  *FTC v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980)*; Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 979 (D.C. Cir. 1976) (denying injunctive relief to party that sought to prevent disclosure by the FTC to a House committee of its "trade secret" information).  And of course, it is axiomatic that disclosure to the government by subpoena, regulation, or order excuses any contract term to the contrary.  *See* Robert L. Haig, ed., 8 Bus. & Comm. Litig. Fed. Cts. § 89:35 (4th ed.) (as a matter of law, a party to a contract may assert an impracticability defense to a contract when "the nonoccurrence of an event is a basic assumption of a contract," including "government intervention that prevents performance"); Restatement (Second) of Contracts § 264 (1981) (Prevention by Governmental Regulation or Order).

Even where a clearly privileged relationship exists with a client, courts routinely refuse to shield the client's identity from disclosure.  *See, e.g., In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir. 1983) ("The federal forum is unanimously in accord with the general rule that the identity of a client is, with limited exceptions, not within the protective ambit of the attorney-client privilege." (collecting cases)); *United States v. Ritchie*, 15 F.3d 592,

602 (6th Cir. 1994) ("[V]irtually every court to consider the issue has concluded that client identity and payment of fees is not privileged information.").

The D.C. Circuit has recognized that "the judiciary must refrain from slowing or otherwise interfering with the legitimate investigative functions of Congress," and that judicial restraint must be exercised where "confidential documents" are at issue. *Owens-Corning Fiberglas Corp.*, 626 F.2d at 970. Accordingly, Plaintiff has failed to meet its burden of establishing a substantial likelihood of success on any "confidentiality" or "privacy" claims.

### E.    The Committee's Subpoena Is Valid.

Under well-established precedent, the Committee Chairman, like all government officials, enjoys a "presumption of regularity" that, absent a contrary showing, requires the Court to conclude that his official duties were properly discharged. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (quotation marks omitted). Nothing in Plaintiff's papers comes close to overcoming that presumption by proving that the Committee's subpoena was not authorized or that the Committee's rules were not adhered to. *See* Comm. Mem. 14-17.

Contrary to Plaintiff's assertions, the Committee's subpoena to Defendant Bank was duly authorized and properly issued. The Committee's authority to conduct this investigation is clear and derives from House Rule X.11(b)(1), which was adopted by the full House of Representatives via the passage of House Resolution 5 on January 3, 2017. *See* Rules of the U.S. House of Representatives (115th Cong.), Rule X.11(b)(1); 163 Cong. Rec. H7-H11 (daily ed. Jan. 3, 2017) (approving H. Res. 5 by vote of 228-184). Consistent with this authorization, and in accordance with the Committee's Rules and internal practices, the subpoena to Defendant Bank was requested by Representative Conaway, signed by Chairman Nunes, and the Ranking Member was properly notified before the subpoena was issued. *See* Committee Rule 10; Stewart Decl. ¶¶ 12, 14, 15.

Despite these facts, Plaintiff complains that the notification to the Ranking Member occurred at the staff level. *See* Pl. Reply at 3. This practice, however, is completely consistent with the Committee's Rules, as authoritatively explained by the Committee's Chief Counsel. *See* Stewart Decl. ¶ 15. Even if there were any doubt about that question, moreover, the courts would lack authority to second-guess the Committee's interpretation and implementation of its own rules. The Constitution expressly delegates to each House of Congress the sole authority to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, and the Supreme Court has consistently held that "within these limitations [– violation of constitutional restraints or fundamental rights –] all matters of method are open to the determination of the [H]ouse, and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just." *United States v. Ballin*, 144 U.S. 1, 5 (1892); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995) (courts may not resolve ambiguities in House Rules). Accordingly, Plaintiff's belief that subpoena notifications should occur differently is of no moment.

## II.   PLAINTIFF CANNOT ESTABLISH IRREPARABLE INJURY.

As the Committee previously explained, *see* Comm. Mem. 37-42, the D.C. Circuit has consistently "set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In particular, the court has emphasized the "requirement that the movant substantiate the claim that irreparable injury is 'likely' to occur. *Bare allegations of what is likely to occur are of no value* since the court must decide whether the harm will *in fact* occur. *The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.*" *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (first and third

emphases added).  Plaintiff has not satisfied this heavy burden, and its attempts to do so fall woefully short.

Far from proffering concrete proof that the alleged harms "have occurred in the past" and are "likely to occur again," or that "the harm is certain to occur in the near future," Plaintiff simply repeats its conclusory and self-serving mantra that its business will be harmed and First Amendment rights will be chilled if 70 bank transactions are produced to the Committee.  Such conclusory allegations could not satisfy the *Wisconsin Gas* test under any circumstances, but they are even more clearly insufficient now, because they are refuted by the recent conduct of Plaintiff and its clients.  Since the time that Plaintiff initially advanced its hyperbolic claims of irreparable injury, Plaintiff and its clients have *themselves* chosen to publicize the very facts that Plaintiff claimed would be most harmful – namely, their identity and involvement in opposition research efforts aimed at now-President Trump, as well as related information regarding Plaintiff's transactions with the author of the "dossier."  Glabe Decl. ¶¶ 11, 15.  Plaintiff has offered no evidence that these disclosures have led to even the slightest hint of the resulting harms that Plaintiff had confidently asserted would ensue from such disclosures.  Thus, Plaintiff has failed to establish a likelihood of irreparable injury.

Plaintiff's claim of irreparable injury also suffers from an independently fatal flaw:  it is foreclosed by binding D.C. Circuit precedent.  All of Plaintiff's speculative claims of hypothesized adverse consequences rest on the premise that production of the records to the Committee will result in public disclosure of the information so produced.  But Plaintiff offers no evidence to substantiate that assumption, and Circuit precedent precludes this Court from accepting it:  "We have heretofore held that release of information to the Congress does not constitute 'public disclosure.' … The courts must presume that the committees of Congress will

exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon Corp.*, 589 F.2d at 589 (citation omitted); *see, e.g., Owens-Corning Fiberglass Corp.*, 626 F.2d at 970; *Ashland Oil*, 548 F.2d at 979; *see also Murphy v. Dep't of Army*, 613 F.2d 1151, 1155, 1155-56 (D.C. Cir. 1979) (rejecting assertion that "disclosure of information to Congress is disclosure to the whole world"). Plaintiff's concerns are particularly misplaced in the context of this investigation, because any records produced by Defendant Bank will be treated as executive session material subject to strict confidentiality provisions under the Committee's Rules. *See* Second Stewart Decl. ¶ 21.

Plaintiff attempts to dispute this proposition, claiming that the Committee's "conduct gives no comfort" that the Committee will abide by its executive session rules. Pl. Reply 5. The stated grounds for this lack of trust are Plaintiff's allegations that (i) "some of what occurred during the otherwise confidential October 18, 2017, depositions of Messrs. Fritsch and Catan" was revealed in an October 19, 2017 Wall Street Journal article, *see* Second Declaration of Joshua A. Levy (ECF No. 14-1) ("Second Levy Decl.) ¶ 11, and (ii) the Committee "leaked the identification of the bank to the press." *Id.* at ¶ 12. Those assertions are completely lacking in merit, because none of the information identified by Plaintiff was subject to the Committee's executive session rules, and its disclosure casts no doubt whatsoever on the Committee's compliance with those rules.

With respect to Plaintiff's principals' assertions of their privilege against self-incrimination, such assertions are not "information received by the Committee" within the meaning of Committee Rule 12(a)(1)(B); rather, they are legal claims proffered to justify a *refusal* to provide "information" to the Committee, and thus the confidentiality obligation does not apply. *See* Second Stewart Decl. ¶ 19. Moreover, Plaintiff's protestations regarding the

purported confidentiality of the assertions of alleged constitutional privilege are particularly baseless here, because Plaintiff's counsel (Mr. Levy) *himself* made public the fact that Messrs. Fritsch and Catan raised constitutional privileges at their committee depositions, shortly after the conclusion of the depositions. *See* Jeremy Herb & Evan Perez, *Fusion GPS Partners Plead Fifth Before House Intel*, CNN (Oct. 18, 2017, 4:58 PM) ("Fusion GPS' Peter Fritsch and Thomas Catan invoked their Fifth Amendment rights not to answer questions during their closed-door appearance before the committee, *according to their attorney Joshua Levy*.") (emphasis added).[6] Plaintiff's attempt to impugn the integrity of the Committee based on the conduct of Plaintiff's own counsel is thus doubly baseless and misleading.

As to the so-called "leak" of Defendant Bank's identity, there exists no requirement, either in House or Committee Rules, that such information be kept confidential. The identity of the recipient of a subpoena is not "information received by the Committee in executive session," Stewart Decl. ¶ 20, within the meaning of the executive session rules; rather, it is information released by the Committee to the recipient of the subpoena, and as such (absent a specific Committee determination to the contrary) it is not subject to the executive-session confidentiality requirement. *See* Second Stewart Decl. ¶ 20. Moreover, as Mr. Levy's declaration notes, the disclosure was made before any ruling on the motion to use a pseudonym, Second Levy Decl. ¶ 12, and there is no evidence that whomever made the disclosure (even assuming it was someone affiliated with the Committee) was even aware that Plaintiff had filed a motion to avoid naming the Bank – a filing that occurred as one small part of a 90-page submission filed shortly before the article at issue was published.

---

[6] *Available at* http://www.cnn.com/2017/10/18/politics/fusion-gps-partners-plead-fifth-before-house-intel/index.html.

Thus, Plaintiff has failed to meet its burden of making a "substantial showing … that the materials in the possession of the [Bank] will necessarily be 'made public' if turned over to Congress." *Ashland Oil*, 548 F.2d at 979. As a result, this Court "must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon*, 589 F.2d at 589 (quotation marks omitted). Plaintiff's claim of irreparable injury therefore fails as a matter of law.[7]

## III.   THE BALANCE OF EQUITIES CLEARLY FAVORS ENFORCEMENT OF THE MODIFIED SUBPOENA.

The balance of the equities now tips even more heavily in favor of the Committee. The Committee has conducted a careful, time-consuming review of the Responsive Records and has dramatically narrowed the scope of its request to only those transactions – a tiny fraction of the whole – that merit further investigation because they may shed additional light on matters of direct interest to the Committee. In its original motion, Plaintiff's theory of injury focused on purported harm to its business and to alleged First Amendment rights arising from what Plaintiff

---

[7] Plaintiff cites two cases in support of the proposition that damage will be done as soon as the information is provided to the Committee. Pl. Reply at 6-7. Neither case is even remotely analogous to the facts and circumstances at issue here. To start, neither case involved a government investigation; rather, they both are civil actions between private entities with no confidentiality requirements or obligations such as those imposed by the Committee Rules here. Second, in *Council on Am.-Islamic Relations v. Gaubatz*, unlike here, "the record … support[ed] a finding that Defendants have unlawfully obtained access to, and have already caused repeated public disclosure of, material containing CAIR's proprietary, confidential and privileged information." 667 F. Supp. 2d 67, 76 (D.D.C. 2009). Finally, in *Morgan Stanley DW Inc. v. Rothe*, unlike here, the customer lists and other information at issue was expressly protected by statute, *see* 150 F. Supp. 2d 67, 76 (D.D.C. 2001) (citing District of Columbia's Uniform Trade Secrets Act). Accordingly, both cases are inapposite, as (i) there are no allegations of unlawful access here, (ii) the Committee has numerous procedures and rules in place specifically intended to prevent the type of public exposure found in *Gaubatz*, and (iii) unlike the records in *Morgan Stanley*, Plaintiff's records are not entitled to any statutory protection. *See* Comm. Mem. 20-24.

characterized as an overbroad request. Pl. Mem. 16-17; Pl. Reply 4-5. That theory lacked merit when originally advanced, *see* Comm. Mem. 42-43, and it is even more obviously meritless now.

Not only has the number of disputed transactions been reduced from "several thousand" to only 70, but Plaintiff and its clients have themselves now chosen to publicize a number of highly significant transactions, Glabe Decl. ¶¶ 11, 15 – transactions that Plaintiff previously described as absolutely inviolate and indeed the very predicate for its claim of irreparable injury. *See* Pl. Reply 7-8 (claiming "chilling" effect from "disclosure of confidential political work that Plaintiff conducted in opposition to Mr. Trump"). Even though that very information has now been publicly disclosed – *not by the Committee, but by Plaintiff and its clients*, evidently as part of their calculated media strategy – Plaintiff offers not a shred of evidence to prove that any of its hyperbolic and wholly speculative assertions of resulting harm have actually come to pass. "Injunctions ... will not issue to prevent injuries neither extant nor presently threatened, but only merely 'feared.'" *Exxon*, 589 F.2d at 594 (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).

In any event, as shown above, D.C. Circuit precedent precludes this Court from indulging Plaintiff's assumption that disclosure of the disputed handful of transactions to the Committee will constitute public disclosure. *See, e.g.*, *Exxon*, 589 F.2d at 589 ("release of information to the Congress does not constitute 'public disclosure'" (quoting *Ashland Oil*, 548 F.2d at 979)). And without that assumption, Plaintiff's house-of-cards theory of harm utterly collapses.

By contrast, further interference with the Committee's exercise of its constitutional power of inquiry would directly harm the Committee's compelling interest in expeditious completion of this investigation, which involves matters of pressing national importance. The transactions at issue contain investigative leads that the Committee seeks to pursue in the exercise of its

constitutional responsibilities, and further delay will directly impede the progress of the

Committee's investigation by blocking its ability to pursue those leads. "This investigation is a

national security necessity," Comm. Press Release (Ranking Member Adam Schiff), yet

Plaintiff's intransigence has already substantially delayed the course of the investigation.  As

one of the Committee's Members recently observed, the Committee's ability to promptly

conclude its investigation has been hampered by the recalcitrance of witnesses that possess

relevant information. *See* Katie Bo Williams, *House Republicans Growing Impatient with*

*Russia Probe*, The Hill (Oct. 26, 2017) (quoting Rep. Eric Swalwell: "I would love to wrap [the

Russia active measures investigation] up as soon as we can and in a comprehensive way –

meaning that witnesses are actually asked to turn over relevant documents. Part of the problem

right now has been that witnesses are coming in without turning over what we've asked[.]").[8]

"For this court on a continuing basis to mandate an enforced delay on the legitimate

investigations of Congress" based on nothing more than Plaintiff's asserted confidentiality

concerns "could seriously impede the vital investigatory powers of Congress and would be of

highly questionable constitutionality." *Exxon*, 589 F.2d at 588.  Plaintiff has failed to meet its

burden of establishing that the balance of equities favors issuance of the intrusive and

unprecedented injunction it seeks.

## IV.   PUBLIC INTEREST SUPPORTS ENFORCEMENT OF THE MODIFIED SUBPOENA.

The public interest compels denial of Plaintiff's renewed attempt to interfere with an

ongoing congressional investigation.  The D.C. Circuit has squarely held that there is a "clear

public interest in maximizing the effectiveness of the investigatory powers of Congress[,]"

---

[8] *Available at* http://thehill.com/policy/national-security/357420-house-gop-growing-impatient-with-russia-probe.

because "the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress[.]" *Exxon Corp.*, 589 F.2d at 594 (citing *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927)). Thus, when a private litigant seeks to enjoin a third party from complying with a congressional request for information, "[i]t would ... require an extremely strong showing ... to succeed in obtaining an injunction in light of the compelling public interest in denying such relief." *Id.* No such showing has been made here.

Plaintiff's attempt to satisfy its heavy burden rests primarily on its First Amendment claim, but as explained above, that claim is meritless, and falls far short of the requisite "extremely strong showing." Plaintiff also asserts that "this case presents novel and important questions of constitutional law regarding the interplay between two co-equal branches of government: the Judiciary and the Legislature." Pl. Reply 21. Even if that were true, it would hardly demonstrate that the public interest supports the extraordinary remedy of an injunction against compliance with a congressional subpoena. In any event, this is hardly the first case in which private parties have sought to enjoin compliance with congressional demands for information, and such attempts have been uniformly rejected in this Circuit. *See, e.g., Exxon*, 589 F.2d at 594 (denying private party's request to enjoin agency from producing confidential trade secrets to Congress); *Ashland Oil*, 548 F.2d at 979 (same). Plaintiff has not made an "extremely strong showing" that the public interest favors injunctive relief in this case, and accordingly its motion must be denied.

43

**CONCLUSION**

For all of the foregoing reasons, Plaintiff's renewed request for a temporary injunction should be denied and the case should be dismissed with prejudice.

Respectfully submitted,

*/s/ Thomas G. Hungar*
THOMAS G. HUNGAR (DC Bar #447783)
  *General Counsel*
TODD B. TATELMAN (VA Bar #66008)
  *Associate General Counsel*
KIMBERLY HAMM (DC Bar #1020989)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
Thomas.Hungar@mail.house.gov

*Counsel for the Permanent Select Committee*
*on Intelligence of the U.S. House of Representatives*

November 21, 2017

**CERTIFICATE OF SERVICE**

I certify that on November 21, 2017, I filed the foregoing document by the court's

CM/ECF system, which I understand caused it to be served on all registered parties.


/s/ Thomas G. Hungar
Thomas G. Hungar