IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BEAN LLC d/b/a FUSION GPS<br>    1700 Connecticut Ave., NW<br>    Suite 400<br>    Washington, DC 20009,<br><br>           Plaintiff,<br><br>v.<br><br>DEFENDANT BANK,<br><br>           Defendant,<br><br>PERMANENT SELECT COMMITTEE ON<br>INTELLIGENCE OF THE U.S. HOUSE OF<br>REPRESENTATIVES,<br>           Intervenor. | Case No. 1:17-cv-02187-TSC |

**DECLARATION OF SCOTT L. GLABE**

1. I currently am, and have been since January 2016, Deputy General Counsel for the House Permanent Select Committee on Intelligence ("Committee"). In this capacity, I have participated in the Committee's investigation regarding the Russian active measures campaign targeting the 2016 U.S. election, and am familiar both with the publicly announced parameters of that investigation as well as the classified scoping document. The facts set forth in this Declaration are based upon my personal knowledge.

2. House Resolution 5, approved on January 3, 2017, and adopting the Rules of the House of Representatives for the 115th Congress, grants the Committee broad oversight over intelligence and intelligence-related activities.

3. In an exercise of its oversight jurisdiction, on March 1, 2017, the Committee

1

publicly announced its Scope of Investigation regarding the Committee's investigation relative to the Russian active measures campaign targeting the 2016 U.S. election. While a detailed, six-page Committee scoping document remains classified, the Committee publicly announced key questions the investigation seeks to answer: *1) What Russian cyber activity and other active measures were directed against the United States and its allies?; 2) Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. Persons?; 3) What was the U.S. Government's response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?; and 4) What possible leaks of classified information took place related to the Intelligence Community Assessment of these matters?*

4. Based on extensive media reporting and the Committee's own investigative efforts, the Committee formed a reasonable belief that Fusion GPS and its co-founders Glenn Simpson, Peter Fritsch, and Thomas Catan may have information relevant to the Committee's investigation.

5. Specifically, the Committee learned of Fusion GPS' commissioning of former British intelligence officer, Christopher Steele, to compile the approximate 35-page "Steele Dossier." The Committee also learned that Mr. Steele had provided the Federal Bureau of Investigation ("FBI") with several memos that also were shared with the website *Mother Jones*.[1] The Committee also became aware that Mr. Steele briefed a *Mother Jones* reporter in late October 2016, as well as met with multiple other news outlets at Fusion GPS' behest during the

---

[1] http://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/.

same time period.[2] A version of the "Steele Dossier" was published by *BuzzFeed News* on January 10, 2017, and CNN subsequently reported that a synopsis of the dossier had been briefed to President Obama and President-elect Donald J. Trump as an appendix to the January 6, 2017, Intelligence Community Assessment on Russian interference in the 2016 election.[3]

6. Additionally, the Committee learned of allegations that Fusion GPS acted as an unregistered agent of the Russian government in violation of the Foreign Agent Registration Act ("FARA") through work it performed for Prevezon Holdings, a Russian state-owned company. According to the allegations, "Prevezon's lobbying efforts were . . . organized . . . through a Delaware non-profit . . . and through the law firm then representing Prevezon in [an] asset forfeiture case [brought by the Justice Department], BakerHostetler."[4] Fusion GPS was alleged to have "dug up dirt" on Hermitage CEO William Browder, a vocal Putin critic.[5] According to a FARA complaint brought by Mr. Browder, individuals associated with these efforts included, among others, a partner of the BakerHostetler law firm; Fusion GPS; Rinat Akhmetshin; "Anatoly Samorchonov, [a] Russian born professional interpreter and project manager for the US State Department"; and "Natalia Veselnitskaya, the Russian lawyer for Prevezon."[6] Mr. Veselnitskaya, Mr. Akhmetshin, and Ms. Samochornov all attended a June 9, 2016, meeting at

---

[2] https://assets.documentcloud.org/documents/3892131/Trump-Dossier-Suit.pdf.

[3] http://www.cnn.com/2017/01/10/politics/donald-trump-intelligence-report-russia/index.html.

[4] https://www.grassley.senate.gov/news/news-releases/complaint-firm-behind-dossier-former-russian-intel-officer-joined-lobbying-effort.

[5] https://www.grassley.senate.gov/news/news-releases/complaint-firm-behind-dossier-former-russian-intel-officer-joined-lobbying-effort.

[6] https://www.grassley.senate.gov/sites/default/files/judiciary/upload/Russia%2C%2003-31-17%2C%20Magnitsky%20Act%20-%202016-%2007-15%20HCM%20Complaint%20to%20FARA%20%28003%29_Redacted.pdf.

3

Trump Tower with senior Trump associates including Donald Trump Jr., the ostensible purpose of which was for Mr. Veselnitskaya, to "provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia."[7] Recent press reports indicate that documents brought to the Trump Tower meeting contained information connecting major donors to Democratic candidates, including former Secretary of State and 2016 presidential candidate Hillary Clinton.[8] These documents also attacked Mr. Browder at length, in a manner consistent with the position advocated by both the Kremlin and Fusion GPS in its work on behalf of Baker Hostetler.[9]

7.  On the basis of this and other information obtained by the Committee, on October 4, 2017, the Committee issued subpoenas for testimony and documents to Fusion GPS co-founders Messrs. Simpson, Fritsch, and Catan.

8.  On October 5, 2017, a Committee subpoena for documents was served on Defendant Bank. The subpoena to Defendant Bank required it to provide, among other items, by October 13, 2017, all documents sufficient to identify Fusion GPS's banking transaction history from August 1, 2015 to October 4, 2017. At the request of counsel for Defendant Bank, Alexander Bono, the subpoena return date was subsequently extended to October 23, 2017. On October 19, 2017, Mr. Bono informed the Committee that Defendant Bank intended to comply with the subpoena and would produce all responsive documents by 9 A.M. on October 23, 2017.

9.  On October 18, 2017, during closed-door depositions before the Committee, Messrs. Fritsch and Catan invoked their First and Fifth Amendment rights not to answer any

---

[7] https://www.nytimes.com/interactive/2017/07/11/us/politics/donald-trump-jr-email-text.html.

[8] https://www.nytimes.com/2017/10/27/us/politics/trump-tower-veselnitskaya-russia.html.

[9] https://www.nytimes.com/interactive/2017/10/29/us/politics/document-Read-the-Talking-Points-Shared-with-the-Kremlin.html.

questions.[10] I am not aware of any information sought by the Committee to date from Fusion GPS or its principals that would give rise to any basis for criminal liability on the part of Fusion GPS or its principals.

10. On the evening of October 19, 2017, during a telephonic conference call with myself and other Committee staff, counsel for Fusion GPS, Mr. William Taylor, outlined a proposal to avert litigation over the subpoena to Defendant Bank. Mr. Taylor proffered that, if the Committee would extend Defendant Bank's subpoena deadline for 48 hours, he would encourage his client to authorize Defendant Bank to produce records relevant to transactions related to the "Steele Dossier"—namely payments to Fusion GPS from the (then-undisclosed) client who funded it. When specifically asked about reports that multiple clients had funded Fusion's anti-Trump research efforts, Mr. Taylor represented that only transactions related to one Fusion GPS client were relevant to the Committee's inquiry.

11. On October 24, 2017, the Committee learned from a *Washington Post* report that the Clinton campaign and the Democratic National Committee ("DNC") had provided funding to Fusion GPS for the research that resulted in the dossier on Mr. Trump. The *Post* report also contained the information that Mark E. Elias, an attorney with the law firm Perkins Coie, and who represented both the Clinton campaign and the DNC, was the individual that retained Fusion GPS. Reporting also disclosed a letter sent by Perkins Coie to counsel for Fusion GPS, informing Fusion GPS that it was released from any client confidentiality obligations and

---

[10] http://www.cnn.com/2017/10/18/politics/fusion-gps-partners-plead-fifth-before-house-intel/index.html. Mr. Simpson is due to appear before the Committee under subpoena on November 8, 2017.

5

authorizing Fusion GPS to disclose its identity as a client, as well as certain substantive details of the engagement.[11]

Initial Production

12. Shortly before 8:00 PM on October 27, 2017, ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████ ("Initial Production"). Contrary to Mr. Taylor's representations on October 19 that only records relating to one Fusion GPS client were relevant to the Committee's investigation, the Initial Production included ███ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████. The transactions and counterparties reflected in the Initial Production are as follows:



13. The Initial Production contained ████████████ that were produced in

---

[11] https://www.documentcloud.org/documents/4116754-Perkins-Coie-Letter.html.

incomplete form. Specifically, the following information was redacted from the ███ ███: Fusion GPS' address, account and routing numbers, and other information related to the banking activity of the counterparties. Complete copies of ███ are necessary for the Committee's investigation and will assist the Committee, among other things, in tracing the source of Fusion GPS' payments and tracing the recipients of payments made by Fusion GPS.

14. ███ also contained redactions of similar information. Complete information for the relevant transactions are necessary for the Committee's investigation and will assist the Committee, among other things, in tracing the source of Fusion GPS' payments and tracing the recipients of payments made by Fusion GPS.

15. Notwithstanding Fusion GPS' representations, the Committee immediately formed a reasonable belief that the Initial Production did not reflect a complete set of relevant transactions, in addition to the deficiencies outlined above. On October 27, 2017—*before* the Committee received the Initial Production—███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

16. ███████████████████████████████████████████████████████████████████████████████████████████████████

### Committee Counsel Review of Responsive Records and Request for Additional Responsive Records

17. On October 30, October 31, and November 1, ███████████████████████████████████████████████████████████████████████████████████████████████



("Responsive Records") ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

18. On November 1, 2017, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇, I identified—in writing to Plaintiff and Defendant Bank—records relating to 112 transactions among the Responsive Records that the Committee, in good faith, deemed necessary for its investigation ("Requested Records"). The Requested Records consist of:

- the 30 transactions included in the Initial Production;
- 12 transactions associated with previously-identified counterparties for whom some but not all transactions were included in the Initial Production;
- 19 transactions associated with payments from eight (8) law firms other than ▇▇▇▇▇▇ or ▇▇▇▇▇▇;
- 12 transactions associated with payments to four journalists and/or researchers other than ▇▇▇▇▇▇ or ▇▇▇▇▇▇;
- 8 transactions associated with ▇▇▇▇▇▇
- 12 transactions associated with payments from Media Company A (▇▇▇▇▇▇);
- 19 transactions associated with two ▇▇▇▇ firms, Business A ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ and Business B (▇▇▇▇▇▇); and
- metadata associated with the 112 identified transactions and contained within specified pages of the Responsive Records.

Although not required by the Confidential Agreement, the Committee—as a show of good faith and to aid the parties, without prejudice to additional reasons the Committee might set forth in any ensuing proceeding—provided a justification articulating, for each payor/payee, the nexus between the records sought and the Committee's investigation.

19. Fusion GPS is not aware of the full scope of the Committee's investigation, which is classified. Classified information made available to the Committee informed, in part, Committee Review Counsel's identification of the Requested Records and its reasonable belief

8

that those records contain investigative leads within the scope of the Committee's investigation.

### *Law Firms*

20. With respect to the eight (8) law firms, the Committee identified Requested Records within the Responsive Records based on Fusion GPS' established pattern and practice of using law firms as intermediaries to mask the true beneficiaries of its research. For example, based on carefully timed disclosures to the press by Fusion GPS and/or its clients, it is now undisputed that Fusion was retained by the law firm Perkins Coie, which was acting on behalf of DNC and the Clinton campaign, to conduct opposition research on then-candidate Trump, and that in the course of that engagement Fusion GPS contracted with Orbis Business Intelligence Ltd. to produce the "Steele Dossier," which primarily relates to Mr. Trump's alleged connections with Russians and was based in substantial part on information allegedly derived from Russian governmental, intelligence, and other sources.

21. Similarly, based on public reporting, it is now undisputed that Fusion GPS was retained by the law firm Baker Hostetler to provide litigation support in the *Prevezon* matter, and engaged in advocacy opposing the Global Magnitsky Act. Such advocacy is consistent with the position articulated by, and possibly directed by, the Kremlin, and involved numerous individuals who participated in a meeting at Trump Tower—the ostensible purpose of which was "provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia."—that is a key focus of the Committee's investigation.

22. In light of this established pattern of law firms retaining Fusion GPS on behalf of publicly undisclosed clients to perform Russia-related work, the Committee has a direct and compelling investigative interest in identifying other law firms that also retained Fusion GPS

during the same relevant time period so that it can pursue its investigation by making inquiries of those law firms to ascertain the nature of their involvement with Fusion GPS and its potential relationship to the subject matter of the Committee's investigation.

*Researchers and Journalists*

23.     The Committee is aware that Fusion GPS' specialty is seeding its opposition research into news stories, a *modus operandi* highlighted by a 2011 interview with Mr. Fritsch.[13] During a conference call with Committee staff on October 19, 2017, counsel for Fusion GPS failed to offer records related to payments to journalists and/or researchers. At no point prior to October 27, 2017, did Fusion GPS proffer or concede that records related to payments to journalists and/or researchers were relevant to the Committee's investigation. However, the Initial Production—comprising records that Fusion GPS now admits are within the scope of the Committee's investigation—included records related to payments to ███████████ ███████.

24.     Later, on November 1, 2017, Fusion GPS authorized the production of records of ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████—consistent with Fusion GPS' efforts to oppose the Act as part of its work performed for BakerHostetler. The Committee was provided with no explanation as to why these records were not previously produced.

25.     Given the clear relevance of journalists and researchers to Fusion GPS's activities of relevance to the Committee's investigation, the Requested Records therefore include records

---

[13] http://www.mondaq.com/x/144198/Antigua+A+New+Spotlight.

10

related to nine payments to three additional journalists and/or researchers who have reported or written on matters within the scope of the Committee's investigation:



*Media Organizations*

26.   On October 27, 2017, Beacon acknowledged that "during the 2016 election cycle we retained Fusion GPS to provide research on multiple candidates in the Republican presidential primary," including Donald Trump.  However, notwithstanding numerous public reports linking the Republican funder of Fusion GPS' anti-Trump research to the dossier,[17] the Initial Production did not include any records related to Beacon. 

. The Committee has a clear investigative interest in scrutinizing Beacon's public claims regarding its relationship with Fusion GPS, including unredacted transaction information associated with Beacon, which has



---

[17] http://www.cnn.com/2017/01/10/politics/donald-trump-intelligence-report-russia/index.html

11

expressly consented to Defendant Bank producing such records to the Committee.

27. As Mr. Steele has acknowledged in other dossier-related litigation, in addition to sharing memos comprising the dossier with *Mother Jones*, in fall 2016 he met with at least five major media outlets at Fusion GPS' direction.[18] Those outlets included *Yahoo News*, which on September 23, 2016, reported purported meetings between Trump campaign adviser Carter Page and specified high-ranking Russian officials, attributed to a single "well-placed Western intelligence source."[19] Substantively similar allegations were contained in the dossier. Given Fusion GPS' demonstrated pattern of dossier-related engagement with media outlets, the Requested Records include records related to 12 payments from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓ *Firms*

28. The Requested Records include 19 records associated with payments from two ▓▓▓▓▓ firms. Based on public reporting, the Committee has formed a reasonable belief that such transactions are relevant to the Committee's investigation.

29. The Committee has information suggesting that Business A ▓▓▓▓▓▓ ▓▓▓▓▓ has long ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Since the publicly-announced parameters of the Committee's investigation include "links between Russia and individuals associated with political campaigns or any other U.S. Persons," these

---

[18] https://assets.documentcloud.org/documents/3892131/Trump-Dossier-Suit.pdf (see p. 8).

[19] https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

alleged communications are within the scope of the Committee's investigation. In addition, since January 2017, Business A ███████████████████ ███████. The Trump campaign's and Administration's policy toward ███ including allegations regarding such policy contained in the dossier, is similarly within the scope of the Committee's investigation.[22]

30.   The Committee also has information that Business B ███████ has long represented a variety of interests, including ███████████████████████████ ███████████████████████████████████████ ███████████████████████. The "Steele Dossier" directly implicates ███ in potential collusion between the Trump campaign and Russia; specifically, it alleges that ███████████████████████████████████████ ███████████████.

### *Bank Records/Metadata*

31.   The Requested Records also included metadata associated with the 112 identified transactions. Specifically, the Committee learned that Defendant Bank utilizes ███████ ███████████████████████████████████████, and ███████████████████.

---

[22] https://democrats-intelligence.house.gov/news/documentsingle.aspx?DocumentID=220 ("Also, according to Steele's Russian sources, the Trump campaign is offered documents damaging to Hillary Clinton, which the Russians would publish through an outlet that gives them deniability, like Wikileaks. The hacked documents would be in exchange for a Trump Administration policy that de-emphasizes Russia's invasion of Ukraine and instead focuses on criticizing NATO countries for not paying their fare share – policies which, even as recently as the President's meeting last week with Angela Merkel, have now presciently come to pass.").

13

requested records relating to the 112 transactions from this ▇ system.[24] These records provide important details about the name and location of the financial institutions utilized by Fusion GPS' counterparties. The Committee understands that these records belong to Defendant Bank, and that banks maintain these records for, among other reasons, FinCEN Section 314(a) screening purposes.[25]

<u>Communications with Fusion GPS after Initial Production</u>

32.  On November 1, 2017, counsel for Fusion GPS indicated that it intended to object to the Committee's request for additional documents on the ground that, with the exception of the records related to ▇ the newly Requested Records "are not pertinent to any question under inquiry and represent the majority of the records that were not produced to the Committee."

33.  On November, 3, 2017, the Committee received Defendant Bank's First Supplemental Production, which included the following 12 Requested Records, all of which Fusion GPS had failed to disclose previously or described as not pertinent to the Committee's investigation:



34.  At no time prior to November 3, 2017, did Fusion GPS proffer or concede that records related to payments to ▇ were relevant to the Committee's

---

[25] *See* https://www.sec.gov/about/offices/ocie/aml2007/fincen-314afactsheet.pdf.

investigation.

35.     As a result of Defendant Bank's First Supplemental Production, only 70 Requested Records remain in dispute ("Disputed Records"). The Requested Records, including the Disputed Records, reflect a tailored request, formulated based on a careful and diligent review.

36.     I am aware of Fusion GPS's claim that the Requested Records constitute a majority of records reviewed by the Committee. I believe this claim to be inaccurate. The 112 transactions in the Requested Records—and particularly the 70 transactions in the Disputed Records—represent no more than a tiny fraction of the total records ███████████ ███████████████████████. Specifically, these 70 records are individual line entries for specific transactions contained within ███████ and ███████. With respect to the ███████, the Committee is seeking only redacted copies of the ███ ███████ (that omit transactions not listed among the Requested Records).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Re-executed this 21st day of November 2017, in Washington, D.C.

_____
SCOTT L. GLABE