IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


BEAN LLC d/b/a FUSION GPS,          )
                                    )
          Plaintiff,                )   CV No. 17-2187-RJL
                                    )
                                    )   Washington, D.C.
       vs.                          )   November 30, 2017
                                    )   3:12 p.m.
JOHN DOE BANK,                      )
                                    )
          Defendant,                )
                                    )
                                    )
       and                          )
                                    )
PERMANENT SELECT COMMITTEE,         )
                                    )
          Defendant-Intervenor.     )
_____    )


REDACTED TRANSCRIPT OF HEARING ON MOTION
FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          Steven Mark Salky
                            Rachel Cotton
                            ZUCKERMAN SPAEDER, LLP
                            Ezra Marcus
                            1800 M Street, NW
                            Suite 1000
                            Washington, D.C. 20036
                            (202) 778-1828
                            ssalky@zuckerman.com
                            rcotton@zuckerman.com

                            Rachel M. Clattenburg
                            CUNNINGHAM LEVY MUSE LLP
                            1250 Connecticut Ave, NW
                            Suite 200
                            Washington, D.C. 20036
                            (202) 261-3599
                            rmc@cunninghamlevy.com

APPEARANCES CONTINUED

For the Defendant:          Joseph J. Aronica
                            Forrest Hanson
                            DUANE MORRIS, LLP
                            505 Ninth Street, NW
                            Suite 1000
                            Washington, D.C. 20004
                            (202) 776-7824
                            jjaronica@duanemorris.com
                            abono@duanemorris.com

                            Alexander D. Bono
                            DUANE MORRIS LLP
                            30 South 17th St.
                            Philadelphia, PA 19103-4196
                            (215) 979-1181
                            abono@duanemorris.com


For the Intervenor:         Thomas G. Hungar
                            Kimberly A. Hamm
                            Todd B. Tatelman
                            U.S. HOUSE OF REPRESENTATIVES
                            Office of General Counsel
                            219 Cannon House
                            Office Building
                            Washington, D.C. 20515
                            (202) 225-9700
                            thomas.hungar@mail.house.gov
                            kimberly.hamm@mail.house.gov
                            todd.tatelman@mail.house.gov

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            U.S. District Court
                            for the District of Columbia
                            333 Constitution Avenue, NW
                            Room 6511
                            Washington, D.C. 20001
                            (202) 354-3249

                            WilliamPZaremba@gmail.com


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                 P R O C E E D I N G S

 2          DEPUTY CLERK:  All rise.  This Honorable Court is

 3  now in session, the Honorable Judge Richard J. Leon

 4  presiding.  God save the United States and this Honorable

 5  Court.  Please be seated and come to order.

 6          Your Honor, we have Civil Action 17-2187, Bean LLC

 7  versus John Doe Bank.

 8          I'll ask that lead counsel approach the lectern --

 9  I mean all counsel approach the lectern and identify

10  yourselves for the record.

11          MR. SALKY:  Good afternoon, Your Honor.  I'm

12  Steven Salky, and I represent Bean LLC or Fusion GPS.

13          THE COURT:  Welcome.

14          MR. SALKY:  Rachel Cotton, also of Zuckerman

15  Spaeder, also for Fusion.

16          THE COURT:  Welcome.

17          MS. CLATTENBURG:  Rachel Clattenburg, Cunningham

18  Levy, for Bean LLC.

19          THE COURT:  Welcome.

20          MR. MARCUS:  Ezra Marcus of Zuckerman Spaeder,

21  also for Fusion/Bean LLC.

22          THE COURT:  Welcome.

23          MR. ARONICA:  Good afternoon, Judge.  Joe Aronica,

24  from Duane Morris, on behalf of the Defendant Bank.

25          THE COURT:  Welcome.
```

1          MR. BONO:  Good afternoon, Your Honor.

2    Alexander Bono, also from Duane Morris, privilege of

3    representing the Bank.

4          THE COURT:  Welcome.

5          MR. BONO:  Good afternoon, Your Honor.

6    Forrest Hanson from Duane Morris also representing Defendant

7    Bank.

8          THE COURT:  Welcome.

9          MR. HUNGAR:  Good afternoon, Your Honor.

10   Thomas hunger for the Permanent Select Committee on

11   Intelligence.

12         THE COURT:  Welcome.

13         MS. HAMM:  Good morning, Your Honor.

14   Kimberly Hamm from the House Office of General Counsel for

15   the Permanent Select Committee.

16         THE COURT:  Welcome.

17         MR. TATELMAN:  Good morning, Your Honor.

18   Todd Tateleman for the Permanent Select Committee on

19   Intelligence.

20         THE COURT:  Welcome.

21         All right, counsel.  Today's hearing is going to

22   have two phases; there's the public phase, which will be

23   first; and then there will be the behind-closed-doors sealed

24   phase, which will come second, which will deal with,

25   unfortunately, this whole host of sealed documents that you

1    all have concocted in this thing:  Protective orders and

2    sealed documents and information you're trying to keep from

3    the public, which, frankly, I find very troubling,

4    especially considering that in order to issue an opinion in

5    this case, the Court is not going to be able to issue an

6    opinion on the current state of play that delays forward for

7    the public to digest and read what really happened here.

8             And we need to seriously think through how we're

9    going to proceed with regard to these protective orders,

10   what happened pursuant to the protective orders, and --

11   remember, I inherited the case from Judge Chutkan.

12            She was involved -- before she had to recuse

13   herself, she was involved in the case under such

14   circumstances where she was -- and she was entitled to --

15   convinced some kind of protective order was appropriate.

16   And she was doing so at a time when an agreement had been

17   reached between the parties with regard to how to proceed.

18   And she blessed that as well, apparently.

19            Well, I've inherited both of those decisions, and

20   I have great concern about whether or not they continue to

21   be viable and how we can proceed with regard to those.  That

22   discussion will have to, unfortunately, proceed behind

23   closed doors.

24            So we'll start off with that which can proceed in

25   a public arena, which is a relatively discrete legal

1    question, as to the authority of this Court to review and

2    evaluate the subpoena that's been issued by the Intelligence

3    Committee and the authority of the Court to do that, and the

4    way in which the Court may do it under the circumstances.

5    So that's kind of what we can talk about today in public.

6              So it's the moving party's motion.  Why don't you

7    take 15 minutes, and you can have five minutes for rebuttal.

8    And, Mr. Hungar, you can have 20 minutes, all right?

9              MR. SALKY:  I would seek the Court's indulgence to

10   go a little bit beyond the 20 minutes.  I think Mr. Hungar

11   and I both had planned to maybe address the Court for 30

12   minutes apiece on the public record, but we'll try to cut it

13   back.

14             THE COURT:  Well, remember, the

15   behind-the-closed-door session will probably take another

16   half hour each easily.

17             MR. SALKY:  Yes, sir.  We'll do our best.

18             THE COURT:  Yeah.

19             MR. SALKY:  On the points, Your Honor, of the

20   redactions, we, too, recognize that the Court is the second

21   judge on this matter.  And we've done our -- we have

22   conferred and done our best to put as much as can be put in

23   the public record, consistent with Judge Chutkan's previous

24   orders with regard to the sealed --

25             THE COURT:  And I appreciate that because,

1    frankly, a big part of the story is how the parties have

2    proceeded to date in order to try to work it out.

3         And the Court is arriving at the scene after

4    efforts have been made by both sides to work it out,

5    procedures have been followed to narrow the demand of the

6    original subpoena, narrow it down to a small number of

7    contested documents, and then move forward.

8         Now, that, to me, is actually an important part of

9    the story, and right now it's behind a shade; it's behind a

10   closed curtain.

11        MR. SALKY:  Well, a lot of it, Your Honor, I think

12   we could talk about without referring to sealed matters, and

13   I'm going to try to go through it to help you.

14        But I agree that there's certain matters that

15   we'll have to discuss.  But it doesn't preclude us from

16   making determinations different than Judge Chutkan made, to

17   now open additional matters up.  But we can discuss that.

18        THE COURT:  Sure.

19        MR. SALKY:  All right.  Thank you, Your Honor.

20        I'm here on behalf of Fusion to tell you why we

21   win this case and to describe to you and explain to you why

22   you have the authority to enjoin the Permanent Committee's

23   subpoena as modified.

24        THE COURT:  Uh-huh.

25        MR. SALKY:  The subpoena, as modified, Your Honor,

1  seeks documents and other data that I will describe to you

2  that are not pertinent to its Russia investigation and

3  impermissibly and irrevocably harm Fusion's business.

4        The subpoena also, Your Honor, impinges upon

5  Fusion's First Amendment of Free Speech and associational

6  rights for which the Committee has not and, I don't think,

7  has any compelling reason to infringe on those rights.

8        And this Court is authorized, by the United States

9  Constitution, as I will explain, and the due process clause,

10  to determine whether or not the documents sought are

11  pertinent to the investigation and whether they

12  impermissibly impinge upon First Amendment rights.

13        THE COURT:  Why is "pertinence" relevance?  This

14  isn't a criminal case.

15        MR. SALKY:  Correct, Your Honor.

16        THE COURT:  Why would "pertinence" be relevant at

17  all?

18        MR. SALKY:  Because "pertinence," under both the

19  *Watkins* decision and the *Sweezy*, decided the same day,

20  Your Honor, makes "pertinence" a matter of due process.

21        Congress cannot, without any relevance or

22  relationship to an investigation, simply roam around in a

23  party's private affairs, including the affairs where their

24  First Amendment associational interests -- indeed, where

25  their First Amendment interests, associational free speech

1    interests, they have to show a compelling interest.

2            THE COURT:  But *Watkins* was a criminal contempt

3    case and it was relevant --

4            MR. SALKY:  Right.

5            THE COURT:  -- to the inquiry as to whether or not

6    the answers to the questions would be pertinent.

7            MR. SALKY:  Whether -- and so *Sweezy*, Your Honor,

8    was a state criminal contempt, where the federal contempt

9    statute, which uses the word "pertinence," was not at issue,

10   and yet the Supreme Court determined in that case, where

11   Mr. Sweezy, if you remember, objected on the basis of both

12   pertinence and First Amendment grounds, to refuse to answer

13   the Attorney General of New Hampshire's questions about his

14   communist associations or his association with communist

15   people; and the Supreme Court ruled in that case,

16   Your Honor, that as a matter of due process, Congress had

17   limitations on its authority.  So that was not a -- those

18   were pertinence limitations in *Sweezy*.

19           And so the Court here has the authority, and

20   we would -- I'm happy to quote, but I will go back to both

21   *Sweezy* and *Watkins*, to determine whether or not the

22   documents sought in this case are pertinent to the

23   investigation.

24           And I'm going to go through their justifications

25   to some degree, in the public record, as much as I can,

1   compare it to the grounds that the Committee says is the

2   basis -- the questions that they seek to answer.  I'm going

3   to assume, for purposes of argument, that those are

4   legitimate legislative inquiries.

5           But there is a pertinency requirement.  It may not

6   be exacting, Your Honor -- and I don't disagree with

7   Mr. Hungar that it's not a terrible difficult test, but he

8   fails to meet it under whatever version of the test he

9   proposes to meet.

10          THE COURT:  So the McFall standard of whether or

11  not something is plainly incompetent or whether the request

12  is plainly incompetent or irrelevant to any lawful purpose

13  is not apposite in this situation, dare I say.

14          MR. SALKY:  No, I don't really contest the

15  question of *McFall* or the pertinency requirement is not

16  well-defined as to what conditions it must meet.

17          Mr. Hungar compares and says, we're like an

18  administrative agency.  An administrative agency, as the

19  Court knows, under the *Morton Salt* test, which you apply

20  every day here to administrative agency subpoenas, at least

21  requires, again, that there be a legitimate investigation

22  and a reasonable relevance of the documents that are sought

23  to that investigation.

24          So whether it's reasonable relevance, as McFall

25  suggests, or some other formulation, "pertinence" is still,

1  under all the Supreme Court cases, a requirement that the

2  Court -- that the United States District Judge, in this

3  instance, where we have no ability to stand in contempt,

4  because the documents are not being sought from us, they're

5  being sought from Defendant Bank -- and this was really --

6  we've addressed this in our reply brief and I know the Court

7  has read it -- this was really the point in Justice

8  Marshall's concurrence in the *Eastland* case:  That it really

9  had nothing to do with this Speech or Debate Clause, because

10  we're not attacking, we're not suing an office, Congressmen.

11  We're here as the AT&T.

12        This Circuit's case points out, in significant

13  respect, that where a third party is in possession of the

14  documents, the affected party then has to bring what we

15  brought, which is an action against the bank to enjoin the

16  bank, to engage the Courts in the process of determining

17  whether the documents are important, and, then, secondarily,

18  but, in this case, importantly, that they infringe upon

19  First Amendment rights.

20        Now, very briefly, Your Honor, because I know

21  you've studied but there were proceedings before you I want

22  to give you a brief history of, because I do think it is

23  relevant, as you pointed out, to the ultimate decision in

24  the case.

25        The history really begins, Your Honor, with the

 1    issuance of a very broad subpoena for all banking records

 2    from a date in 2015, I think it was August 1, to the

 3    present.

 4            And the subpoena was issued because Fusion refused

 5    to, under its First Amendment rights, it refused to produce

 6    records that the Committee sought in order to -- because the

 7    Committee took the position that Fusion's investigation of

 8    the candidate for President Donald Trump, on behalf of the

 9    opposing candidate, and its simultaneous work on behalf of

10    another client justified it to be a central part of its

11    investigation.  Fusion refused, on First Amendment grounds,

12    to produce documents, so the Committee, through

13    Congressman Nunes, issued this very, very broad subpoena.

14            But for the fact that we sought a

15    Temporary Restraining Order -- we first tried to ask the

16    Committee to narrow their subpoena and to work it out.  But

17    we weren't able to do that, and so we had to bring the

18    action in this Court to prevent the Bank, which had no --

19    "in the game," so to speak, to -- it wasn't going to be held

20    in contempt in order not to produce our records.  We had to

21    make the motion to come before this Court with a

22    Temporary Restraining Order.

23            Judge Chutkan encouraged the parties to try to

24    work it out, and so the parties did, Your Honor.  And after

25    Fusion was released by its clients, who had hired it to do

1  the opposition research that it did on Then-Candidate Trump,

2  we did produce the documents that were the heart of what the

3  Committee sought.  We produced the documents that related to

4  the payments from Perkins Coie, it's in the record, that

5  represented the Democratic National Committee and the

6  Hillary Clinton campaign; and we also produced all the

7  records related to payments from Baker Hostetler, who had

8  hired Fusion by the United States against a Russian company

9  called Prevezon.

10         THE COURT:  And that which was produced was a

11  small subset of what was initially asked for, right?

12         MR. SALKY:  That what was produced was 30 --

13         THE COURT:  Transactions.

14         MR. SALKY:  -- documents.

15         30 pages, Your Honor.

16         And I have in this binder, which I want to hold --

17  share with the Court under seal, both the documents that

18  we've produced, the redactions, and I'm -- transparent

19  redactions of what we redacted that the Bank now, excuse

20  me -- that the Committee now seeks that we give to them,

21  again, in unredacted form, which contains a lot of

22  additional data about the banks; for instance, that if you

23  have a wired transfer, you have information from the source

24  of the wired transfer about that client's bank account and

25  the client's bank account number that we do not turn over to

1    the Committee, that the Committee now wants turned over, not

2    only that that's in these records, but that is in something

3    that is called a research and payment archive, is that -- am

4    I getting that right, Joe?

5             THE COURT:  So the fight now is over a larger

6    number of documents.

7             MR. SALKY:  That were originally turned over.

8             THE COURT:  That were reviewed -- from the bank's

9    documents, that were reviewed as being responsive to the

10   subpoena but it's contested as to whether or not you should

11   have to produce them, right?  That's what it boils down to.

12            MR. SALKY:  So it boils down to this:  We

13   cooperated and produced initial production of 30 transaction

14   documents on October 27, okay?

15            THE COURT:  Right.

16            MR. SALKY:  We then -- the Committee, through the

17   protocol that I can't get into because it's under seal,

18   requested some additional documents, and we produced 12

19   additional documents and -- or allowed the bank to produce

20   the 12 additional documents.

21            So what's outstanding now, Your Honor, is 70

22   additional documents that the Committee says it wants.  And

23   I can describe them briefly to you on the record, because

24   these are not sealed facts.  19 of those relate to other law

25   firms that Fusion did work for during a period of time; 19

1     of them have to do with two different businesses that were

2     Fusion's clients during the same period of time; 12 of them

3     have to do with a media company that was Fusion's client.

4     And that's 50.  And the remainder have to do with various

5     vendors and other people to whom Fusion made payments during

6     various periods of time.

7                 THE COURT:  Let me be clear about this:  As to

8     those contested documents that you just described --

9                 MR. SALKY:  Yes.

10                THE COURT:  -- what would become publicly known

11    would be who the vendor was, right?

12                MR. SALKY:  Correct.

13                Currently, those are under seal.

14                THE COURT:  Right.  They're under seal.

15                But if it were to become known, it would be who

16    the vendor is.

17                To the Committee.  The Committee got them.

18                MR. SALKY:  The Committee, if the Committee

19    received them --

20                THE COURT:  They don't have them yet, but they

21    would have the name of the vendor or the person --

22                MR. SALKY:  Or the clients.

23                THE COURT:  Or the client.

24                MR. SALKY:  Or the clients, primarily.

25                Most of these records concern clients of

1   Fusion's --

2           THE COURT:  Right.

3           MR. SALKY:  -- whose payments -- who were paid by

4   Fusion, for work Fusion did, on unrelated matters.

5           THE COURT:  It would be clients and vendors and

6   the amounts, right?

7           MR. SALKY:  Correct.

8           THE COURT:  But not what the work was for.

9           From looking at the document, you can't tell what

10  the work was for?

11          MR. SALKY:  Correct, Your Honor.  Correct.

12          THE COURT:  So let's say it was a law firm,

13  hypothetically.

14          So you'd have the name of a law firm, XYZ firm,

15  X number of dollars, whatever the amount of money was that

16  was -- the check was for, and that's all you'd know.  And

17  the date.

18          MR. SALKY:  And our client has put -- we put

19  affidavits into the record that says those clients have

20  nothing whatsoever to do with Trump, they have nothing

21  whatsoever to do with Russia.  These were engagements.

22          As you know from the records, Your Honor, Fusion

23  is -- has -- the matters that you know about that are on the

24  record are very typical of Fusion's business.  One of those

25  matters, it's on the record, is the work for Perkins Coie,

1   the law firm that represented the opposing candidate for

2   President.  And often, Fusion does work in political matters

3   of public importance such as that.

4          The other matter that's in the public record is

5   for another law firm, Baker Hostetler, who was representing

6   a company, happens to be a Russian company, in a matter in

7   the Southern District of New York and hired Fusion to assist

8   it in representing that company, as often also is the case,

9   Fusion gets hired by law firms to assist it in doing

10  research or investigative work.

11         THE COURT:  The *Prevezon* case.

12         MR. SALKY:  In typical, the *Prevezon* case.

13         And there are now -- the Committee is seeking

14  these payment records from eight additional law firms that

15  they have no reason -- we have an affidavit that says, this

16  has nothing to do, they don't trust us, they want to look at

17  it themselves, but there's nothing from the records that is

18  going to tell them.  And our position, Your Honor, is that

19  these records are not pertinent to the Russia investigation.

20         If I can put -- Your Honor's familiar with this,

21  but I used posters with the Court before, and I had success

22  with them, so I'm going to use them again.

23         These are the four matters that the Committee says

24  it is investigating in its Russia investigation.  This is

25  the public --

1          THE COURT:  I want Counsel to be able to see it,

2    so that's fine.

3          MR. SALKY:  Yes.

4          This is the public record they have put in.  We

5    all agree.  These are the four matters.

6          What Russian cyber activity and other active

7    measures were directed against the United States and its

8    allies.

9          Did the Russian active measures include links

10   between Russia and individuals associated with political

11   campaigns or other U.S. persons.

12         What was the U.S. Government's response to these

13   Russian active measures -- I'm not going to read it on.

14         And what possible leaks of classified information

15   took place related to the Intelligence Community.

16         So this is the -- we're -- for purposes of this

17   legal argument, I'm not going to contest that these are

18   legitimate -- or at least these are the stated bases for the

19   Committee's investigation --

20         THE COURT:  Right.

21         MR. SALKY:  -- okay?

22         And what it wants, Your Honor -- and I'll just use

23   the law firm as an example because we don't have any

24   redactions in the justifications used by the Committee for

25   the law firm records.

1            And the law firm justification, Your Honor, is --

2    if I can put that on top, the Fusion has established a

3    pattern and practice of using law firms as intermediaries to

4    mask the true beneficiaries of its research; that we

5    conducted activities relevant to the Committee's

6    investigation via at least two law firms, Perkins Coie,

7    related to the dossier; and Baker Hostetler in the *Prevezon*

8    case; and the Committee, therefore, seeks records related to

9    Fusion's other work on behalf of other law firms that are in

10   the period covered by its subpoena.

11            And our position very succinctly and very easily

12   stated is that those records, there is no conceivable

13   pertinence of those records to these purposes.  And our

14   belief, and I'm happy to go through the cases with you, but

15   I think you can read the cases as well as I can, that this

16   Court is empowered.

17            Now, to prevent that -- now, the Court is also

18   empowered, Your Honor, where there are First Amendment

19   interests.

20            And Mr. Hungar concedes in his papers that if

21   there are First Amendment interests, that the Court has to

22   balance the Committee's purposes, and it has to find a

23   compelling interest to justify impinging or infringing on

24   First Amendment issues.

25            THE COURT:  Well, Mr. Hungar --

1          MR. SALKY:  He says, "We don't have it."

2          THE COURT:  -- seems to be saying -- we'll let him

3    speak for himself in a minute -- that the Court can't even

4    make the kind of inquiry you say I can.

5          Isn't that what he's saying, in essence?

6          MR. SALKY:  I think that's what he's saying, is

7    the Court has no basis, but I think that's for the reasons

8    I've just stated in *Sweezy* and *Watkins* and *Gibson versus the*

9    *Florida Legislative Committee*, and other cases.  That is

10   wrong.

11         And while the *AT&T* case, I concede to Mr. Hungar,

12   involved an Executive Branch, it wasn't the fact that it was

13   the Executive that was seeking to interfere or seek a

14   preliminary injunction against the Committee's efforts to

15   obtain records from AT&T that influenced the discussion in

16   the case about the ability of a party like Fusion to come

17   before a Court and get the Courts to involve itself in these

18   matters.  So I think he's absolutely wrong that the Court

19   has no role under this Circuit's case law.

20         THE COURT:  So assuming the Court were to agree

21   with you, what would you envision as the process by which

22   I would go through the review?

23         Would there be an adversarial process, where the

24   plaintiffs would argue, here's why this is not within the

25   scope of these four topics?

1          And the government's committee representative

2   would get up, the congressional committee representative

3   would get up and say, here's why it is within the scope.

4          MR. SALKY:  And here are the records that I would

5   propose to give to the Court that would be at issue.

6          The Court would have the records before it.  It

7   would get to look at the records that have been produced to

8   date.  It would then be able to look at the records that are

9   in dispute, and we would have a trial in this case.

10         THE COURT:  It would have to be behind closed

11  doors, wouldn't it?

12         MR. SALKY:  Some of it might be, depending on

13  where we come out in the behind-the-closed-doors proceeding

14  as to what we can open up.

15         THE COURT:  Well, the Intelligence Committee has

16  made it very clear through its pleadings that there are

17  aspects to its investigation that are classified, and that

18  it has -- those have not been shared with either you or this

19  Court, and I'm not really in a position, obviously, to order

20  them to share it with me, so I...

21         MR. SALKY:  To the extent we have their

22  justifications, Your Honor, in Exhibit B, a lot of which is

23  redacted, but you have Exhibit B with the Committee's

24  justifications for the records, and you can determine that

25  none of that is based upon classified information, you can

1  determine whether any of those justifications are

2  sufficient, even under a review that's not terribly

3  exacting.

4          We're not asking you to do anything beyond make a

5  determination of pertinence.  We're not asking you to make

6  them -- except when it comes to First Amendment interests,

7  Your Honor, and that's where I do need to get your -- I do

8  need to tell you why we, Fusion, have First Amendment

9  issues, because I know Mr. Hungar is going to say that those

10 are -- we have none.  We have them for the reasons that the

11 subpoena, Your Honor, creates them, because the subpoena in

12 this case, Your Honor, and the documents that are still

13 outstanding under the subpoena, request that -- let me back

14 up.

15         We're first alleged to be at the center of this

16 Russia investigation because we engaged in protected

17 First Amendment speech by conducting opposition research on

18 a presidential candidate for the opposing presidential

19 candidate.  Now, if that's not in the heartland of the

20 First Amendment, the work that was done, I don't know what

21 is.

22         And they now seek to compel the production of

23 documents from a party that engaged in that First Amendment

24 conduct to explore how to discredit it.  That's what's going

25 on here.  There's no real mystery here, Your Honor, that the

1   leadership of this Committee wishes to discredit Fusion and

2   the work it did on the dossier.

3           THE COURT:  But in those 70 transactions that are

4   up for grabs, so to speak, that are being contested at the

5   moment, to the extent that they represent relationships

6   with, say, two or three law firms or two or three vendors or

7   something like that, it's your position that if those were

8   to become known by the Committee or the public, that that

9   would somehow harm the First Amendment rights of your

10  client?

11          MR. SALKY:  Yes, Your Honor.

12          It's the -- yes, sir.

13          The ability of our client to associate anonymously

14  with firms to do the kind of First Amendment activity that

15  it did in this case is chilled, is infringed, is impinged by

16  the Committee obtaining the information about who it

17  associated with in those context and who it didn't associate

18  with that is the focus of the subpoena.

19          So, yes, the First Amendment, I'm not --

20  I don't know -- and that's what a trial would be about is

21  whether every document that's requested would impinge on our

22  First Amendment issues.  But, certainly, the focus of the

23  subpoena, as it exists today, with the modifications that

24  have been made, do directly go to our ability to associate

25  anonymously to engage in free-speech-related activities on

1   behalf of political candidates and others.

2          Now, the important fact, the reason that I'm here

3   today is because, before we have this trial, the question

4   is, are we irrevocably harmed, irreparably harmed by the

5   subpoena?

6          And I submit to you that the record evidence in

7   this case establishes it, because you have nine Jane and

8   John Doe affidavits that attest to the clients that come to

9   Fusion to conduct business with Fusion, saying, we depend

10  upon the confidentially of our relationships with this

11  company in order to hire it.

12         And we will -- six of those clients, some law

13  firms, some others, Jane and John Doe, because they don't

14  want their identities, given the circumstances of the

15  Committee's investigation, public.  They have testified in

16  those affidavits that they would not hire Fusion if that was

17  revealed, and it would be revealed by production.

18         Now, the Committee's explanation or -- says, well,

19  wait a second, we're not going to publish that information.

20  We have executive rules that we're the Select Committee and

21  we're not going to necessarily publish that information, and

22  we'll keep it confidential.

23         Two responses.  First, Your Honor, we don't have a

24  lot of confidence in the representations for two reasons.

25  On October 20th, the same afternoon we filed our motion for

1   Temporary Restraining Order, we also filed a motion for the

2   Defendant Bank to proceed under a pseudonym.  It wasn't in

3   our interest to expose the name of the bank, and so we filed

4   a consent motion that afternoon.  We filed it by hand in

5   this courthouse at 1:30; we didn't file it electronically

6   till later.

7            At 2:52 p.m., the *Washington Examiner* published a

8   story that this Committee had subpoenaed the bank and named

9   the bank for Fusion's records.

10           So on the very day that we were seeking to have

11  the bank treated as a pseudonym, the information was leaked.

12  I have the article; I'm happy to hand it to the Court as an

13  exhibit.

14           On October 27th and November 3rd, the bank

15  produced the records that have been produced to date, the

16  30 --

17           THE COURT:  The 30.

18           MR. SALKY:  -- and the 12; altogether, 42,

19  Your Honor.

20           THE COURT:  42.

21           MR. SALKY:  And on November 7th, the same day that

22  the Committee filed its response to our renewed motion for

23  Temporary Restraining Order, Fox News, Your Honor, published

24  that it "has learned that bank records show that Fusion GPS

25  was paid by" -- and I'm not going to -- an unnamed law

1    firm -- okay -- that's four days after the second

2    production, Fox News is reporting the bank records that were

3    produced to the Committee show.

4           Now, I don't have proof; I'm never going to be

5    able to have proof, Your Honor, as to how the Fox News got

6    that information or how the *Washington Examiner* got the

7    information from the bank, but I'm pretty confident that it

8    wasn't from Fusion or the bank.

9           I'm not here to make accusations.  I could never

10   prove, and I won't.  But we don't have a lot of confidence

11   in the Executive Session rules.

12          And, more importantly, Your Honor, as this Court

13   has recognized in a case in 2011 -- and I'm going to quote

14   Your Honor's decision in R.J. Reynolds Tobacco Company

15   versus the FDA, but there's plenty of circuit law to support

16   it, the harm flowing from a First Amendment violation is,

17   per se, irreparable.

18          And in that case, you examined where the merits --

19   were they likely to prevail on the merits of their

20   constitutional claim and whether their First Amendments are

21   either threatened or, in fact, being impaired at the time

22   relief is sought, there's more than sufficient showing of

23   irreparable harm.

24          And the circuit cases are similar:  The loss of

25   First Amendment freedoms, even for minimal periods of time,

1    unquestionably, constitute irreparable injury.

2            So both from the harm to our business that cannot

3    be recovered, we can't sue for money damages, this

4    Committee; and from the First Amendment perspective, we have

5    demonstrated irreparable harm.

6            THE COURT:  Well, you've also demonstrated that

7    your silver tongue has gotten you 35 minutes, and you're

8    only supposed to take 15.

9            MR. SALKY:  That clock has never changed.

10           THE COURT:  No.  Believe me, it's the clock here

11   that matters.

12           Do you want any rebuttal time?

13           MR. SALKY:  Yes, sir, I do.

14           THE COURT:  You better sit down then.

15           MR. SALKY:  Thank you, Your Honor.

16           THE COURT:  Mr. Hungar, what do you want him to do

17   with those posters while you're speaking or do you care?

18           MR. HUNGAR:  I don't care.

19           THE COURT:  Good.

20           All right.

21           MR. HUNGAR:  Thank you, Your Honor.

22           I'll start with pertinency since that's where

23   Mr. Salky started.

24           THE COURT:  That's a good place to start.

25           MR. HUNGAR:  All right.

1            So, first of all, with respect to *Watkins* and

2  *Sweezy*, as Your Honor noted, those are criminal contempt

3  cases.  There's also actual, valid First Amendment

4  associational rights at interest in those cases.

5  I don't think they really shed any light on the question

6  here, which is, in a third party -- an action by a third

7  party to enjoin a willing subpoena recipient's compliance

8  with the congressional subpoena, can the third party obtain

9  an injunction merely by disputing pertinence, no Court has

10  ever so held, and I submit that this Court ought not to be

11  the first to so hold.

12            Now, in a criminal contempt case, in an

13  enforcement action brought by a congressional committee

14  seeking judicial intervention to compel compliance with a

15  subpoena, those are obviously different questions.  The

16  *Packwood* case is an example.  Obviously, the *Watkins* case

17  are cases in which pertinence was deemed part of the element

18  of the claim there.

19            But this is not such a case.

20            THE COURT:  No.

21            MR. HUNGAR:  And I submit that when this Court is

22  being asked to grant the extraordinary, indeed,

23  unprecedented, in this Circuit, relief on behalf of a

24  private party trying to interfere with an ongoing

25  congressional investigation, something more must be shown

1   than merely the types of arguments that plaintiff is making

2   here.

3           In any event, even if pertinence were a relevant

4   factor in and of itself in the absence of a

5   constitutional -- a valid constitutional claim, which we

6   don't think it is, the standard, under Packwood, and the

7   many cases cited in our brief, that the plaintiff would need

8   to establish -- they try to shift the burden of proof, but,

9   of course, they're the plaintiff, they're seeking a

10  preliminary injunction, they have the burden of proof and

11  it's an extraordinarily high one in general, in particular

12  in this context, the standard that they would have to meet

13  in order to establish a lack of pertinence is that there is

14  no reasonable possibility -- this is Packwood citing

15  *J.R. Enterprises* case from the Supreme Court.

16          THE COURT:  It's *McFall*, too, right?

17          MR. HUNGAR:  And *McFall*, the same point, yes.

18          No reasonable possibility that the information

19  sought by the subpoena could produce relevant material to

20  the Committee's investigation.

21          They can't possibly establish that, Your Honor,

22  because they have already conceded -- they have already

23  conceded, it is undisputed in this case, that of the 112

24  records that the Committee is now seeking, 42 of them are

25  directly relevant, directly pertinent, even according to the

1   plaintiff.

2          That's the end of the analysis under the

3   pertinency inquiry.

4          THE COURT:  Well, it's not -- correct me if I am

5   wrong, Mr. Hungar, but I thought the review that resulted --

6   I don't want to cross into the area that's under seal, so

7   I'm trying to be careful how I weigh these words.

8          But let's just say, in general terms, the review

9   that was conducted to narrow the field of documents was a

10  review that was done by Committee folks on a relevancy

11  basis, and that's how it got -- the field got narrowed down

12  to the 42 that have been turned over, and the 70 that are

13  still being contested, right?

14         MR. HUNGAR:  I don't know that I would use those

15  precise words, but certainly --

16         THE COURT:  Well, you can adjust it.  Go ahead.

17         MR. HUNGAR:  Well, I don't want to be too precise

18  because of the confidentially obligation.

19         THE COURT:  Right.  Yeah.

20         MR. HUNGAR:  But, yes, in general, the Committee

21  conducted a review, has ascertained the specific records, a

22  tiny fraction of the total at issue.

23         THE COURT:  Out of thousands.

24         MR. HUNGAR:  Out of thousands.  Yes, Your Honor.

25         The tiny fraction that it needs for purposes of

1    its investigation in order to pursue the investigative leads

2    that are revealed in those specific transactions and now is

3    seeking that much narrowed set of information from this

4    Court.

5           THE COURT:  They want this -- if I understand

6    correctly Mr. Salky's position, they want me to be the

7    determiner of whether or not these 70 documents are actually

8    relevant to the investigative purposes that the Committee's

9    acting pursuant to, right, in essence?

10          MR. HUNGAR:  That is what they're asking,

11   Your Honor.  And that is clearly contrary to case after case

12   in terms of how courts respond to investigative subpoenas

13   issued by governmental entities.

14          THE COURT:  So from your point of view, what would

15   be this Court's role, just to simply inquire of the

16   Committee, hey, are any of these documents irrelevant?  If

17   the answer is yes, then that's the end of the inquiry?

18          How would you envision this Court should proceed

19   where there's a contest of this type?

20          MR. HUNGAR:  Well, again, in the context of a

21   third -- a private third party trying to enjoin compliance

22   with a subpoena, we don't think the Court ought to get into

23   any of that.

24          THE COURT:  Has any role.

25          MR. HUNGAR:  Well, I mean, if the plaintiff could

1   make out an actual, valid constitutional claim, certainly,

2   this Court would have a role to protect constitutional

3   rights.

4           THE COURT:  Well, how about First Amendment

5   rights?

6           MR. HUNGAR:  Yes.  If they had a valid claim,

7   which they don't, for the reasons set forth in our brief.

8           But if we're talking about pertinency, we don't

9   think the Court needs to get into that at all.  If it

10  thought that it needed to, it's a very low standard,

11  particularly in the context of an investigative subpoena,

12  and particularly in the context of an investigative

13  subpoena, whether the party trying to enjoin compliance

14  concedes that some of the information sought within those

15  112 records is, in fact, relevant and the party that is

16  trying to enjoin compliance is also inextricably intertwined

17  with the very subject matter of the Committee's

18  investigation, when you're doing an investigation and you

19  find that party that's inextricably intertwined with the

20  subject matter of the investigation, what investigators do

21  is try and pursue leads.

22          That's exactly what the community is doing here.

23  If this were a Grand Jury investigation, if there were an

24  administrative subpoena, it would be clear beyond pure

25  venture that the investigating entity is entitled to this

1    information.  It is equally true, if not more so, in the

2    context of a congressional investigation under Article I,

3    legislative power.

4           THE COURT:  What about the argument that these

5    companies or vendors that are represented by these 70

6    documents, if that were to become known, it would have a

7    chilling effect on -- and, hence, harmful to the

8    First Amendment rights of the plaintiff, might have a

9    chilling effect on their ability to do business in the

10   future with similar vendors or similar types of law firms or

11   other clients of that kind.

12          MR. HUNGAR:  Yes, Your Honor.

13          Similar arguments could be made in any

14   circumstance where there's a request for disclosure of

15   information.  Private, civil discovery, administrative

16   subpoenas of all kinds.

17          And as we've cited in numerous cases on our

18   briefs, such as the *Fleck* case out of the Ninth Circuit,

19   when the threshold question for the First Amendment claim

20   is, is there a First Amendment association present?  Because

21   if there isn't, that's the end of the analysis, there's no

22   First Amendment right at issue.

23          And they can't assert the right of their clients

24   unless they are a First Amendment association and their

25   clients are effectively members who have banded together

1  with each other and with the entity to pursue some joint,

2  shared interest in advocating on behalf of some shared

3  interest, some shared goal.

4       The *Hunt* case from the Supreme Court, the *Fleck*

5  case from the Ninth Circuit, the other cases in our brief,

6  *NAACP against Alabama*, they all make clear that the

7  association right is limited to associational entities in

8  the First Amendment context, not merely some for-profit

9  entity that goes out and advocates on behalf of or

10  researches on behalf of his client to do whatever it is that

11  they individually seek to pursue with no shared common

12  interest.

13       And that's clearly the case here.  They do all

14  sorts of things.  They do due diligence.  They do research

15  for private companies, political research.  They do whatever

16  somebody's willing to pay them to do the search.

17       THE COURT:  And that, of course, wouldn't be known

18  from these bank records?

19       MR. HUNGAR:  All these bank records would do is

20  give the community the opportunity to pursue investigative

21  leads in ways that it thinks has a reasonable possibility of

22  providing additional information of relevance to its

23  inquiry.

24       THE COURT:  Do you think that fact has any

25  relevance to the Court in terms of the assessment of the

1   extent to which there's a First Amendment harm or violation

2   here?

3            MR. HUNGAR:  Which fact, Your Honor?

4            THE COURT:  The fact that the records in question

5   here would not reveal in any way the nature of the work that

6   had been done?

7            MR. HUNGAR:  Absolutely.  Absolutely, Your Honor.

8            Even if there were, even if there could be in this

9   context, some First Amendment concerns, which we don't think

10  there could be because there's no association, that whatever

11  burden you could possibly imagine on the First Amendment

12  rights here is trivial, because all it's going to reveal, as

13  Your Honor noted, is the identity of the counterparties.

14           And, moreover, these will be subject to Executive

15  Session rules.  And D.C. Circuit precedent makes clear that

16  absent clear proof that those rules will not be observed,

17  the Court must presume that they will be and that the matter

18  will not be disclosed.

19           And Counsel adverted to the disclosure by someone

20  of the name of the bank.  That was not Executive Session

21  material.  We don't know who disclosed that information;

22  but, in any event, it was not Executive Session material in

23  the first place, and so it sheds no light on the question of

24  whether the Committee would abide by its Executive Session

25  rules as it does.

1          And then this is the first I've heard of this

2     other allegation about Fox News.

3          The fact of the matter is, plaintiff and

4     plaintiff's clients have publicly disclosed their

5     involvement in the Trump dossier, the so-called Trump

6     dossier.  That information was not disclosed by the

7     Committee, it was disclosed by plaintiff and their clients.

8          And that is the core of what plaintiff was

9     claiming when it filed this lawsuit would be the end of the

10    world, from their standpoint, would destroy their business

11    and bring their First Amendment crashing down around all our

12    ears if that information were to be disclosed.

13         They chose to disclose that information themselves

14    publicly, and they have offered not a shred of evidence that

15    any of the dire consequences they predicted have actually

16    occurred, which, under the *Wisconsin Gas* case from the

17    D.C. Circuit and similar cases, in those circumstances, you

18    can't credit their conclusory assertions of irreparable

19    injury.  They've got to produce actual evidence that proves

20    that it is, in fact, likely that these terrible predictions

21    will come to pass.

22         And here, in fact, there have been disclosures by

23    them and none of the adverse consequences have followed, so

24    the irreparable injury claim must fail as well.

25         Just turning back to one point that I didn't touch

1    on earlier.

2           Mr. Salky relies on the AT&T case.  But as

3    Your Honor knows, that case is completely distinguishable

4    from this context because of the fact that it was an

5    interbranched dispute, where the Court was attempting to

6    navigate that complex situation here, okay.

7           THE COURT:  Very, very different set of

8    circumstances.

9           MR. HUNGAR:  Yes, Your Honor.

10          And in the *Exxon* case, which was decided after

11   AT&T II, the Court, in a context where it was a private

12   party seeking to enjoin compliance with a congressional

13   request for information, the Court made clear, unlike in the

14   AT&T context, that the same principles that underlie the

15   *Eastland* decision, which said that you can't sue Congress to

16   enjoin congressional subpoena, the same principles, although

17   not applicable of their own force, but they caution great

18   hesitation before a Court could ever consider enjoining a

19   third party from complying with a congressional subpoena,

20   because that would border on the very type of relief that

21   *Eastland* said is absolutely forbidden as a direct matter and

22   would raise serious constitutional issues, there's no need

23   here for the Court to raise those serious constitutional

24   issues, because the extremely high, compelling showing that

25   would be required before the Court could ever entertain such

1    relief has not been made here.

2            THE COURT:  Okay.

3            What would you make of the fact that their

4    confidential, or secret, even, bases for the Intelligence

5    Committee's investigation that are not known to the parties,

6    not known to the Court, beyond the four that are up on the

7    board here that Mr. Salky was relying on, wouldn't the

8    Court, in the final analysis, if it were to follow

9    Mr. Salky's recommendation, have to affirmatively look at

10   those to determine and assess irrelevancy of the demand for

11   these documents as it relates to those as well?

12           MR. HUNGAR:  Well --

13           THE COURT:  And should have?

14           MR. HUNGAR:  -- I think in order to do what

15   Mr. Salky is urging the Court to do, yes, the Court would

16   have to do that, which we submit is unnecessary, for all the

17   reasons I've articulated and all the reasons set forth in

18   our brief.  And also inappropriate.

19           The *McShirley* case talks about the fact, it's not

20   the role of the Court to review on a document-by-document

21   basis the kind of information that a Congressional

22   Committee --

23           THE COURT:  It's like micromanaging.

24           MR. HUNGAR:  -- is seeking --

25           Exactly.

1            THE COURT:  It's basically micromanaging.

2            MR. HUNGAR:  Highly disrespectful to a coordinate

3    branch of government.

4            I would also note with respect to the other chart

5    he had up where he listed the four categories of information

6    sought by the Committee, that's actually not even the extent

7    of what the Committee has publicly said it's seeking,

8    because if you read the rest of that parameters document

9    that the Committee issued and it's in the record -- this is

10   public -- "The Committee also says that the inquiry will

11   seek to ensure that the Intelligence Committee assessment

12   comported with all relevant Intelligence Community analytic

13   standards, and that allegations of Russian collusion with

14   any U.S. persons are fully investigated."

15           What we have here is an entity that we know was

16   obtaining information from Russian persons, directly or

17   indirectly; disseminating that directly or indirectly to

18   media entities and to the Intelligence Community during the

19   relevant time period on the subjects relevant to the

20   investigation; they have other connections, we know, with

21   other entities that have connections with Russian entities;

22   the Committee has an interest in investigating the nature

23   and scope of those relationships, just as it has an interest

24   in investigating the nature and scope of the relationships

25   that they have already admitted that fall squarely within

1   the Committee's jurisdiction.

2        It would go far beyond the proper role of a

3   Federal Court in these circumstances to enjoin the

4   Committee's ability to obtain that information and pursue

5   those investigative leads.

6        THE COURT:  What about the public-interest

7   component of the preliminary injunction standard?

8        MR. HUNGAR:  Your Honor, the public-interest

9   component, obviously, is one of the four that the plaintiff

10  must satisfy in order to obtain injunctive relief, and they

11  cannot possibly satisfy it here.

12       The D.C. Circuit, in the *Exxon* case, recognized

13  the compelling interest that Congress has in pursuing

14  investigations within the scope of its legislative

15  jurisdiction, which this, indisputably, is.

16       And plaintiff offers essentially nothing on the

17  other side, except the meritless First Amendment allegation

18  that they have asserted that is clearly inconsistent with

19  controlling precedent.

20       THE COURT:  All right.

21       Do you have anything else?

22       MR. HUNGAR:  I think that's it, Your Honor.

23  Thank you.

24       THE COURT:  All right.

25       Mr. Salky, you can have three minutes.

1          MR. SALKY:  His position, Your Honor, is, every

2     third-party subpoena is unreviewable.

3          If the third party doesn't take contempt, they're

4     never going to -- the bank is never going to take contempt;

5     that the Court has no authority whatsoever to review a

6     congressional subpoena.  That cannot be the case.

7          And *AT&T*, Your Honor, I would ask you to study it

8     carefully, because while it arose in a different context

9     involving an Executive Branch, the rationale for the

10    decision as it relates to the ability of a party like Fusion

11    to come before the Court and to engage the Court in an

12    analysis of the pertinency and the First Amendment issues

13    has nothing to do with the fact that the agency is an

14    Executive Branch agency.

15         And I would direct the Court's attention to pages

16    129 and 130.  I had a quote that I would read you but

17    I don't have the time.

18         THE COURT:  Talk about the irreparable harm

19    argument.  Mr. Hungar says you haven't been able to

20    establish irreparable harm.

21         And if you could, include in that discussion the

22    fact that this information, as it relates to these

23    transactions that are being contested, would not reveal the

24    nature of the work being done, it would just be the name of

25    the individual, or the institution or the law firm or

1    whatever, or the vendor, and the amount of money involved.

2    That's it.  That's all it would say.

3              It's a lead, basically.

4              MR. SALKY:  Right.

5              But even that, Your Honor, we don't have to be the

6    NAACP in order to be entitled to First Amendment protections

7    to operate anonymously when we're engaging in conduct that

8    Mr. Hungar concedes we engaged in, which is -- the very

9    dossier was about political speech and was about

10   investigating one candidate for the Presidency on behalf of

11   the other candidate for Presidency.  And we have

12   associational rights in that context to associate

13   anonymously.

14             It's just like -- what he's looking for,

15   Your Honor, what he's looking for is just what the

16   Committees were looking for in *Watkins* and in *Sweeney* and in

17   those other cases involving communists.

18             They're now looking for any Russian connections

19   that they can use to discredit the work that Fusion did and

20   to try to discredit Fusion.  That's the goal.

21             Therefore, it is out of the context of this

22   subpoena -- and *Fleck*, by the way, doesn't stand for the

23   proposition he cites it for.  I will be happy to give you

24   the distinguishing characteristics.

25             But the proposition is, Your Honor, that we have

1   rights to associate freely and under the First Amendment

2   anonymously with those who we do work for on these political

3   matters.  That's the key distinction.

4            I would say one thing, Your Honor, only because

5   I did want the Court to know that I filed an affidavit to

6   address the law firm claim that Professor Saltzburg -- I

7   submitted an affidavit.

8            THE COURT:  I've seen that.

9            MR. SALKY:  I just wanted to make sure you saw

10  that.  He was here.  He came in case the Court had any

11  questions for him.  I wanted to make sure you had that and

12  had had an opportunity to review it.

13           The only -- if I can.  I know we're going to go

14  back in the back, Your Honor.

15           The *McFall* and the citations *in Packwood*, this

16  Committee is not a Grand Jury, and it is not entitled, as a

17  Grand Jury might -- Mr. Hungar's position in his papers was

18  that we're like an administrative agency, and the

19  administrative agency standard, Your Honor, I'm willing to

20  live with; that the documents that are sought are reasonably

21  relevant to the matters under investigation.

22           And it's not my position that these are the

23  matters under investigation.  That was the position in their

24  brief; that this is what you ought to measure the legitimate

25  legislative activity against, those four questions.

1          Thank you, Your Honor, for your patience.  And our

2    request -- we don't think the Court is a potted plant; we

3    don't think the Court has no ability to review a

4    congressional subpoena.  And where First Amendment interests

5    are at stake, we ask you to issue a preliminary injunction

6    and we'll have a trial in this courtroom in two weeks.

7          THE COURT:  In two weeks?

8          MR. SALKY:  Well, whatever time the Court would

9    propose to have the trial.

10          THE COURT:  Well, I didn't ask Mr. Hungar what the

11    time sensitivity of the situation is, but my guess is his

12    answer would have been ASAP.

13          MR. SALKY:  Well, he wanted it yesterday,

14    Your Honor.  We've been six to seven weeks already.

15          Thank you.

16          THE COURT:  All right.

17          Well, looking at the size of the crowd here in the

18    well of the Court, it might just be easier to take a

19    five-minute break and have everyone leave, other than the

20    lawyers here.

21          All of these lawyers are familiar with the

22    documents that are currently covered by the protective

23    order, correct?

24          MR. SALKY:  Correct.

25          THE COURT:  Yeah.  So there's no -- they're all

1  part of the secrecy, so to speak, that enshrouds part of

2  this case.  So they can all remain.

3          But the audience can't, unfortunately.  So we'll

4  take a five-minute break and excuse the audience and then

5  we'll come back and we'll have the discussion with regard to

6  the continued viability of the agreement and the protective

7  order and how that's going to impact the Court's ability to

8  issue a public opinion in this case.

9          See you in five minutes or ten minutes.

10         DEPUTY CLERK:  All rise.

11         (Recess from 4:10 p.m. to 4:25 p.m.)

12         (Sealed proceedings were held.)

13         DEPUTY CLERK:  ██████████

14  ████████████████████████████████████

15  ██████████████████████████████████████

16  █████████████████████████████████████

17  █████████████████████████████████████

18         THE COURT:  █████████████

19  ████████████████████████

20  ██████████████████████████████████

21         MR. SALKY:  ████████████████████

22  ████████████████████████████████

23  ██████████████████████████

24  ███████████████████

25  █████████████████████████████████

1  ███████████████████████████████████████

2  ████████████████████████████████████████

3  ██████████████████████████████

4  THE COURT:  ████████████

5  ███████████████████████████████████

6  ███

7  MR. HUNGAR:  ██████████████████

8  ████████████████████████████████████████

9  ████████████████████████████████████████

10 ████████████████████████████████████████

11 ██████████████████

12 THE COURT:  ██████████████████

13 ████████████████████████████████████████

14 MR. HUNGAR:  ████████████

15 THE COURT:  ██████████████

16 ██████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 █████████████████████████████

22 ███████████████████████████████████

23 █████████████

24 ████████████████████████████████

25 ████████████████████████████████████

1

2

3          MR. SALKY:

4

5

6

7          THE COURT:

8          MR. SALKY:

9          THE COURT:

10         MR. SALKY:

11

12

13

14

15

16         MR. ARONICA:

17         MR. SALKY:

18

19

20

21

22

23

24

25

```
 1  ████████
 2        ████████████████████████
 3  ██████████████████████████████
 4  ██████████████████████████████
 5      THE COURT:  ████████████████████
 6  ██████████████████████████████
 7  ████████████████████
 8      MR. SALKY:  ████████
 9      THE COURT:  ████████████████████
10  ██████████████████████████████
11  ██████████████████████████████
12  ██████████████████████████████
13  ██████████████████████████████
14  ██████████████████████████████
15  ██████████████████████████████
16  ███
17        ██████████████████████
18  ████████████████████████████
19  ██████████
20      MR. SALKY:  ████████████████
21  ██████████████████████████████
22  ██████████████████████████████
23  ██████████████████████████████
24  ████████████████████
25      THE COURT:  ████████
```

1          MR. SALKY:  █████████████████████████████

2    ███████████████████████████████████████████████

3          █████████████████████████████████████████

4    ████████████████████

5          MR. HUNGAR:  ██████

6          MR. SALKY:  █████████████

7          ████████████████████████████████████████████

8          ████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ██████████████████████████████████████████

11   ██████████████████████████████████████

12   ███████

13         █████████████████████████████████████████

14   ██████████████

15         THE COURT:  ███████

16         █████████████████████████████████

17   ████████████████████

18         MR. SALKY:  ████████████████████████

19   ████████████████████████████████████████████████

20   ██████████████████████████████████████████

21   ████████████████████████████████████████████

22   ██████████████████████████████████████████

23   ████████████████████████████

24         THE COURT:  ███████████████████

25         MR. SALKY:  ██████████████████

1

2

3

4

5

6

7

8

9      THE COURT:

10

11

12      MR. SALKY:

13

14      THE COURT:

15

16

17

18

19      MR. SALKY:

20

21

22

23

24

25



1

2

3       THE COURT:

4       MR. SALKY:

5       THE COURT:

6       MR. SALKY:

7

8

9

10

11

12      THE COURT:

13

14

15

16

17      MR. SALKY:

18      THE COURT:

19      MR. SALKY:

20      THE COURT:

21      MR. SALKY:

22

23      THE COURT:

24

25

1   ███████████████████████

2       ███████████████████████

3       MR. SALKY:   ████████████████████

4       THE COURT:   ███████████████

5         ████████████████████████████

6   ███████████████████████████████

7   ██████████

8       MR. SALKY:   ██████

9       ████████████████████████████

10  ███████

11      THE COURT:   █████████████

12      ██████████████████████████████

13  ████████████████████████████

14  ███████████████████████████████

15  ██████████████████

16      ██████████████████████████████

17  █████████████████████████████████

18  ████████████████████████████

19  █████████████████████████████████

20  █████████████████████████████████

21  ██████████████████████████████

22  ██████

23      ██████████████████████████████

24  █████████████████████████████████

25  ████████████████████████████

```
 1  ████████████████████████████████████████
 2  ████████████████████████████████████████████
 3  ████████████████████████████████████████████
 4  ██████████████████████████████████████████
 5  ██████████████████████████████████████
 6  █████████████████████████████████████████
 7  ████████████████████████████████████████████
 8  ████████████████████
 9      ██████████████████████████████████
10  ██████████████████████████████████████████
11  █████████████████████████████████████
12  █████████████████████████████████████
13  ██████████████████████████████████████
14        MR. SALKY:    ██████████
15        THE COURT:    ██████████████
16        MR. SALKY:    █████
17      ██████████████████████████████████
18  ██████████████████████████████████████████
19  ████████████████████████████████████████████
20  ████████████████████████████████
21  ████████████████████████████████████████
22  ██████████████████████████████████
23  ████████████████████████████████████████████
24  ████████████████████████████████████████████
25  █████████████████
```



1

2

3

4          THE COURT:

5

6          MR. HUNGAR:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          THE COURT:

23          MR. HUNGAR:

24

25

1    THE COURT:  ███████████████

2    ██████████████████

3    MR. HUNGAR:  █████████████████████

4    ███████████████████████████████████████████

5    ██████████

6    THE COURT:  ██████████████████████████

7    ███████████████████████████████████████████

8    ██████

9    MR. HUNGAR:  ███████████████████████

10   ██████████████████████████

11   THE COURT:  ████

12   MR. HUNGAR:  █████████████████████

13   ██████████████████████████████████████

14   ██████████████████████████████████

15   ████████████████

16   THE COURT:  ███████████████████████████

17   ███████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████████████

20   ████████████████████████████████████

21   █████████████████████████████████████

22   ██████████

23   MR. HUNGAR:  █████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████

1  ████████████████████████████████████████████

2  ███████████

3     ██████████████████████████████████

4  ██████████████████████████████████████████████

5  ████████████████████████████████████████████

6     ████████████████████████████████████████████

7  ██████████████████████████████████████████████

8  ██████████████████████████████████████████

9  ████

10    ████████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████

13    █████████████████████████████████████████

14 █████████████████████████████████████

15 █████████████████████████████████████

16 ██████████████████████████████████████

17 ███████████████████████████████████

18 ██████████████████████████████████

19     THE COURT:    ████████████████████████████████

20     MR. HUNGAR:   ████████████████████

21    █████████████████████████████████████████

22 ███████████████████████████████████

23 ███████████████████████████████████████████

24 ██████████████████████████████████████

25 ███████████████████████████████████████████

 1  ████████████████████████████████████████████████

 2  ████████████████████████████████████████████████

 3  ██████████████████████████████████████████████████

 4  ███████████████████████████████████████████████

 5  ████████████████████████████████████████████

 6  ██████████

 7      ███████████████████████████████████████████

 8  ████████████████████████████████████████████████

 9  ███████████████████████████████████████████████

10      ███████████████████████████████████████████

11  ██████████████████████████████████████████

12  ██████████████████████████████████████████████████

13  █████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  █████████████████████████████████████████████████

16  ███████████████████████████████████████████████

17          THE COURT:      ████████████

18          MR. HUNGAR:     ████████████

19      █████████████████████

20          MR. SALKY:      ████████████████████████

21  ██████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████

24  █████████

25      ███████████████████████████████████



1          MR. HUNGAR:   ███████

2        ████████████████████████

3    █████████

4        ██████████████████████████████

5   ███████████████████████████

6   ██████████████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████

9   ████████████████████████

10       ███████████████████████████

11  ██████████████████████████████████

12  █████████████████████████████████

13  ████████████████████████████████████

14  ████████████████████████████████████

15  ████████████████████████

16       █████████████████████████████████

17  ████████████████████████████████████

18  ████████████████████████████████

19  ███████████████████████████████

20  ████████████████████████████████████

21  ████████████████████████████████████

22  ██████████████████████████████████

23  ██████████████████████████████████

24          THE COURT:   ████████████████████

25    ███████

1     ████████████████████████████████████████████████

2          MR. ARONICA:   ██████████████████

3          THE COURT:   ██████████████████████

4   ███████████████████████████████████

5          MR. ARONICA:   █████████████████████████████████

6   ██████████████████████████████████████████

7        ████████████████████████████████████████████████

8   ██████████████████████████████████████████

9        ██████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12       ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ███████████████████████████████████████████

15  █████████████████████████████████

16       █████████████████████████████████████

17  ████████████████████████████████████████████████

18  ██████████

19       ████████████████████████████████████████████████

20  █████████████████████████████████████████

21  ███████████████████████████████████████

22  ██████████████

23       ████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

1   ████████████████████████████████████████

2   ███████████████████████████████████████████

3   ████████████████

4   ████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████

7   THE COURT:  ████████████████████████████

8   ████████████████

9   MR. ARONICA:  ████████████

10  ████████████

11  MR. SALKY:  ███████████████████████

12  ███████████████████████████████████████████

13  ███████████████████████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████

16  ████████████████████████████████████████████

17  ██████████████████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████

21  ████████████████████████████████████████████

22  ███████████████████████████████████████

23  MR. ARONICA:  ████

24  MR. SALKY:  ██████████████████████

25  ███████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17     THE COURT:

18

19     MR. SALKY:

20

21

22

23

24

25     MR. ARONICA:



18          MR. SALKY:

25          THE COURT:

1

2

3

4

5        MR. HUNGAR:

6

7

8

9

10

11

12

13

14        THE COURT:

15

16        MR. ARONICA:

17        MR. SALKY:

18        MR. ARONICA:

19

20        MR. SALKY:

21        MR. ARONICA:

22        MR. SALKY:

23        MR. ARONICA:

24        MR. SALKY:

25        MR. ARONICA:

```
 1          MR. SALKY:    ████████████████████████████

 2   ██████

 3          MR. ARONICA:    ██████████████████████████

 4   ██████

 5          MR. SALKY:    █████████████████████████████

 6   ██████

 7          MR. ARONICA:    ██████

 8          MR. SALKY:    ████████████████████

 9          THE COURT:    ███████████████████████████

10   ████████████████████████████████████████████████

11   ██████████████████████████████████

12          MR. HUNGAR:    ███████████████████████

13        ██████████████████████████████████████

14   █████████████████████

15        ███████████████████████████████████

16   ███████████████████████████████████████████

17   ██████████████

18        ███████████████████████████████████████

19   ██████

20          THE COURT:    ██████████████████████

21          MR. HUNGAR:    ██████

22        ████████████████████████████████████████████

23   ██████████████████████████████████████████

24   █████████████████████████████████████████

25   ███████████████████████████████████████████
```

1

2          THE COURT:

3

4          MR. HUNGAR:

5

6

7          THE COURT:

8

9          MR. HUNGAR:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   ████████████████████████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████

4        THE COURT:  ██████████████████████████████

5   ███████████████████████████████████████████████

6   █████████████████████████

7        MR. HUNGAR:  █████████████████████████████

8        THE COURT:  ██

9        MR. HUNGAR:  ██████████████████████████

10  ██████████████████████████████████

11       THE COURT:  ██████████████████████████

12  ███████████████████████████

13       MR. HUNGAR:  ███████████████████████████████

14  ███████████████████████

15       THE COURT:  ███████████████████████████

16  ██████████████████████████████

17       MR. ARONICA:  ██████████

18       ███████████████████████████████████████████

19  ██████████████████████████

20       THE COURT:  ███████████████████

21  ████████████████

22       MR. ARONICA:  ██████████████████████████

23       THE COURT:  ██████████████████████████

24  ████████████████████

25       MR. ARONICA:  ██████████████████████
```



1
2      THE COURT:
3
4
5
6
7
8
9      MR. SALKY:
10
11     THE COURT:
12     MR. ARONICA:
13
14     THE COURT:
15     MR. ARONICA:
16
17     THE COURT:
18
19     MR. SALKY:
20
21
22
23
24
25     MR. HUNGAR:

```
 1   ████████████████████████████████████████████
 2   ██████████████████████
 3            MR. SALKY:   █████████████████████████████
 4   ███████
 5            █████████████████████████████████████████
 6   █████████
 7            THE COURT:   ████████████
 8            MR. SALKY:   ████████████
 9            THE COURT:   █████████████████████████████
10   █████
11            MR. SALKY:   █████████████
12            THE COURT:   ████████████████████████
13   ██
14            MR. SALKY:   █████████████████
15   ████████████████
16            ████████████████████████████
17   ███████████████████████████████████████████████
18   ██████████████████████████████████████████████
19   █████████████████████████████████████████████████
20            ██████████████████
21            █████████████████████████████████████████
22   ███████████████████████████████████████████████
23   ███████████████████████████████████████████████
24   ███████████████████████████████████████████████
25   ██████████
```

1

2

3

4

5

6

7

8

9

10    THE COURT:

11    MR. HUNGAR:

12

13

14

15

16

17

18

19    MR. SALKY:

20

21

22

23

24

25



5          THE COURT:

6          MR. SALKY:

13        THE COURT:

23        MR. HUNGAR:

24        THE COURT:

1            MR. SALKY: ███████████████

2    █████████████████████████████████████

3    ██████████████████████████████████████████

4    ████████████████████████████████████████

5    ███████████████████████████

6            THE COURT: ██████████

7        ████████████████████████████████████████████

8    ████████████████████████████████████

9    ████████

10           MR. HUNGAR: ████████████████

11           THE COURT: ███████████████

12       ███████████████████████████████

13   ███████████████████████████████████

14       ██████████████████████████████████

15   ████████████████████████

16       ███████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████

19           MR. SALKY: █████████████████

20   ██████████████████████████████████

21   ██████████████████████

22           THE COURT: █████████████████

23   ██

24           MR. HUNGAR: ████████████████████

25   ████████

```
1          THE COURT:    ██████████

2          MR. HUNGAR:   ████████████████████████

███████████████████████████████

       ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

       █████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

13         THE COURT:    ██████████████████████████

█████████

15         MR. HUNGAR:   ██████████████████████████

███████████

       █████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

20         MR. SALKY:    ████████████████████████████

████████████████████████████████████████

22         MR. HUNGAR:   ██████████████████████████

███

24         MR. SALKY:    ██████████

       ████████████████████████████████████████████
```



1

2

3

4      THE COURT:

5

6      MR. SALKY:

7

8

9

10

11

12

13

14     THE COURT:

15

16     MR. SALKY:

17

18

19     THE COURT:

20

21     DEPUTY CLERK:

22     THE COURT:

23

24

25     (Proceedings concluded at 5:05 p.m.)

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: December 5, 2017_____   /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR